FILED

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

2009 JUL 20  P 1: 01

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| WYE OAK TECHNOLOGY, INC., ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Civil No. 1:09CV793 |
| ) | Hon. ~~AJT/JFA~~ |
| ) | |
| REPUBLIC OF IRAQ, ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

**<u>VERIFIED COMPLAINT AT LAW – BREACH OF CONTRACT</u>**

## PARTIES

1.  The Defendant, The Republic of Iraq, is a sovereign state.

2.  The Plaintiff, Wye Oak Technology, Inc. (hereinafter "Wye Oak"), is a Delaware corporation, with company headquarters in Pennsylvania, and doing substantial business in Alexandria, Virginia and Arlington, Virginia. The Estate of Dale C. Stoffel is the sole shareholder. Barbara N. Stoffel, widow of Dale C. Stoffel, is the sole beneficiary.

## JURISDICTION

3.  Jurisdiction in this matter is asserted under 28 U.S.C. §1330 (a) and §1605 (a)(2), the Foreign Sovereign Immunities Act (hereinafter "FSIA"), which reads in relevant part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;
> ....

4.  As more fully developed below, jurisdiction over the Defendant under these alternative grounds is established because:

   (1) Iraq carried on "commercial activity" in the United States through its agent Wye Oak;

   (2) Wye Oak performed acts in the United States in connection with this "commercial activity"; and

(3)  Iraq's action (breach of contract regarding the "commercial activity") caused a direct effect in the United States.[1]

## VENUE

5.  Venue is asserted under 28 U.S.C. §1391 (f)(1). This section reads, in relevant part:

> A civil action against a foreign state as defined in section 1603 (a) of this title may be brought ... in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ....

6.  Plaintiff Wye Oak was Defendant's sole and exclusive agent in the United States for the sale of scrap metal and for the refurbishment of military equipment. Wye Oak, as Defendant's agent, performed a substantial part of this contract in Alexandria, Virginia, and in Arlington, Virginia.

---

[1] Wye Oak was commissioned as agent for Iraq for selling and refurbishing military equipment. In carrying out its responsibilities to Iraq, it was engaged in "commercial activity" within the meaning of the FSIA. According to the oft-cited legislative history of the FSIA:

> [T]he fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial nature of an activity or transaction that is critical. Thus, a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity.
>
> (H.R. REP. 94-1487, 94TH Cong., 2ND Sess. 1976, 1976 U.S.C.C.A.N. 6604, p. 6615, 1976 WL 14078 (Leg.Hist.) (Sept. 9, 1976).)

See also *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) ("a contract to buy army boots or even bullets is a 'commercial' activity").

## **THE CONTRACT AND ITS BREACH**

7. In 2003, the United States began massive efforts to stabilize and rebuild war-torn Iraq, for which efforts Congress appropriated an initial fund of $30 billion. However, Congress did not appropriate funds for the refurbishment of damaged Iraqi military equipment. Nor were such funds appropriated in 2004.

8. At all relevant times herein, Wye Oak was registered with the U.S. Department of State, the Office of Defense Trade Controls, and as an Exporter, Broker and Importer of defense related articles and services in the United States and throughout the world. Since 1995, Wye Oak has delivered millions of dollars worth of foreign military equipment to NATO member governments and to defense contractors. Wye Oak's employees were experienced in assessing, repairing, cutting, grinding, brokering and scrapping military weaponry, including arms and ammunition, armored personnel vehicles and tanks, supervising local mechanics, and the construction of military facilities.

9. During the first several months of 2004, several American private contractors, including Wye Oak, were invited to and did work in Iraq on various reconstruction programs and operations. Wye Oak contributed its specialized experience and capabilities in the acquisition, refurbishment and sale of military equipment and infrastructure.

10. In June 2004, under the auspices of the United States Department of Defense, the Multi-National Security Transition Command-Iraq (hereinafter "MNSTC-I") was tasked with the responsibility for developing, organizing, training, equipping and sustaining the Iraqi Security Ministries, namely the Ministry of Defense (hereinafter "MOD"), Ministry of Interior and associated Iraqi Security Forces. From June 2004 to September 2005, MNSTC-I was commanded by Lt. General David H. Petraeus.

11. In mid-2004, the Iraqi MOD initiated the Iraqi Military Equipment Recovery Project (hereinafter "IMERP") in order to provide the Iraqi military and security forces with effective and capable equipment. One of the first objectives of IMERP was to have several armored vehicle battalions in place by the 30 January 2005 Iraqi national election. A long term IMERP objective was to identify, collect and sell as scrap metal on the international market, irreparably damaged military equipment and infrastructure.

12. Toward both these objectives the MOD requested Wye Oak's assistance. Furthermore, in a letter dated July 4, 2004 to Lt. General Petraeus, the MOD requested access for Wye Oak personnel, specifically Dale C. Stoffel (hereinafter "Stoffel"), to military equipment dumps and depositories. Stoffel's assessment of damaged military equipment was described as critical and time sensitive.

