**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
WYE OAK TECHNOLOGY, INC., |
|
    **Plaintiff,** |
|    **Civil No. 1:10-cv-01182-RCL**
    **v.** |
|
REPUBLIC OF IRAQ, et al. |
|
    **Defendants.** |
|

**DEFENDANTS REPUBLIC OF IRAQ AND MINISTRY OF DEFENSE**
**MOTION TO COMPEL PLAINTIFF WYE OAK TECHNOLOGY, INC. RESPONSES**
**TO ALL OF DEFENDANTS' DISCOVERY REQUESTS**

Defendants Republic of Iraq ("Iraq") and Ministry of Defense of the Republic of Iraq

("MoD") (collectively, "Defendants") respectfully move this Court, as a matter of urgency, to

order Plaintiff Wye Oak Technologies, Inc. ("Wye Oak" or "Plaintiff") to respond to each of

Defendants' timely discovery requests to Wye Oak by not later than Monday, April 2, 2018 (the

fact discovery cutoff date provided by the Scheduling Order [Dkt. #191]):

    1.    Defendants' First Set of Requests for Production of Documents to Plaintiff Wye

        Oak, served on Wye Oak by email at 11:55 p.m. (Eastern time), Wednesday, 28

        February 2018. *See* Exhibit 1 (true and correct copy of transmittal email between

        Defendants lead counsel Timothy Mills (hereinafter "Defendants Counsel") and

        Wye Oak counsel of record C. Allen Foster, Eric Rowe, John Pavich, Robert

        Pavich, John Quinn Jr. and Wye Oak co-counsel Adrian Snead, Erik Bolog and

        Patrick Klemz (herinafter, "Wye Oak Counsel") dated 11:55 p.m. (Eastern time),

        Wednesday, 28 February 2018).  The parties have agreed that these requests are

deemed to be served on March 1, 2018. Thus: pursuant to Fed. R. Civ. P. 6(a)(1)

(hereafter, "Rule 6"), the 30th day is Saturday, March 31, 2018 and pursuant to

Rule 6(a)(1)(C), the due date becomes Monday, April 2, 2018 (the last day of fact

discovery under the Scheduling Order)[1];

2.      Defendant Iraq's First Set of Requests for Admissions and First Set of

Interrogatories, served on Wye Oak by email at 5:37 p.m. (Eastern time), March

1, 2018.  *See*  Exhibit 2 (true and correct copy of transmittal email between

Defendants Counsel and Wye Oak Counsel dated 5:37 p.m. (Eastern time), March

1, 2018).  Again, pursuant to Rule 6(a)(1), the 30th day is Saturday, March 31,

2018 and pursuant to Rule 6(a)(1)(C), the due date becomes Monday, April 2,

2018 (the last day of fact discovery under the Scheduling Order);

3.      Defendant Iraq's Second Set of Interrogatories and First Set of Requests for

Production of Documents, served on Wye Oak by email at 3:27 p.m., March 2,

2018. *See*  Exhibit 3 (true and correct copy of transmittal email between

Defendants Counsel and Wye Oak Counsel dated 3:27 p.m. (Eastern time), March

2, 2018).  Pursuant to Rule 6(a)(1), the 30th day is Sunday, April 1, 2018, and

pursuant to Rule 6(a)(1)(C), the due date becomes Monday, April 2, 2018 (the last

day of fact discovery under the Scheduling Order); and

---

[1] Defendants, through counsel, planned to complete and serve all discovery requests several days earlier.  However, Defendants' undersigned counsel was impeded from doing so because of the need to prepare and file Defendant's Motion to Quash Plaintiff's Deposition Notice to Defendants' Counsel Timothy Mills (seeking a court order prohibiting any such deposition) on February 21, 2018 [Dkt. #204].  Thus, one of the harms of concern to courts in deciding to protect a party's lead litigation counsel against being deposed by an opposing party's counsel already has occurred here: disruption of Defendants counsel's preparation of Defendants' case. *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003) ("Courts have been especially concerned about the burdens imposed on the adversary process when lawyers themselves have been the subject of discovery requests, and have resisted the idea that lawyers should routinely be subject to broad discovery").

4.      Defendant MoD's First Set of Interrogatories and Second Set of Requests for

Production of Documents, served on Wye Oak by email at 3:28 p.m., March 2,

2018. *See* Exhibit 4 (true and correct copy of transmittal email between

Defendants Counsel and Wye Oak Counsel dated 3:28 p.m. (Eastern time), March

2, 2018).  Again, in accordance with Rule 6(a)(1), the 30th day is Sunday, April 1,

2018, and under Rule 6(a)(1)(C), the due date becomes Monday, April 2, 2018

(the last day of fact discovery under the Scheduling Order).

The 30-day response due dates are stated in each discovery request, citing to:

- For Interrogatories, Fed. R. Civ. P. 33(b)(2):

  "(2) *Time to Respond.* The responding party must serve its answers and any
  objections within 30 days after being served with the interrogatories. A shorter or
  longer time may be stipulated to under Rule 29 or be ordered by the court.

