## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

WYE OAK TECHNOLOGY, INC.,          )
                                   )
          Plaintiff,               )
                                   )          Civil No. 10-cv-1182 (RCL)
     v.                            )
                                   )
THE REPUBLIC OF IRAQ, et al.,      )
                                   )
          Defendants.              )
_____)

### PLAINTIFF'S MOTION TO REOPEN THE RECORD BASED UPON ADDITIONAL EVIDENCE PROVIDED BY DEFENDANTS, AND FOR RELATED RELIEF, AND SUPPORTING MEMORANDUM

Plaintiff Wye Oak Technology, Inc., moves the Court to reopen the evidentiary trial record of this case and admit into evidence the documents attached hereto, consisting of (1) the written summary produced by Defendant The Republic of Iraq ("Iraq") of Conviction # 20 of former MoD officials for violation of Iraqi Penal Code 340 in connection with the improper payment of $24,714,679.15, to Lebanese Company General Investment Group, s.a.l. ("GIG"), with English translation (attached as Exhibit A and previously filed at ECF No. 436); (2) English translations of Article 340 of the Criminal Code of Iraq (attached as Exhibit B and previously filed at ECF No. 406-2 at pp. 195); and (3) Supplemental Expert Report of Professor Chibli Mallat (attached as Exhibit C, discussing the implications of documents (1) and (2).

Based upon this new evidence and upon the entire record in this case, Plaintiff asks the Court to enter judgment and an award of damages that will "render full justice on the merits" and make the Plaintiff whole from Defendants multiple breaches of contract accompanied by fraud and subsequent fraud upon the Court and the Plaintiff in their deliberately false defenses and prolongation of this litigation.

As part of the reopening of the record, Wye Oak also supplements its proposed findings of fact and conclusions of law to summarize this new evidence and its significance for the Court, just as Wye Oak did for the other evidence admitted in the case.  Wye Oak's Supplemental Proposed Findings of Fact and Conclusions of Law are Attached Hereto as Exhibit D.

I.      **THE RECORD SHOULD BE REOPENED TO ADMIT THE NEWLY DISCLOSED RELEVANT AND ADMISSIBLE EVIDENCE.**

If a party seeks to introduce additional evidence while the matter is under advisement with the Court and prior to the entry of a final judgment, it is considered as a motion to reopen the evidence.  *In re Moore*, 559 B.R. 243, 264 (Bankr. M.D. Fla. 2016).  As one district court explained,

> Even though there is no express statutory provision of substantive law specifically allowing the reopening of a trial, the court finds that such has become a rule of law supplied by the jurisprudence. It appears to be a cannibalization of those qualities found in Rules 59 and 60, Federal Rules of Civil Procedure, New Trials and Relief from Judgment or Order respectively, geared by the philosophy of Rule 1, that is, the 'just, speedy, and inexpensive determination of every action.'
>
> In the case of *Schick Dryshaver v. General Shaver Corp*., D.C., 26 F.Supp. 190, it was held that the reopening of that case while under advisement did not constitute a motion for a new trial under Rule 59. The purpose of such a move is to seek the right to offer additional evidence before the Court has reached a final decision thereon, so that the Court may have all of the facts upon which it can ***render full justice on the merits of plaintiff's cause of action***.

*Caracci v. Brother Int'l Sewing Mach. Corp. of La.*, 222 F. Supp. 769, 771 (E.D. La. 1963), *aff'd*, 341 F.2d 377 (5th Cir. 1965) (emphasis added).

A motion to reopen the evidence is distinguishable from a Rule 59 motion because the moving party is seeking to supplement the record, rather than reconsider, alter, or amend a judgment.  *In re Kanewske*, No. 9:15-BK-08727-FMD, 2017 WL 4381282, at *5 (Bankr. M.D. Fla. Sept. 29, 2017).  Thus, the court need not find that the evidence is newly discovered or would demonstrate a manifest error of law or fact.  *Id.*   As one court explained, the standards ordinarily

required for a motion for new trial under Rule 59 (such as that the evidence must be newly discovered or that it could not have been discovered by a party acting with due diligence) do not apply in a motion to reopen the record made before the Court has ruled:

> At present, this Court has not rendered an opinion, and, accordingly, is not being asked to reconsider, amend, or alter its judgment, nor is the issue effectively being relitigated pursuant to a new trial, only supplemented. Rather the Court is being asked to take additional testimony prejudgment, which is distinct from the requirements for Rule 59. Correspondingly, the grounds for relief under Rule 59 do not translate into such a context.

*In Matter of Dunson*, No. 13-10604-WHD, 2014 WL 7793689, at *4 (Bankr. N.D. Ga. Sept. 16, 2014) *quoting* 12 Moore's Federal Practice § 59.13(3)(c) (Matthew Bender 3d ed. 2002) ("Although similar to a Rule 59 or Rule 60(b) motion based on newly discovered evidence, a motion to reopen does not require that the evidence be newly discovered or that it could have been discovered during the pendency of the trial by a party acting with due diligence.").

The decision to reopen the evidentiary record rests within the sound discretion of the court. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331, (1971) (a motion to reopen the trial record to submit additional proof "is addressed to [the Court's] sound discretion").  In exercising its discretion on such a motion, a court must weigh "the interest of fairness and substantial justice," the burdens placed upon the parties and their witnesses, undue prejudice resulting from granting or denying the motion, and whether granting or denying the motion would facilitate judicial economy.  *In re ORFA Corp. of Am. (Del.)*, 115 B.R. 799, 807 (Bankr. E.D. Pa. 1990).

A district court's decision to reopen the record "turns on flexible and case-specific criteria." *Davignon v. Hodgson*, 524 F.3d 91, 114 (1st Cir. 2008).  These criteria include "whether (1) the evidence sought to be introduced is especially important and probative; (2) the moving party's explanation for failing to introduce the evidence earlier is bona fide; and (3) reopening will cause

no undue prejudice to the non-moving party." *Id.* (quoting *Rivera–Flores v. Puerto Rico Tel. Co.*, 64 F.3d 742, 746(1st Cir. 1995)).   Here, these criteria are easily met.  As set forth below, the evidence is "especially important and probative."  In addition, even if Wye Oak was required to make a showing that the evidence could not have been obtained by it through an exercise of due diligence (and no such showing is required on a motion made before the judgment is announced), such diligence exists here.  As detailed below, Wye Oak asked repeatedly in discovery for production of this very evidence, and its motion to compel production was even denied by the Court based upon Defendants' representations that the evidence did not exist.  Having hidden the evidence, Defendants can hardly complain that Wye Oak did not find it.  Finally, reopening the record to introduce a document that Defendants themselves have provided to the Court, in response to an inquiry from the Court, will not cause undue prejudice to Defendants.  Defendants cannot claim surprise that Wye Oak wants to make use Defendants' own document, and Defendants have had eight years to evaluate the significance of the information contained in the document to the defense they have presented in this case.  On the flipside, there would be substantial prejudice to Wye Oak if the document were not to be admitted.  It would indeed reward Defendants for successfully suppressing the existence of Conviction 20 until such time as Defendants could claim consideration of this evidence was too late.  For the reasons set forth below, the law, the equities and this Court's good judgment demand the reopening of the record for the purposes sought herein.

## II.   THE NEW EVIDENCE IS RELEVANT AND ADMISSIBLE, AND THE RECORD SHOULD BE REOPENED TO HAVE THE EVIDENCE ADMITTED.

Rule 401 of the Federal Rules of Evidence provides that evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.  Rule 402 of the Federal Rules of Evidence

4

provides that relevant evidence is admissible unless provided otherwise by the Constitution, a federal statute, the Rules of Evidence, or other rules prescribed by the Supreme Court.

Here, the new evidence bears directly upon the theory of the case as repeatedly espoused by the Defendants. It renders Defendants' version of events in this case significantly less probable because it eviscerates their principal defense and establishes that the Defendants have lied to Wye Oak and to this Court throughout this proceeding. The evidence is relevant, and no other rule or law operates to exclude it.

### A.    The summary of Conviction 20 is relevant.

The summary of Case Number 20, which was produced by the Defendants for the first time on June 13, 2019, details the criminal convictions of Ziyad Tariq Abdallah Salih Al Qattan ("Ziad Cattan"), the former director of procurement for MoD, Bruska Shaways, the former Secretary General of the MoD, and Dr. Sawsan Jasim, the former Finance Director of the MoD, all three of whom were intimately involved in Wye Oak's IMERP contract and in the fraudulent payment of Wye Oak's $24.7 million to Zayna/GIG. The summary recites:

Summary of case number 20

Name: Ziyad Tariq Abdallah Salih Al Qattan

Case number (34/CR3/2011)

In 2004, convicted fugitive Ziyad Tariq Abdallah Al Qattan, when he was working as the Deputy Secretary-General at the Ministry of Defense, in conjunction with the defendants Bruska Nouri Sadeeq and Sawsan Jasim Mohamed when they were working at the Ministry of Defense, concluded a financial agreement with the General Investment Group (GIG) Company to finance a Ukrainian company tasked with the rehabilitation of tanks for the Ministry. Failure to follow the legal procedures for contracting caused intentional harm to the state assets and to the interest of the entity for which he was working. An amount of four million dollars was paid for the maintenance of tanks type (T72). **There was a second payment valued at (twenty-four million and seven hundred fourteen thousand and six hundred ninety-seven dollars and fifteen cents) for the maintenance of tanks type (T55).** The evidence collected against him is: the statement of the legal representative, the report by the Financial Oversight Board, the administrative

investigation, transcripts, and case documents. He was convicted by the Al Rasafa
Criminal Court, the specialist in integrity cases, and he was sentenced in absentia
to seven years in prison, pursuant to article (340) of the Criminal Penalties Code,
on 24/3/2011 in case number (34/CR3/2011).