13. By letter dated July 20, 2004, Lt. General Petraeus granted the requested access:

> I fully support the Iraqi Ministry of Defense in initiating and expediting the Iraqi Military Equipment Recovery Project. We will provide all necessary documentation and escort for ... Mr. Dale Stoeffel [sic] to visit the equipment dumps and depositories at the Taji military base.

(Exhibit 1, attached.)

14. In meetings and discussions among the MOD, the MNSTC-I and Wye Oak, Stoffel's proposal was accepted, namely, that the cost of refurbishing and producing Iraqi military equipment for use by the new Iraqi security forces would be financed entirely by salvaging and selling abroad as scrap metal the unusable Iraqi military equipment and infrastructure.

15. Following inspections and assessments at Iraqi military bases, the MOD and Wye Oak entered into an agreement (hereinafter "the Contract") represented in the following documents dated August 16, 2004:

(a) Broker Services Agreement between Wye Oak Technology, Inc and the Ministry of Defense of the Republic of Iraq. (Exhibit 2, attached.)

(b) Letter from Secretary General Iraqi Ministry of Defense to Stoffel, President of Wye Oak Technology, Inc. dated August 16, 2004 commissioning Wye Oak as "the sole and exclusive agent for the recovery and sales of all Iraqi Ministry of Defense material described as scrap military equipment in the territory of Iraq." (Exhibit 3, attached.)

16. The Contract provides in relevant part:

1. **DEFINITIONS.**

   (a) "**Broker**" shall mean Wye Oak Technology, Inc.

   ...

   (f) "**Ministry**" shall mean The Ministry of Defense of the Republic of Iraq and shall be deemed to include all its affiliated instrumentalities, divisions and agencies of the Government of the Republic of Iraq.

   ...

2. **EXCLUSIVE APPOINTMENT OF BROKER.**

The Broker has extensive experience in facilitating and arranging for the purchase and sale of all types of Military Equipment at the highest and best commercial prices and rates. The Ministry acknowledges that Broker has established contacts throughout the world regarding the sale of Military Equipment and Broker has also established government and other contacts in Iraq. With respect to subject matter herein, the Ministry hereby appoints Broker as its sole and exclusive Broker ... [.]

...

3. **SERVICES.**

Broker shall use all reasonable commercial efforts to perform the Military Refurbishment Services and in the development of

markets and sales prospects for Military Equipment, including Refurbished Military Equipment and Scrap Sales. Broker shall be under no obligation to spend any sum of monies, whether promotional or otherwise, in performing such services or in doing such development, other than any sums of monies that are advanced by the Ministry to cover certain expenses associated with the performance of the Military Refurbishment Services, the sales of any Military Equipment, Refurbished Military Equipment or any Scrap Sales.

4. **DUTIES OF THE MINISTRY.**

(a) The Ministry shall fully inform Broker at all times of all materials reasonably required to enable Broker to properly carry-out its duties as set forth above.

(b) The Ministry shall work exclusively with the Broker regarding furnishing of Military Refurbishment Services, Scrap Sales and the sale of Refurbished Military Equipment with respect to all Military Equipment:

(i) As a sub-contractor for the Broker where Broker has procured a contract for itself or one of its affiliates from the Customers for the Military Refurbishment Services, any Scrap Sales or the sale of Refurbished Military Equipment. Each sub-contract will be based either on the terms and conditions of the primary contract procured by the Broker or on other terms and conditions as may be mutually agreed upon by the Ministry and Broker and set forth in a separate written sub-contract.

(ii) As the primary contractor, where the Broker has procured a Sales Contract for and on behalf of the Ministry from the Customers.

5. **COMPENSATION.**

(a) The Ministry shall pay Broker a commission of minimum of ten percent (10%) based on the Contract Value set out in each Sales Contract entered into by the Ministry, pursuant to this Agreement. With respect to Refurbished Military Equipment, the Ministry will pay Broker ten percent (10%) of such equipment's refurbishment cost.

(Exhibit 2, pp. 1-3)

17.     On August 30, 2004 an Amendment to the Contract expanded the scope of Wye Oak's services to include, among other things, "construction of facilities, bases, billeting, service/repair depots, repair factories/facilities." (Exhibit 4, attached.)

18.     In September 2004, the MOD informed Wye Oak that the MOD would work through General Investment Group sal to facilitate general operational financing, bank guarantees, cash services and letters of credit, when and as requested by Wye Oak. (See Exhibit 5, attached.)

19.     From August 16, 2004 through January 2005 Wye Oak performed under the Contract by, among other things:

(a) repairing and refurbishing several armored battalions for demonstration and use during the period of the January 2005 Iraqi national elections; and

(b) identifying and arranging for the sale of scrap military equipment.