- For Producing Documents, Fed. R. Civ. P. 34(b)(2)(A):

  (A) *Time to Respond.* The party to whom the request is directed must respond in
  writing within 30 days after being served . . . ."

- For Requests for Admissions, Fed. R. Civ. P. 36(a)(3):

  (3) *Time to Respond; Effect of Not Responding.* A matter is admitted unless,
  within 30 days after being served, the party to whom the request is directed serves
  on the requesting party a written answer or objection addressed to the matter and
  signed by the party or its attorney. A shorter or longer time for responding may be
  stipulated to under Rule 29 or be ordered by the court.

The parties' practice in this litigation has been to serve *all* discovery requests by email, in

accord with ¶ 3 of the Parties' Joint Report and Discovery Plan dated March 27, 2014 [Dkt. #95]

(the "Parties Plan"):

3.      **Service of Discovery Papers:** The parties agree to make and accept service by
email for all Rule 26 disclosures, discovery requests, discovery objections, and discovery
responses; however, the parties **do not** waive the additional time allowed for electronic
service as provided in Rule 6(d) of the Federal Rules of Civil Procedure.

Exhibit 5 (Parties Joint Report and Discovery Plan dated March 27, 2014 [Dkt. #95]).  (The

Parties' Plan was *not* so-ordered by the Court, and, thus does not have the effect of an order.)

However, on April 28, 2016, the Supreme Court amended Federal Rule of Civil Procedure

6(d) to remove electronic service from the modes of service under Rule 5(b)(2) that allow an extra

three (3) days to respond, effective December 1, 2016:

> Rule 6(d) is amended to remove service by electronic means under Rule 5(b)(2)(E) from
> the modes of service that allow 3 added days to act after being served.

Advisory Committee Notes on Rules – 2016 Amendment, republished at

https://www.law.cornell.edu/rules/frcp/rule_6.

The Parties' Plan non-waiver of the 3-added days "allowed for electronic service **as**

**provided in Rule 6(d)**" made in 2014 would survive so long as Rule 6(d)'s 3-added days

provision continued to exist – *but no longer*. The Supreme Court's amendment of Rule 6(d)

effective December 1, 2016 thus erased the Parties' Plan's non-waiver of the 3 days additional

time to act formerly provided by Rule 6(d)."[2]

Consistent with the Supreme Court's removal from Rule 6(d) of the "3 added days to act"

upon items electronically served, in *all* discovery responses in this action (all of which were

made by Defendant *after* December 1, 2016), Defendants (as well as Plaintiff) calculated

Defendants' discovery due dates without regard to the 3-added-day provision – up until March 1,

2018, when Plaintiff's counsel began to realize the highly likely adverse effect on Plaintiff's

claims of Plaintiff's required full responses to Defendants' outcome-determinative discovery

requests.  That is, Plaintiff required responses to Defendants' discovery requests are

---

[2] If the parties had intended the 3-added days to act provision to survive any amendment of Rule
6(d), the parties could have said so in the writing by simply adding "saving language" such as the
following underlined text: "the parties do not waive the additional time allowed for electronic
service as provided in Rule 6(d) of the Federal Rules of Civil Procedure, regardless of any
amendment to Rule 6(d)". The parties did not.

extraordinarily likely to shine the light of truth on the outcome-determinative issues of fact in this action such that there no longer will be any genuine dispute that Plaintiff's claims are meritless and false and that Plaintiff knew so long before commencing this action with a "verified" Complaint.

Upon receiving Defendants' discovery, it would be apparent to Wye Oak counsel that there now exists a very real prospect that Defendants will bring – and the Court will grant – a Rule 56 summary judgment motion in Defendants' favor soon after Wye Oak responded to Defendants' discovery requests.

At 1:31 p.m, March 1, 2018, Plaintiff's lead counsel attempted to invoke the now-revoked 3-added day provision in an attempt to allow Wye Oak to evade responding *at all* to the *entirety* of Defendants' discovery requests (those set forth above).  Plaintiff's counsel wrote:

> On further reading of ECF 95 [Plaintiff's Plan], it is apparent that the intention of the parties' agreement was to preserve the three day addition to response time in the case of service by email. We will proceed on that basis.

Exhibit 6 (True and correct copy of email from C. Allen Foster to Timothy B. Mills, Subject: RE: Defendants' First Requests for Production of Documents to Plaintiff Wye Oak, dated 1:31 p.m., March 1, 2018).  Mr. Foster subsequently clarified that, based on Mr. Foster's interpretation of ¶ 3 of the Parties' Plan, Wye Oak will not respond to any of Defendants' discovery.