*See* Exhibit A (emphasis added).  Defendants themselves submitted an English translation of this

document to the Court in ECF No. 430 at 21, which translation incorrectly transposed numbers in

the amount of money recited and incorrectly referred to Article "240" of the Iraqi Criminal Code.

Defendants have since provided a corrected translation.  ECF 436 at 7.

The criminal conviction is singularly important to this case because it involves the very

same "contract of financial agreement" between MoD and GIG that Defendants rely upon in this

case as a defense to Wye Oak's claims, and involves the same exact funds that were supposed to

have been paid to Wye Oak under its IMERP contract with MoD, and which are at issue in this

case.  The conviction shows that when Cattan and his cohorts paid to Zayna/GIG the money that

was supposed to be paid to Wye Oak, they caused "intentional harm to the state assets and the

interest of the entity he works for."

In addition, and as important, as the Court observed at the Hearing on July 3, 2019, the

existence of this conviction "cannot be squared" with representations previously made by the

Defendants to both the Court and Wye Oak (some of which representations were made under

penalty of perjury).  In those representations, Defendants unequivocally stated that they had no

knowledge of any corruption at MoD involving IMERP or Zayna/GIG, that they had no knowledge

of any investigation of corruption at MoD involving IMERP or Zayna/GIG, and that none of the

convictions that did occur involving corruption at MoD involved either IMERP or Zayna/GIG.  As

shown by the summary of Case Number 20, the convictions (and necessarily the preceding

investigation) were based upon corruption at MoD that involved both IMERP and Zayna/GIG.

The Summary of Case Number 20 further shows that Iraq itself never believed the theory of the defense presented to this Court, and that Iraq itself found the MoD officials' explanations for refusing to pay Wye Oak to be so devoid of any basis that it prosecuted and convicted three of the persons who concocted the entire scheme.

Both the fraud upon which the convictions are based and the fraud upon the Court and Wye Oak by the blatant falsehoods repeatedly advanced by Defendants have major implications for the appropriate remedy in this case.  Despite all of the trial testimony detailing the corruption at MoD, which corruption undoubtedly included Wye Oak's IMERP contract and Zayna/GIG relationship, this new evidence cannot be rejected as merely cumulative evidence supporting the conclusion of breach of contract.  Because of Defendants' sanctimonious denial of that corruption and their intransigent refusal to respond to discovery on that issue, Wye Oak was foreclosed from investigating the connection among MoD corruption, MoD's breach of contract by paying Wye Oak's money to Zayna, and the murder of Dale Stoffel.  The new evidence affects not only any potential issues of credibility of Defendants' witnesses, defenses and contentions, but also the pending motions for sanctions, the Court's consideration of any remaining issues under the Foreign Sovereign Immunities Act and the range of remedies available to the Court to "render full justice on the merits" and to ensure that Wye Oak is made whole.

   1. **The summary of Conviction 20 is Relevant Because it Relates to The IMERP Program Which Was Exclusively Implemented Through the Wye Oak Contract.**

As a critical component of rebuilding post-war Iraq, the Iraqi Military Equipment Recovery Project ("IMERP") commanded the attention of the governments of both Iraq and the United States at their highest levels.  W.O. FF+COL, ECF No. 416 at FF 72–75.1.1, 79–79.10.1, 294–296.  The singular goal of the IMERP—re-equipping the Iraqi Army—was to occur through salvage and

refurbishment of existing equipment, including the construction of necessary maintenance and repair facilities at Iraqi military bases.  *Id.* at FF 73-73.1.  To fulfill the mission of the IMERP, MoD engaged Wye Oak as the exclusive broker of salvage and refurbishment services, such that all efforts had to go through Wye Oak.  *Id.* at FF 51, 79.8.1.1, 80.3.1.  This resulted in the Broker Services Agreement ("BSA"), executed on August 16, 2004.  PX-005.

### 2. Conviction 20 is relevant because it shows that MoD's insertion of Zayna/GIG into the payment process and the payment to Zayna were improper.

In October 2004, Wye Oak presented three *pro forma* invoices, PX-018, pursuant to paragraph 5(b) of the Broker Services Agreement ("BSA") for payment of initial costs and as advances to enable an immediate "ramp up" of Wye Oak's business model for performing the contract. *See* PX-005.4 (BSA).  These invoices totaled $24,714,697.15, and included sums for the refurbishment of T55 and T72 tanks.  At a meeting attended by Wye Oak on October 19, 2004, MoD officials told Wye Oak that they were committed to paying Wye Oak the amounts of the invoices.  FF 98–99.8.  However, the MoD officials present had other plans.

MoD had earlier demanded that Wye Oak involve a middleman in the payment process – Raymond Zayna – ostensibly for the purpose of providing bank guarantees for potential repayment of moneys advanced, *see* FF 218.6–218.6.1, 221.3, 403.4–403.5 (there is no evidence that any such bank guaranties were actually provided) and, pursuant to this demand from the MoD officials, Wye Oak had granted to Zayna a limited power of attorney "to arrange financing and the [sic] request bank guarantees for and on behalf of the Wye Oak Iraqi Military Equipment Recovery Program ("IMERP Contract")."  PX-013.  When Wye Oak president Dale Stoffel arrived at the October 19, 2004, meeting, Zayna was already there, meeting alone and ahead of time with senior MoD officials Ziad Cattan, Bruska Shaways and Sawsan Jasim, FF 99–99.4, the same three

officials whose ultimate convictions are recited in Case Number 20. We now know that the conspirators were plotting the Contract for Financial Agreement under the "cover" of which they were going to defraud Wye Oak (and their own country).

Although MoD committed to paying Wye Oak at the October 19 meeting, no payment was forthcoming. Instead, on October 24, 2004, MoD concluded the CFA with Zayna's company, General Investment Group, sal, ("GIG"). PX-021. The Contract of Financial Agreement was signed by Ziad Cattan and Sawsan Jasim, both of whom had been present, with Cattan, at the October 19 meeting with Zayna. Id. Indeed, the Defendants' insistence that the CFA had been discussed on October 19 is nothing but a reflection that it was indeed "plotted" that day (and so dated), but not while Dale Stoffel was present.

Thereafter, instead of paying Wye Oak, MoD paid Zayna, personally, the sum of $24,714,697 (the amount of the Three Invoices, less fifteen cents), which sum was deposited into Zayna's personal bank account. FF 99.12–99.15. The check authorizations (and the checks) were signed by Dr. Sawsan. ECF No. 418 at 11; PX-22 (checks). None of this money was ever paid to Wye Oak. As Defendants' counsel would later explain to this Court, the MoD officials "construed the contract for financial agreement to be the contract coverage for the 24.7 million." Trial Tr. 12/17 (AM) at 65:24–66:2.

### 3. Conviction 20 is relevant because it disproves Defendants' principal defense that the payment of $24.7 million to Zayna was payment to Wye Oak.

To justify the diversion of the money, Defendants asserted as their principal defense in this case that the payment of the $24.7 million to Zayna was in fact a payment to Wye Oak (even

though Wye Oak got none of the money).[1]  However, the BSA, which required all amendments to be in writing, nowhere required Wye Oak to post bank guarantees and nowhere permitted MoD to require that moneys be paid to Wye Oak through Zayna.  FF 221.3.1.  As a result, in the absence of a written agreement from Wye Oak to amend the BSA, MoD's insistence upon Zayna's involvement was itself a fundamental breach of the BSA.

To escape the obvious breach of the BSA, Defendants then contended that the Three Invoices involved some other contract between Wye Oak and MoD, and that Wye Oak agreed to Zayna's involvement in that other contract at the October 19 meeting.  However, Defendants offered no testimony or other evidence to support its new-found version of events.  In actuality, the two persons present at the October 19 meeting who did testify in this case, both of whom were impartial, third-party witnesses, both testified that there was no discussion at all at the October 19 meeting regarding Zayna's involvement in the payment process and that, in fact, the meeting had resulted in an instruction that Wye Oak would be paid directly.  FF 99.6–99.7.

---

[1] In the same breath, Defendants also contended that Zayna was precluded from paying Wye Oak until he got further permission from MoD, which means that the payment to Zayna could not have been a payment to Wye Oak.  In particular, Defendants' filed their Rule 26 disclosure on September 16, 2013.  ECF No. 228-3.  Iraq claimed that Wye Oak was paid in full for its work when the MOD paid Mr. Zayna on October 24, 2004 and contended that Mr. Zayna was Wye Oak's "attorney-in-fact" and agent, such that payment to Mr. Zayna discharged the debt.  Iraq's R. 26 Disclosure, ECF No. 228-3 at 9.  Nevertheless, in the same document, Defendants also argued, "The deposited funds could be drawn by Wye Oak only upon the fulfilment of certain conditions precedent, including: (1) the approval of the Ministry of Defense for work actually performed. . . ."  Iraq's R. 26 Disclosure, ECF No. 228-3 at 11–12.  Because an additional approval from MoD was required before Zayna could disburse funds to Wye Oak, at best Zayna was holding the money as MoD's agent -- the payment to Zayna could not possibly have been a payment to Wye Oak.  That inherent contradiction did not, however, prevent Defendants from maintaining the defense of payment and satisfaction for nearly 10 years and forcing Wye Oak to incur vast attorney's fees and expenses in disproving it.

   **4. Conviction 20 is relevant because it shows that Cattan was criminally
   convicted for entering into the contract of financial agreement with GIG
   and for paying the $24.7 million to Zayna/GIG.**

The summary of Case Number 20 recently provided by Defendants recites that Ziad Cattan,

along with co-defendants Bruska Shaways and Sawsan Jasim, all whom were present at the

October 19 meeting, and two of whom signed the Contract of Financial Agreement with GIG, had

been prosecuted criminally because they "caused an intentional harm to the state assets and the

interest of [the MoD]" when they "concluded a financial agreement with the company General

Investment Group" and when they made a payment in the amount of $24,714,697.15–the precise

amount of the Three Invoices that were supposed to have been, but were not, paid to Wye Oak.