20.     Beginning September 1, 2004, Stoffel and other key Wye Oak employees conducted themselves as agents for the Iraqi Ministry of Defense and in that capacity were given complete access to the Taji Military Base, Camp Normandy, Camp Ashraft, Camp Anaconda, and the Hilla Military Facility, in Iraq.

21.     Beginning in mid-August, 2004, Wye Oak, through its offices in the United States and its employees and sub-contractors in the field, inventoried depots in Iraq for scrap, tagged equipment that, in its judgment, was not worth refurbishing, estimated scrap tonnages, and de-activated any "caps" on the shells that might still be there. In addition Wye Oak identified potential foreign buyers. Jordan, Kuwait, Norway, Sweden, Ukraine, and Turkey were identified as potential buyers of the scrap; all destinations were cleared through the office of Lt. General Petraeus.

22. The following specific tasks under the IMERP contract were performed by Wye Oak in the United States:

(1) Accounting;

(2) Computer programs for tracking military equipment and other items;

(3) Meetings with Department of Defense officials in the Pentagon for on-going coordination of the refurbishment program with American reconstruction activities in Iraq;

(4) Monitoring Wye Oak's employees in the field;

(5) Contacting agents for foreign governments who might have been interested in buying scrap;

(6) Ensuring that all licenses required under the IMERP project and for international arms sales were up to date;

(7) Creating spread-sheet systems to ensure that pricing of scrap equipment and salvageable equipment could be compared and correlated with constantly shifting world market prices;

(8) Creating and making maintenance preparations for an IMERP project website to provide the required project information to interested parties; and

(9) Maintaining and monitoring Wye Oak's U.S. based bank accounts.

23. From mid-August, 2004, until early December 2004, the Wye Oak field operatives recruited, organized and supervised Iraqi civilians to repair and refurbish damaged Iraqi military

equipment. All of Wye Oak's work was done in tandem and with the approval of the U.S. Military/Coalition General Command. Wye Oak worked directly with Lt. General Petraeus, General Beadle, Brigadier Clements, and the U.S. Council of Colonels, and their staffs, as well as the Iraqi MOD. Everything that Wye Oak did was approved by the relevant Iraqi and United States/Coalition officials.

24. In addition to the refurbishing work, Wye Oak was working on its first international scrap metal sale under the Contract. It contacted qualified buyers from Turkey who expressed interest in purchasing a large number of brass shell casings stored at Camp Taji.

25. The efficacy of Stoffel's work was later evaluated by Lt. General Petraeus as follows:

> ... Dale made a direct and lasting contribution to our efforts to create capable and effective Iraqi security forces. Only months ago, the Iraqi Armed Forces had no mechanized force; now, there are already many operational tanks and armored vehicles, and Iraq is on track to have a battalion's worth of soldiers trained and equipped prior to January's elections. None of this would have been possible without ... [Stoffel's] visionary leadership, relentless drive, and complete dedication.

(Exhibit 6, attached.)

26. In October 2004, Wye Oak submitted three invoices to the Ministry totaling $24,714,697.15 (Twenty four million, seven hundred fourteen thousand, six hundred ninety seven dollars and fifteen cents). These invoices represented the work being done for the January 2005 election military display, as well as funds necessary to undertake the first few months of refurbishing work under the contract to be done at the approximately eighty military bases throughout Iraq. (Exhibit 7, pp. 1-3, attached.)

27. When these invoices had not been paid by mid-November 2004, the contract and the IMERP project itself were in jeopardy. A meeting between Stoffel and the U.S. Secretary of Defense, Donald Rumsfeld, was tentatively scheduled at the Pentagon for late November/early

December 2004 to ensure that the January 2005 deadline would be met. A high-level meeting in Baghdad was convened to resolve any payment issues.

28. The Baghdad meeting was held on December 5, 2004. Stoffel attended the meeting, and, upon information and belief, the following persons were also present at the meeting: Captain Elizabeth Young (U.S. Central Command); Nick Hutchinson (U.S. Department of State); Ziad Cattan (Iraqi Ministry of Defense); Brigadier David Clements (U.S. Central Command); Nick Beadle (U.S. Department of State); Patrick Marr (U.S. Department of State); Kelly Andy; John G. Townsend (U.S. Department of State); and Sergeant Elizabeth Hanson. It was agreed that payment in the amount of $24,714,697.15, which had been authorized by the Defendant in October 2004, would be made to Wye Oak directly and immediately.

29. Because of his continuing concerns regarding accountability and transparency in performance over the next three years under the contract, Stoffel was scheduled to attend a meeting on December 10, 2004 with Mr. Stuart Bowen, who held the office of Special Inspector General for Iraq Reconstruction (hereinafter "SIGIR"). The office had been created in 2004 to oversee Iraqi reconstruction programs and operations. Stoffel had been working and cooperating with Mr. Bowen since early 2004.