Yet, thereafter, Plaintiff's counsel had his assistant serve on Defendants' counsel – by email, in compliance with ¶ 3 of the Parties' Plan – Wye Oak's Fourth Documents Requests to MOD and Fifth Document Requests to Iraq, commanding in those requests that MoD and Iraq must respond within 30 days (by April 2, 2018) – the same day that Wye Oak's discovery responses are due to Defendants without regard to the former "3-added day to act" provision of

Rule 6(d) and the final day of fact discovery under the Scheduling Order.  *See* Exhibit 7 (True

and correct copy of email from M. Tutman to Timothy Mills, Sub: Wye Oak's Fourth RFP to

MOD and Fifth RFP to Iraq, dated 5:49 p.m., March 1, 2018).

Plaintiff's counsel attempted to maneuver his way out of his contention that the revoked

3-added day rule must apply to all discovery responses by also having his associate attorney

"hand deliver" the new Wye Oak discovery requests to the law office of Defendants' counsel at

5:45 p.m., March 1, 2018 (after the close of business hours at Defendants counsel's office –

disregarding that, in ¶ 3 of the Parties' Plan:

> "**The parties agree to make and accept service by email for all . . . discovery**
>
> **requests. . ..**" (Emphasis added.)

In sum, Wye Oak, through counsel, has sought to apply a double-standard to evade Wye

Oak's obligation to respond to Defendants' discovery, on the pretext of Wye Oak applying a no-

longer-existent-3-additional-days-to-act rule while at the same time Wye Oak has sought to

mandate that Defendants must respond to Wye Oak's discovery requests served by email on the

same day, or earlier.

Taken together, Defendants' comprehensive, triple-pronged discovery requests

(Interrogatories, document requests, and requests for admissions) cut to the core of Plaintiff's

false claims, seeking the truth about each of these outcome-determinative issues:

**1.      Wye Oak's $24,714,687.15[3] false claim that Defendant Ministry of Defense**

**did not pay the three Wye Oak invoices as alleged in the Amended Complaint** [Dkt. #122],

attached at Amended Complaint Exhibit 7 [122-7].  **MoD paid the three invoices in full, in**

**accordance with Wye Oak's wishes and knowledge**, by delivering three MoD checks to Wye

---

[3] This number is alleged and claimed by Wye Oak in the Amended Complaint.  *See* Amended
Complaint at ¶¶ 27, 31, 39.

Oak's financial representative, Raymond Zayna of GIG.  The documentary record at MoD is sparse, because the former MoD procurement chief, Ziad Cattan, illegally removed numerous contract files from MoD when he left office.  However, Defendants understand that then-Wye Oak president Dale Stoffel was in regular contemporaneous communication with Mr. John Quinn, then Wye Oak's secretary, treasurer and attorney (and one of Wye Oak's counsel for record in this action) about literally *all* critically-important developments.  Defendants' triple-pronged discovery requests are directed at discovering the truth about this matter.

**2.      Wye Oak's $23.99 million[4] additional false claim that Wye Oak is due any commission compensation whatsoever for "Scrap Sales" (as defined in Section 1(i) of Broker Services Agreement** (Exhibit 2 to the Amended Complaint [Dkt. #122-2]).  Under Broker Services Agreement Section 5 (Compensation), to be entitled to any compensation for "Scrap Sales", Wye Oak must meet three conditions precedent:

(1)      Wye Oak must present to MoD a "Customer" for a "Sales Contract" (as defined in Broker Services Agreement Section 1(h) for "Scrap Sales" (as defined in Broker Services Agreement Section 1(c));

(2)      The "Customer" must enter into a written "Sales Contract" with MoD for "Scrap Sales", signed by MoD and the Customer, with an exact stated "Contract Value" (as defined by Broker Services Agreement Section 1(b)), and, arguably, the "Customer" must pay MoD for the Sales Contract so as to generate the cash to pay a commission to Wye Oak; and

(3)      Wye Oak must submit a pro forma invoice to MoD in the amount of 10% of the "Contract Value" of the "Sales Contract" for "Scrap Sales".

---

[4] This number is reported by Wye Oak's preferred "expert" report on damages previously served on Defendants.

Thus, if there is neither: (1) a Wye Oak presentation of a "Scrap Sales" "Customer" to MoD; nor (2) a "Sales Contract' for "Scrap Sales"; nor (3) a Wye Oak submission of a Wye Oak pro forma invoice in the amount of 10% of the "Contract Value" of a "Sales Contract" for "Scrap Sales", then MoD has no liability whatsoever to Wye Oak for *any* commissions for "Scrap Sales", no matter what happened during the term of the Broker Services Agreement (from August 16, 2004 through arguably August 16, 2007, according to Wye Oak's calculation of the term).