Thus, not only did the diversion of funds breach the Wye Oak contract, it violated Iraqi law.  As a

result, when evaluating Defendants' contention that the payment to Zayna discharged the debt to

Wye Oak, the Court should also consider that, prior to asserting this defense, these same

Defendants concluded that the transfers to Zayna/GIG were illegal and a fraudulent theft of state

assets.

   **5. As evidenced by subsequent events, Wye Oak never consented to the
   payment of Zayna.**

Following the October 19 meeting, Wye Oak complained loudly and repeatedly about

MoD's refusal to pay and its insistence upon Zayna's involvement.  Wye Oak president Dale

Stoffel complained to the American authorities overseeing IMERP that Wye Oak would quit the

project unless it was paid and different, and transparent, payment procedures were implemented.

The military authority, MNSTC-I, convened a meeting on December 5, 2004, at which Wye Oak

detailed its protests of non-payment and Zayna's possession of its funds and, as a result, additional

promises were made of direct and immediate payment to Wye Oak.  FF 104.2–104.7.  On his way

to obtain that payment on December 8, 2004, Mr. Stoffel was ambushed by gunmen and murdered.

11

Wye Oak was never paid and, tellingly, neither MoD nor Iraq ever tried to recover the money from Zayna.  FF 109.

**B.      The summary of Conviction 20 is not hearsay.**

Having been presented to the Court by the Defendants, the only potential basis for exclusion of the evidence is the hearsay rule.  However, although it is an out of court statement being offered for the truth of the matter asserted, the summary is not hearsay.  Pursuant to Federal Rule of Evidence 801(d)(2), the statement of an opposing party that "was made by the party in an individual or representative capacity" is not hearsay.  The document containing Conviction 20 has been represented by the Defendants to have been obtained from the Integrity Commission of Iraq ECF No. 430 at 1, and Ms. Muneer testified on behalf of the Defendants that the Integrity Commission is a part of the Republic of Iraq, one of the defendants in this case:

> [Mr. Leon] Is the Integrity Commission part of the Republic of Iraq?
>
> Ms. Muneer] Yeah.

Muneer Tr. 2/7/19 at 385:2–4.  Therefore, the summary of Conviction 20 is not hearsay.[2]

Because it is relevant and not excluded, the summary of Conviction 20 is admissible into evidence.

---

[2] Wye Oak is not offering, and does not ask the Court to admit into evidence, the remaining documents proffered by Defendants as having been obtained from the Integrity Commission.  To the extent relied upon by the Defendants, such documents are hearsay, and Wye Oak objects to their admission.  Wye Oak notes that its objection is not based upon any concern that the other convictions are, somehow, harmful to Wye Oak.  Indeed, many of them detail other payments for services for which Wye Oak was the exclusive broker under the BSA and which, therefore, should have been made to Wye Oak, and on which Wye Oak has a claim.  To the contrary, Wye Oak's objection is that their admission would undoubtedly unleash additional, similarly unsupported allegations and defenses by Defendants on which Wye Oak has had no discovery.  Thus, they should be excluded not only because they are hearsay but because they would produce the manifold prejudice of metastaticizing litigation.

III.   **ARTICLE 340 PROVIDES CRIMINAL PENALTIES FOR PUBLIC CORRUPTION, IS RELEVANT, AND ITS ADMISSION IS NOT CONTESTED BY THE DEFENDANTS.**

The parties have agreed that the following is a fair and accurate translation of Article 340 into English:

> **Article 340** – Any civil servant or employee appointed to public service who purposefully causes harm to the finances or interests of the organization for which he works, or with which he is connected as part of his job or to the finances of the individuals contracting with it, may receive a punishment of imprisonment not to exceed seven years.

ECF No. 406-2 at pp. 195. The actions prohibited (purposeful causation of harm by a public servant) fall squarely within the very definition of public corruption. Here, Cattan and the others were convicted of violating Article 340 by entering into the contract of financial agreement with GIG in order to use it as a "cover" for the payment to Zayna/GIG of the $24,714,679 actually owed to Wye Oak under the Three Invoices.

IV.   **THE NEW EVIDENCE ESTABLISHES THAT THE DEFENDANTS HAVE MADE REPEATED MISREPRESENTATIONS TO THE COURT, AND MUST BE CONSIDERED AS FURTHER EVIDENCE IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS.**

On March 6, 2019, Wye Oak filed a motion for sanctions predicated on Defendants' discovery abuses and misrepresentations to the Court (those that were known at the time). ECF Nos. 390. While that motion noted that the conduct detailed therein would justify a default judgment sanction, Wye Oak limited its requested sanction to certain evidentiary inferences and monetary sanctions. However, the outright and repeated lies revealed by the existence of Conviction 20 push Defendants' behavior firmly into the territory where further sanctions are mandated to properly protect Wye Oak and the integrity of this Court's process and the restoration of respect for the rules and authority of this Court.

In addition to completely undermining Defendants' principal defense, the new evidence establishes that multiple representations by Defendants to the Court during the long history of this case have been knowingly false.  In particular, Wye Oak brought this action on July 20, 2009, almost 10 years ago, ECF No. 1, and the issue of MoD corruption has been a part of the case from the beginning.  Paragraph 29 of the initial complaint alleged that

> Because of his continuing concerns regarding accountability and transparency in performance over the next three years under the contract, Stoffel was scheduled to attend a meeting on December 10, 2004 with Mr. Stuart Bowen, who held the office of Special Inspector General for Iraq Reconstruction (hereinafter "SIGIR").  The office had been created in 2004 to oversee Iraqi reconstruction programs and operations. Stoffel had been working and cooperating with Mr. Bowen since early 2004.

Verified Complaint, ECF No. 1 at ¶ 29.  (Mr. Stoffel was murdered before he could attend this meeting.).

The new evidence shows that, on March 24, 2011, Cattan, Shaways and Jassim were convicted of their crimes of using the Contract of Financial Agreement to divert Wye Oak's money to Zayna/GIG.  Obviously and necessarily, the investigation into those crimes occurred before the trial and before the conviction.  As a result, it is inescapable that, at the same time the Republic of Iraq was initially defending this case, which began in 2009, it was also investigating the potential criminal conduct of Cattan and other two officials who had been employed by MoD during the time period in which the events in this case occurred, including the very officials who had dealt with Wye Oak, the Wye Oak contract, the Contract for Financial Agreement and the actual diversion of the funds themselves.[3]

---

[3] As set forth below, Defendants have stated that some of the convictions occurred in 2007, before the Wye Oak's suit was filed.  *See* ECF No. 142 at 3.

Iraq moved to dismiss this case on March 29, 2010.  While it sought dismissal under the Foreign Sovereign Immunities Act, it previewed its ultimate defense in the case, namely that the payment of money to Zayna had been authorized and directed by Wye Oak:

> Counsel for Iraq is informed that Wye Oak's demand for IMOD direct payment of the invoices to Wye Oak ran counter to Wye Oak's general agreement with GIG and the GIG instructions to IMOD (authorized under the Wye Oak limited power of attorney) for all IMOD payments under the Broker Services Agreement to be made to GIG's bank account in Beirut for appropriate re-distribution by GIG in accordance with the general agreement between Wye Oak and GIG.

ECF No. 19 at 7.

After the denial of the motion to dismiss was affirmed on appeal (and the case was transferred to this Court), Iraq tried another argument to avoid adjudication in the United States – that the case should be tried in Iraq—in a motion to dismiss for forum *non conveniens*, filed on October 22, 2012.  At this point in time, Cattan and the others had been convicted criminally, nineteen months earlier, of having "caused an intentional harm to the state assets" by entering into the Contract of Financial Agreement with GIG and by paying the $24,714,697.15 to GIG/Zayna.[4] Despite its singular knowledge of these convictions, Iraq explained in a declaration from its counsel in this case that:

> Witnesses *familiar with the records state* that Wye Oak granted the power of attorney to Mr. Zayna and GIG specifically so that Mr. Zayna and GIG could arrange and deliver to the Ministry of Defense the necessary Bank Letter of Guaranty, and then obtain payment from Ministry of Defense in the name of and on behalf of Wye Oak. Further, with Mr. Stoffel's full knowledge, Wye Oak, GIG and the Ministry of Defense agreed that the advance payment represented by the three *pro forma* invoices were to be deposited by the Ministry of Defense at the bank appointed by Wye Oak's attorney-in-fact, Mr. Zayna and GIG[.]" *Id.* at 8.

---

[4] The summary of conviction of conviction 20 also refers to the rehabilitation of tanks for the Ministry, which was expressly within the scope of Wye Oak's exclusive contract, a part of the IMERP.  In addition, Defendants themselves contend in this case that the Contract of Financial Agreement (for which Cattan was convicted) was the mechanism through which IMERP moneys were to be paid.  *See* pages 24–25, *infra*.

Mills Decl., ECF No. 68-1 at 8 (emphasis added).[5]  Having received these representations, the Court denied the motion to dismiss for forum *non conveniens* on April 23, 2013.  ECF No. 74.

Iraq filed its answer on June 13, 2013, two years and three months after Cattan's conviction. The answer asserted the affirmative defense that Wye Oak had been paid in full on the Three Invoices by virtue of the payment to Zayna, which Iraq steadfastly asserted to have been legal and proper despite knowing full well—and despite having contended in Cattan's trial—that the payments had been illegal and improper.