30. On December 8, 2004, while en route to Baghdad to collect payment due under the invoices, Stoffel and a colleague, Joseph Wemple, were assassinated. Stoffel's laptop computer was stolen at the time of his death.

31. After the death of Stoffel, work pursuant to the contract continued under the supervision of other Wye Oak employees and subcontractors. Wye Oak continued working full-time on refurbishing and construction in order to finish the first part of the job in time for the Iraqi elections in January 2005.

32.  Wye Oak completed the refurbishing of armored vehicles, T-55 tanks, and other heavy military equipment in time for the Iraqi elections in January, 2005. The Iraqi Army's First Mechanized Brigade, assembled and refurbished entirely by Wye Oak, paraded through the streets of Baghdad on Election Day.

33.  Wye Oak succeeded, without reimbursement or payment from Iraq, in repairing and delivering more than 160 armored vehicles (MTLB's, T-55's) to the Iraqi Army.

34.  Despite repeated requests of the Defendant for payment of the invoices following the death of Stoffel, the Plaintiff received no payment under the contract.

35.  At no time during the period from the death of Stoffel through the term of the contract in August 2007 did the Defendant ever object to or question the invoices.

36.  Plaintiff remained ready and able to fully perform under the contract throughout the contract period, i.e., through August 2007, but could not do so without payment of invoices in the amount of $24,714,697.15 initially submitted to the Defendant in October 2004, or further invoices for advanced funding and payment of services that would thereafter be submitted from time to time during the three-year term of the contract.

37.  By not paying these invoices to Plaintiff, the Defendant breached its agreement with the Plaintiff which was documented in the Contract of August 16, 2004, the Amendment to the Contract of August 30, 2004 and reaffirmed in the Baghdad meeting of December 5, 2004.

## **RELIEF REQUESTED**

WHEREFORE the Plaintiff, Wye Oak Technology, Inc., seeks damages arising from the Defendant's breach of Contract to include:

>   (1)  payment of all amounts due under the invoices submitted to the Defendant in October 2004 and repeatedly thereafter, plus accrued interest;

(2)  the loss of profits and fees, plus accrued interest, which the Plaintiff reasonably expected to earn through full performance of the Contract by refurbishment work and the sale of military scrap materials; and

(3)  any and all other relief the Court deems just.

Respectfully submitted,

Wye Oak Technology, Inc.

By: _____
John H. Quinn, Jr.
Attorney for Wye Oak Technology, Inc.

WYE OAK TECHNOLOGY, INC.

By: David J. Stoffel, President

District of Columbia:

I, David J. Stoffel, under penalty of perjury, affirm that I am the President of Wye Oak Technology, Inc., and that I verify the foregoing Verified Complaint – Breach of Contract for and on behalf of said Wye Oak Technology, Inc.; that I am duly authorized to do so; that the facts stated therein have been assembled by authorized employees and counsel for said Wye Oak Technology, Inc.; and that the allegations therein are true and correct to the best of my knowledge, information, and belief.

David J. Stoffel

District of Columbia:

Personally appeared before me, the undersigned authority in and for the District of Columbia, David J. Stoffel, who acknowledged to me under oath that he is the President of Wye Oak Technology, Inc., and that he verifies the foregoing Verified Complaint – Breach of Contract for and on behalf of said Wye Oak Technology, Inc.; that he is duly authorized to do so; that the facts stated therein have been assembled by authorized employees and counsel for said

Wye Oak Technology, Inc.; and that the allegations therein are true and correct to the best of his knowledge, information, and belief.

(Seal)

Ross M. Sarraf
Notary Public, District of Columbia
My commission expires 10/31/2013.

JOHN H. QUINN, JR. (VSB N o. 6232)
Quinn, Racusin & Gazzola Chartered
1667 K Street, N.W., Suite 720
Washington, D.C. 20006
(202) 842-9300
(202) 682-0148 (FAX)
jhq@qrglawfirm.com

ROBERT JAMES PAVICH (*Pro hac vice* application pending)
Monico Pavich & Spevack
20 South Clark Street, Suite 700
Chicago, Illinois 60603
(312) 782-8500
(312) 853-2187 (FAX)
rpavich@monicopavich.com

JOHN J. PAVICH (*Pro hac vice* application pending)
Monico Pavich & Spevack
20 South Clark Street, Suite 700
Chicago, Illinois 60603
(312) 782-8500
(312) 853-2187 (FAX)
jjpavich@psaint.com

ANTHONY D'AMATO
Northwestern University School of Law (*Pro hac vice* application pending)
357 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-8474
(312) 587-9969 (FAX)
a-damato@northwestern.edu

Attorneys for Plaintiff, Wye Oak Technology, Inc.