If Wye Oak had brokered even one "Sales Contract" for "Scrap Sales" between a "Customer" and MoD, concluded by the "Customer" and MoD signing a written "Sales Contract", then Wye Oak would have prepared and submitted pro forma invoices to MoD in the amount of 10% of the "Contract Value" of the "Sales Contract" for "Scrap Sales".  Wye Oak's then-president Dale Stoffel would have safe kept such highly-valued documents by doing what Mr. Dale Stoffel always did with other such highly-valued documents: send them to Wye Oak's offices and to Wye Oak's secretary-treasurer-attorney John Quinn Jr. (counsel of record for Wye Oak in this action.  *See* executed Broker Services Agreement (Exhibit 2 to Amended Complaint [Dkt. #122-2]; MoD letter dated August 16, 2004 "commissioning" Wye Oak as an "agent" of MoD (Exhibit 3 to Amended Complaint [Dkt. #122-3]); Wye Oak letter dated 28 September 2004 granting "Raymond Zayna of GIG" a limited power of attorney to "arrange financing and the request (sic.) banking guarantees for and on behalf of the Wye Oak Iraqi Military Equipment Recovery Program ("IMERP Contract") (Exhibit 5 to Amended Complaint [Dkt. #122-5]; Wye Oak pro forma invoices #MUQ001 (dated October 11, 2004), MUQ002 (dated October 18, 2004) and TAJI001 (dated October 11, 2004) (Exhibit 7 to Amended Complaint [Dkt. #122-7].

Additionally, if Wye Oak had actually concluded any "Sales Contract" for "Scrap Sales", Wye Oak's and the Customer's next step would have been to perform the "Sales Contract" by

the "Customer" or Wye Oak paying MoD the "Contract Value", obtaining the scrap export license from the Ministry of Trade required by applicable Iraqi law, transporting the scrap to the Iraqi border crossing point, paying required Iraqi customs duties associated with the export of scrap across the Iraqi border crossing point.   Wye Oak and the "Customer" would have records of all of this if any such event occurred.  So too would MoD, as to MoD's involvement, and the Ministry of Trade, as to licensing, and the Ministry of Finance, as to customs duties.  But, on the Iraqi side, no such records have been found.  And, quite obviously, on the Wye Oak side it is also true that no such records exist.

Wye Oak's initial disclosures under Rule 26(a)(1)(A)(ii) (disclosure of a copy or description by category and location of all documents and electronically stored information ("ESI") in Wye Oak's possession, custody or control that Wye Oak may use to support its claims) did not include *any* copy of any such records, or any description by category and location of such records, or any disclosure of any such ESI. (We note that, as to pro forma invoices, in its Rule 26 disclosures, Wye Oak only provided the three Wye Oak pro forma invoices Wye Oak attached as Exhibit 7 to the Amended Complaint [Dkt #122-7].)

Wye Oak also would have provided all such documents to Wye Oak's "damages expert", and, under Fed. R. Civ. P. 26(a)(2)(B)(iii), the expert report must include such documents as exhibits.  Yet, Wye Oak's damages "expert report' is devoid of any mention of any such supporting documents, and does *not* include any such documents.

There is only one set of inferences that can be drawn from these facts:  Wye Oak never brokered any "Sales Contract" for any "Scrap Sales" – put slightly differently but equally truthfully: (1) no "Sales Contract" for any "Scrap Sales" exists because Wye Oak did meet its obligations to MoD under the Broker Services Agreement to bring "Customers" who actually

entered into such "Sales Contracts" with MoD; and (2) Wye Oak never submitted any pro forma invoices to MoD for 10% of the "Contract Value" of any "Sales Contract" for "Scrap Sales".

There is only one conclusion that will follow from these facts, as a matter of law:  Wye Oak has no entitlement, and MoD has no liability whatsoever to Wye Oak – on Wye Oak's claim for compensation under the Broker Services Agreement for any "Scrap Sales".

Defendants' triple-tier discovery requests, when fully responded to by Wye Oak, will go toward the early termination of this false claim, through summary judgment in Defendants' favor.  Defendants are informed that Wye Oak has no documents or other proof of any "Sales Contract" for "Scrap Sales".  And, in MoD's discovery responses to Wye Oak, MoD has stated and disclosed there is *no* evidence that MoD ever entered into *even one* "Sales Contract" for "Scrap Sales" with any "Customer".

Wye Oak must so admit in response to Defendants' discovery requests, most particularly Defendants' Requests for Admission to Wye Oak. By  the Court compelling Wye Oak to do so, the Court will employ the Federal Rules of Civil Procedure to serve their purpose: securing the just, speedy determination and (hopefully from here on out) the inexpensive conclusion of this action through summary judgment being entered against Wye Oak on these frivolous claims. *See* Rule 1, Fed. R. Civ. P.

**3.    Wye Oak's further false claim of between $14.6 million to $55.5 million[5] that Wye Oak is due any commission compensation whatsoever for "Military Refurbishment Services" (as defined in Section 1(e) of Broker Services Agreement**.  Again, under Broker Services Agreement Section 5 (Compensation), to be entitled to any compensation for "Military

---

[5] *Id.*

Refurbishment Services", Wye Oak must meet the three conditions precedent discussed immediately above, namely:

(1)    Wye Oak must present to MoD a "Customer" for a "Sales Contract" for "Military Refurbishment Services";

(2)    The "Customer" must enter into a written "Sales Contract" with MoD for "Military Refurbishment Services", signed by MoD and the Customer, with an exact stated "Contract Value", and, arguably, the "Customer" must pay MoD for the Sales Contract so as to generate the cash to pay a commission to Wye Oak; and

(3)    Wye Oak must submit a pro forma invoice to MoD in the amount of 10% of the "Contract Value" of the "Sales Contract" for "Military Refurbishment Services".