Iraq served its Rule 26 Disclosures on September 16, 2013, two years and six months after Cattan's criminal conviction for having diverted the money from Wye Oak to Zayna/GIG.  Iraq's disclosure amplified its "release and payment through a separate agreement with GIG/Zayna" defense.  Iraq's Rule 26(a) Disclosures, explained that, "with Mr. Stoffel's full knowledge, Wye Oak, GIG and the Ministry of Defense agreed that the advance payment represented by the three *pro forma* invoices were to be deposited by the Ministry of Defense at the bank appointed by Wye Oak's attorney-in-fact, Mr. Zayna and GIG" (at 11), and that:

> B. Under Iraqi law, the Ministry of Defense fulfilled its payment obligation under this financing arrangement by depositing the full amount of these funds in an agreed upon bank, to be drawn upon when due and upon proper documentation, which deposit, under Iraqi law, constituted full payment (against security) of the *pro forma* invoices.
>
> C. Under Iraqi law, the Ministry thereby fulfilled – and did not breach – its payment obligations under the IMERP program.

ECF 228-3, at 12-13.  In other words, as later argued by Defendants' counsel at trial, the MoD officials "construed the contract for financial agreement to be the contract coverage for the 24.7 million."  Trial Tr. 12/17 (AM) at 65:24–66:2.  More importantly, the disclosures admitted that

---

[5] No evidence was ever produced by Defendants that bank guarantees were ever provided or ever existed.

the payments due to Wye Oak under the Three Invoices were part of the IMERP program, and it

is also apparent the argument set forth above would have been the same argument advanced by the

officials in defense of the charges of corruption—defenses rejected by the Iraqi courts.

On December 5, 2013, Wye Oak served its First Request for Production of Documents,

seeking, inter alia, numerous categories of documents relating to the conduct of the MoD officials

with whom Wye Oak had dealt:

> # 7 – documents re suspected corruption at MoD;
>
> #8 – documents re suspected corrupt activities of Bruska Shaways;
>
> #9 – documents re suspected corrupt activities of Ziad al-Cattan;
>
> #10 – documents re corrupt activities of others; and
>
> #24 – all documents referring or relating to Zayna, Shaways, Hazim al-Shaalan (Minister of Defense at the time of the BSA) Ziad Kattan, or Dale C. Stoffel.

ECF No. 87-1 at 7.  Refusing to produce any documents at all, Iraq responded that the documents

were "irrelevant to the claims and defenses asserted in this action."  ECF No. 87-3 at 3–4.

Not content with this non-response, on February 26, 2014, Wye Oak moved to compel

production of the documents requested.  ECF No. 87.  In its opposition, ECF No. 91, Iraq

acknowledged that both Cattan and Shaways had been convicted of crimes involving public

corruption, but ***asserted that none of those charges and convictions arose from the IMERP, and***

***that none of them implicated GIG***:

> Iraq acknowledges that both former Secretary General of the Ministry of Defense of the Republic of Iraq, Bruska Shaways, and former Ministry of Defense official Ziad Kattan [Ziad Cattan] were involved in the IMERP, and that both were formally charged with public corruption, both have absconded, and both were convicted of those crimes in absentia. **Iraq can and will produce those public record documents**.[6] However, **Iraq's United States counsel understands that none of**

---

[6] These promised documents were never provided in discovery.

> those charges and convictions arose from the IMERP, and none implicate non-party General Investment Group s.a.l., Beirut, Lebanon ("GIG").

Defs' Opp. to Mot. To Compel, ECF No. 91 at 11–12 (emphasis added).  Based upon this allegation, the Court denied Wye Oak's motion to compel.  However, it is now abundantly clear that these statements were false, and known to be false, when made.

During this time, Iraq moved repeatedly to stay the case, usually based upon contentions that civil strife within Iraq prevented its Iraqi and American lawyers from being able to gather documents and evidence.  ECF Nos. 85, 109, 119.  The Court granted each stay.  ECF Nos. 99, 116, and 137.  On March 8, 2014, Iraq began filing status reports to justify continuation of the stays.

On March 5, 2015, Wye Oak amended the complaint to add the Ministry of Defense as a Defendant.  ECF No. 122 (March 5, 2015).  MoD Answered the First Amended Complaint ("FAC") on April 29, 2015, ECF No. 129, and the Republic of Iraq Answered the First Amended Complaint on August 14, 2015, ECF No. 139.  Both Iraq and MoD asserted several affirmative defenses, including the now-familiar contention that Wye Oak had been paid in full when MoD paid Zayna and that MOD properly paid Mr. Zayna to complete Wye Oak's work because Wye Oak "abandoned" it.  (MOD Ans. To FAC, ECF No. 129 at 10; Iraq Ans. To FAC, ECF No. 139 at 14)

On July 31, 2015, the Court announced that further stays were unlikely, ECF No. 137 at 3, and on August 20, 2015, ordered discovery to be complete by August 1, 2016, ECF No. 141.  Less than a month later, Iraq filed its Ninth Status Report, advancing a new rationale for continued delays:  Defendants now asserted that files, including the IMERP program file, had been stolen by Ziad Cattan, Bruska Shaways, and/or Hazim al-Shalan:

> In 2005, certain contract files (apparently including the IMERP contract file) were removed from the MoD nearly simultaneously with the resignation from office of

18

then-Minister of Defense Hazim al-Shaalan (who left office in May 2005), MoD
Chief of Procurement Ziad Cattan (who left office in 2005), and MoD Secretary
General Bruska Noori Shaways (who also left office in 2005)

ECF No. 142 at 3. Defendants' continued to deny that the convictions involved the IMERP

contract:

> Al-Shaalan, Cattan and Shaways were charged, _tried in absentia and convicted of_
> _corruption in 2007_ by the Iraq Commission on Public Integrity. _None of the_
> _corruption charges involved the IMERP contract._ United States counsel for
> Defendants is endeavoring to obtain the publicly-available records of the charges
> and convictions (which are in Arabic). Upon United States counsel for Defendants
> receiving such documents (which are expected to be received within the next 60-
> 90 days), the documents will be produced to Plaintiff.[7]

_Id._ (emphasis added). Unlike earlier statements, there was no qualifier that "counsel is informed

that…" At the time these statements were made, Defendants were well aware that the 2011

convictions of Cattan, Shaways and Jassim had been based upon corruption charges specifically

involving the IMERP contract.

Still not content with Defendants' representations, Wye Oak served additional discovery

upon both MoD and the Republic on November 2, 2015, seeking to learn whether any

investigations had occurred regarding corruption involving the IMERP and, if so, details of those

investigations. This time, Defendants did not respond at all within the time limits imposed by the

rules but, instead, engaged in a number of delay tactics, postponing their response until December

12, 2017, more than two years after service of the requests. At the time Wye Oak served the

requests, throughout the two year delay in responding, and at the time they finally did respond,

Defendants knew that the criminal convictions of Cattan and others had in fact involved the

IMERP project, and specifically involved the money that was supposed to have been paid to Wye

---

[7] This second promise to provide the publicly available documents was <u>never</u> fulfilled.

Oak but which, instead, was paid to GIG/Zayna.  Nevertheless, both Defendants categorically denied those facts.

MOD denied the facts, supported by a declaration, under penalty of perjury, executed by Ali Talib, whose title is Senior Legal Advisor, Ministry of Defense of the Republic of Iraq:

**INTERROGATORY NO. 7:**

Identify any current or former authorized representative of IMOD with knowledge of any corruption within, relating or connected to the IMERP. For each such individual, specifically identify the particular areas of knowledge relating to corruption within, relating or connected to the IMERP.

**Answer**

**MoD does not know of any current or former authorized representative of IMOD with knowledge of corruption within, relating or connected to the IMERP.**

**INTERROGATORY NO. 8:**

Identify whether any internal Iraqi and/or IMOD investigations into suspected corruption within and/or related to the IMERP were conducted.

**Answer**

**MoD does not know of any internal Iraqi and/or IMOD investigations into suspected corruption within and/or related to the IMERP.**

**INTERROGATORY NO. 9:**

If the answer to Interrogatory 8 above is in the affirmative, identify those responsible for conducting the investigation(s), including any individuals participating in the investigations and convictions of IMOD officials referred to in paragraphs 1.(B)(2) and (3), p. 3, of Document # 142, filed by the Defendant Republic of Iraq in this action, and entitled "Defendant's Ninth Status Report."

**Answer**

By the terms of Interrogatory No. 9, no answer to Interrogatory No. 9 is required to be given. (Interrogatory 9 states that an affirmative answer to Interrogatory No. 8

is a prerequisite to MoD answering Interrogatory No. 9. MoD has not answered Interrogatory No. 8. in the affirmative.)

MoD Resp. to 1st Interrogs., ECF No. 228-6 at 21–22 (emphasis added).  The Republic of Iraq's responses were, essentially, carbon copies of MoD's responses, and were supported by a declaration under penalty of perjury by Ms. Wafaa S. Muneer, whose title is Senior Manager of Foreign Litigation, Legal Department, Ministry of Justice, Republic of Iraq, and testified that she has been in charge of responding to discovery in this case since 2012 (ECF No. 418-6, Muneer Trial Dep 03/06/19 at 168:18–169:10):

> **INTERROGATORY NO. 7:** Identify any current or former authorized representative of Iraq with knowledge of any corruption within, relating or connected to the IMERP. For each such individual, specifically identify the particular areas of knowledge relating to corruption within, relating or connected to the IMERP.
>
> **Answer**
>
> **Iraq does not know of any current or former authorized representative of Iraq with knowledge of any corruption within, relating or connected to the IMERP.**
>
> **INTERROGATORY NO. 8**: Identify whether any internal Iraqi and/or IMOD investigations into suspected corruption within and/or related to the IMERP were conducted.
>
> **Answer**
>
> **Iraq does not know of any internal Iraqi investigations into suspected corruption within and/or related to the IMERP.** According to the Defendant MoD's corresponding Interrogatory Answers to Plaintiff Wye Oak and well as documents according to the documents produced by Defendants MoD and Iraq in response to Plaintiff's Requests for Documents, Iraq further answers as follows: Iraq does not know of any internal IMOD investigations into suspected corruption within and/or related to the IMERP.
>
> **INTERROGATORY NO. 9:**  If the answer to Interrogatory 8 above is in the affirmative, identify those responsible for conducting the investigation(s), including any individuals participating in the investigations and convictions of IMOD officials referred to in paragraphs 1.(B)(2) and (3), p. 3, of Document # 142, filed by the Defendant Republic of Iraq in this action, and entitled "Defendant's Ninth Status Report."