Thus, as with "Scrap Sales" (discussed immediately above), if there is neither: (1) a Wye Oak presentation of a "Military Refurbishment Services" "Customer" to MoD; nor (2) a "Sales Contract' for "Military Refurbishment Services"; nor (3) a Wye Oak submission of a Wye Oak pro forma invoice in the amount of 10% of the "Contract Value" of a "Sales Contract" for "Military Refurbishment Services", then MoD has no liability whatsoever to Wye Oak for *any* commissions for "Military Refurbishment Services", no matter what happened during the term of the Broker Services Agreement (from August 16, 2004 through arguably August 16, 2007, according to Wye Oak's calculation of the term).

As with "Scrap Sales", if Wye Oak had brokered even one "Sales Contract" for "Military Refurbishment Services" between a "Customer" and MoD, concluded by the "Customer" and MoD signing a written "Sales Contract", then Wye Oak would have prepared and submitted pro

forma invoices to MoD in the amount of 10% of the "Contract Value" of the "Sales Contract" for "Military Refurbishment Services".  If any of this had happened, Wye Oak

The analysis set forth above with respect to the frivolousness of Wye Oak's commission claims for "Sales Contracts" for "Scrap Sales" applies with equal force and effect here: (1) Wye Oak's Rule 26 disclosures are devoid of any copies of any such documents or any description by category and location of any such documents, and also are devoid of any such ESI; (2) Wye Oak's "damages expert report" neither refers to or includes any such documents; (3) other than the work stated on Wye Oak pro forma Invoices Nos. MUQ002 and TAJI001 (*i.e.*, two out of the three Wye Oak pro forma invoiced Wye Oak appended at Exhibit 7 to the Amended Complaint [Dkt. #122-7][6]), MoD never entered into any "Sales Contract" for "Military Refurbishment Services" brokered by Wye Oak because Wye Oak never presented any "Customers" to MoD who entered into any such "Sales Contracts".

Once again, there is only one set of inferences that can be drawn from these facts:  (1) no "Sales Contract" for any "Military Refurbishment Services" exists because Wye Oak did meet its obligations to MoD under the Broker Services Agreement to bring "Customers" who actually entered into such "Sales Contracts" with MoD; and (2) other than Wye Oak pro forma Invoice Nos. MUQ002 and TAJI001, Wye Oak never submitted any pro forma invoices to MoD for 10% of the "Contract Value" of any "Sales Contract" for "Military Refurbishment Services". And the one conclusion that follows from these facts, as a matter of law is the same as for Wye Oak's "Scrap Sales" commission claim:  Wye Oak has no entitlement, and MoD has no liability whatsoever to Wye Oak – on Wye Oak's claim for compensation under the Broker Services Agreement for any "Sales Contract" for "Military Refurbishment Services".

---

[6] Wye Oak pro forma Invoice No. MUQ001 was for construction only, and not for "Military Refurbishment Services as defined in the Broker Services Agreement (without amendment).

As with the issue of Wye Oak's "Scrap Sales" commission entitlements, Wye Oak's full responses to Defendants' discovery requests will bring about the early termination of this false claim, through summary judgment in Defendants' favor.

Wye Oak must so admit in response to Defendants' discovery responses, including Defendants' Requests for Admission.

**4.      Wye Oak's false claim of $15.32 million[7] based on the allegation that MoD executed the First Amendment to the Broker Services Agreement purportedly dated August 30, 2004 (Exhibit 4 to the Amended Complaint [Dkt. #122-4]), and thereby added exclusive brokering of "construction of facilities, bases, billeting, service/repair depots, repair factories/facilities" to the scope of the Broker Services Agreement, and then breached that "new" part of the Broker Services Agreement** by not dealing exclusively with Wye Oak as the broker for "Sales Contracts" for "construction of facilities, bases, billeting, service/repair depots, repair factories/facilities".

Incredulously, Wye Oak claims $15.32 million in damages for commission on "Sales Contracts" for "construction of facilities, bases, billeting, service/repair depots, repair factories/facilities" based solely on Wye Oak's bare allegation that MoD *and* Wye Oak executed a copy of the *unexecuted* First Amendment to the Broker Services Agreement (the "BSA First Amendment") that Wye Oak has attached as Exhibit 4 to the Amended Complaint [Dkt. 122-4].

Wye Oak has no evidence whatsoever that either MoD *or* Wye Oak ever executed the BSA First Amendment.  Wye Oak has *never* produced to the Court, or to Defendants in Wye Oak's Initial Disclosures, or to Wye Oak's damages expert, any executed original of the BSA First Amendment or photocopy of an executed original of the BSA First Amendment. Wye Oak

---

[7] Fn.3, supra.

also has not described by location where any claimed execution original of the BSA First Amendment is located.