**Answer**

By the terms of Interrogatory No. 9, no answer to Interrogatory No. 9 is required to be given. (Interrogatory 9 states that an affirmative answer to Interrogatory No. 8 is a prerequisite to MoD answering Interrogatory No. 9. MoD has not answered Interrogatory No. 8. in the affirmative.)

Iraq Resp. to 1st Interrogs., ECF No. 228-4 at 27–28.

These sworn interrogatory answers denying any investigation or prosecution of corruption involving the IMERP program cannot be reconciled with the criminal convictions of Cattan and others set forth in the summary of Case #20, which records both investigations and convictions regarding corruption in the IMERP. Both Mr. Talib and Ms. Muneer testified in this case, and in light of the outright falsehoods in the interrogatory answers, no credibility can be ascribed to them and they should be reported to the United States Attorney for indictment for perjury.

Similar false responses were given to the document requests, which Defendants answered on December 13, 2017:

**REQUEST NO. 7:** Produce any and all notes, emails, memoranda, reports, notices, alerts or other internal Iraqi documents relating to suspected corruption within the MOD from January 2004 through January 2006.

…

Objecting further specifically:

A. **MoD does not know of any suspected corruption within, relating or connected to the IMERP**. *See* MOD Answer to Interrogatory No. 8.

B. **Iraq does not know of any suspected corruption within, relating or connected to the IMERP**.

**REQUEST NO. 8:** Produce any and all notes, emails, memoranda, reports or other internal Iraqi documents relating to the suspected corrupt activities of former Secretary General of the Ministry of Defense of the Republic of Iraq, Bruska Shaways.

**Response:**

The investigative files of the Iraqi criminal investigative authorities and the Iraqi court records with respect to the prosecution of Bruska Shaways are withheld

subject to the specific objections to this Request [which incorporated by reference the specific objections to "Request No. 7., above"]

**REQUEST NO. 9:** Produce any and all notes, emails, memoranda, reports or other internal Iraqi documents relating to the suspected corrupt activities of former MOD officer Ziad Kattan (Cattan).

**Response:**

The investigative files of the Iraqi criminal investigative authorities and the Iraqi court records with respect to the prosecution of Ziad Cattan are withheld subject to the specific objections to this Request [which incorporated by reference the specific objections to "Request No. 7., above"].

**REQUEST NO. 10:** Produce any and all internal Iraqi documents related to the suspected corrupt activities of any and all current and former Iraqi officers, employees and/or any official representatives of the Iraqi government which may, in any way, directly or indirectly be connected to any and all activities of GIG.

**Response:**

**Iraq does not possess or control any documents responsive to this Request.**

ECF No. 228-8 at 6–7; ECF No. 228-13 at 11–12. The recent production by Defendants discloses that investigations did occur regarding corruption related to the IMERP and corruption related to GIG. These prior representations were false, and known to be false, when made.

In their cross motion for Summary Judgment, filed July 16, 2018, Defendants' continued with their fraudulent defense:

At a meeting at the Ministry of Defense in Baghdad on October 19, 2004 . . . all parties concerned reached the following agreement: at the direction of Wye Oak, MoD would pay the Three Wye Oak Invoices after Raymond Zayna/GIG presented MoD with a bank guarantee acceptable to MoD to secure the payment to Wye Oak. . . . The bank guarantee was a condition precedent to MoD paying the Three Invoices. . . . At the October 19, 2004 meeting, Dale Stoffel consented to this specific payment mechanism. . . .

Defs' Cross Mot. for SMJ, ECF No. 242/244 at 9–10. Defendants asserted that Mr. Stoffel's agreement derived from fact that he did not object to the procedure at the meeting. Id. However,

based upon the testimony of those present, Mr. Stoffel's "non-objection" occurred because the procedure was not actually discussed when he was present at the meeting and there was, therefore, nothing to which he could object.  ECF No. 416 at FF 99.11.

Defendants conceded that MoD and GIG entered into the contract of financial agreement separate and apart from Wye Oak, and that Wye Oak was not a party to such agreement, but presented it as a legal and legitimate basis for the payment to GIG/Zayna, rather than Wye Oak*, even though Defendants knew that Cattan had been convicted for this very contract and payment*:

- "After Wye Oak's approval, MoD proceeded to enter into a Financial Services Agreement with GIG, by which the "First Party [MoD] gives to Second Party [GIG/Zayna] several payments under the bank guarantees as far as the amount of such payments for purpose of implementation of the contract."

- "Subsequently, the MoD Budget and Programming Division processed the Three Wye Oak Pro Forma Invoices for payment by three MoD checks drawn on Rafidain Bank, each in the exact amount of the corresponding Wye Oak Proforma Invoice, and each made payable to Raymond Zayna."

Defs' Cross Mot. for SMJ, ECF No. 242/244 at 11.

By the time trial commenced in December 2018, Defendants still had not provided any information to Wye Oak or to the Court about investigations into corruption involving the IMERP contract or whether that corruption involved Zayna/GIG, nor had they provided any information as to the convictions, nor had they abandoned their defense of payment and satisfaction which relied on the legitimate payment to Mr. Zayna of Wye Oak's invoices.

During hearings and trial, the Court asked counsel for both parties for information related to the charges against Messrs. Shaways, Cattan, and al-Shalan.  *See* Trial Tr. 12/17/18 (AM) at 42:18–21.  The Court was clearly troubled with regard to the basis of payments to Mr. Zayna and how they fit into Wye Oak's contractual scheme.

THE COURT: What was the basis for the payment to Zayna then, the 24 point, whatever million.

MR. MILLS: I'll be happy to get into that in a moment.

THE COURT: Okay.

MR. MILLS: Okay. So we come now to the Wye Oak and the MOD meeting. And it was asked at the meeting, the Ministry of Defense said at the meeting we want a bank guaranty. And it turns out that the way the bank guaranty was structured was that the 24.7 million had to be paid. And that would then activate the bank guaranty. That's in the contract for financial agreement. You can see it. And in that meeting, the testimony of Mr. Marr is that this was discussed, meaning the providing of a bank guaranty and payments to Mr. Zayna were discussed in the meeting.

.        .        .

THE COURT: No, but my question went to, if the BSA didn't require payment for the construction, what was the 24 point –

MR. MILLS: No, the 24 million was for the direct work under the --

THE COURT: Under what contract?

MR. MILLS: I'm sorry?

THE COURT: Under what contract?

MR. MILLS: **Well, you can see that the MOD construed that that was done under the contract for financial agreement. They construed the contract for financial agreement to be the contract coverage for the 24.7 million.**

THE COURT: I don't understand that.

MR. MILLS: **The MOD construed that they were making the payment under the contract for financial agreement. The contract for financial agreement because of the simultaneous approval of the invoices and the financial arrangement incorporated the scope of work under the three invoices.**

THE COURT: Go ahead.

MR. MILLS: In any event, after the 24.7 million was paid by MOD to GIG and Raymond Zayna, Wye Oak began the work on the three -- covered by the three invoices."

Trial Tr. 12/17 (AM) 64:9–23, 65:16–66:12 (emphasis added).  When Defendants' lawyer made

these statements, Defendants knew that Cattan had been criminally convicted for making this very

payment to Zayna/GIG under this very Contract for Financial Agreement.  Indeed, Mr. Mills

almost quotes the summary of the conviction even though he claims not to have received it until late May 2019.

During the trial, in February 2019, Wye Oak took the *de bene esse* depositions of Defendants' only two trial witnesses, Ali Talib and Wafaa Muneer.  Almost inconceivably, even though Defendants had predicated their entire defense of upon the October 19 meeting in Shaways' office, and the Contract of Financial Agreement signed by Cattan, Ms. Muneer, who was the person in charge of document collection for Iraq, testified that she did not know who Shaways, Cattan, or al-Shalan even were, despite the fact that she signed interrogatory responses noting that they were individuals with relevant information (*see* ECF No. 228-4) or that she was in charge of document recovery for the Republic, whose RFP responses recited that one or more of these individuals allegedly absconded with relevant discovery (*see* ECF No. 228-8 at RFPs. 7–10).  ECF No. 418-7, Muneer 2/7/19 Tr. at 291:9–292:2.  Ms. Muneer professed to be unaware that any of these individuals had ever been convicted of a crime.  *Id.*

Ms. Muneer also testified that she never looked for such documents and claimed that she had told Mr. Mills that, "issues related to corruption are in the purview and in the possession of criminal authorities and court authorities that we have no material to provide in that regard."  *Id.* at 293:21–294:2.  She went on to claim that she did not ask the criminal prosecutors for any documents because they were "confidential." *Id.* at 294:9–15.  Nor did she ask the Integrity Commission for any documents and she testified she did not know if they possessed any documents about investigations in to the 2004/05 fraud at the MOD.  *Id.* at 357:19-358:5.  Instead of asking for such materials, which Ms. Muneer testified she did not even know was a subject for which she was responsible for collecting documents, Ms. Muneer asserted at her February 7, 2019, deposition

that such materials would not have been turned over even if asked for because they were "confidential and secret." *Id.* at 360:2–3.