Instead, in Wye Oak's Rule 26 Initial Disclosures, Wye Oak provided an unexecuted Word document that is in exactly the same format and content of the BSA First Amendment attached as Exhibit 4 to the Amended Complaint [Dkt. #122-1], including the same fonts, line breaks, page margins, and exact page contents) of the BSA First Amendment.  The metadata in this document undermines Wye Oak's contention that BSA First Amendment was ever executed on or around August 30, 2004, or thereafter: the metadata proves that the Word document was created on October 25, 2004 – the same day that MoD issued checks paying the three Wye Oak pro forma invoices, including Wye Oak pro forma Invoice MUQ001, for construction [Exhibit 7 to the Amended Complaint [Dkt. #122-7].  The timeline and factual inference is becoming clear, piece-by-piece; *after* MoD approved the three Wye Oak invoices on 19 October 2004, and paid the three Wye Oak invoices by delivering three MoD checks to Raymond Zayna on October 25, 2004 with the full knowledge, participation and consent of Wye Oak's then-President Dale Stoffel, Wye Oak *attempted but did not succeed in having* MoD amend the Broker Services Agreement to name Wye Oak as MoD's "exclusive broker" for "Sales Contracts" for "construction of facilities, bases, billeting, service/repair depots, repair factories/facilities".

It now appears that, with full knowledge of these facts, Wye Oak and its counsel then falsely concocted these claims in the hopes of reaping a $15.32 million windfall.

Defendants' discovery will require Wye Oak to finally tell the truth and admit that no executed BSA First Amendment has ever existed, and, therefore, as a matter of law, Wye Oak has no claim for Broker Services Agreement commissions for any "Sales Contracts" for "construction of facilities, bases, billeting, service/repair depots, repair factories/facilities".

The Court, by compelling Wye Oak to respond to Defendants' triple-pronged discovery requests, will further the ends of this action coming to a speedy and just determination in favor of Defendants.

**5.     Wye Oak's false allegation that Wye Oak continued to perform the work stated on the Wye Oak pro forma invoices (appended as Exhibit 7 to the Amended Complaint [Dkt #122-7]) following the death of Wye Oak then-President Dale Stoffel on December 8, 2004 and the other work required of Wye Oak by the Broker Services Agreement, when, in truth, Wye Oak made a party admission in a January 25, 2004 email from then-Wye Oak Executive Vice President William Felix to General Petraeus (just 5 days before the January 30, 2004 Iraqi national elections) that Wye Oak abandoned the work and left MoD stranded at a critical time in performance of the refurbishment of armored vehicles needed to provide security during the week of the Iraq national elections and afterward:**

> Given the tragic and very suspicious circumstances during the week of December 6, 2004, management of Wye Oak recalled all American employees and contractors from the Iraqi theater for the obvious reasons of personal safety.  We are now prepared to resume direct management of IMERP work assuming that critical and self-evident program adjustments can be quickly agreed to and arranged.

*See* Exhibit 8 (true and correct copy of email from Wye Oak officer William Felix to Commanding General David Petraeus, U.S. Multinational Security Transition Command-Iraq (MNSTC-I) dated 9:58 a.m., Tuesday, January 25, 2004, Subject: IMERP Jumpstart Initiative, produced in Wye Oak Rule 26 Initial Disclosures).

Under Iraqi law, Wye Oak was obligated to continue to perform, materially breached Wye Oak's contractual obligations to MoD by ceasing to perform.  Performance was not

impossible, and was not excused.  Others (particularly Raymond Zayna's company) did perform under the same conditions and circumstances, when MoD demanded.

The time is now at hand for Defendants and the Court to be able to establish the facts – the truth – through Wye Oak's own documents that the Federal Rules of Civil Procedure requires Wye Oak to produce and admissions that the Rules require Wye Oak to make.

**6.      Wye Oak's false contention that Wye Oak did not know (allegedly because Wye Oak was not informed by MoD) that: (1) under applicable Iraqi law (including orders and regulations with the force and effect of Iraqi law) any export of scrap metal under any "Sales Contract" between a "Customer" and MoD for "Scrap Sales" that involved exporting scrap from Iraq required either Wye Oak or the "Customer" to obtain a scrap export license from the Ministry of Trade and pay customs duties at the Iraqi border (this applied to all such contemplated "Sales Contracts" for "Scrap Sales" under the Broker Services Agreement: all "Customers" were outside Iraq, *see* Amended Complaint at ¶ 22); and (2)  Wye Oak also did not know that the Prime Minister of Iraq, exercising his executive power, stopped all scrap exports by all Ministries "according to the high national interest of Iraq" by the Prime Minister's order of July 17, 2004, and further did not know that on December 29, 2004, the Council of Ministers of the Government of Iraq ordered all Ministries (including MoD) to deliver all "excess scrap" to certain State-owned companies of the Ministry of Industry and Minerals ("MIM") (such as Basra Iron and Steel Company) "free of charge" for use by those companies "because they are the main and only users in Iraq, and scrap is used as their primary material."**