During the *de bene esse* depositions, Wye Oak learned that the witnesses had brought documents with them, which Wye Oak demanded and the Defendants' then turned over only after the Court's involvement.   One of these documents was an internal memorandum regarding Defendants' discovery obligations, one portion of which indicated that Defendants' counsel had been given documents regarding Cattan's, Shaways', and al-Shalan's convictions years before but never turned them over to Wye Oak.  *See discussion*, Wye Oak Mot. For Sanctions, ECF No. 390 at 30–31 (citing ECF No. 390-3 at pp. 6–7).  (TALIB0000238–9)).  Specifically, the English translation shows:

Request No. 7

Provide any and all comments, emails, memoranda, reports, notices and other internal Iraqi documents relating to the suspicions in respect of the occurrence of corruption at the Ministry of Defense for the period from January 2004 until January 2006.

[handwritten: Response: The decisions issued by the criminal courts, which issued sentences of conviction in respect of employees at the Ministry of Defense in cases of administrative and financial corruption, have been previously provided.]

That same document demonstrated that Iraq had failed to turn over other responsive documents even though they had been provided to counsel.  *See discussion*, Wye Oak Mot. For Sanctions, ECF No. 390 at 30–31 (citing ECF No. 390-3 at pp. 6–7 (TALIB0000238–9)).

2- Any court records about criminal procedures against previous officials at the Ministry of Defense that were declared. Please provide these records once again to Mr. Miles.

- [handwritten: Judgments issued were previously provided]

Another indicated that the documents relating to the criminal investigation of Ziad al-Qattan "are no longer subject to the objections in respect of this request:"

Request No. 9

Provide any and all comments, emails, memoranda, reports, notices and other internal Iraqi documents relating to the suspicions in respect of the occurrence of corruption by the former official at the Ministry of Defense in the Republic of Iraq, Ziad al-Qattan

Iraq's Response

The files of the investigation committee at the criminal investigation authorities and the records of the Iraqi courts with regard to the Ziad al-Qattan claims are no longer subject to the objections in respect of this request.

Follow-up Procedures

The same as for Request No. 7

ECF No. 390-3 at 7.  Despite the removal of the objection, no documents had been provided to Wye Oak.

Had it not been for this fortuitous discovery, which was ordered by the Court during a teleconference in the middle of *de bene esse* depositions, it is likely that the Court and Wye Oak would still be in the dark about the exact circumstances of Mr. Cattan's conviction.  Instead, Wye Oak was able to present evidence of missing documents during the San Antonio portion of the trial.  After hearing Mr. Talib and Ms. Muneer's testimony, the Court voiced concern.

> THE COURT: I am a little troubled though, Mr. Mills, I will say, by the testimony that was played from Miss Muneer [sic, it was actually Mr. Talib] about -- I don't know exactly where that testimony was, but the idea that how it came about in that playing of that video where it was said that the convictions of those ministry officials had been previously sent to Washington. And I think that there's never been any production by the defendants of those convictions. I've never seen anyway, any evidence of who was actually convicted and of what. So why was that person saying he had previously sent those to Washington, but I've never seen them? Do you know?
>
> MR. MILLS: Your Honor, I would have to investigate that.
>
> THE COURT: Okay. I'm very interested in knowing if we know who was actually convicted and of what. And somebody on that tape today said that it had been sent to Washington and I've never seen it. I don't know if anybody else has, but --

MR. LEON: Your Honor, it was actually, just so your Honor is clear, the source of that, when we were publishing documents to the Court before Mrs. Muneer testified, one of the documents that we received after the close of those two *de bene esse* documents was an English translation of an internal document that appeared to have been authored by Mr. Talib.

THE COURT: That's where I saw that?

MR. LEON: Yes. And there was a list of things and he said "previously provided."

THE COURT: Previously provided?

MR. LEON: Right. 2017.

THE COURT: If it was previously provided, who was it provided to?

MR. LEON: There is a reference directly to Mr. Mills' name in the document. We don't have it in evidence.

MR. SNEAD: It's in the record. It's in the court's file.

MR. LEON: Yeah, because it's attached to the sanctions motion. But, your Honor, just so the Court is aware, you know, that last second document dump, we're still kind of going through it because there was some translational delays. The other thing is there was a lot of privilege claims, which we just have not had a chance to resolve. So it may be that if we -- your Honor, if we can't get some agreement and we think there is something to move on, we may have to do that.

.       .       .

THE COURT: I still am very interested and would even consider reopening the record if there is any evidence of who was actually convicted and of what. I think it would be of interest to the Court to know, particularly if it was these particular people.

MR. MILLS: Your Honor, I've taken note of that, and I will act on it very promptly.

THE COURT: Because I was surprised to see somebody say that they had already sent it to Washington.

MR. MILLS: And, your Honor, I don't rely on my recollection on things in years past, or even a month past, because I may be at that age of overload, overload by years if not by work, and so therefore I need to investigate, but I will investigate and will respond to the Court and to counsel.

Trial Tr. 3/08/19 at 49:14–51:24.

Despite all of the foregoing and their certain knowledge, for eight years, that their repeated assertions concerning the bases of the convictions were false, on April 16, 2019, Defendants filed a Corrected Opposition to [Plaintiff's] Motion for Sanctions, continuing, under penalty of perjury pursuant to an attached declaration, to assert that the convictions had nothing to do with the IMERP program.  Defendants stated:

> Defendants respond to the Court's concern and interest in being made aware of:
>
> (1) the publicly-available court records of the criminal and supporting charges imposed on certain former Ministry of Defense officials <u>who Wye Oak claims (without evidence) engaged in corrupt activity involving the IMERP program</u>; and

ECF No. 408 at 2–3 (emphasis added).  In connection with Defendants' Opposition, they filed a declaration of Ms. Muneer dated April 12, 2019.  In it, she avers:

- She has received and read Wye Oak's Motion for Sanctions (which contends that Iraq's defense of payment was fraudulent because of the convictions of Cattan et al.)

- **"There is no indication that the court charges brought against [Cattan et al.] involved any aspect of the Wye Oak program, or involved Raymond Zayna or GIG."**

- She attaches "publicly available documents concerning court proceedings [against those persons]"

ECF No. 406-2 at ¶¶ 3, 9 (emphasis added).  But **the attached documents *did not* include Conviction No. 20**, which plainly concerns IMERP and the corrupt payment to GIG/Zayna of monies owed to Wye Oak.  There can be but one conclusion: her concealment of Case #20 was intentional.  It simply cannot be squared with what Defendants turned over in June 2019, namely the extradition request that shows Conviction # 20.  Moreover, it cannot be squared with the publicly available documents Professor Mallat was able to uncover that also detail the convictions of Cattan, Shaways, and Sawsan related to rehabilitation contracts concluded between MoD and GIG.  *See* Ex. C, C. Mallat 4th Rpt. at pp. 25–26.

Finally, on June 13, 2019, nearly a decade after suit was filed, Defendants furnished to the Court and to Wye Oak selected records relating to the criminal convictions (information the Defendants had had since at least 2011), which revealed that the convictions were for making payments of the three Wye Oak IMERP invoices to Zayna under the Contract for Financial Agreement.  ECF No. 430 at 21 (summary of Conviction No. 20).  Defendants' provided a new translation on July 2, 2019.  ECF No. 436.  It reads:

> Summary of case number 20
>
> Name: Ziyad Tariq Abdallah Salih Al Qattan
>
> Case number (34/CR3/2011)
>
> In 2004, convicted fugitive Ziyad Tariq Abdallah Al Qattan, when he was working as the Deputy Secretary-General at the Ministry of Defense, in conjunction with the defendants Bruska Nouri Sadeeq and Sawsan Jasim Mohamed when they were working at the Ministry of Defense, concluded a financial agreement with the General Investment Group (GIG) Company to finance a Ukrainian company tasked with the rehabilitation of tanks for the Ministry. Failure to follow the legal procedures for contracting caused intentional harm to the state assets and to the interest of the entity for which he was working. An amount of four million dollars was paid for the maintenance of tanks type (T72). **There was a second payment valued at (twenty-four million and seven hundred fourteen thousand and six hundred ninety-seven dollars and fifteen cents) for the maintenance of tanks type (T55).** The evidence collected against him is: the statement of the legal representative, the report by the Financial Oversight Board, the administrative investigation, transcripts, and case documents. He was convicted by the Al Rasafa Criminal Court, the specialist in integrity cases, and he was sentenced in absentia to seven years in prison, pursuant to article (340) of the Criminal Penalties Code, on 24/3/2011 in case number (34/CR3/2011).

Defendants' just-filed documents show that the Government of Iraq has known, since at least 2011, that at least three of the officials from MoD involved in the IMERP contract, including Messrs. Shaways and Cattan and Dr. Sawsan, corruptly transferred money to GIG through Mr. Zayna using the "cover" of the Contract for Financial Agreement.  An Iraqi court could not have procured such a conviction without the knowledge or cooperation of the Iraqi Ministry of Defense or the Iraqi Ministry of Justice.  By hiding these files, Defendants not only defaulted on

their litigation obligations, but have cost Wye Oak and the Court thousands of attorney hours and millions of dollars in needless litigation over an issue that should never have been asserted.

Defendants not only failed to inform Wye Oak or the Court that these senior MoD officers were convicted for fraud related to GIG and the Wye Oak contract, they actively denied that the convictions had anything to do with IMERP.   Republic of Iraq Resp. to 1st RFP, ECF 228-8 at RFPs. 7–10; MoD Resp. to 1st RFP, ECF 228-13 at RFPs. 7–10 (Mr. Shaways and Mr. Ziad Cattan "were prosecuted in Iraqi criminal courts in absentia for criminal acts ***committed while in office that do not relate to the IMERP***.") (emphasis added)). Both Defendants denied, in a sworn interrogatory responses, any knowledge about corruption or even knowledge of investigations into such corruption related to IMERP. *See* Iraq Resp. to 1st Interrogs., ECF No. 228-4 at 27–28; MoD Resp. to 1st Interrogs., ECF No. 228-6 at 21–22.