As noted above, *if* Wye Oak had concluded any "Sales Contracts" with MoD for "Scrap Sales", then to perform those contracts either Wye Oak or the "Customer" would be required to

obtain a scrap export license from the Ministry of Trade.  Wye Oak now feigns ignorance of this requirement.  But, Defendants are informed that Wye Oak had actual knowledge of this requirement from Wye Oak's activities leading up to and during the term of the Broker Services Agreement.  For example, Defendants are informed that shortly after the August 16, 2004 Broker Services Agreement start date, Wye Oak obtained a copy of scrap export license no. 225 for iron blast and cutting (possibly provided to Wye Oak by an American Army Lieutenant Colonel then serving as an advisor to the Ministry of Industry and Minerals).

(With respect to the Prime Minister's order to stop the export of scrap, and the Council of Minister's order to all Ministries to deliver all excess scrap free of charge to the MIM companies, Iraq produced true and correct copies of the Arabic originals and English translations of these decisions to Wye Oak in response to a Wye Oak's document request.)

Defendants provide the Court with the produced true and correct copies of the Arabic originals and English translations.  *See* Exhibit 9 (true and correct copy of original of General Secretary of the Council of Ministers Letter No. M Kh S/40/80 dated July 17, 2004 (in Arabic) (and English language translation thereof) communicating the order of the Prime Minister of Iraq to stop exports of scrap from Iraq; *see* Exhibit 10 (true and correct copy of original of General Secretary of the Council of Ministers Letter No. 7/1/6018 dated December 29, 2004 (in Arabic) (and English language translation thereof) communicating to all Ministers the decision of the Council of Ministers that: "no sale of scrap be made to merchants or any other entity belonging to the private sector for any reason", and "it is required for the Ministries to deliver extra scrap to the companies belonging to the Ministry of Industry and Minerals free of charge  . . . because they are the main and only users in Iraq, and scrap is used as their primary material.")

Wye Oak alleges in ¶ 24 of the Amended Complaint that, by some inexplicable means, if Wye Oak had been informed by MoD of these decisions, then, impliedly, such knowledge would allowed Wye Oak to evade the universal consequences of the Prime Minister's order stopping scrap sales and the Council of Minister's order that *all* excess scrap of *all* Ministries (including MoD) must be provided "free of charge" to those certain State-Owned companies.

Defendants' comprehensive discovery requests, when fully responded to by Wye Oak, will go toward the early termination of any defense that Wye Oak may attempt to assert based on either: (1) the false contention that Wye Oak either did not understand that scrap export licenses were required from the Ministry of Trade for *all* "Sales Contracts" for "Scrap Sales" (there is *no* evidence that Wye Oak or any "Customer" (a party) to any "Sales Contract" for "Scrap Sales"; or (2) that Wye Oak could have continued to broker "Scrap Sales" under the Broker Services Agreement notwithstanding the Prime Minister's public policy decision to stop scrap exports and the decision of the Council of Ministers decision to order all Ministries (including MoD) to deliver all excess scrap "free of charge" to the MIM companies.

**7.      Wye Oak Foreign Sovereign Immunities Act ("FSIA") jurisdictional allegations pertaining to Iraq that with respect to the Broker Services Agreement MoD was the "agent" or Iraq and that Iraq engaged in "commercial activities" that caused an effect in the United States.**   Defendant Iraq's three-pronged discovery requests to Wye Oak on these issues are highly relevant to the Court speedily disposing of any Wye Oak contention that the Court possesses FSIA jurisdiction over Iraq and that Iraq should be held liable for the contracting activities of MoD on a Wye Oak theory (unsupported by any facts) that MoD was so extensively control by Iraq so as to become the "agent" of Iraq for purposes of jurisdiction and liability.

By the Court requiring Wye Oak to respond to Iraq's Requests for Admission, Documents Requests and Interrogatories – and Wye Oak responding as required by the Federal Rules of Civil Procedure – these issues then may be disposed of by summary judgment in favor of Iraq.

**8.      Discovery on matters related to Wye Oak's contentions that corruption infected the Broker Services Agreement through the activities of Raymond Zayna.**  This has been a constant Wye Oak theme – for which MoD and Iraq have no evidence whatsoever.

It has come to Defendants' knowledge that Wye Oak then-President Dale Stoffel made such allegations in December 2004 written and verbal communications to officials at Department of Defense and perhaps to the Office of the Special Inspector General for Iraq Reconstruction. Commencing about one month after Mr. Stoffel's' death in December 2004, such allegations began appearing in media outlets, including the *Los Angeles Times*.

Defendants also are informed that Wye Oak then-secretary-treasurer-attorney John Quinn knows of the substance of such allegations and any factual basis for such allegations.