Beyond the fact of these obvious false statements, Defendants' long-maintained defense that Wye Oak was paid when MoD paid Mr. Zayna is also clearly a lie.   The summary of Mr. Cattan's conviction lays bare the truth of the testimony the Court heard from Wye Oak's witnesses: the payments to Mr. Zayna and GIG were fraudulent.  Mr. Zayna's attempted usurpation of Wye Oak's contract was fraudulent.  And, most important, the maintenance of this false defense was a fraud on the Court and Wye Oak.

What's more, the conviction summary shows that Mr. Zayna received an additional $4 million for rehabilitation of T-72 tanks. That four million should have gone to Wye Oak because of its exclusive right to perform such work.  The conviction summary serves as an admission that Wye Oak's damages should be $4 million more (plus appropriate interest) than stated in Dr. Gale's damages calculation.

And, most important, the conviction summary provides irrefutable proof that, under Iraqi law, the Court can, and should, grant supplemental damages that will "render full justice on the merits" and will make Wye Oak whole.

## V.     THE MALLAT OPINION AND THE NEW EVIDENCE.

The Court has previously accepted Professor Chibli Mallat as an expert on Iraqi law, and he has provided testimony as to what an Iraqi court would do when presented with certain facts and evidence.  Prof. Mallat explained in his previous testimony that there exist three potential impediments to the Court's being able to "render full justice on the merits" and to make Wye Oak whole: (1) the provision for prejudgment interest at the unrealistically low rate of 6%; (2) running prejudgment interest from the date of suit rather than the date of breach, which results in Wye Oak receiving no compensation for Iraq's breach of contract for four and one-half years; and (3) the potential that compounded prejudgment interest does not apply, thereby depriving Wye Oak of a financial benefit it would have enjoyed if the contract had not been breached. ECF No. 416 at FF 391–391.1.  Prof. Mallat also opined that, on the facts of this case, an Iraqi court would find that Iraq's conduct in this case—both in connection with the fraudulent nature of the breach of contract and also in connection with Iraq's delays and fraudulent discovery violations – entitles Wye Oak to enhanced compensation to make it whole. *Id*. at CL 123–128.

Now that the knowingly fraudulent nature of Iraq's principal defense has been laid bare by the record of convictions in Case Number 20, Prof. Mallat has offered a supplemental report with respect to this new evidence, attached as Exhibit C.  His new report also attached records that he was able to retrieve from the Court in Baghdad that provide some additional evidence regarding Conviction Summary 20.  (The Court should note that Conviction Summary 20 was created as part of an extradition request; Defendants did not provide the original court documents related to the

conviction).  In his new report, Prof. Mallatt first recalls the basic principle of Iraqi law: "As a reminder, the principle under Art. 173.2 is that the judge may decide enhanced payment of compensation in case of fraud or gross error, regardless of the [restrictions on compensation enumerated above]."  Ex. C, C. Mallat 4th Rpt. at ¶2.  As to the convictions at issue, he reasons:

> The first conviction "refers to the contract dated 25.10.2004.  This is the GIG-MoD Financial Services Contract, resulting in the payment of $24,714,679.15, wrongfully and illegally under Iraqi law, to GIG/Mr. Zayna.  It led to the criminal conviction of the three MoD officials who are party to the contract. The decision [of this case and of the second case Prof. Mallat cites] show clearly that the MoD knew of the IMERP contract and GIG, in contradiction with various statements in the course of the US trial.  Moreover . . . the legal representative of the MoD was in all likelihood at the forefront of the prosecution.  . . .   There are also several investigative reports in the docket which the decisions are based on, and they are naturally available to MoD [but which MoD denied having], which can be used to recoup part or all of the expenses and damages occasioned to MoD by various parties [but which MoD has never pursued]."

*Id.* at ¶2.1.

As a result, Prof. Mallatt concludes that these facts mandate the application of Art. 173.2 to grant enhanced compensation to do justice on the merits and to make Wye Oak whole:

> In CM 1 [C. Mallat First Rpt. 1, PX-115], I argued, inter alia, that Mr. Zayna or GIG, who were not party to a contract with MoD, could not receive money under the IMERP for a contract between MoD and Wye Oak.  [The first decision my office was able to find and which is attached to my Fourth Report] condemns MoD officials for illegal payment to GIG.  In CM2 [C. Mallat 2d Rpt., PX-116], I argued, inter alia, that the main problem of the MoD argument [its "defense of payment"] was that payment was made to the wrong person, Mr. Zayna/GIG for a contract between MoD and Wye Oak, and that the absence of [a] claim to get it back from Mr. Zayna, is characteristic of an egregious fault.  In CM3 [C. Mallat Third Rpt. PX-115], I argued principally that Art. 173.2 of the Civil Code was enacted precisely for a situation where the wrong person was paid, and the example given from the civil law scholarship was the wrong payment to the notary-public as an example of gross fault.  [The three convictions my office was able to find and which are attached to my Fourth Report] underline the gross fault from a criminal perspective. . . .   This is an accumulation of fraudulent/gross fault acts which an Iraqi civil judge would no doubt apply in his discretion to punish under Art. 173.2 of the Civil Code."

*Id.* at ¶¶2.10, 2.11, and 2.12.  Further, Prof. Mallatt concludes:

> [In the second conviction], the court specifically allow[s] MoD to go after the three criminals for civil compensation.  This opens up the possibility for MoD to also go after GIG, more specifically to Mr. Zayna since the illegal payment was made personally to him.  The court specifically "ruled to keep the right of the plaintiff [MoD] to request compensation before the civil courts after the decision is final."  This is a clear response in the affirmative to [the] question [whether Messrs. Quattan, Shaways, Jasim and Zayna engaged in a criminal conspiracy under Iraqi law].

*Id.* at ¶2.5.

Wye Oak only requests that the Court enter judgment in an amount that makes Wye Oak whole and renders full justice on the merits of plaintiff's cause of action.  In that connection, all the evidence in the case, including the unrebutted testimony of Dr. Gale and Prof. Mallat, demonstrates that augmented damages in the amount of $1,206,399,244 (including compound interest of 17.11% calculated from the date of the breach, 10/28/2004, to Augusts 31, 2019) are necessary to render Wye Oak whole from the time of breach to the time of judgment.

## VI.   SPECIFIC ACTION IS NEEDED TO "RENDER FULL JUSTICE ON THE MERITS" AND MAKE WYE OAK WHOLE.

Defendants have not been content just to refuse to perform their obligations under Wye Oak's contract, steal Wye Oak's money, and to be complicit in the murder of Wye Oak's president, Dale Stoffel.  In the ten years in which this case has been pending, Defendants have set out to inflict additional injury upon Wye Oak, and have thumbed their nose at the authority and processes of this Court by unabashedly engaging in lies and deceit.  Such bad faith behavior must have consequences.

### A.   The Court Must Strike Defendants' Defenses and Grant Judgment to Wye Oak in the full amount proved by Dr. Gale (*See* Sanctions Motion, ECF No. 390 and Reply in Support at ECF No. 419).

In the Sanctions Motion, ECF 390, Wye Oak explained why all of the Defendants' defenses should be stricken.  The concealment of the convictions of Cattan and others, coupled with the outright lies that none of the convictions involved the IMERP or implicated GIG, when the

convictions recited in Case # 20 plainly did both, demonstrate that the discovery violations have been intentional.  As a consequence, all of the Defendants' defenses (and there are none with any actual evidentiary support) must be stricken.

**B.      The Court must make all adverse inferences urged by Wye Oak (See Sanctions Motion, ECF No. 390 and Reply in Support at ECF No. 419).**

In the Sanctions Motion, ECF 390, Wye Oak explained further why all adverse inferences urged by Wye Oak must be made.  The conduct described above is additional evidence of the misconduct requiring application of the adverse inferences.

**C.      The Court must enter judgment in Wye Oak's favor on its Sanctions motion under Rule 37 and/or the Court's inherent powers, with the same findings and the same remedy as on the merits (*See* Sanctions Motion, ECF No. 390 and Reply in Support at ECF No. 419).**

Because Defendants have provided no actual, admissible, competent evidence in support of any of their claims, Wye Oak would be entitled to judgment in its favor even in the absence of the Defendants' misconduct.  However, because of the Defendants' bad faith behavior, judgment may, and should, be entered as a sanction under Rule 37 and under the Court's inherent powers.  Because the same evidence of misconduct applies both to the merits and to the sanctions issues, the Court should enter judgment on both bases with the same findings and the same remedies.

**D.      The Court should make a specific finding that Zayna was Defendants' agent and co-conspirator.**

As set forth above, no later than October 24, 2004, Cattan, Shaways, Jassim and Zayna entered into a criminal conspiracy to divert to themselves the $24.7 million owed to Wye Oak, using the Contract of Financial Agreement as the "cover" or "excuse" for paying that money to GIG/Zayna.  The conspirators committed additional overt acts in furtherance of the conspiracy, including (1) representing falsely to Wye Oak and to Mr. Beadle that Zayna's insertion into the MoD/Wye Oak relationship was necessary to transfer funds out of the country, (2) concealing the

CFA from Wye Oak, (3) participating in the December 5, 2004 meeting in which they initially represented, falsely, that Wye Oak had not performed under the BSA, that not all the money could be paid to Wye Oak because it was not available and that Zayna needed permission of MoD to pay the money to Wye Oak, (4) representing falsely that Zayna would pay the money to Wye Oak (5) being complicit in the murder of Dale Stoffel to avoid paying the money and to attempt to forestall an investigation by U.S. authorities into corruption at MoD in the IMERP and other contracts and (6) MoD's never attempting to recover any of the money from GIG/Zayna.  Because the agreement with GIG and the payment to Zayna in connection with the conspiracy resulted in criminal convictions, the agreement, payment and conspiracy violated the BSA and Iraqi law.  GIG/Zayna were intimately and inextricably involved in all aspects of the conspiracy, acting in concert with the corrupt officials to steal the money and murder Dale Stoffel.  Proposed findings are attached hereto as Exhibit D.