Iraq has a public policy interest in learning the truth about these allegations – namely, what allegations Mr. Stoffel was making and what the factual basis was  (if any) for any communications of such allegations to any person by Wye Oak, Mr. Stoffel or Mr. Quinn.

**9.      Discovery as to the potentially corrupt beginnings of the Wye Oak arrangement with family relatives of the former Defense Minister Ali Allawi (Mr. Ghazi Allawi) and of Ahmed Chalabi (Mr. Mohammed Chalabi) to have Wye Oak become a confidential "front company" to enter into a scrap broker contract with MoD of the same character as the Broker Services Agreement, and for Mr. Ghazi Allawi and Mr. Mohamed Chalabi to silently share in the profits through a confidential hidden contract.**  Defendants

learned about this likely arrangement by examining documents, including an unsigned June 20, 2004 Memorandum of Understanding reportedly found on Mr. Stoffel's computer and posted on the internet by an apparent insurgent group who claimed to have obtained and accessed Mr. Stoffel's computer following Mr. Stoffel's death.  *See* Exhibit 11 (Unsigned "Memorandum of Understanding among Ghazi Allawi, Dale Stoffel, Mohammed Chalabi and Ahmet Ersavci" bearing the date June 20, 2004 stating that the parties are "endeavoring to establish Mr. Stoffel as the exclusive broker to the Ministry of Defense with respect to the disposition of all military arms and weapons, including inventories, acquisitions and procurements").

The document bears the hallmarks of having been prepared by the same person(s) who prepared documents either in Wye Oak's name or involving Wye Oak related to the Broker Services Agreement.

Defendants have a public integrity interest in discovering the truth about these potentially corrupt origins of the Broker Services Agreement, and whether Ghazi Allawi or Mohammed Chalabi had any interest in benefitting from the Broker Services Agreement.  If so, there is the likelihood that the Broker Services Agreement is illegal under applicable Iraqi law, and that Wye Oak then would not be entitled to any benefit from the Broker Services Agreement.  (Iraq refers the Court to Iraq's Answer to the Amended Complaint [Dkt. #139], Eighteenth Affirmative Defense: "Iraq hereby gives notice that Iraq intends to rely upon any other defense that may become available or appear during the discovery proceedings in this case."

## Conclusion

For each of the above reasons, Defendants respectfully urge the Court to grant Defendants' motion and compel Wye Oak to respond to Defendants' discovery requests by not later than Monday, April 2, 2018.

A proposed order is attached.

## L.Cv.R 7(m) Conference Statement

On March 5, 2018, in accordance with L.Cv.R. 7(m), Defendants' undersigned counsel

conferred with Wye Oak counsel C. Allen Foster concerning the relief requested in this motion.

Plaintiff opposes the relief requested.

Dated:  March 6, 2018                    Respectfully submitted,


**MAGGS & MCDERMOTT, LLC**

By:____/s/ Timothy B. Mills_____
Timothy B. Mills
D.C. Bar No. 425209
910 17th Street, N.W., Suite 800
Washington, DC  20006
Telephone:  (202) 457-8090
Fax: (202) 478-5081
TimothyBMills@aol.com
*Lead Counsel for Defendants Republic of Iraq and*
*Ministry of Defense of the Republic of Iraq*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of March 2018, I electronically transmitted the foregoing paper to the Clerk of the Court using the ECF System for filing, who will transmit a Notice of Electronic Filing to the following ECF registrant counsel for Plaintiff:

John H. Quinn Jr.
jhq@qrglawfirm.com
Quinn, Racusin & Gazzola Chartered
888 17th Street N.W., Suite 640
P.O. Box 65778
Washington , D.C. 20006-3325
Telephone: (202) 842-9300
Facsimile: (202) 682-0148
*Counsel for Plaintiff*

Robert J. Pavich, *Pro Hac Vice*
John J. Pavich, *Pro Hac Vice*
PAVICH LAW GROUP, P.C.
20 S. Clark Street
Suite 700
Chicago, IL 6063
Telephone: (312) 782-8500
Facsimile: (312) 853-2187
rpavich@pavichlawgroup.com
jpavich@pavichlawgroup.com
*Co-Counsel for Plaintiff*


Charles Allen Foster
Whiteford Taylor & Preston LLP
1800 M Street, NW
Suite 450N
Washington, DC 20036
Telephone: (202) 689-3153
Facsimile: (202) 331-0573
Email: cafoster@wtplaw.com
*Counsel for Plaintiff*

Eric C. Rowe
Whiteford Taylor & Preston LLP
1800 M Street, NW
Suite 450N
Washington, DC 20036
(202) 659-6787
Fax: (202) 689-3164
Email: erowe@wtplaw.com
*Counsel for Plaintiff*


      /s/ Timothy B. Mills      


**engaged in commercial activity**

all's false contention that Wye Oak did not know (allegedly because Wye Oak was not informed by MoD) that: (1) under applicable Iraqi law (including orders and regulations with the force and effect of Iraqi law) any export of scrap metal under any "Sales