      **E.**      **The Court should find that, under *Bancec,* because of Defendants' actions, it would be inequitable not to exercise jurisdiction.**

As Wye Oak has explained, because MoD is an organ of the Republic of Iraq, MoD and Iraq cannot be considered separate entities for application of the Foreign Sovereign Immunities Act.  ECF No. 416 at CL 30.  Nevertheless, to the extent that any issues remain that MoD may be considered in "instrumentality" of Iraq, such that the *Bancec* factors must be considered, Iraq's concealment of and lies about the criminal convictions arising out of the IMERP and the theft of MoD moneys owed to Wye Oak disposes of them.  Iraq itself accepted the benefits under Wye Oak's contract and sought be avoid paying for them by advancing these lies.  As a result, it would be manifestly inequitable to permit Iraq to escape from having to answer for its misconduct.

**F.      The Court Should Find That Conviction 20 Supports and Necessitates Enhanced Complementary Damages Under Iraqi Civil Code Section 173(2).**

As Professor Mallat has explained, and as discussed extensively in Plaintiff's Proposed Findings of Fact FF 392–FF 404.5 and its Proposed Conclusions of Law CL 123–125.12, Iraqi Civil Code Art. 173(2) provides: "The creditor may claim a complementary compensation to be added to the legal or contractual interests if he has established that the damage which exceeds the interests was due to cheating [*ghishsh,* fraud] or gross fault [*khata'jasim*] committed by the debtor." PX-117.9, C. Mallat 3d Report; Iraqi Code, PX-97.47 at Art. 173(2). The existence of, and the Defendants' concealment of, Conviction 20 supports and necessitates the award of complementary damages in this case.

However, these filings were made <u>before</u> Defendants disclosed the criminal convictions arising from Defendants' payments to Raymond Zayna and GIG. Seen in the light of these convictions, the defense in this case has been no more than a cover for the crimes committed in 2004. As Prof. Mallat stresses in his Supplemental Report, these crimes, and the 10-year cover-up of these crimes, would cause an Iraqi judge to "no doubt apply in his discretion to punish under Art 173.2 of the Civil Code." Exhibit C, C. Mallat 4th Rpt. at 12, ¶ 2.10.3. But, Wye Oak is not asking here for punishment. Wye Oak simply asks to be awarded full compensation for its economic loss.

The unrebutted expert testimony of Dr. John Gale establishes the amount necessary to make Wye Oak whole, in other words, full and fair compensation. However, Iraqi law generally places limits on breach of contract damages, imposing technical, artificial impediments to such compensation: 6% interest on principal sum, not compounded, which begins to accrue not at the time of breach but at the time a complaint is filed. However, Iraqi Law also provides (as explained in the unrebutted expert testimony of Prof. Chibli Mallat) that these artificial limits do not apply

where the conduct of the Defendants constitutes fraud or gross misconduct. Both fraud and gross misconduct exist here.

Conviction #20 establishes that the misconduct proven by the evidence in this case was not only fraudulent but consisted of three distinct criminal acts: (1) payment to Raymond Zayna/GIG in October of 2004, which led to; (2) the murders of Dale Stoffel and Joe Wemple to cover the criminal payment and the fact that the money promised on December 5 was sitting in Raymond Zayna's Lebanese bank account and could therefore not be paid to Wye Oak on December 8; (3) 10 years of covering up the above crimes in this litigation.  The cover-up itself is a crime under Iraqi Law (Article 248 of the Iraq Penal Code), which provides that "Any person who, with intent to deceive, alters the condition of a person, place or thing or who conceals the evidence of an offence or makes false statements in respect of that offence knowing them to be untrue is punishable by detention plus a fine or by one of those penalties."

To compensate Wye Oak for the full range of economic damages to which it is entitled because of the breach, Dr. Gale identified a compounding interest rate of 17.11% (based upon the cost of borrowing by Iraq in 2004). Defendants have not countered this unrebutted expert economic analysis. Indeed, the 17.11% is not even mentioned in any of Defendants' responses to Wye Oak's proposed findings of fact or conclusions of law.

Based upon this rate, the amount of money needed to fully compensate Wye Oak for its economic loss is $1,248,099,617.  Exhibit E, Wye Oak 7/3/19 Hearing PPT at 48 (including both damages under the CFA and damages for the additional $4 million contract); *see also* Wye Oak Reply in Support of FF+COL, ECF No. 433 at 130–131.  And for the reasons explained by Prof. Mallat, under the circumstances of this case, an Iraqi judge ". . . would no doubt apply in his

discretion . . . Article 173.2 of the Civil Code," and remove any artificial impediments to full compensation.  Exhibit C, C. Mallat 4th Rpt. at 12 ¶ 2.10.3.

### G.     The Court should award Wye Oak is its legal fees under both Paragraph 15 of the BSA and Rule 37.

As Wye Oak has explained, the BSA, by its plain terms, requires Defendants to pay Wye Oak's legal fees incurred in enforcing the agreement.  ECF No. 433 at 17–18.  Legal fees are also available under Rule 37 based upon Defendants' discovery violations.  Fed. R. Civ. P. 37(c)(1)(A).  Defendants' conduct described above commands that fees be awarded under both theories.  Because the necessity to rebut Defendants' spurious and fraudulent defense of payment so pervaded all of Wye Oak's efforts in this case, its entire attorney's fees were caused by the violations.

### H.     The Court should grant Wye Oak damages for the admitted breach of the exclusivity clause of the BSA.

Conviction 20 is an admission by Iraq that MoD contracted with another company—GIG— to perform work that was exclusively to be given to Wye Oak under the BSA.  This admission is brand new and Iraq's midnight revelation of this breach of the BSA's exclusivity provision comes far too late to permit discovery or other development of the evidence.  Conviction 20 does indicate that "An amount of four million dollars was paid for the maintenance of tanks type (T72)" to GIG.  This Court should award Wye Oak the $4 million which should rightfully have gone to Wye Oak under the BSA and enhance that $4 million from the date of the breach at the compensatory 17.11% compounded interest rate for a total award to Wye Oak from this breach of exclusivity in the amount of $41,760,373.00.  Exhibit E, Wye Oak 7/3/19 Hearing PPT at 48 (including both damages under the CFA and damages for the additional $4 million contract); *see also* Wye Oak Reply in Support of FF+COL, ECF No. 433 at 130–131.

I.     **The Court should refer for further investigation by the United States Attorney of the evidence concerning Zayna's and MoD's participation in Mr. Stoffel's murder.**

Finally, the circumstantial evidence has long indicated the complicity of MoD officials and Zayna in the murder of Dale Stoffel, for all the reasons set forth in Wye Oak's FF 110–114. Defendants' concealment of the criminal convictions of Cattan and others until after discovery closed and after the evidence had been presented at trial stand as admissions that Defendants know, and have known, that Wye Oak's allegations of their complicity were true. Because of the discovery violations, Wye Oak has been precluded from exploring the connection between Mr. Stoffel's murder and MoD's refusal to pay. Because Defendants' breach of contract and the resulting damages have been proven, Wye Oak is not asking to reopen this case for further discovery. But, Wye Oak is respectfully requesting that the Court refer the matter to the Department of Justice so that it can investigate and ultimately bring justice to the Stoffel family.

## CONCLUSION

Defendants have known since the beginning of this case that MoD officials Cattan, Shaways and Jassim, along with GIG and Zayna, were involved in a fraudulent scheme involving the IMERP contract and the theft of the initial $24.7 million due to Wye Oak. Defendants actively deceived Wye Oak and the Court for years, filing false document after false document averring that the convictions of Mr. Cattan and Shaways had *nothing to do* with the IMERP contract or with GIG/Zayna. For years, Defendants maintained that Wye Oak was paid when MoD paid Mr. Zayna. For years, Defendants' maintained that Mr. Zayna was properly paid pursuant to a "bank guarantee" provided to MoD by GIG. For years, Defendants' maintained that Wye Oak abandoned the contract after Mr. Stoffel's death and that GIG rightfully took over Wye Oak's contract, completing work that uncontroverted testimony establishes was completed by Wye Oak or its

subcontractors.  Defendants went so far as to take discovery and question witnesses at trial based on these false assertions, knowing full well that they theory of the case was entirely false.

Given these facts, Wye Oak asks the Court to reopen the record, admit the new evidence, and provide the relief requested above.

Dated: July 8, 2019

Respectfully submitted,

_____/S/ Adrian F. Snead_____
C. Allen Foster (D.C. Bar No. 411662)
Erik D. Bolog (D.C. Bar No. 433614)
Eric C. Rowe (D.C. Bar No. 466182)
Adrian Snead (D.C. Bar No. 1531946)
Whiteford, Taylor & Preston LLP
1800 M St., NW, Suite 450N
Washington, DC 20036
cafoster@wtplaw.com
ebolog@wtplaw.com
erowe@wtplaw.com
asnead@wtplaw.com
Telephone: (202) 659-6800
Facsimile: (202) 331-0573

Robert J. Pavich, Pro Hac Vice
Jeffrey A. Leon, Pro Hac Vice
PAVICH LAW GROUP, P.C.
30 West Monroe 13th Floor
Chicago, Illinois 60603
rpavich@pavichlawgroup.com
jleon@ pavichlawgroup.com
(312) 690-8400 (Telephone)
(312) 853-8401 (Facsimile)

John H. Quinn, Jr. (D.C. Bar No. 34959)
Quinn, Racusin & Gazzola Chartered
888 17th Street, N.W., Suite 640
Washington, D.C. 20006-3325
(202) 842-9300 (telephone)
(202) 682-0148 (facsimile)
jhq@qrglawfirm.com