## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **WYE OAK TECHNOLOGY, INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 1:10-cv-01182-RCL** |
| | ) | |
| **REPUBLIC OF IRAQ** *et al.*, | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

I. Legal Standard .................................................................................................................. 2

II. Factual Background........................................................................................................... 3

   A.   The Initial Effort to Rebuild Iraqi Armed Forces Following the U.S.-led Invasion in 2003 ... 3

   B.   Iraq Contemplates Stopping Some Scrap Exports ......................................................... 6

   C.   Wye Oak and MoD Execute the BSA ......................................................................... 7

   D.   Wye Oak Begins Performance ................................................................................. 11

   E.   Wye Oak and Zayna Sign a Limited Power of Attorney ................................................. 13

   F.   Wye Oak Presents Three Invoices to MoD.................................................................. 15

   G.   October 19, 2004 Meeting ..................................................................................... 16

       1. *MoD Approved Wye Oak's Three Invoices* ............................................................ 16

       2. *Wye Oak and MoD Effectuated the First Amendment to the BSA* ................................ 17

   H.   MoD and GIG Sign the Contract of Financial Agreement ............................................... 21

   I.   MoD Paid Zayna Instead of Wye Oak ....................................................................... 24

   J. Wye Oak Continued to Perform until Nonpayment Became a Serious Impediment ........... 25

       1. *Wye Oak Performed Work in Iraq* ...................................................................... 25

       2. *Wye Oak Performed Work in the United States* ...................................................... 27

       3. *Nonpayment Eventually Became a Significant Impediment to Wye Oak's Work* ............. 28

   K.   December 5, 2004 Meeting ..................................................................................... 29

   L.   Wye Oak Goes Back to Work, But Dale Stoffel is Murdered .......................................... 31

   M.   Wye Oak Produced Armored Vehicles in Time for the January 2005 Elections, But Eventually Ceased to Perform Work in Iraq Because It was Never Paid ............................... 33

   N.   Iraq Prohibits Scrap Sales ..................................................................................... 35

III. Legal Discussion ............................................................................................................ 35

   A.   MoD is Not Separate from the Republic of Iraq........................................................... 35

   B.   The Court has Subject Matter Jurisdiction and Personal Jurisdiction Over Defendants ... 39

       1. *The BSA was a "Commercial Activity" Under the FSIA* ................................................. 40

       2. *This Action is Based Upon an Act Performed in the U.S. in Connection with a Commercial Activity of Iraq Elsewhere*................................................................... 41

    3. *The Court has Personal Jurisdiction over Iraq and MoD* ................................................ 44
  C.   Defendants Breached the BSA .............................................................................................. 45
    1. *Wye Oak's Three Invoices Were Submitted Under the BSA* ........................................ 45
    2. *Wye Oak was never paid for its three invoices* ............................................................ 50
    3. *Wye Oak Performed Under the BSA* .......................................................................... 51
    4. *MoD Materially Breached the Contract with Wye Oak* ............................................. 52
  D. The Court Rejects Defendants' Affirmative Defenses ....................................................... 52
    1. *The Court Rejects the Defense Wye Oak was Not Properly Licensed* ........................ 53
    2. *The Court Rejects the Defense Wye Oak was Not Owed Any Compensation Under the*
    *BSA Because Wye Oak Did Not Conclude Any Sales Contracts* .................................... 55
    3. *The Court Rejects the Defense Wye Oak Waived any Breach* .................................... 55

IV. Damages ................................................................................................................................. 56
  A. Dr. Gale's Expert Damages Report .................................................................................... 59
    1. *The Court Finds Defendants Breached the BSA on October 28, 2004* ...................... 60
    2. *Gale Did Not Err in Not Taking Into Account Subsequent Events* ............................. 61
      a. Dale Stoffel's Murder .............................................................................................. 62
      b. Wye Oak's Withdrawal of American Personnel ...................................................... 63
      c. The Scrap Ban .......................................................................................................... 63
  B. Damages for the Three Invoices ......................................................................................... 67
  C. Lost Profits ......................................................................................................................... 70
    1. *Defendants' Overall Objections to Plaintiffs' Lost Profits Calculations* ..................... 70
    2. *Lost Profits from Construction* .................................................................................... 75
    3. *Lost Profits from Refurbishing Military Equipment* .................................................... 78
    4. *Lost Profits from Scrap Sales* ...................................................................................... 88
    5. *Lost Profits From the Sale of Surplus Military Equipment* ......................................... 93
  D. Terminal Value ................................................................................................................... 94
  E. Discounted Future Income .................................................................................................. 95
    1. *Risk-Free Rate* ............................................................................................................. 97
    2. *Equity Risk Premium* ................................................................................................... 97
    3. *Firm Size Premium* ...................................................................................................... 98
    4. *Industry Risk Premium* ................................................................................................ 99
    5. *Defendants' Objections that Gale Did Not Include a Company-Specific Risk Premium and*
    *Did Not Apply a Higher Discount Rate to Damages in Option Years* ............................. 100
    6. *Discount rate* ............................................................................................................... 100
  F. Prejudgment Interest ......................................................................................................... 101
  G. Enhanced Damages ........................................................................................................... 102
  H. Costs, Including Reasonable Attorney's Fees and Expenses ............................................ 104

V. Conclusion ............................................................................................................................. 105

Fifteen years ago, Wye Oak Technology, an American company, entered into the Broker Services Agreement (BSA) with the Iraqi Ministry of Defense (MoD) to play a key role in re-equipping the Iraqi military. Iraq urgently needed to rebuild its armed forces as the Coalition Provisional Authority (CPA) transferred sovereignty back to the Iraqi people and the interim Iraqi government prepared to hold its first parliamentary elections since the fall of Saddam Hussein. The BSA was set to be the central component of the Iraqi Military Equipment Recovery Project (IMERP).

Under the BSA, Wye Oak was responsible for developing an inventory and assessing what military equipment was salvageable and what was scrap, providing military refurbishment services, arranging for scrap sales, and arranging for the sale of military equipment. Wye Oak began performing as soon as the BSA was effectuated. By October 2004, Wye Oak submitted three pro forma invoices to MoD for work in relation to the IMERP.

But MoD never paid these invoices to Wye Oak. Instead, MoD paid a third-party, Raymond Zayna, the money owed to Wye Oak under the BSA. Nonetheless, Wye Oak continued to perform under the contract while desperately trying to extract the funds it was owed. And briefly, Wye Oak thought it succeeded. After months of performing vital activities as part of the IMERP despite not being paid, all issues seemed to be solved after a December 5, 2004 meeting. However, this was not the case.

A few days later, Wye Oak's president Dale Stoffel and his colleague Joe Wemple were brutally murdered on their way to arrange for funding to finally be released. Nonetheless, Wye Oak still did not immediately abandon the IMERP even after Dale Stoffel's tragic death. Instead, Wye Oak exceeded the goal of producing a mechanized brigade of operational armored vehicles

1

for Iraq's January 2005 parliamentary election. Yet Wye Oak was never paid for the vital work it performed under the BSA.

Now, more than fifteen years after Wye Oak entered into the BSA, and more than a decade after Wye Oak first filed suit, the Court finds MoD breached the BSA. And because MoD is an integral component of the national government itself, the Republic of Iraq is also liable for the breach.

Ultimately, the Court will award Wye Oak damages for its three invoices, lost profits from construction, lost profits from refurbishing military equipment, and lost profits from scrap sales. Also, the Court will award Wye Oak prejudgment interest and costs, including reasonable attorney's fees and expenses.

**I. Legal Standard**

Wye Oak bears the burden of proving its breach of contract claim by a preponderance of the evidence. The preponderance of the evidence standard "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 622 (1993) (internal quotation marks omitted). In a bench trial, the Court is the trier of fact and rules on the law. Wye Oak will only succeed in its suit if it demonstrates it is more likely than not that the MoD materially breached the BSA.

The BSA provides it "shall be exclusively construed and interpreted pursuant to the laws of the Republic of Iraq." Pl.'s Ex. 5 ¶ 21. Thus, under this choice-of-law clause, Iraqi law controls for the purposes of interpreting the contract.

Under Iraqi law, the rules of evidence and procedure of the venue where the dispute is pending control. Mallat Dep. 2/14/19, 33:17–34:4. Thus, the Federal Rules of Evidence apply to any evidentiary issues in this matter.

Finally, under the Federal Rules of Evidence, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law." Fed. R. Evid. 44.1.

## II. Factual Background

### A. The Initial Effort to Rebuild Iraqi Armed Forces Following the U.S.-led Invasion in 2003

In March 2003, U.S. forces invaded Iraq and swiftly toppled Saddam Hussein's dictatorial regime. The U.S.-led Coalition forces set up the CPA to govern Iraq as a transitional government. On June 28, 2004, the CPA transferred sovereignty to the Iraqi people and an interim Iraqi government. This interim government held office until parliamentary elections occurred in January 2005.

As part of Iraq's rebuilding efforts, Iraq needed to rebuild its own armed forces. This was especially vital as a growing insurgency began to take hold following the U.S.-led invasion and occupation.

Secretary of Defense Donald Rumsfeld requested that then-Lieutenant General David Petraeus lead the Multi-National Security Transition Command–Iraq (MNSTC-I) to help rebuild the Iraqi armed forces and police. MNSTC-I's mission was to oversee and support the reconstruction of Iraq's Ministry of Defense and Ministry of Interior. MNSTC-I developed the IMERP to re-equip the Iraqi military. The IMERP's goal was to salvage the military equipment

that could be refurbished and the scrap military equipment that was scattered across Iraq after the fall of Saddam Hussein's regime.

Under Saddam Hussein, Iraq had an extremely large military with extensive stocks of military equipment. Expert Report of John M. Gale app. C, 11, 43–47, Pl.'s Ex. 101. A significant amount of this equipment consisted of Soviet weaponry. Tr. 12/18/18 PM 65:7–9; Tr. 12/19/18 PM 85:8–13. Destroyed and abandoned equipment littered the country following the U.S.-led invasion. *See* Tr. 12/17/18 PM 28:25–29:25; Tr. 12/19/18 AM 13:7–14, 33:6–34:2; Tr. 12/20/18 PM 37:8–19; Petraeus Dep. 14:18–15:20; Pl.'s Ex. 63. The IMERP intended to determine what equipment was recoverable and what could be scrapped, hoping to immediately repair salvageable equipment so that a portion of the Iraqi armed forces could be rebuilt as quickly as possible. IMERP's immediate focus was to prepare at least one armored mechanized brigade to be on the streets in time for the new Iraqi government's parliamentary election in January 2005. *See* Tr. 12/17/18 PM 35:21–37:5; Tr. 12/19/18 AM 25:9–26:14; Joe Kane, *Iraqi Mech Brigade Moves Toward Initial Ops*, The Advisor, Oct. 9, 2004, Pl.'s Ex. 16, at 1, 8. This was a critical component of the Coalition and Iraq's goal to withdraw American troops and have Iraqi security forces take on greater responsibility. Petraeus Dep. 20:19–21:2, 28:19-30:3.

The Coalition and MNSTC-I leaders viewed Wye Oak and its president, Dale Stoffel, as capable of executing the IMPERP effort. Wye Oak, and Dale Stoffel in particular, had extensive familiarity with Soviet military equipment and had government contacts throughout the world. *See* Tr. 12/18/18 PM 65:7–9; Pl.'s Ex. 1; Pl.'s Ex 5 ¶ 2. Further, Wye Oak possessed the necessary arms and weapons licenses to perform the planned work. Pl.'s Ex. 1; Pl.'s Ex. 51. And Wye Oak had a strong relationship with CLI Corporation, an American based construction firm that had experience working in Iraq, as Dale Stoffel was a part owner of CLI. Pl.'s Ex. 51.

On June 25, 2004, Wye Oak officially presented MoD its proposal to carry out the IMERP. Pl.'s Ex. 1. Wye Oak offered its services to "assess [MoD's] discarded and/or damaged military equipment to identify military salvageable equipment and scrap, account and inventory, value and identify purchasers for such military equipment and scrap, to maximize and to assist you in carrying out the Iraqi Military Equipment Recovery Project. In such role, Wye Oak would act as the exclusive broker for such transactions for the [sic] Iraq's Ministry of Defense for a minimum of ten percent commission on each such transaction." *Id.* Following this letter, on July 4, 2004, Iraq's Minister of Defense, Hazim al-Shalan, requested access to the military equipment depositories at the Taji military base so MoD personnel and Dale Stoffel could inspect and assess the equipment as part of the beginning phase of the IMERP. Pl.'s Ex. 2. Petraeus responded on July 20, 2004 with his full support for the MoD's expeditious initiation of the IMERP, and granted al-Shalan's request. Pl.'s Ex. 3.

Wye Oak and MoD began drafting the BSA. Nicholas Beadle, a United Kingdom government official and senior Coalition advisor to the Iraqi MoD, Iraqi Minister of Defense Hazim al-Shalan, and Iraqi MoD Secretary General Bruska Shaways, recalled his conversations with Shaways in July 2004 regarding the draft contract. Beadle made sure Shaways understood the MoD was agreeing to pay Wye Oak up front based on pro forma invoices—besides commissions—without having seen the completed work and would only have an opportunity to reconcile the payments at a later time. Tr. 12/20/18 PM 37:20–38:16, 53:11–54:3; Tr. 12/21/18 AM 36:16–38:20. On August 16, 2004, the MoD and Wye Oak officially entered into a contract, the BSA, to carry out the IMERP.

B. Iraq Contemplates Stopping Some Scrap Exports

While Wye Oak and MoD were negotiating the BSA, Iraq was also in the process of cracking down on scrap smuggling. On June 19, the General Secretary of Iraq's Council of Ministers informed the Ministries of Industry, Trade, and Finance that the Prime Minister directed the formation of a committee of representatives from these ministries to study scrap exports and provide a recommendation on the topic. Defs.' Ex. 56.

Following this directive, the Ministry of Trade wrote the Council of Ministers to inform the Council of its views on exporting scrap. Defs.' Ex. 55. The Ministry of Trade stated the decision to export scrap was implemented in accordance with CPA Order 54 on the Trade Liberalization Policy of 2004 issued on February 26, 2004. *Id.* According to the Ministry of Trade, CPA Order 54 in part sought to stop scrap smuggling and institute a legal regime to govern scrap exports. *Id.* CPA Order 54 prohibited the export of "metals of all kinds, including scrap," in quantities in excess of personal use without a license from the Ministry of Trade. Defs.' Ex. 54. However, the Basra Governate apparently interfered with authorized scrap exports. *Id.* This led the Ministry of Trade to request the Basra Governate be directed not to interfere with the export of scrap done in accordance with previously granted licenses. *Id.*

The committee formed pursuant to the Prime Minister's direction ultimately recommended stopping scrap exports but allowing those who already had export licenses to continue their export efforts because those licensees only accounted for a small portion of existing scrap. Defs.' Ex. 57. But the committee also urged the Ministry of Interior and General Commission of Customs to institute strict procedures to prevent scrap smuggling. *Id.*

On July 17, 2004, the General Secretary of the Cabinet issued a letter to the Ministry of Interior regarding the prohibition of exporting scrap with copies to the Office of the Prime

Minister, Ministry of Industry and Minerals, Ministry of Trade, and National Intelligence Service. Defs.' Ex. 53. Specifically, the letter stated the Prime Minister agreed to the Ministry of Industry and Minerals' proposal to stop exporting scrap, with the exception that some materials of a military nature could still be exported upon the Prime Minister and his economic committee's approval. *Id.* Unfortunately, this Court was never provided with the Ministry of Industry and Minerals' proposal referenced in this letter, which makes it impossible to fully comprehend the exact terms of the prohibition on exporting scrap the Prime Minister approved.

This deliberation on scrap exports and decision by the Prime Minister was never communicated to Wye Oak at any time during the BSA negotiations or after Wye Oak and the MoD signed the BSA. And Beadle testified he understood all orders prohibiting scrap sales to only apply to private sales, not the MoD. Tr. 12/21/18 AM 7:25–8:10. Further, Neal testified General Bashar, an MoD official working on the effort to recover vehicles, informed him the scrap ban was intended to stop individuals from illegally taking scrap and did not affect Wye Oak. Tr. 12/19/18 AM at 29:22–31:16; Tr. 12/19/18 PM 4:9–18.[1]

C. Wye Oak and MoD Execute the BSA

Wye Oak and MoD entered into the BSA to carry out the IMERP on August 16, 2004. The BSA was signed by Dale Stoffel on behalf of Wye Oak and countersigned by Iraqi MoD Secretary General Bruska Shaways. Pl.'s Ex. 5. Secretary General Shaways had the "full signatory authority" of MoD regarding all matters related to Wye Oak's work recovering and selling scrap military equipment. Pl.'s Ex. 6. Under the BSA, MoD was required to "work exclusively with [Wye Oak]

---

[1] General Bashar's declarations were admitted into evidence as admissions by a party-opponent—and therefore non-hearsay—under Federal Rule of Evidence 801(d)(2). General Bashar was an MoD employee speaking on a matter—whether the scrap ban applied to the MoD—within the scope of his relationship with the MoD, as he worked on the IMERP, which contemplated exporting scrap as part of the program, while he was employed by the MoD. Fed. R. Evid. 801(d)(2)(D).

regarding furnishing of Military Refurbishment Services, Scrap Sales and the sale of Refurbished Military Equipment with respect to all Military Equipment." Pl.'s Ex. 5. The BSA appointed Wye Oak as the sole and exclusive broker for:

> (i) the accounting, inventory, and assessment of discarded and/or damaged Military Equipment in connection with the Iraqi Military Equipment Recovery Project to identify which Military Equipment is salvageable and suitable for Military Refurbishment Services and which Military Equipment is scrap;
> (ii) the arranging of any Scrap Sales of any Military Equipment that is not suitable for Military Refurbishment Services;
> (iii) the provision of Military Refurbishment Services with respect to all of the various military bases, offices and properties owned by, or under the control of, the Ministry and/or the Republic of Iraq, wherever such bases, offices and property maybe [sic] located and all the related military equipment located thereon or otherwise owned by the Ministry and/or the Republic of Iraq; and
> (iv) the arranging for the sale of Military Equipment and/or Refurbished Military Equipment to Customers during the term of this Agreement or for Scrap Sales of any such Military Equipment that is not suitable for Military Refurbishment Services, which arranging shall include the valuation of any such Military Equipment, whether original, refurbished or scrap, and the identification of prospective Customers for such sales.

Pl.'s Ex. 5 ¶ 2. MoD agreed "not to conduct any Military Refurbishment Services or arrange for the use, sale or lease of any Refurbished Military Equipment provided for under [the BSA] nor engage in any scrap sales, except pursuant to an engagement with [Wye Oak] under [the BSA]." *Id.* The BSA stated Wye Oak would begin performing services at five military facilities: "Taji Military Base/Camp Cooke, Camp Normandy, Camp Ashraft, Camp Anaconda, and the Coalition facilities at the Hilla Military Facility." *Id.*

The BSA provided specific definitions for the terms military equipment, military refurbishment services, refurbished military equipment, customers, and scrap sales. Military equipment was defined as "any equipment that is used by or in the provision of military [sic], including, without limitation, any and all vehicles, aircrafts, guns, missiles, armored personnel carriers, heavy armor/tanks, military radar equipment, ballistic missiles, rocket launchers, artillery,

artillery scrap, small arms, small arms scrap or any parts or components thereof." *Id.* ¶ 1. The contract defined military refurbishment services as "any services sold, performed for, or provided with respect to any Refurbished Military Equipment that is either retained by the Ministry or sold or otherwise provided to Customers by the Ministry, including, but not limited to, the inspection of the Military Equipment prior to performing any Military Refurbishment Services to make a value assessment and a refurbishing assessment for such Military Equipment." *Id.* The BSA provided that "Refurbished Military Equipment shall mean any Military Equipment that has been refurbished by, or under the direction of, the Broker pursuant to this Agreement, and sold or provided to customers by the Ministry." *Id.* Customers were defined as "purchasers of the 'Military Refurbishment Services' and/or 'Refurbished Military Equipment' and 'or Scrap sales' including, but not limited to, Iraqi Ministry of Defense, commercial establishments and governmental and semi-governmental entities in the military sector." *Id.* And scrap sales were defined as "sales to any third party of any Military Equipment or other items which may not be defined as scrap but contemplated by the nature of this Agreement (e.g., brass, gun barrels, etc.) that the Broker or Iraqi Ministry of Defense determines is not suitable for Military Refurbishment Services in accordance with the terms of this Agreement." *Id.*

Further, Wye Oak was required to use "all reasonable commercial efforts to perform the Military Refurbishment Services and in the development of markets and sales prospects for Military Equipment, including Refurbished Military Equipment and Scrap Sales." *Id.* ¶ 3. Wye Oak was not under any obligation to expend any money in performing these services or activities, except money that was advanced by the MoD to cover "certain expenses associated with the performance of the Military Refurbishment Services, the sales of any Military Equipment, Refurbished Military Equipment or any Scrap Sales." *Id.* ¶ 3. In addition, MoD was required to

"fully inform [Wye Oak] at all times of all matters reasonably required to enable [Wye Oak] to carry-out its duties as set forth [in the BSA]." *Id.* ¶ 4.

As compensation, MoD was required to pay Wye Oak "a commission of [a] minimum of ten percent (10%) based on the Contract Value set out in each Sales Contract entered into by the Ministry, pursuant to this Agreement." *Id.* ¶ 5. With respect to Refurbished Military Equipment, the MoD was required to pay Wye Oak 10% of such equipment's refurbishment cost. *Id.* The commissions were to be paid "pursuant to proforma invoices submitted by [Wye Oak] and then reconciled by final invoice. Upon providing such proforma invoice, Ministry will make full payment on such invoice immediately upon presentation. All payments to be made to [Wye Oak] under this Agreement shall be made in United States Dollars in the form and manner as directed by [Wye Oak]." *Id.* Also, the BSA provided significant protections for Wye Oak. Wye Oak was entitled to receive and retain all commissions for sales contracts for military refurbishment services, refurbished military equipment, or scrap MoD cancelled or terminated, regardless of the cause. *Id.*

The BSA was set to last for one year. This one-year term was to renew automatically for two subsequent, consecutive one-year periods unless either Wye Oak or the MoD gave the other party written notice it would not renew at least sixty days prior to the end of any term. If termination notice was provided, the BSA was set to terminate at the end of the then-current term. *Id.* ¶ 6.

This Agreement was not assignable by either party. *Id.* ¶ 8. Any purported assignment of the BSA without written consent from both parties was void and without effect. *Id.* A failure by one of the parties to assert any right in the BSA or upon a breach of the BSA would not constitute a waiver of such rights. *Id.* ¶ 12. And a written waiver of any right was not deemed to extend to

any subsequent breach. *Id.* The BSA was not to be amended or supplemented except in writing, signed by both parties. *Id.* ¶ 13. The BSA constituted the entire agreement between Wye Oak and the MoD. *Id.* ¶ 14.

In addition, the BSA contained an indemnification clause. Each party was to "indemnify, defend and hold harmless the other party from and against any and all liabilities, demands, claims, lawsuits, damages, judgments, costs (including reasonable attorney's fees and expenses) including but not limited to injury to persons (including death), loss or damage to, or destruction of property arising out of that party's breach of this Agreement or that party's negligent or willful actions while performing hereunder." *Id.* ¶ 15.

Finally, the English version of the Agreement governed and the BSA was required to be construed and interpreted pursuant to Iraqi law. *Id.* ¶¶ 18, 21.

D.   Wye Oak Begins Performance

Wye Oak more likely than not began performing activities related to the BSA around the same time as the contract was signed. In the days preceding the BSA, Wye Oak identified 70,000 tons of brass artillery casings it believed could be sold as scrap. Wye Oak began trying to broker a sale of these scrap brass shell casings and had some communications with at least one potential customer after the BSA was signed. *See* Defs.' Ex. 91 (email from Coskun Akdeniz to Dale Stoffel on August 18, 2004, regarding a potential customer for the scrap brass casings).[2] Unfortunately, these shell casings were stolen from the Iraqi military base where they were stored before Wye Oak could broker any sales contract. *See* Pl.'s Ex. 24 (email from Dale Stoffel to Nick Beadle, William Felix, and Colonel David Styles with the subject line "missing brass" and attached pictures of the brass); Pl.'s Ex. 26 (email from Colonel David Styles to Dale Stoffel, Nick Beadle,

---

[2] This exhibit was moved into evidence by defendants as a Wye Oak business record without objection by Wye Oak. Tr. 12/18/18 AM 81:16–84:15.

and William Felix regarding the stolen brass); Tr. 12/18/18 AM 81:16–84:21 (David Stoffel testifying the potential sale of the 70,000 tons of brass shell casings was never completed). While Wye Oak claims MoD and Iraq were at fault for this theft, the evidence presented to the Court is insufficient to establish this point.

Nonetheless, Wye Oak continued to move ahead. Wye Oak worked with its sister company CLI, and Wye Oak and CLI hired Iraqi laborers. Tr. 12/18/18 PM 64:17-64:19; Felix Dep. 20:15–23:1, 80:22–81:3. On September 6, 2004, Secretary General Shaways wrote to Multi-National Forces-Iraq Commanding General George Casey to inform him that "Wye Oak has begun the initial assessment of equipment and is preparing to assemble the necessary personnel to inventory, assess and remove Iraqi military equipment or scrap for sale or use by the Iraqi Ministry of Defense." Pl.'s Ex. 10. Shaways then requested access to Iraqi military bases under the U.S. military and Coalition forces' control because military equipment and scrap were located on those bases. *Id.*

On September 17, Dale Stoffel reached out to a Ukrainian company to invite specific employees and affiliates to Iraq to assist Wye Oak in assessing, recovering, and refurbishing military equipment for the IMERP. Pl.'s Ex. 11. Wye Oak offered to provide transportation from Ukraine to Iraq and to arrange visas for these individuals. *Id.* Several witnesses testified Dale Stoffel brought in a team from Ukraine to assist with the work. *See, e.g.*, Tr. 12/19/18 AM 42:1–9; Felix Dep. 102:24–104:06. While Dale Stoffel and individuals from CLI, Iraqi laborers, and workers from Ukraine got started on identifying, assessing, and refurbishing military equipment in Iraq, David Stoffel worked on the IMERP from the United States. David Stoffel oversaw all information technology services for Wye Oak. Tr. 12/18/18 AM 31:7–32:1, 43:22–25, 44:11–20, 48:25–49:5.

By September 29, 2004, Wye Oak provided MNSTC-I project officer Colonel David Styles an initial survey of equipment that had been reviewed thus far at Camp Normandy. Pl.'s Ex. 14. This survey consisted of 745 units of military equipment, including various tanks, armored personnel carriers, artillery, rocket launchers, anti-aircraft guns, and vehicles. *Id.* Even the equipment marked "operational" still likely required at least some maintenance before it could be put back into operation. Tr. 12/19/18 AM 12:14–20.

The Iraqi government announced in October 2004 it would be standing up a mechanized brigade of about 3,000 soldiers by early 2005. Pl.'s Ex. 16 at1. Iraqi Brigadier General Mahmoud Bashar, the official selected to lead the new brigade, proudly proclaimed most of the tanks and personnel carriers would come from Iraq. *Id.* These statements were reported in *The Advisor*, an authorized publication of MNSTC-I. This publication was authenticated as a self-authenticating official publication and newspaper under Federal Rules of Evidence 902(5) and 902(6). The Iraqi government and General Bashar's declarations were admitted into evidence as admissions by a party-opponent—and therefore non-hearsay—under Federal Rule of Evidence 801(d)(2). Nicholas Beadle testified Wye Oak was the one performing the work to refurbish the vehicles discussed in *The Advisor*'s October 2004 issue that the Iraqi government and General Bashar boasted about. Tr. 12/20/18 PM 57:5–21. Beadle declared, "Wye Oak were the only show in town. They were the only ones who were performing refurbishment work of this sort." Tr. 12/20/18 PM 57:5–21.

E.  Wye Oak and Zayna Sign a Limited Power of Attorney

On September 28, 2004, Wye Oak granted Raymond Zayna, a Lebanese businessman in charge of the General Investment Group, s.a.l. (GIG), a limited power of attorney to arrange financing and bank guarantees on behalf of Wye Oak for its contract with MoD. Pl.'s Ex. 13. Wye Oak made clear Zayna's authority under this agreement was circumscribed. Wye Oak specified

13

"GIG will provide financial services with respect to the IMERP Contract *when and as requested by Wye Oak*." *Id.* (emphasis added). The parties drastically differ on how Raymond Zayna came to be involved with Wye Oak and MoD.

Wye Oak insists Zayna was inserted by MoD, while defendants claim Wye Oak and Zayna had a business relationship dating back to summer 2004. Neither side offers definitive evidence on this point. Wye Oak bases its contention on several witnesses' personal observation giving the impression that Dale Stoffel and Raymond Zayna did not have any form of relationship. *See, e.g.*, Tr. 12/17/18 PM 24:6–21 (Clements stated he did not believe any relationship existed between Stoffel and Zayna based on his observations of their interactions during meetings); Tr. 12/17/18 PM 25:21–26:7 (Clements recalled a December 5, 20004 meeting in which discussions focused on the fact Zayna was holding funds on behalf of MoD and needed MoD's authorization to release those funds to Wye Oak); Tr. 12/20/18 76:24–77:24 (Beadle saw Zayna in the MoD without Stoffel or anyone from Wye Oak on occasions). On the other hand, defendants point to an email from Dale Stoffel in November 2004 indicating GIG paid for Ukrainian expert's travel to Iraq to help assess and repair military equipment (likely as a result of Dale Stoffel's September 17, 2004 invitation) to indicate Dale and Zayna had a preexisting relationship. Pl.'s Ex. 31, 2 ("$112,150.00 from Invoice #MUQ002 due to GIG for completed work for the transportation of Ukrainian Experts to assess the repair/overhaul work."). But David Stoffel did not recall ever hearing about Zayna until September or October 2004. Tr. 12/18/18 AM 57:13–18. And William Felix repeatedly stated he associated Zayna with MoD. Felix Dep. 141:7–16. It is unlikely David Stoffel and William Felix, two important players among a small group of people that made up Wye Oak and CLI, would either not have heard of Zayna or viewed him as an interloper to Wye Oak's arrangement with MoD if Wye Oak was indeed the party who inserted Zayna into this deal in the

first place. This leads the Court to believe it is more likely than not that Zayna was inserted at the behest of the MoD.

This conclusion is even more likely given that Ziad Cattan, the Deputy Secretary General of the MoD, was convicted for his role, along with Bruska Shaways and Sawsan Jasim, in concluding a financial agreement with GIG, Zayna's company, that violated Iraqi law and intentionally caused harm. *See* 34/CR3/2011, ECF No. 430; 34/CR3/2011, ECF No. 438-1. This conviction indicates these MoD officials conspired with Zayna to steal millions of dollars. The Court is left with the distinct inference from this Iraqi Integrity Commission case that Zayna had a relationship with these MoD officials and was more likely than not inserted by these officials into the arrangement between Wye Oak and MoD.

F. Wye Oak Presents Three Invoices to MoD

In October 2004, Wye Oak submitted three pro forma invoices to MoD for work in relation to the IMERP. On October 11, 2004, Wye Oak submitted two pro forma invoices for construction at the Muqdadiya Armored Depot (Invoice #MUQ001) and Taji Facility (Invoice #TAJI001). Pl.'s Ex. 18. These invoices covered the initial construction costs for armored vehicle repair facilities, costs of purchasing tools and moving spare parts, the initial hiring and training of workers, and a 10% mobilization fee for construction efforts at Taji. *Id.* Further, these invoices included a 15% overhead cost and 10% profit. *Id.* Invoice #MUQ001 was for $2,302,300 and Invoice #TAJI001 was for $5,945,500. *Id.* On October 18, 2004, Wye Oak submitted a third invoice, Invoice #MUQ002, for vehicle recovery efforts at Muqdadiya. *Id.* at 3. This invoice covered travel, lodging, and food for technical experts, materials to wash and paint vehicles, costs for skilled and unskilled labor, and costs for the initial repair of 246 armored vehicles at both Muqdadiya and

Taji. *Id.* This invoice also included a 15% overhead cost and 10% profit. *Id.* It was for $16,466,897.15. *Id.* In sum, these three invoices totaled $24,714,697.15.

G. <u>October 19, 2004 Meeting</u>

On October 19, 2004, a meeting was convened at MoD headquarters to ensure the IMERP was progressing. The meeting consisted of Shaways, Beadle, Marr, Dale Stoffel, Zayna, Styles, Ziad al-Cattan, and Jasim. Tr. 12/20/18 AM 13:21–14:19; Pl.'s Ex. 20, 6.

Marr arrived at the MoD at about the same time as Dale Stoffel, and they waited together for about an hour while Zayna met with the senior MoD officials in Shaways office. Tr. 12/20/18 AM 13:21–14:19. Beadle arrived shortly before Marr, Stoffel, and him entered Shaways office. *Id.* And they were later joined by Colonel Styles. *Id.*

1. *MoD Approved Wye Oak's Three Invoices*

During the meeting, the parties discussed Wye Oak's three invoices and how they would be financed. Tr. 12/20/18 PM 64:3–16. Ultimately, Marr testified that Shaways declared MoD accepted the invoices. Tr. 12/20/18 AM 16:13–20. And Beadle further testified Shaways agreed to pay the invoices to Dale Stoffel. Tr. 12/20/18 PM 65:23–66:4. This testimony regarding Shaways' ratification of the invoices and agreement to pay Dale Stoffel was admissible as non-hearsay admissions by a party-opponent. Shaways was authorized to make such decisions for MoD regarding all matters related to Wye Oak's work under the BSA. *See* Pl.'s Ex. 6 (letter from Shaways asserting he had full signatory authority on all matters with respect to the BSA, as designated by the Iraqi Minister of Defense); Fed. R. Evid. 801(d)(2)(C). Further, Shaways was an MoD employee speaking on a matter—work related to the IMERP—within the scope of his relationship with MoD while he was employed by MoD. Fed. R. Evid. 801(d)(2)(D). The Court

therefore concludes it is more likely than not MoD approved Wye Oak's three invoices and agreed to pay this money to Wye Oak's president, Dale Stoffel.

## 2. *Wye Oak and MoD Effectuated the First Amendment to the BSA*

In addition to discussing and approving the three Wye Oak invoices, the parties at the October 19 meeting took up an amendment to the BSA. Tr. 12/20/18 AM 18:5–18:20; Tr. 12/20/18 PM 63:7–17. The amendment, termed the "First Amendment," was presented to the Court as Wye Oak's business record, but lacked any signature from either Shaways or Dale Stoffel. Tr. 12/18/18 AM 26:4–35:25; Pl.'s Ex. 19; Pl.'s Ex. 19.1.

Defendants took issue with the unsigned amendment as initially presented to the Court because defendants wanted to also admit the document's metadata in addition to the document itself. Tr. 12/18/18 PM 3:5–4:12. Wye Oak had no objection to the admission of the document's metadata. Tr. 12/18/18 PM 3:21–4:6. Metadata is data that describes and gives information about other data. Here, the file's metadata describes the file's creation date, time saved, and who created, edited, and saved the file. Pl.'s Ex. 19.1. The metadata showed William Felix last saved the Microsoft Word document. *Id.* Indeed, David Stoffel testified this document was found on the computer he had purchased for Felix. Tr. 12/18/18 PM 93:6–7. Further, the metadata showed the document was created on October 25, 2004 at 3:26 a.m. and also last saved on October 25, 2004 at 3:26 a.m., with a total editing time of 6 minutes. Pl.'s Ex. 19.1. However, Marr and Beadle both testified the First Amendment was brought up, and signed, during the October 19, 2004 meeting. This raises a question as to whether the document presented to the Court was indeed the pertinent document discussed at the October 19 meeting or whether it was created in the first instance on October 25, after the meeting.

17

Metadata can be misleading. For example, "if a Microsoft Word document is created on one machine, and transferred to and saved to a second machine without being altered, the copy on the second machine (erroneously) will show the date the document was saved to the second machine as the date created." *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, 171 (2018). "There is . . . the real danger that information recorded by the computer as application metadata may be inaccurate." *Id.* at 211. This is a significant note of caution regarding the utility of metadata in determining a document's true creation date.

Ultimately, the Court finds it is more likely than not that the First Amendment presented to the Court during trial, Pl.'s Ex. 19, was a copy of the document discussed during the October 19 meeting. Marr and Beadle both testified during the trial this amendment was discussed by the parties at the meeting. Tr. 12/20/18 AM 18:5–6 ("I saw a document, the document looked like [Pl.'s Ex. 19]."); Tr. 12/20/18 PM 63:7 ("Well, they discussed this amendment, first of all."). The Court found Marr and Beadle to both be extremely credible witnesses, who participated in the October 19 meeting. Their testimony, which corroborates one another, when weighed against the inherent potential misimpressions metadata can produce, leads the Court to conclude the preponderance of the evidence establishes this document was the same document the parties dealt with at the October 19, 2004 meeting.

The Court must next decide whether this First Amendment was actually signed by Shaways and Dale Stoffel. Both Marr and Beadle testified they personally saw Shaways and Dale Stoffel sign the document. Referring to the First Amendment, Marr asserted "I saw Bruska Shaways sign it and Dale Stoffel sign it." Tr. 12/20/18 AM 18:9–10. Beadle also responded in the affirmative when he was specifically asked by Wye Oak's counsel whether he saw Bruska

Shaways sign the First Amendment and whether he saw Dale Stoffel sign the First Amendment. Tr. 12/20/18 PM 63:12–17. While defendants contend these statements are hearsay that cannot be admitted to establish the First Amendment was signed and effectuated as a valid amendment to the BSA, the testimony about Shaways and Stoffel's signatures is admissible.

First, signatures are written assertions and nonverbal conduct intended as assertions, which makes them statements under Federal Rule of Evidence 801(a). Shaways signature is certainly not hearsay, as it constitutes an admission by a party-opponent under Rule 801(d)(2). Shaways was authorized to make decisions for the MoD regarding all matters related to Wye Oak's work under the BSA. *See* Pl.'s Ex. 6 (letter from Shaways asserting he had full signatory authority on all matters with respect to the BSA, as designated by the Iraqi Minister of Defense). So Shaways was authorized to amend the BSA. Accordingly, his signature was a statement made by an individual authorized to make a statement on the subject that is now being offered against the defendants. *See* Fed. R. Evid. 801(d)(2)(C). Shaways was also an MoD employee making a statement on a matter— the BSA—within the scope of his relationship with MoD while that relationship existed. *See* Fed. R. Evid. 801(d)(2)(C).

Further, Shaways and Stoffel's signatures constitute verbal acts where the legal effects of the statements flow just by virtue of the fact they were made. In other words, the significance of these signatures lies solely in the fact they were made. Testimony about the fact the signatures occurred was not offered to prove the truth of anything asserted. Accordingly, these signatures are not hearsay. *See* Fed. R. Evid. 801(c) adv. comm. note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."); *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992) (finding communications relevant to making a contract, such as conversations and letters, are not hearsay

because such "verbal acts" are not assertions and are not offered to prove the truth of the matter); 2 McCormick on Evidence § 249 (7th ed. 2016) ("[P]roof of oral utterances by the parties in a contract suit constituting the offer and acceptance which brought the contract into being are not evidence of assertions offered testimonially but rather verbal conduct to which the law attaches duties and liabilities."); *see also Preferred Properties, Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 799 n.5 (6th Cir. 2002); *Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1154 (9th Cir. 2000). The credible testimony from Marr and Beadle regarding Shaways and Stoffel signing the First Amendment sufficiently demonstrates it is more likely than not both parties signed the First Amendment and therefore validly amended the BSA.[3]

This amendment attempted to clarify the BSA. The First Amendment altered the definition of "military refurbishment services" to read:

> any services sold, performed for, or provided with respect to any Refurbished Military Equipment that is either retained by the Ministry or sold or otherwise provided to Customers by the Ministry, including, but not limited to, the inspection of the Military Equipment prior to performing any Military Refurbishment Services to make a value assessment and a refurbishing assessment for such Military Equipment, including but not limited to, construction of facilities, bases, billeting, service/repair depots, repair factories/facilities.

Pl.'s Ex. 19; Pl.'s Ex. 19.1. Wye Oak's role as the sole and exclusive broker for providing military refurbishment services was altered such that Wye Oak was now appointed for:

> the provision of Military Refurbishment Services with respect to all of the various military bases, offices and properties owned by, or under the control of, the Ministry and/or the Republic of Iraq, wherever such bases, offices and property maybe [sic] located and all the related military equipment located thereon or otherwise owned by the Ministry and/or the Republic of Iraq, including but not limited to, construction of facilities, bases, billeting, service/repair depots, repair factories/facilities.

---

[3] Beadle's testimony was especially convincing. He was the Coalition's senior advisor to the MoD at this time. Tr. 12/18/18 PM 26:20–24. Beadle had significant insight into MoD's operations and closely worked with the MoD figures involved in this contract. And Beadle demonstrated his impartiality throughout his testimony.

Pl.'s Ex. 19;  Pl.'s Ex. 19.1. And one of the compensation terms in the BSA was altered such that:

> The Ministry shall pay [Wye Oak] a commission of minimum of ten percent (10%) based on the Contract Value set out in each Sales Contract entered into by the Ministry, pursuant to this Agreement. With respect to Refurbished Military Equipment and Military Refurbishment Services, the Ministry will pay [Wye Oak] ten percent (10%) of such Military Refurbishment Services and equipment's refurbishment cost.

Pl.'s Ex. 19;  Pl.'s Ex. 19.1.

H.   <u>MoD and GIG Sign the Contract of Financial Agreement</u>

Defendants contend the parties at the October 19, 2004 meeting also discussed a financial plan that ultimately resulted in the Contract of Financial Agreement (CFA) between MoD and GIG. Under the CFA, GIG committed to finance the IMERP program MoD had contracted with Wye Oak to carry out. Pl.'s Ex. 21. Defendants' allegation that this arrangement was discussed during the October 19 meeting is solely based on the fact the memorandum Marr signed (but did not write) commemorating the meeting states that Shaways approved the three invoices and "the financial plan," which defendants claim refers to the CFA. *See* Pl.'s Ex. 20; Tr. 12/20/18 AM 25:8–26:3. Defendants proceed to argue there is no evidence Dale Stoffel objected to the payment plan set forth in the CFA despite being present when it was allegedly discussed and agreed upon during the October 19 meeting. Defs.' Proposed Findings of Fact & Conclusions of Law 16, ECF No. 431-1 [hereinafter ECF No. 431]. Defendants contend Wye Oak, through Dale Stoffel, had a legal obligation under Iraqi law to express disagreement with the CFA's payment plan under Article 81(1) of the Iraqi Civil Code. Article 81(1) provides: "No statement will be attributed to a silent person but silence in the course of need for expression will be deemed to be an acceptance." Pl.'s Ex. 97. Defendants conclude Wye Oak's failure to object to the CFA at the October 19 meeting or at any time prior to Zayna being paid, as discussed in the following section, means Wye Oak consented to such payment arrangement. ECF No. 431-1, at 45–46.

21

However, Marr robustly refuted this characterization of events when he testified during trial. Marr testified he understood the term "financial plan" in the memorandum he signed to be referring to the First Amendment. Tr. 12/20/18 AM 26:10–15. Indeed, Marr stated "[t]here was no discussion of a financial plan that has been documented elsewhere in the exhibits," referring to the CFA, and the only financial plan he reviewed during the October 19 meeting was the First Amendment. Tr. 12/20/18 AM 26:10–23. In addition, Beadle testified he never saw the CFA before it was presented to him as an exhibit at trial. Tr. 12/20/18 PM 78:19–24. And Beadle recalled the "financial plan" approved at the October 19 meeting referred to in Marr's memorandum was a plan "for the refurbishment program and the establishment of the facilities . . . It was largely -- the conversation started on the basis of those -- of the second invoice, which showed a proportion of what -- a much larger bill, and that bill was the financial plan." Tr. 12/20/18 PM 67:4–12. Based on this testimony thoroughly rebutting the tenuous (at best) evidence put forward by defendants, the Court concludes the CFA was not discussed during the October 19 meeting. This means no inference can be drawn that Dale Stoffel was ever even aware of—let alone consented to—the CFA.

Thus, without any input from Wye Oak, MoD and GIG concluded and signed the CFA on October 24, 2004. The CFA declared MoD had "signed contract [sic] with Wye Oak Technology Inc. to implement the program of rehabilitation and repair of military equipment" and GIG had "committed to funding this program of (Wye Oak Technology Inc.)." Pl.'s Ex. 21. The CFA stated that "[MoD] gives to [GIG] several payments under the bank guarantees as far as the amount of such payments for purposes of implementation of the contract," and "[GIG] submits cost invoices to the [MoD], so as to enable [GIG] of the resolve the invoices from the amount of the bank guarantee provided for the [MoD]." *Id.* Despite focusing on Wye Oak and the IMERP, the Court

concludes the CFA did not legitimately implicate the BSA, as the evidence establishes the CFA was not agreed to—let alone signed—by Wye Oak and therefore did not meet the requirements set forth in the BSA's modification clause. *See* Pl.'s Ex. 5 ("This Agreement shall not be amended or supplemented except in writing, signed by both parties.").

Further, following trial, this Court was presented with evidence—for the first time—that MoD officials were convicted for violating Iraqi law and intentionally causing harm based on their conclusion of a financial agreement with GIG, which the Court concludes more likely than not refers to the CFA. After a decade of litigation and months after this trial concluded, defendants produced a summary of the criminal conviction of Ziad Cattan along with Bruska Shaways and Sawsan Jasim. 34/CR3/2011, ECF No. 430. The summary states:

> In 2004, convicted fugitive Ziyad Tariq Abdallah Al Qattan, when he was working as the Deputy Secretary-General at the Ministry of Defense, in conjunction with the defendants Bruska Nouri Sadeeq and Sawsan Jasim Mohamed when they were working at the Ministry of Defense, concluded a financial agreement with the General Investment Group (GIG) Company to finance a Ukrainian company tasked with the rehabilitation of tanks for the Ministry. Failure to follow the legal procedures for contracting caused intentional harm to the state assets and to the interest of the entity for which he was working. An amount of four million dollars was paid for the maintenance of tanks type (T72). There was a second payment valued at (twenty-four million and seven hundred fourteen thousand and six hundred ninety-seven dollars and fifteen cents) for the maintenance of tanks type (T55). . . . He was convicted by the Al Rasafa Criminal Court, the specialist in integrity cases, and he was sentenced *in absentia* to seven years in prison, pursuant to article (340) of the Criminal Penalties Code, on 24/3/2011 in case number (34/CR3/2011).

34/CR3/2011, ECF No. 438-1.[4] The second payment cited in the conviction summary matches the exact amount owed to Wye Oak for the three invoices but paid to Zayna instead, as discussed below. And the summary appears to be referring to the CFA, as this was an agreement constituted

---

[4] Article 340 of the Iraqi Criminal Penalties Code states: "Any public official or agent who willfully inflicts damage on the property or interests of the authority for which he works or to which he is associated by virtue of his position or on another's property that has been entrusted to him is punishable by a term of imprisonment not exceeding 7 years or by detention." ECF No. 438-2.

between MoD and GIG in 2004 relating to the IMERP, which included the rehabilitation, refurbishment, and maintenance of tanks. This strongly indicates the CFA was a fraudulent scheme between these MoD officials and Zayna to steal millions of dollars.

I. MoD Paid Zayna Instead of Wye Oak

Following the CFA, MoD proceeded to pay Zayna for the invoiced amounts in three checks mirroring the three Wye Oak invoices, despite the fact Wye Oak was not a party to the CFA. On October 25, 2004, MoD paid three checks to Zayna. The first check was for $5,945,500, the second check was for $2,302,300, and the third check was for $16,466,897. Pl.'s Ex. 22 at 4. These amounts matched the totals of Invoice #TAJI001, Invoice #MUQ001, and Invoice #MUQ002, respectively, minus 15 cents.[5] *Compare id.*, *with* Pl.'s Ex. 18. This leads the Court to conclude these checks were payments for Wye Oak's three invoices, which MoD approved and had agreed to pay to Dale Stoffel at the October 19, 2004 meeting.

Although Felix testified Dale Stoffel was aware MoD released the money to Zayna and conveyed this to him, Felix Dep. 163:4–164:20, there is no evidence to indicate Wye Oak directed MoD to release the funds in this manner or concurred with this action. *Cf.* Pl.'s Ex. 5 ("All payment to be made to [Wye Oak] under this Agreement shall be made in United States Dollars in the form and manner directed as by [Wye Oak]."). As discussed, Wye Oak was not a signatory to the CFA so this agreement did not modify the BSA. And under the limited power of attorney granted by Wye Oak to Zayna, GIG was only supposed to provide financial services "when and as requested by Wye Oak," yet there is no evidence to suggest Wye Oak ever made such a request. Accordingly, the Court concludes these payments to Zayna—not Wye Oak—constituted a material breach of the BSA by MoD.

---

[5] Invoice #MUQ002 was for $16,466,897.15, whereas the third check to Zayna was for $16,466,897.00. The other two checks from MoD to Zayna matched Invoice #TAJI001 and Invoice #MUQ001 exactly.

J. Wye Oak Continued to Perform until Nonpayment Became a Serious Impediment

1. *Wye Oak Performed Work in Iraq*

Nonetheless, Wye Oak continued to perform activities as part of the IMERP. At trial, Major Todd Neal testified he observed Wye Oak working on the IMERP when he was tasked with leading the effort to refurbish vehicles to operational condition to be provided to the Iraqi military. Neal remembered that Dale and Ukrainian experts inspected warehouses at Taji and assessed military equipment. Tr. 12/19/18 AM 42:1–9; *see* Pl.'s Ex. 64. Dale Stoffel worked on the equipment alongside others at Muqdadiya and Taji, or had laborers working at those installments. Tr. 12/19/18 AM 42:12–43:4. Dale Stoffel brought Iraqi mechanics to these installations to have them perform work under the IMERP. Tr. 12/19/18 PM 59:2–10. Neal specifically recalled Dale Stoffel providing instructions for these workers and paying them for their work. Tr. 12/19/18 PM 59:2–10, 60:4–6. When asked whether he had knowledge of GIG hiring a workforce at Taji and Muqdadiya for the IMERP, Neal unequivocally responded GIG did not employ such a workforce. Tr. 12/19/18 PM 63:22–64:3. Neal reiterated the workers he interacted with were employed by Dale Stoffel, not anyone else. Tr. 12/19/18 PM 63:22–64:3. And based on his recollection, Neal estimated Wye Oak had between 12 and more than 20 people working at Muqdadiya and between 12 to 15 people working on armored vehicles alone at Taji. Tr. 12/19/18 AM 27:11–28:5.

As further evidence of Wye Oak's work, on October 23, 3004, Major John Petkosek wrote Colonel Styles, copying Dale Stoffel on the email, to report that "Dale and his team have been here [Muqdadiya] for a few days and they are doing great work. They have been working on the vehicles for several days now." Pl.'s Ex. 50.[6] Major Petkosek even attached a photograph—one of many admitted into evidence—of Wye Oak's team working on military vehicles. *Id.*

---

[6] This exhibit was admitted as a business record of Wye Oak's without objection. Tr. 12/18/18 AM 33:23–24; Tr. 12/18/18 PM 3:1–5:5.

In addition, Beadle recalled that Wye Oak was making progress and General Petraeus shared his pleasure with Wye Oak's labor. Tr. 12/20/18 PM 70:2–5; Petraeus Dep. at 40:12–16, 41:2–7. Petraeus avowed Wye Oak had " [a] lot of wrench-turners, as we used to say, and they were cranking out refurbished vehicles pretty expeditiously . . . what I saw was a lot of elbows and other parts of the body, as we used to say, actively turning wrenches, fixing equipment, repairing parts, replacing parts, and all the rest of this. Again, it was quite a beehive of activity up there." Petraeus Dep. 40:12–16, 41:2–7.

Finally, plaintiff cites another article from *The Advisor*, published on November 27, 2004, authenticated as a self-authenticating official publication and newspaper under Federal Rules of Evidence 902(5) and 902(6), to support the notion Wye Oak continued to perform into November 2004. *See* Pl.'s Ex. 29. In this article, the Iraqi 1st Mechanized Brigade Commander states the brigade represents the core of what could potentially be an expanded Iraqi force and could grow into a full division. *Id.* Although this assertion by an Iraqi MoD official was obviously an out-of-court statement, it is not hearsay and is admissible into evidence. The statement is not offered to prove the truth of the matter asserted—that the brigade could potentially lead to an expanded Iraqi force; rather, the statement is solely offered to show a brigade was actually being developed at this time.[7] Therefore, this falls outside the rule against hearsay. The Iraqi MoD official's statement is further acknowledgement that a brigade was being produced as part of the IMERP. This coincides with multiple pieces of evidence discussed above pointing to Wye Oak being the one conducting this IMERP work.

And Wye Oak was aided in its work by its informal partnership with CLI. Although Wye Oak never had a formal, signed subcontract agreement between it and CLI, CLI worked with Wye

---

[7] Even if this assertion was offered to prove the truth of the matter asserted, it would still be admissible as an admission by a party-opponent under Rule 801(d)(2). Fed. R. Evid. 801(d)(2).

Oak on the IMERP. Tr. 12/18/18 AM 53:8–25; Felix Dep. 42:14–44:21. David Stoffel recalled Wye Oak prepared a formal subcontract agreement for CLI, but the parties never went ahead with officially consummating that agreement because Wye Oak was waiting payment for the three invoices so it could use that money to pay its subcontractor. Tr. 12/18/18 AM 53:8–25. Wye Oak did not want to sign the agreement with CLI unless it actually had the money to pay CLI under that agreement. Tr. 12/18/18 AM 53:8–25. Nonetheless, William Felix testified the two companies had a verbal agreement. Felix Dep. 42:22–45:16. CLI employees, such as Kenny Kelzer and Joe Wemple, worked with Wye Oak on the IMERP due to the close relationship between these two companies. Tr. 12/19/18 AM 43:1–4; Tr. 12/18/18 PM 8:1–4, 50:21–25; Felix Dep. 6:16–7:24, 42:14–45:16, 114:1–115:11.

### 2. *Wye Oak Performed Work in the United States*

While Dale Stoffel and others on Wye Oak's team performed in Iraq, David Stoffel supported the group from the U.S. David Stoffel focused on writing a computer program that could ultimately be used to inventory and track all the equipment Wye Oak was refurbishing and would potentially broker for sales. Tr. 12/18/18 AM 38:11–41:17; Pl.'s Ex. 65. Dale Stoffel would send David Stoffel information regarding the equipment and how far along pieces of equipment were in the refurbishment and scrapping process. Tr. 12/18/18 AM 38:11–41:17; Pl.'s Ex. 65. David used this information to build the computer program to aid the company in its IMERP work.

David Stoffel also purchased computer equipment and materials, such as software, for the business in the U.S. Tr. 12/18/18 AM 44:5–19. He oversaw all electronic communications, in part to ensure Wye Oak's leadership was aware of all messages they received, as the team traveled frequently and maintaining e-mail communications and Internet connection could be challenging at times in Iraq during this period. Tr. 12/18/18 AM 44:5–19. In addition to these duties, David

Stoffel maintained regular communication with the Wye Oak members in Iraq to see what they needed him to work on. Tr. 12/18/18 AM 50:1–24.

### 3. *Nonpayment Eventually Became a Significant Impediment to Wye Oak's Work*

Eventually, the nonpayment of Wye Oak's three invoices to Wye Oak created a significant impediment to their continued IMEPR work. Frustrated by not receiving payment, Dale Stoffel returned to the U.S. in November 2004. Tr. 12/18/18 AM 60:18–20. Yet, his brother, David, observed him continuing to work on the Wye Oak venture focused on the IMERP even when he was back in the United States during this time. Tr. 12/18/18 AM 60:18–61:15. David and Dale Stoffel reached out to American officials, including senators and Secretary of Defense Donald Rumsfeld, during this period to notify them about the significant hurdles to accomplishing the IMERP's goal. Tr. 12/18/18 AM 59:17–60:20. In late November, Dale Stoffel and Bob Irey, a member of CLI, met with then-Senator Rick Santorum's staff regarding the lack of payment to Wye Oak for work it performed under the IMERP initiative. Pl.'s Ex. 60, 6.[8] Wye Oak and CLI representatives also met with then-Deputy Under Secretary for International Technology Security John Shaw to discuss this issue. *Id.*

On November 25, 2004, Dale Stoffel emailed Zayna to stress the necessity of GIG releasing the funds for the work being conducted under the IMERP. Pl.'s Ex. 31.[9] Stoffel conveyed officials had become concerned over delays in the IMERP and he wanted the funds to be released to prevent any future delays. *Id.*[10] However, Zayna refuted Stoffel's characterization of events—claiming

---

[8] This document was admitted into evidence under the public records exception to the rule against hearsay. Fed. R. Evid. 803(8). The documents in this exhibit were released pursuant to the Freedom of Information Act (FOIA) by the U.S. Department of State. They are records of a public office setting out that office's activities and therefore fall under the public records exception. *Id.*

[9] This email was admitted as evidence without objection as a business record of Wye Oak's. Tr. 12/18/18 AM 33:23–24; Tr. 12/18/2018 PM 3:1–5:5.

[10] Dale instructed Zayna to transfer money owed to Wye Oak to Wye Oak's bank account at national City Bank of Pennsylvania in Monongahela, Pennsylvania. Pl.'s Ex. 31.

GIG was a partner in the project and was paying for everything. Pls.' Ex. 33.[11] And Zayna urged Dale Stoffel to return to Iraq to sort through these financial issues. *Id.*

Finally, Brigadier David Clements set up a call with Stoffel at the end of November to try to convince Stoffel to return to Iraq. Tr. 12/17/18 PM 17:7–18:9. The IMERP was a critical program and those involved needed to figure out a way to get the program moving forward once again. Ultimately, at the end of the call between Stoffel and Clements, Stoffel agreed to return to Iraq. *Id.*

K. December 5, 2004 Meeting

Brigadier Clements's staff convened a meeting at MoD headquarters on December 5, 2004 to remedy the problem that had arisen with the IMERP. Tr. 12/17/18 PM 18:10–13. Dale Stoffel attended the meeting on behalf of Wye Oak; Ziad Cattan, Bruska Shaways, Michal al-Sarraf, and others attended on behalf of MoD; Clements, Beadle, Styles, Marr, and others attended on behalf of the Coalition; and Zayna also attended. Tr. 12/17/18 PM 19:4–20:11; Tr. 12/20/18 AM 33:3–14; Tr. 12/20/18 PM 71:17–72:16.

Clements, Marr, and Beadle each testified at trial regarding their recollection of what transpired at this meeting. The conversation focused on why Wye Oak had not been paid. Clements asked the Iraqi officials to respond to the allegation Wye Oak had not been paid despite submitting the invoices and doing the work under the IMERP:

> [Brig. Clements]: Ziad Cattan spoke first. And in what can only be described as a display of some bluster, started off by saying: Well, the work hasn't been done, and there are problems with the work and that's why the invoices hadn't been paid.
> I tried to pin him down to say precisely what had not been done or what work was unsatisfactory. He was unable to give any concrete examples of this, and became increasingly agitated as he was trying to describe things that he didn't have the facts for.

---

[11] This email was admitted as evidence without objection as a business record of Wye Oak's. Tr. 12/18/18 AM 33:23–24; Tr. 12/18/2018 PM 3:1–5:5.

He was interrupted, at some point, by Bruska Shaways, who said: Well, actually, the real issue is, we cannot pay the invoices because the money to pay the invoices is being held by this gentleman. And he pointed to the person who hadn't been introduced to me at the start of the meeting. And he explained that this was somebody who I later learned was Mr. Zayna, who was some form of intermediary holding the funds in Beirut, Lebanon. And that was the first I or, indeed, any of my staff who briefed me on the contractual arrangements had heard of the funding arrangements for IMERP.

[Plaintiff's Counsel]: So you learned that the funds actually had been paid but had been paid to a Mr. Zayna, and those funds were in Lebanon, correct?

[Brig. Clements]: That's what I was told, yes.

[Plaintiff's Counsel]: All right. Did you then make inquiry of the MOD as to how they could get those funds paid to Wye Oak?

[Brig. Clements]: I think I made the inquiry of Mr. Zayna to say: Well, are you going to pay this money to Wye Oak and to Mr. Stoffel?

Bruska Shaways had explained to me that this somewhat unusual arrangement was necessary as a means of transferring money from Baghdad, because the banking system was not working after the invasion and in the difficult circumstances at the time. So I said: Okay. But let's talk about this. *And I asked Zayna, directly what he needed to pay the money to Wye Oak. And he explained that he could not pay that money without the authorization of the Iraqi MOD.*

I went back to the Iraqi MOD and I said: Can you give Mr. Zayna the authorization to pay the monies to Wye Oak? And despite the earlier bluster from Mr. Cattan, both he and Mr. Shaways agreed that, yes, they could give that direction to Mr. Zayna, and that they would tell him to pay the money to Wye Oak.

I asked Zayna if he was happy with what the Iraqi MOD would tell him; he said he was. And I asked Mr. Stoffel if he was happy with what the Iraqis and Mr. Zayna had said, and Mr. Stoffel said that, yes, he was satisfied with that.

Tr. 12/17/18 PM 20:12–22:25 (emphasis added). Marr and Beadle each recounted substantially similar versions of what transpired at the December 5 meeting. Each recalled that Cattan or Shaways initially objected to paying Wye Oak, but eventually agreed the money should be released, through Zayna, to Wye Oak. Tr. 12/20/18 AM 33:15–34:25, 35:9–25, 36:14-37:1; Tr. 12/20/18 PM 72:17–73:21; 73:22–74:9.

The statements by Cattan, Shaways, and Zayna were all admissible as admissions by party-opponents—and therefore non-hearsay—under Federal Rule of Evidence 801(d)(2). Cattan and Shaways were authorized by the MoD to make statements regarding the BSA and IMERP, and were both MoD officials making statements on a matter—the BSA—within the scope of their

relationships with MoD while that relationship existed. *See* Fed. R. Evid. 801(d)(2)(C)–(D). Also, Zayna was MoD's agent, as MoD had paid Zayna the money for the invoices and Zayna was being used as an intermediary by MoD to pay Wye Oak. Thus, Zayna's statements constituted assertions made by MoD's agent on a matter—the payments under the BSA for the three invoices—within the scope of that relationship while it existed. Fed. R. Evid. 801(d)(2)(C).

Ultimately, the largely parallel testimony offered by Clements, Marr, and Beadle—three highly credible witnesses who were present for the December 5 meeting—establishes by a preponderance of the evidence MoD agreed to provide authorization for the release of the funds by Zayna to Wye Oak to pay for the three invoices. The Coalition officials and Dale Stoffel believed they had finally solved this critical issue and the IMERP program could proceed. *See, e.g.*, Tr. 12/17/18 PM 24:23–25:20; Tr. 12/20/18 AM 36:23–37:1; Pl.'s Ex. 40.

L.  Wye Oak Goes Back to Work, But Dale Stoffel is Murdered

Several days after the meeting, on December 8, Clements toured Taji with Dale Stoffel to review Wye Oak's work. Tr. 12/17/18 PM 26:8–25; *see* Pl.'s Ex. 59 (pictures from Clements's December 8 tour of Wye Oak's activities at Taji). Clements observed a "vast area of armored vehicles and other equipment in various states of repair," and specifically focused on numerous vehicles that were in decent condition and were selected to be refurbished next. Tr. 12/17/18 PM 28:13–24, 30:7–23; Pl.'s Ex. 59 at 4 (a picture of Clements, Stoffel, General Bashar (the Iraqi Mechanized brigade Commander), and others standing in front of one of the tanks deemed suitable for the refurbishment effort). Wye Oak and MNSTC-I personnel set up a triage process to determine what vehicles were most suitable for refurbishment. Tr. 12/17/18 PM 34:15–35:1. The IMERP appeared ready to once again move forward.

But tragedy struck. Dale Stoffel left Taji with his interpreter and Joe Wemple, who was the construction manager working with Dale on the IMERP, to travel to Baghdad to arrange for funding to be released later in the day on December 8. Tr. 12/18/18 PM 5:3–6:11; Pl.'s Ex. 42; Defs.' Ex. 40. Their car was attacked and Dale Stoffel and Joe Wemple were brutally murdered. Pl.'s Ex. 42. Dale Stoffel and Joe Wemple were shot multiple times and killed, and their car was shot up. *Id.* It remains unknown what happened to the translator traveling with them. Although a terrorist group claimed responsibility for their murders, numerous witnesses speculated this terrorist group was just a cover-up and Zayna and Cattan were actually responsible for their killings.[12] Tr. 12/18/18 AM 70:7–72:2; Tr. 12/19/18 PM 6:20–7:18; Tr. 12/20/18 PM 16:8–18:16, 20:9–24.

Wye Oak's work, led by Dale Stoffel, had already made a significant impact. Indeed, General Petraeus credited Dale Stoffel for refurbishing a significant number of armored vehicles and tanks in his letter to Dale Stoffel's wife, Barbara Stoffel, after his murder. On December 15, 2004, General Petraeus wrote:

> While there is nothing I can say to minimize your grief, I hope that in time you will take comfort in knowing that Dale made a direct and lasting contribution to our efforts to create capable and effective Iraq security forces. Only months ago the Iraqi Armed Forces had no mechanized force; now, there are already many operational tanks and armored vehicles, and Iraq is on track to have a battalion's worth of soldiers trained and equipped prior to January's elections. None of this would have been possible without your husband's visionary leadership, relentless drive, and complete dedication. An irreplaceable member of our team, he will be sorely missed by all who knew him.

Petraeus Dep. 26:23–30:3; Pl.'s Ex. 43.

---

[12] The Court is unable to make a definitive assessment of who was responsible for Dale Stoffel and Joe Wemple's murders based solely on the testimony elicited during trial.

M. Wye Oak Produced Armored Vehicles in Time for the January 2005 Elections, But Eventually Ceased to Perform Work in Iraq Because It was Never Paid

Nonetheless, Wye Oak did not immediately abandon the IMERP after Dale's death and actually exceeded the goal of producing a mechanized brigade of operational armored vehicles for Iraq's January 2005 parliamentary election.

William Felix took over as Wye Oak's CEO and President following Dale's death. Felix Dep. 200:8–15. And Wye Oak and CLI's American personnel either returned to the U.S. or stayed in the U.S. rather than travel back to Iraq. Felix Dep. 48:24–49:7. Yet Wye Oak did not abandon the IMERP. They relied on their local contractors to move forward. Tr. 12/18/18 AM 72:15–23. David Stoffel specifically testified Ahmet Ersavci, a Turkish businessman, continued working with Wye Oak through 2005. Tr. 12/18/18 PM 7:14–19. And Major Neal, who was charged with overseeing the work on behalf of the U.S. military to ensure the IMERP progressed, testified the same personnel continued to conduct work at Muqdadiya and Taji even after Dale's death as had been working on the IMERP for Wye Oak prior to Dale's murder. Tr. 12/19/18 AM 24:18–25:8. In particular, Neal recalled that an individual named Karem, Wye Oak's Iraqi supervisor and foreman at Muqdadiya who Dale hired, was in charge of Wye Oak's labor force in Iraq after Dale's death. Tr. 12/19/18 PM 65:3–21; Pl.'s Ex. 44. And Neal provided instructions to Karem during this period, essentially becoming a project manager as they worked to accomplish the IMERP mission. Tr. 12/19/18 PM 65:3–21. Neal testified Zayna stepped in after Dale's death to pay the workers, but he never actually saw Zayna provide payment to the workers. Tr. 12/19/18 AM 21:12–23:20. And Beadle adamantly stated Zayna and GIG did not do any work in connection with refurbishing military equipment, bases, or facilities while Beadle was in Iraq, which was until March 2005. Tr. 12/21/18 AM 12:11–22; 17:11–17.

By December 17, 2004, Wye Oak's team, under Karem and Neal's leadership, had 26 tanks running and an MTLB (a Soviet multi-purpose armored vehicle) and seven troop carriers ready to move from Muqdadiya to Taji. Pl.'s Ex. 44 at 1. Neal also projected they would have another 20 vehicles, mostly tanks, ready the following week. *Id.* Wye Oak's work was on display during Iraq's January 5, 2005 Army Day parade to Iraqi Prime Minister Ayad Allawi. Iraqi tanks and armored vehicles all flying the Iraqi flag were featured in this parade. Petraeus Dep. 21:3–22:9. General Petraeus and Beadle both testified the tanks and armored vehicles on display during the Army Day parade were the result of Wye Oak's refurbishment efforts. Tr. 12/21/18 AM 1:11–12:22; Petraeus Dep. 39:2–40:16.

And by January 15, 2005, the Iraqi 1st Mechanized Brigade was fully operational and ready to assume its mission. In an article in *The Advisor*, Iraqi Staff Brigadier General Kasim Jasim Nazal declared "[t]he brigade is at the Ministry to protect it and all the election centers . . . We are also going to keep Baghdad secure and protect the main gates of the city; the brigade will be very visible on election day." Pl.'s Ex. 47 at 3.[13] Neal testified Wye Oak exceeded the goal of producing a battalion of hard-skinned vehicles and tanks to have in Baghdad for the January 30, 2005 election. Tr. 12/19/18 AM 25:9–25, 26:6–14. It was very important to have Iraqi forces providing security for the first Iraqi elections since the fall of Saddam Hussein. Tr. PM 12/17/18, 36:1–10. "The original mandate was to provide one battalion of armored vehicles. At the elections we had provided two and a half battalions of armored vehicles, almost the entire brigade complement." Tr. 12/19/18 AM 25:9–25, 26:6–14; *see* Pl.'s Ex. 64 at 63 (a picture of U.S. and Iraqi forces with tanks at a checkpoint in Baghdad as the Coalition delivered the vehicles to Baghdad for the

---

[13] This statement was admissible as an admission by a party-opponent under Rule 801(d)(2). Fed. R. Evid. 801(d)(2). Iraqi Staff Brigadier General Nazal was an Iraqi MoD official authorized to make statements about the mechanized brigade he was tasked with leading and was an employee making a statement on a matter within the scope of his employment relationship while it lasted.

election); Tr. 12/19/18 AM 46:20–47:4. And Neal asserted: "Wye Oak's people refurbished [those vehicles]." Tr. 12/19/18 AM 25:9–25, 26:6–14.

But eventually, the lack of funding caused Wye Oak to cease operations in Iraq sometime after the January 2005 election.[14]

## N.   Iraq Prohibits Scrap Sales

Finally, while Wye Oak worked to provide armored vehicles in time for the January 2005 election, the Council of Ministers issued a decision to prohibit scrap sales to private parties. Defs.' Ex. 58. On December 28, 2004, the General Secretary of the Council of Ministers sent a letter addressed to all ministries stating scrap materials were proscribed from being sold to merchants or any private sector entities. *Id.* Further, the letter required ministries to deliver extra scrap to the state-owned companies belonging to the Ministry of Industry and Minerals. *Id.*

Yet, as with the scrap policy decision made in July 2004, there is no evidence Wye Oak was ever informed of this directive and the Court does not believe defendants established it ever applied to MoD.[15] No copy of this letter was found in MoD's files, and as discussed below, the Court has reason to believe the absence of a copy of this letter indicates it did not apply to MoD.

## III. Legal Discussion

### A.   MoD is Not Separate from the Republic of Iraq

This Court previously held MoD and Iraq are separate juridical entities as a matter of Iraqi law in an opinion denying Wye Oak's motion for judgment on the pleadings on this narrow question. *Wye Oak Tech., Inc. v. Republic of Iraq*, 72 F. Supp. 3d 356, 359 (D.D.C. 2014). This

---

[14] The Court was not presented with any evidence or testimony Wye Oak continued to perform work on the IMERP after early 2005.

[15] As stated *supra* in Section II(B), Neal testified General Bashar, an MoD official working on the effort to recover vehicles, informed him the scrap ban was intended to stop individuals from illegally taking scrap and did not affect Wye Oak. Tr. 12/19/18 AM 29:22–31:16; Tr. 12/19/18 PM 4:9–18.

determination was grounded in Iraq's answer to Wye Oak's complaint that stated MoD is a separate juridical entity from the Republic of Iraq. *Id.* at 360–61. On a motion for judgment on the pleadings, the Court was required to accept as true all facts pled by the non-moving party and make all reasonable inferences favorable to the non-movant. *Peters v. National R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992). Accordingly, this Court made the presumption that MoD is a legally separate entity from Iraq for purposes of determining liability in this case. *Id.* The Court recognized the ultimate determination on this issue was necessarily fact dependent and reserved final judgment on the matter until the then-sparse record at that stage in litigation was more fully developed. Now that the Court has had the benefit of completing the bench trial and having expert testimony from plaintiff's Iraqi law expert (the only Iraqi law expert presented to this Court), the Court is finally able to resolve this issue. MoD is not separate from the Republic of Iraq—MoD and Iraq are legally one and the same.

The Foreign Sovereign Immunities Act (FSIA) provides federal courts with original jurisdiction over suits against foreign states if one of the statute's enumerated exceptions to sovereign immunity applies. 28 U.S.C. § 1330. Under the FSIA, a "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Id.* § 1603. The distinction between (1) a political subdivision of a foreign state and (2) an agency or instrumentality of a foreign state is fundamental under the FSIA.

Without the benefit of a complete record, this Court turned to the Supreme Court's decision in *First National City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611 (1983), addressing the separate juridical status of state-owned entities. In *Bancec*, the specific question was whether a separate instrumentality, a state-owned bank, could be held liable for actions of the foreign state. *Id.* The Supreme Court held that "government instrumentalities

established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626–27. However, this presumption could be overcome if: (1) the instrumentality was so extensively controlled by the sovereign that a relationship of principal and agent is created; or (2) recognizing the instrumentality as a separate entity would "work a fraud or injustice." *Id.* at 629–30.

Now that this Court has a fully developed record, the Court can now finally assess whether MoD is an inseparable part of the Republic of Iraq or constitutes an agency or instrumentality. The Court concludes the *Bancec* presumption does not apply here because no meaningful distinction can be drawn between MoD and Iraq. *Bancec* focused on foreign sovereigns' instrumentalities, but MoD is an integral component of the national government itself.

Courts use the "core functions" test to distinguish between foreign states and their agencies and instrumentalities. Under the core functions test, the Court must determine whether the foreign entity's core functions are predominantly government or commercial. *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994). If the entity's core functions are governmental, then the entity is considered part of the state itself. *See e.g.*, *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (holding that the Iranian "Ministry of Foreign Affairs must be treated as the state of Iran itself rather than its agent" because the conduct of foreign affairs is an indispensable governmental function); *Transaero*, 30 F.3d at 151 (holding the Bolivian Air Force was a foreign state because its core functions were governmental); *see also Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) (concluding the Polish Ministry of the Treasury is not an "agency or instrumentality" for purposes of the "takings" exception of the FSIA, but rather is an integral part of Poland's political structure with an indisputable governmental function, and as such is the "foreign state" itself).

37

MoD's core functions are primarily governmental. MoD was established as part of the transitional government by CPA Order 67. Pl.'s Ex. 113. Professor Chibli Mallat, plaintiff's Iraqi law expert, testified CPA Order 67 and other CPA orders "re-organiz[ed] the government in a way that would extricate it from its regrettable antecedence of bearing the main features of a dictatorship . . . the CPA order is the establishing order for the operation of government in Iraq and this has naturally an important consequence in this case on the placing of the Ministry of Defense as part and parcel of the Iraqi government." Mallat Dep. 2/14/19 37:11–21. Mallat repeatedly stressed the CPA orders promulgated at this time regarding the MoD were intended to "subordinate" the MoD to Iraq's civilian institutions that were elected by the Iraqi people. Mallat Dep. 2/14/19, 37:22–41:4. CPA Order 67 explicitly states "all those who work in the MoD are responsible to lawfully elected civilian authority." Pl.'s Ex. 113 § 5(c). Indeed, the Prime Minister is the commander-in-chief of the Iraqi armed forces. Pl.'s Ex. 111 art. 78; Pl.'s Ex. 112 art. 39. Further, CPA Order 67 declares "[t]he mission of the MoD is to secure, protect, and guarantee the security of Iraq's borders and to defend Iraq." Pl.'s Ex. 113 § 4. Nothing could be a more core governmental function.

Also, the Iraqi Law of Executive Authority, which Iraq uses to argue MoD is a separate instrumentality, provides that each ministry "shall be considered as an expression of the word government." Law of Executive Authority No. (50) 1964, art. I, para. 2, Pl.'s Ex. 108. Contrary to Iraq's contention, this text demonstrates MoD, as a ministry, is "part and parcel of the government." Mallat Dep. 2/14/19, 53:4–55:22.

As the D.C. Circuit determined in *Transaero*, "armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state. The 'powers to declare and

wage war' are among the 'necessary concomitants' of sovereignty." *Transaero*, 30 F.3d at 153 (D.C. Cir. 1994) (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936)). The Court's examination of the evidence and testimony presented in this case lead it to determine this rule is aptly applied to the MoD here. No governmental entity is more closely linked with the state itself than the MoD—the entity charged with defending the nation. As a result, the Court holds that MoD is an inseparable part of the Republic of Iraq. And the Republic of Iraq is therefore liable for any breach of the BSA by MoD.

B. <u>The Court has Subject Matter Jurisdiction and Personal Jurisdiction Over Defendants</u>

The FSIA provides the only means of suing a foreign sovereign in U.S. courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). A foreign state is presumptively immune from federal and state courts' jurisdiction, subject to several codified exceptions. *See id.* §§ 1604–1607.

Jurisdiction in this case is predicated upon the FSIA's commercial activity exception to sovereign immunity. Under the FSIA:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

*Id.* § 1605(a)(2). Wye Oak only needs to establish its claim falls within one of the exceptions provided in § 1605(a)(2) because the exceptions are disjunctive and only one needs to apply to bestow jurisdiction.

### 1. *The BSA was a "Commercial Activity" Under the FSIA*

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d). The Supreme Court has further elaborated on what constitutes commercial activity under the FSIA. In *Weltover*, the Court concluded:

> when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. Moreover, because the [FSIA] provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce."

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614–15 (1992) (citing Black's Law Dictionary 270 (6th ed. 1990)). Specifically, the Supreme Court stated "a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." *Id.* at 615.

Under the BSA, Wye Oak was contracted to provide commercial services to MoD. Wye Oak was appointed as the sole and exclusive broker to conduct inventory, assess, and rehabilitate military equipment in connection with the IMERP; arrange scrap sales; provide military refurbishment services, including constructing facilities; and arrange military equipment sales. *See* Pl.'s Ex. 5; Pl.'s Ex. 19. A contract to engage in these activities is undoubtedly commercial in nature because private companies can similarly contract to have goods inventories and rehabilitated, contract to have facilities constructed, and contract with a broker to arrange the sale of goods. It is irrelevant under § 1603(d) that the contract involved activities related to the military

and aimed to re-equip the Iraqi military to enhance that country's security—a core sovereign interest. Accordingly, the BSA constituted a "commercial" activity under the FSIA.

### 2. *This Action is Based Upon an Act Performed in the U.S. in Connection with a Commercial Activity of Iraq Elsewhere*

This Court has jurisdiction under clause two of the commercial activity exception. Wye Oak's breach of contract claim is based on acts performed in the U.S. in connection with a commercial activity of the foreign state, Iraq, elsewhere.[16]

The Fourth Circuit previously concluded Wye Oak sufficiently showed that its breach of contract claim could proceed under clause two in denying Iraq's appeal of the denial of its motion to dismiss on sovereign immunity grounds.[17] *Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 216 (4th Cir. 2011). The Fourth Circuit determined Wye Oak's computer programming and administrative activities performed in the U.S. in connection with MoD's activities regarding the BSA in Iraq demonstrated the breach of contract claim was based on an act performed in the U.S. in connection with a commercial activity of the foreign state elsewhere. *Id.*

Although the case was transferred to this Court, and therefore is no longer within the Fourth Circuit, the law-of-the-case principle indicates the Fourth Circuit's opinion should nonetheless control. The law-of-the-case principle stipulates a court should be loath to disturb its own or a coordinate court's prior decisions absent extraordinary circumstances. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988); *see Hill v. Henderson*, 195 F.3d 661, 678 (D.C. Cir.

---

[16] The Court refers to the foreign state as Iraq in its discussion on its subject matter and personal jurisdiction over defendants because MoD is part of the state itself. *See supra* Section III(A).

[17] The Fourth Circuit's opinion had the oddity of being decided after the case was transferred to this Court. The Eastern District of Virginia district court that originally had the case transferred it to the U.S. District Court for the District of Columbia, but reached the issue of jurisdiction in the same opinion granting Iraq's request to transfer the case to this district. *Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:09cv793, 2010 WL 2613323 (E.D. Va. June 29, 2010). Iraq appealed that district court's denial of its motion to dismiss based on sovereign immunity, and this Court stayed the case pending the outcome of the Fourth Circuit's decision. The Fourth Circuit determined it had jurisdiction over Iraq's appeal. *Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 209–11 (4th Cir. 2011).

1999) (recognizing "a decision of a court of coordinate state is entitled to be considered law of the case") (internal quotations marks omitted); *see also* Charles A. Wright et al., *Federal Practice and Procedure* § 4478.4 (4th ed. 2007) ("Special situations . . . may bring the same case successively to different courts of appeals. . . . In all of these circumstances, an appellate court tends to defer to the earlier appellate decision in much the same way as it would defer to its own earlier decision.").

The mandate rule further compels this Court to follow the Fourth Circuit's decision on this matter. The mandate rule forbids lower "courts from reconsidering issues that have already been decided in the same case." *Indep. Petrol. Ass'n of Am. v. Babbitt*, 235 F.3d 588, 597 (D.C. Cir. 2001) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 n.3 (D.C. Cir. 1996) (en banc)). "When matters are decided by an appellate court, its rulings, unless reversed by it or by a superior court, bind the lower court." *Ins. Grp. Comm. v. Denver & R. G. W. R. Co.*, 329 U.S. 607, 612 (1947).

And in any event, the Fourth Circuit's determination was correct. The Supreme Court in *Nelson* held that the phrase "based upon" in the FSIA's commercial activity exception refers to "those elements that, if proven, would entitle a plaintiff to relief under his theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993). In *Nelson,* an American employee of a Saudi hospital sued the Kingdom of Saudi Arabia seeking damages for injuries he allegedly suffered while detained and tortured by the Saudi government. *Id.* The employee argued the commercial activity exception applied because the hospital recruited him in the U.S. *Id.* While the Supreme Court determined these recruiting activities "led to the conduct that eventually injured" the employee, they were not the basis for the suit. *Id.* at 358. The torts Saudi Arabia allegedly committed formed the basis for the suit—not the arguably commercial activities that came before their alleged commission. *Id.* Because the employee had no need to demonstrate the hospital

42

recruited him in order to prevail on the merits, the hospital's recruiting activities provided no basis for his suit. *Id.*

Although *Nelson* interpreted the phrase "based upon" in the commercial activity exception's first clause, the nearly identical statutory text and structure of clauses one and two led the D.C. Circuit to conclude that "based upon" means the same thing in both clauses. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 37 (D.C. Cir. 2014). The D.C. Circuit noted, "to the degree that the text leaves any ambiguity, the legislative history is 'crystal clear' that clause two's reference to acts 'performed in the United States in connection with a commercial activity of the foreign state elsewhere' is 'limited to those' acts 'which in and of themselves are sufficient to form the basis of a cause of action.'" *Id.* at 37–38 (quoting *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514 (D.C. Cir. 1988) (quoting H.R. Rep. No. 94–1487, at 19 (1976), 1976 U.S.C.C.A.N. 6604)); *see* S. Rep. No. 94–1310, at 18 (1976), 1976 U.S.C.C.A.N. 1983.

In *Odhiambo*, the D.C. Circuit fashioned a test under clause two based on *Nelson*. The D.C. Circuit stated: "a suit against a foreign sovereign may proceed under clause two only if the 'act performed in the United States in connection with a commercial activity of the foreign state elsewhere' establishes a fact without which the plaintiff will lose." *Odhiambo*, 764 F.3d at 38. Here, the acts Wye Oak performed in the U.S. in connection with the BSA in Iraq established Wye Oak performed under the BSA, which is a necessary aspect to succeeding in a breach of contract case when a defendant asserts the plaintiff did not perform.

As discussed in Section II(J)(2), Wye Oak performed work in the United States. David Stoffel conducted activities supporting Wye Oak's efforts under the BSA. David Stoffel focused on writing a computer program that could ultimately be used to inventory and track all the equipment Wye Oak was refurbishing and would potentially broker for sales. Tr. 12/18/18 AM

38:11–41:17; Pl.'s Ex. 65. This work aided Wye Oak's efforts under the IMERP. Further, David Stoffel oversaw the company's electronic communications from his perch in the U.S., in part to ensure Wye Oak's leadership was aware of all messages they received, as the team traveled frequently and maintaining e-mail communications and Internet connection could be challenging at times in Iraq during this period. Tr. 12/18/18 AM 44:5–49:18. In addition, Wye Oak performed administrative activities in the U.S. in support of the BSA. Tr. 12/18/18 AM 49:19-50:24.

These acts performed in the U.S. were done in connection with Iraq's commercial activity, the BSA, in Iraq. And these U.S.-based acts establish Wye Oak performed (partly in the U.S. and partly outside the U.S.) under the BSA. Performance is a fact without which Wye Oak would lose. So Wye Oak's action falls within clause two: the action is based upon "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2). Thus, the Court has subject matter jurisdiction over Iraq and MoD.

### 3. *The Court has Personal Jurisdiction over Iraq and MoD*

This Court has personal jurisdiction over Iraq and MoD under 28 U.S.C. § 1330(b). Section 1330(b) provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district court" has subject matter jurisdiction under the FSIA as long as the defendant was properly served under 28 U.S.C. § 1608. As discussed above, this Court has subject matter jurisdiction over defendants, as Iraq and MoD are not entitled to sovereign immunity based on the FSIA's commercial activity exception. And proper service was effectuated in this case in accordance with 28 U.S.C. § 1608(a)(3).[18] The Clerk of Court mailed a copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state to the head of Iraq's Ministry of Foreign Affairs at the Minister's office in Baghdad,

---

[18] 28 U.S.C. § 1608(a)(3) requires that service be sent "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of court to the head of the ministry of foreign affairs of the foreign state concerned."

Iraq. Certificate of Clerk, ECF No. 127; Service, ECF No. 128.[19] The Court does not need to examine whether Iraq and MoD have the minimum contacts that would otherwise be required to find personal jurisdiction under the Fifth Amendment's Due Process Clause, as foreign sovereigns are not "persons" protected by the Fifth Amendment. *I.T. Consultants, Inc. v. Islamic Republic of Pakistan*, 351 F.3d 1184, 1191 (D.C. Cir. 2003); *see also Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) (in FSIA cases, "subject matter jurisdiction plus service of process equals personal jurisdiction") (internal quotation marks and citation omitted). Accordingly, this Court has personal jurisdiction over the defendants.

## C. Defendants Breached the BSA

### 1. *Wye Oak's Three Invoices Were Submitted Under the BSA*

Wye Oak's three invoices were submitted pursuant to the BSA. Under the BSA, Wye Oak was the sole and exclusive broker for several enumerated activities. Pl.'s Ex. 5 ¶ 2. Two of these activities are applicable to the three invoices. First, Wye Oak was appointed as MoD's sole and exclusive broker for "the accounting, inventory, and assessment of discarded and/or damaged Military Equipment in connection with the Iraqi Military Equipment Recovery Project to identify which Military Equipment is salvageable and suitable for Military Refurbishment Services and which Military Equipment is scrap." *Id.* Second, Wye Oak was appointed as MoD's sole and exclusive broker for "the provision of Military Refurbishment Services with respect to all of the various military bases, offices and properties owned by, or under the control of, the Ministry and/or the Republic of Iraq, wherever such bases, offices and property maybe [sic] located and all the

---

[19] MoD and Iraq each filed their answers to Wye Oak's amended complaint after proper service was effectuated. Answer by the Ministry of Defense of the Republic of Iraq, ECF No. 129; Answer by the Republic of Iraq, ECF No. 139.

related military equipment located thereon or otherwise owned by the Ministry and/or the Republic of Iraq." *Id.*

The BSA further directed Wye Oak to provide military refurbishment services pursuant to the terms of the Agreement, designated the military installations where the work would commence, and required Wye Oak to use all reasonable commercial efforts to perform the work. *Id.* ¶ 2–3. The BSA specified Wye Oak was not under any obligation to spend *any* sum of money in performing military refurbishment services or in developing markets and sales prospects for equipment and scrap under the BSA other than money advanced by MoD to cover expenses associated with performing military refurbishment services, selling military equipment or refurbished military equipment, or scrap sales. *Id.* ¶ 3.

As detailed in Section II(C), the BSA provided specific definitions for the terms used in the contract. The terms "military equipment," "military refurbishment services," "refurbished military equipment," and "customers" are all applicable to determining whether the three invoices fall under the BSA. Military equipment was defined as "any equipment that is used by or in the provision of military, including, without limitation, any and all vehicles, aircrafts, guns, missiles, armored personnel carriers, heavy armor/tanks, military radar equipment, ballistic missiles, rocket launchers, artillery, artillery scrap, small arms, small arms scrap or any parts or components thereof." *Id.* Military refurbishment services was defined as "any services sold, performed for, or provided with respect to any Refurbished Military Equipment that is either retained by the Ministry or sold or otherwise provided to Customers by the Ministry, including, but not limited to, the inspection of the Military Equipment prior to performing any Military Refurbishment Services to make a value assessment and a refurbishing assessment for such Military Equipment." *Id.* The BSA provided that "Refurbished Military Equipment shall mean any Military Equipment that has

been refurbished by, or under the direction of, the Broker pursuant to this Agreement, and sold or provided to customers by the Ministry." *Id.* And customers were defined as "purchasers of the 'Military Refurbishment Services' and/or 'Refurbished Military Equipment' and 'or Scrap sales' including, but not limited to, Iraqi Ministry of Defense, commercial establishments and governmental and semi-governmental entities in the military sector." *Id.*

In October 2004, Wye Oak submitted three pro forma invoices to MoD: Invoices #MUQ001, #TAJI001, and #MUQ002. These invoices covered the initial construction costs for armored vehicle repair facilities and for the initial repair of 246 armored vehicles at Muqdadiya and Taji. Pl.'s Ex. 18. They also covered the costs of purchasing tools and moving spare parts; the costs of initial hiring and training of skilled and unskilled workers; the costs of travel, lodging, and food for technical experts; the costs of materials to wash and paint vehicles; and a 10% mobilization fee for construction efforts at Taji. *Id.* Finally, these invoices included a 15% overhead cost and 10% profit. *Id.*

These invoiced costs all fall within the BSA. First, these activities involved the accounting, inventory, and assessment of military equipment in connection with the IMERP to identify which equipment was salvageable and suitable for refurbishment services and which equipment was scrap as called for in § 2(i) of the BSA. *See* Pl.'s Ex. 5 ¶ 2(i). To carry out these responsibilities, Wye Oak needed to construct facilities, purchase tools, hire and train workers, and bring in technical experts. Wye Oak would not be able to conduct these duties under the BSA without places to carry out such work, the equipment necessary to carry out such work, and the workers required to perform such work. Neal testified the facilities necessary to scrap and refurbish armored vehicles were largely non-existent at Taji and Muqdadiya in 2004 and 2005. Tr. 12/19/18 AM 34:4–35:15. There was only a tank depot at Taji, but it was not operational and needed to be

47

overhauled to be capable of working on armored vehicles to determine if they should be scrapped or could be refurbished. Tr. 12/19/18 AM 34:4–35:15. And Wye Oak was not under any obligation to spend its own money in carrying out these activities. Rather, MoD was to advance the sums of money to cover the expenses associated with performing these activities, as these activities all constituted military refurbishment services under the BSA. These activities were focused on developing the capability to inspect military equipment prior to performing refurbishment efforts to assess the equipment and to carry out such inspection. They were also carried out with respect to military equipment that was being refurbished by Wye Oak and provided to MoD. Accordingly, these invoiced costs fell squarely within the BSA.

Second, the invoiced activities involved the direct provision of military refurbishment services as called for § 2(iii) of the BSA. *See* Pl.'s Ex. 5 ¶ 2(iii). Constructing repair facilities, repairing armored vehicles, hiring and training workers, bringing in technical experts, acquiring tools and spare parts, and acquiring materials to wash and paint vehicles are all core aspects of refurbishing military equipment to sell or provide to MoD. Wye Oak would not have been able to carry out the military refurbishment services without engaging in these activities and undertaking such costs. Thus, these invoiced costs were also covered by the BSA. And again, while the BSA provided Wye Oak was required to use all reasonable commercial efforts to perform these military refurbishment services, Wye Oak was not under any obligation to spend money carrying out these services. Instead, MoD was supposed to cover the expenses associated with performing military equipment services.

The First Amendment further supports these conclusions. The First Amendment clarified the definition of military refurbishment services to explicitly include the "construction of facilities, bases, billeting, service/rapier depots, repair factors/facilities." Pl.'s Ex. 19; Pl.'s Ex. 19.1. The

48

Court believes such construction activities were already covered under the BSA's original definition of military refurbishment services, as this construction would always be required to provide Wye Oak with the spaces needed to inspect, assess, and refurbish military equipment. So such construction would be a service "performed for[] or provided with respect to any Refurbished Military Equipment." Pl.'s Ex. 5 ¶ 1(e). But the First Amendment makes it unquestionable that construction activities, which were part of the invoices, were covered under the contract as amended.

And contrary to defendants' contention, the BSA did not provide that MoD would only pay Wye Oak a 10% commission on sales contracts for military refurbishment services, refurbished military equipment, and scrap sales. ECF No. 431-1, 4–5. This commission was just one aspect of Wye Oak's potential compensation under the BSA. MoD was also required to pay Wye Oak 10% of the refurbishment cost for refurbished military equipment, which consists of any military equipment refurbished by Wye Oak and sold or provided to customers, including MoD itself. Pl.'s Ex. 5 ¶ 5(a). Refurbishment cost necessarily includes the costs associated with conducting the refurbishment, such as labor, equipment, and the construction of facilities—the costs accounted for in the three invoices. This was clarified in the First Amendment, which made explicit that MoD was required to pay Wye Oak 10% of military refurbishment services and equipment's refurbishment cost. Pl.'s Ex. 19; Pl.'s Ex. 19.1.

Payments to Wye Oak based on sales contracts or refurbishment costs were to be paid pursuant to pro forma invoices submitted by Wye Oak. Pl.'s Ex. 5 ¶ 5(b). The BSA required the MoD to fully pay such invoices "immediately upon presentation." *Id.* Here, Wye Oak presented the three pro forma invoices to MoD.

49

Defendants' assertion also ignores the fact the BSA required Wye Oak to use all reasonable commercial efforts to perform the military refurbishment services yet did not require Wye Oak to spend any money carrying out these services. Instead, MoD was supposed to cover the expenses associated with performing military equipment services. As explained, this was another basis in the BSA for payment to Wye Oak from MoD for the invoiced costs.

Finally, while the BSA made Wye Oak ultimately "responsible for its own administrative costs, expenses and charged necessary or incidental to its functions" under the Agreement, this does not change the clear language throughout the rest of the BSA that MoD was to advance funds to Wye Oak and pay 10% of the refurbishment cost for refurbished equipment.

Accordingly, Wye Oak's three invoices were submitted under the BSA.

### 2. *Wye Oak was never paid for its three invoices*

Although Wye Oak submitted the three invoices pursuant to the BSA, MoD never paid Wye Oak. Instead, MoD paid Zayna these amounts. *See supra* Section II(I). But Wye Oak never authorized Zayna to receive these funds on its behalf. *See supra* Section II(I).

Defendants contend ¶ 10 of the BSA provided that MoD had the right to determine payment terms for sales contracts or contractual arrangements equivalent to sales contracts Wye Oak arranged. Defendants assert they could therefore insert intermediaries or demand bank guarantees as referenced in the CFA. Defs.' Further Rebuttal to Wye Oak's Proposed Findings of Fact & Conclusions of Law 14, ECF No. 431-2 [hereinafter ECF No. 431-2]. However, this section only required Wye Oak to obtain written instructions from MoD concerning the terms of commitments and contract offers made in the name of or on behalf of MoD. Pl.'s Ex. 5 ¶ 10 ("[Wye Oak] is not authorized to enter into commitment of any kind in the name or on behalf of the Ministry, nor shall [Wy Oak] make any contractual offers to Customers or prospective Customers on behalf of

Ministry unless [Wye Oak] shall have first obtained written instructions from Ministry concerning the terms of such offers."). This had nothing to do with the invoiced activities that related to military refurbishment services. Thus, MoD was not authorized under the BSA to require bank guarantees never referenced in the contract or to insert a middleman into the contractual relationship absent a written amendment including such new terms signed by both parties, which never occurred. *See id.* ¶ 13.

And, as the Court concluded in Section II(G)(1), Wye Oak established by a preponderance of the evidence that MoD approved Wye Oak's invoices and agreed to pay this money to Wye Oak's president, Dale Stoffel, at the October 19, 2004 meeting. *See supra* Section II(G)(1). Yet this money was to Zayna, not Wye Oak. Wye Oak was never paid for the three invoices.

### 3. *Wye Oak Performed Under the BSA*

As discussed in Sections II(D), (J), (L), and (M), Wye Oak performed under the BSA. Shortly after signing the BSA, Wye Oak began putting together the necessary workforce and identifying, recovering, and assessing military equipment in Iraq. Wye Oak then started refurbishing armored vehicles—a critical part of the IMERP. And although nonpayment of Wye Oak's three invoices created a significant impediment to Wye Oak continuing to work on the IMERP—and resulted in the October 19 and December 5 meetings in which MoD agreed to pay the funds—Wye Oak ultimately continued performing. Wye Oak refurbished a significant number of armored vehicles. And even after Dale Stoffel's murder, Wye Oak did not abandon the IMERP. In fact, Wye Oak exceeded the goal of producing a mechanized brigade of operational armored vehicles for Iraq's January 2005 parliamentary election. Eventually, Wye Oak did cease operations in Iraq sometime after the January 2005 election, though, as it never received funding from MoD despite MoD's promises at the October 19 and December 5 meetings.

### 4. *MoD Materially Breached the Contract with Wye Oak*

Accordingly, MoD materially breached the BSA by not paying Wye Oak for the three invoices and the work Wye Oak performed. Wye Oak submitted two pro forma invoices on October 11, 2004, and a third pro forma invoice on October 18, 2004. Under the BSA, MoD was required to fully pay these invoices immediately upon their presentation. *Id.* ¶ 5. And MoD approved these three invoices and agreed to pay this money to Wye Oak's president, Dale Stoffel, at the October 19, 2004 meeting. Yet MoD never paid Wye Oak.

Wye Oak's damages expert assessed the date of breach as October 28, 2004, and Wye Oak has proposed this date as the date of breach. Wye Oak and its damages expert reason that while payment on the invoices was due immediately upon presentation (October 11 for two invoices and October 18 for the third) and MoD approved the invoices on October 19, a ten-day grace period to October 28 for payment to occur was reasonable. The Court sees no reason to reject plaintiff's allowance of a grace period during which payment should have occurred, especially since payment should have occurred immediately under the strict terms of the BSA. Thus, the Court finds MoD materially breached the BSA on October 28, 2004.

MoD's material breach meant Wye Oak was no longer required to perform. Therefore, Wye Oak did not breach the contract by ceasing to perform sometime after the January 2005 election, as its duties had already been discharged by this point in time.

### D. The Court Rejects Defendants' Affirmative Defenses

Iraq and MoD have put forward several affirmative defenses to this suit. To prevail on an affirmative defense, defendants bear the burden of proving the affirmative defense by a preponderance of the evidence. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). The Court finds defendants have not met their burden for any of the alleged affirmative defenses.

### 1. *The Court Rejects the Defense Wye Oak was Not Properly Licensed*

Iraq and MoD argue Wye Oak failed to receive permission from the Ministry of Trade to act as a broker and therefore could not have consummated sales contracts. Iraq and MoD cite Iraq's Law of Trade, stating: "A non-Iraqi person can exercise a commercial activity in accordance with the requirements of the national plan by permission from the Concerned Entity." Article 8 of the Law of Trade (Law No. 30 of 1984). They allege Wye Oak failed to ever apply for and receive permission to act a broker from the Ministry of Trade so it cannot claim damages under the BSA. Defendants cite several Iraqi court cases in which a plaintiff's failure to prove the plaintiff applied for and received the required permission necessitated the court deny any claims for broker fees and dismiss the lawsuit. So defendants contend Wye Oak is unable to obtain relief on its breach of contract claim as a result of its omission to obtain the required license.

However, plaintiff's Iraqi law expert gave numerous reasons why this license requirement did not apply to Wye Oak. First, Mallat distinguished the current matter from the Iraqi court cases cited by defendants. Those cases involved a different Iraqi trade law, not the provision of Iraq's Trade Law cited by Iraq and MoD here. In the cases cited by Iraq and MoD, an Iraqi plaintiff sued a foreign government official and foreign state-owned corporation claiming the defendants did not pay him pursuant to their contracts. The Iraqi courts rejected the plaintiff's claims because he had not obtained the required business license to represent a foreign person or corporation. ECF No. 253-3. Here, Wye Oak was working with MoD, part of the Iraqi government, not a foreign person, corporation, or government. The law at issue in the cases cited by Iraq and MoD is clearly not applicable to this suit. Therefore, these cases do not demonstrate Wye Oak was required to obtain any license.

Second, this expert asserted CPA Order 39 modified Iraq's Law of Trade when it was enacted in September 2003. Chibli Mallat 3rd Expert Report 3, Pl.'s Ex. 117. Mallat informed the Court CPA Order 39 liberalized trade and placed foreign and domestic business on equal footing. *Id.* CPA Order 39 provided "A foreign investor shall be entitled to make foreign investments in Iraq on terms no less favorable than those applicable to an Iraqi investor." *Id.* This led Mallat to conclude requiring Wye Oak to obtain a license when it was operating in Iraq as a broker for MoD would undermine CPA Order 39.

Third, Mallat stated that even if Article 8 of the Law of Trade remained in force after CPA Order 39, the license requirement would not have been applicable to Wye Oak because Wye Oak was MoD's agent under the BSA. According to Mallat, because MoD would not have needed a license, neither did Wye Oak. Pl.'s Ex. 115.

Fourth, Mallat pointed to the BSA's requirement that MoD "shall fully inform [Wye Oak] at all times of all matters reasonably required to enable [Wye Oak] to properly carry out its duties." Pl.'s Ex. 5 ¶ 4(a). MoD never informed Wye Oak of this alleged licensure requirement and never requested Wye Oak obtain a license. The evidence establishes Wye Oak performed work under the BSA without any complaint from MoD that Wye Oak lacked a license to perform such activities. And finally, the evidence establishes MoD paid the invoiced amounts—albeit to Zayna not Wye Oak—without voicing any complaint regarding a licensing issue. This indicates the license requirement either did not apply to Wye Oak, as it would be quite odd for MoD to engage in unlawful contractual activity, or MoD did not fulfill its contractual obligation to inform Wye Oak about this requirement.

Ultimately, defendants have not met their burden of proof to establish this affirmative defense. The Court concludes that Article 8 of the Iraqi Law of Trade likely did not apply to Wye

Oak, acting as MoD's agent, even if it remained in full effect after CPA Order 39. This conclusion is supported by MoD's own actions not informing Wye Oak of any such requirement and paying Zayna the invoiced amounts without ever raising any licensure issue.

### 2. *The Court Rejects the Defense Wye Oak was Not Owed Any Compensation Under the BSA Because Wye Oak Did Not Conclude Any Sales Contracts*

Iraq and MoD argue Wye Oak needed to conclude sales contracts as a precondition to any payment under the BSA. ECF No. 431-1, at 4–5, 8–12; ECF No. 431-2, at 16–17. Defendants allege MoD was only obligated to pay Wye Oak 10% commissions on sales contracts for military refurbishment services, refurbished military equipment, and scrap sales. Defendants contend Wye Oak was therefore not owed any money under the BSA because Wye Oak never concluded any sales contracts.

However, the Court has already rejected this argument in Section III(C)(1). The BSA did not provide that MoD would only pay Wye Oak a 10% commission on sales contracts for military refurbishment services, refurbished military equipment, and scrap sales. As explained above, this commission was just one aspect of Wye Oak's potential compensation under the BSA. MoD was also required to pay Wye Oak 10% of the refurbishment cost for refurbished military equipment. And MoD was supposed to cover expenses associated with performing military equipment services under the BSA, as Wye Oak was required to use all reasonable commercial efforts to perform military refurbishment services yet was not required to spend any money carrying out these services. Accordingly, the Court rejects this defense.

### 3. *The Court Rejects the Defense Wye Oak Waived any Breach*

Finally, defendants argue that even if MoD did breach its contract with Wye Oak, Wye Oak waived any breach by agreeing to payment terms at the December 5, 2004 meeting and then never providing documentation it had performed the invoiced work. Defendants allege the parties

at the December 5 meeting agreed MoD would authorize GIG to disburse the funds it was holding

upon receipt of documentation of the work Wye Oak had performed. This appears to be primarily

based on an exchange between defense counsel and Clements:

> [Defense Counsel]: There was discussion during the December 5th meeting, was there not, that in order to get paid Wye Oak should produce cost invoices from, whether it's from a labor force or parts that they're buying, indication of the expenditure of monies?
> [Clements]: Again, I can't claim that that was precisely what was being talked about. As far as I was concerned, it was to provide more detail that would allow the funds to be released. I don't know whether it was cost of invoices, sales contract or whatever it was. As far as I was concerned, it was more detail.
> [Defense Counsel]: Okay. Well, more detail that would support the claim under the pro forma invoices?
> [Clements]: Yes, sir, that's fair.

Tr. 12/18/18 AM 6:25–7:13. Defendants state they never received such documentation.

However, any such discussion about providing additional details could not have validly

amended the BSA and constituted a waiver by Wye Oak. The BSA could only be amended by a

written amendment signed by both parties, and there is no evidence the December 5 meeting

resulted in any valid written, signed amendment to the BSA. Therefore, Wye Oak did not validly

agree to the new payment scheme thereby releasing MoD from its breach as defendants allege.

Rather, the evidence shows Wye Oak was simply trying to extract payment that was owed to it

from MoD. This payment issue risked hindering the IMERP and spurred the December 5 meeting.

Thus, Wye Oak did not waive MoD's breach of the BSA's requirement to pay the invoices

immediately upon presentation.

## IV. Damages

The Court must next examine the damages Wye Oak is owed for defendants' breach of the

BSA. Wye Oak contends it is owed four categories of damages: the amounts under the three

invoices it never received, lost profits from constructing bases, lost profits from refurbishing

military equipment, and lost profits from broker fees earned on scrap sales. Wye Oak also seeks

damages for categories of lost profits its damages expert, Dr. John Gale, was unable to calculate

because of defendants' discovery abuses. Further, Wye Oak seeks prejudgment interest. And Wye

Oak argues it is entitled to enhanced damages because of defendants' alleged bad faith and fraud.

Finally, Wye Oak contends it is entitled to costs, including reasonable attorney's fees and

expenses.

The Iraqi approach to damages is set forth in Article 169 of the Civil Code. Article 169

declares:

> (1) If the compensation (damages) has not been estimated in the contract or in a
> provision of the law it will be assessed by the court.
> (2) The damages shall be in respect of every obligation which arises from the
> contract be it an obligation of conveyance of property, a benefit or any other
> right in rem, or an obligation to do or to abstain from doing an action and
> includes the loss of and the lost profit suffered by the creditor on account of
> loss of or delay in receiving the right provided that this was a natural result of
> the failure of or delay by the debtor to perform the obligation.
> (3) Where the debtor had not committed cheating (fraud) or a grievous fault the
> compensation may not exceed the loss suffered or the amount of the lost profit
> which has been normally anticipated at the time of the contracting.

Pl.'s Ex. 97 art. 169. Wye Oak is therefore permitted to recover damages for payments it never

received pursuant to the three invoices and for lost profits. Beyond citing Article 169, the parties'

briefings on the issue of damages entirely focus on U.S. case law. This indicates the parties believe

Iraqi damages principles mirror that of American law. Accordingly, the Court will turn to the

American rule on damages as set forth in the seminal case of *Story Parchment Co. v. Paterson

Parchment Paper Co.,* 282 U.S. 555 (1931), to determine the amount of damages to be awarded

to Wye Oak.

In *Story Parchment Co.*, the Supreme Court stated:

> Where the tort itself is of such a nature as to preclude the ascertainment of the
> amount of damages with certainty, it would be a perversion of fundamental

> principles of justice to deny all relief to the injured person, and thereby relieve the
> wrong-doer from making any amend for his acts. In such case, while the damages
> may not be determined by mere speculation or guess, it will be enough if the
> evidence show the extent of damages as a matter of just and reasonable inference,
> although the result be only approximate.

*Id.* at 562. The Supreme Court emphasized "the clear distinction" in the standard of proof

necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those

damages. *Id.* ("[T]here is a clear distinction between the measure of proof necessary to establish

the fact that petitioner had sustained some damage, and the measure of proof necessary to enable

the jury to fix the amount"). While a plaintiff must prove entitlement to damages with reasonable

certainty or preponderance of the evidence, proof of the amount of damages only requires a

reasonable estimate. *See id.*; *see also Hill v. Republic of Iraq*, 328 F.3d 680, 684–85 (D.C. Cir.

2003) (holding "that to recover damages a FSIA plaintiff must prove that the projected

consequences are "reasonably certain" (i.e., more likely than not) to occur, and must prove the

amount of damages by a "reasonable estimate" under this circuit's application of *Story*");

*Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (plaintiff must

"prove the fact of injury with reasonable certainty, [and prove] the amount of damages . . . based

on a reasonable estimate"); *Wood v. Day*, 859 F.2d 1490, 1493 (D.C. Cir. 1988) (plaintiff need

only provide "some reasonable basis on which to estimate damages") (*quoting Romer v. District

of Columbia,* 449 A.2d 1097, 1100 (D.C. 1982)); *Abraham v. Gendlin,* 172 F.2d 881, 883 (D.C.

Cir. 1949) ("[T]here is a clear distinction between the measure of proof necessary to establish the

fact of damage and the measure of proof necessary to enable the jury to fix the amount.").

Thus, the Court's must "'make a just and reasonable estimate of the damage based on

relevant data.'" *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 905

(D.C. Cir. 2010) (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)). Such

relevant data may include "probable and inferential as well as direct . . . and positive proof." *Bigelow*, 327 U.S. at 264. In setting about this task, the Court is mindful that damages "may not be determined by mere speculation or guess . . . although the result may be only approximate." *Hill*, 328 F.3d at 684; *see also Rhodes v. United States*, 967 F. Supp. 2d 246, 313–14 (D.D.C. 2013).

Finally, the D.C. Circuit instructs trial courts to explain the reasons for the determination of the damages award and tether these reasons to the record. *See Eureka Inv. Corp. v. Chicago Title Ins. Co.,* 743 F.2d 932, 940 (D.C. Cir. 1984) ("[I]t is essential that the trial court give sufficient indication of how it computed the amount so that the reviewing court can determine whether it is supported by the record.") (citing *Hatahley v. United States*, 351 U.S. 173, 182 (1956)); *see also Safer v. Perper*, 569 F.2d 87, 100 (D.C. Cir. 1977) ("The measure of damages and method of computation [must] be exposed so as to inform the litigants and afford a possibility of intelligent review."). The Court turns to this important task after briefly discussing Dr. Gale's expert damages report.

A. Dr. Gale's Expert Damages Report

The Court accepted Dr. Gale as a qualified expert witness to perform economic damages analysis. Tr. 12/21/18 PM 99:2–12. Gale is a qualified expert in economics, with a specialty in measuring the economic effects of government contracts. He received his Ph.D. in Economics from the University of Wisconsin, with a specialization in Industrial Organization, and has over 20 years of experience modeling competition and consumer demand to calculate damages due to breach of contract and other causes. Pl.'s Ex. 101 at 30–35. Further, Gale has previously been accepted as a damages expert. *See id.* at 29. Gale is the only damages expert in this case, as defendants did not put forward their own damages expert.

Dr. Gale used a "but for" analysis to determine Wye Oak's damages. *Id.* at 4. This methodology is well-established and commonly used in the determination of damages due to breach of contract and other economic harm. *See id.*; Tr. 12/21/18 PM 58:13–60:1. Such "but for" analyses are commonly accepted by courts. *See, e.g.*, *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 371–72 (5th Cir. 2004) (holding expert testimony of hypothetical damages for breach of contract, based on putting plaintiff in position it would have occupied but for breach, is one proper measure of damages). Under the but for test, Gale calculated the profits Wye Oak would have earned if MoD had complied with the BSA's terms (the but for profits), determined the profits Wye Oak actually earned (the actual profits), and calculated damages as the difference between these figures.

In addition to attacking Gale's individual damage calculations, defendants take issue with Gale's but for analysis. First, they contend the date of breach occurred in December 2004, after Dale Stoffel was killed, not on October 28, 2004.[20] Second, if the Court finds the breach occurred on October 28, they contend Gale ignored critical events subsequent to the date of the breach of the BSA. Namely, Gale's assessment was not affected by Dale Stoffel's death or by Iraq's alleged scrap sales ban. The Court now addresses these overarching objections.

### 1. *The Court Finds Defendants Breached the BSA on October 28, 2004*

Dr. Gale assessed the date of breach as October 28, 2004, and Wye Oak has proposed this as the date of breach. Defendants counter Wye Oak waived any breach at the December 5, 2004 meeting. So defendants argue the ultimate breach must not have occurred until later in December 2004 when defendants yet again failed to pay Wye Oak the money it had been owed since October

---

[20] Although defendants vehemently dispute any breach of contract occurred, the Court has determined a breach did indeed occur.

2004. The Court has already assessed and rejected defendants' waiver argument in Section III(D)(3).

While payment on the invoices was due immediately upon presentation (October 11 for two invoices and October 18 for the third) under the BSA and MoD approved these invoices on October 19, Wye Oak and its damages expert have stated a ten-day grace period to October 28 for payment to occur was reasonable. As stated above, the Court does not see any reason to reject plaintiff's proposal permitting a grace period during which payment should have occurred. Accordingly, the Court finds MoD materially breached the BSA on October 28, 2004.

### 2. *Gale Did Not Err in Not Taking into Account Subsequent Events*

Defendants take issue with the fact that Dr. Gale did not take into account that Dale Stoffel was killed in December 2004, that Wye Oak pulled its American personnel out of Iraq following Dale's death, and that Iraq allegedly prohibited scrap sales in December 2004. Defendants contend that when years have passed between the date of the breach of contract and the trial, the Court should consider post-breach evidence when determining damages. *See Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933) (finding in the patent dispute context that when years have passed between the date of the purported wrong to the date of trial, subsequent events constitute a "book of wisdom that courts may not neglect"); *see also Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1369–70 (Fed. Cir. 2010) ("[W]here it is necessary to fashion an appropriate award, a court 'may consider post-breach evidence when determining damages in order to place the non-breaching party in as good a position as he would have been had the contract been performed.'") (quoting *Fifth Third Bank v. United States*, 518 F.3d 1368, 1377 (Fed. Cir. 2008)). According to defendants, Dale Stoffel's death, Wye Oak's withdrawal of American personnel from Iraq, and the alleged scrap ban were all intervening causes for Wye

61

Oak's purported lost profits damages for which defendants were not responsible. While the Court recognizes it is appropriate to consider post-breach events in a case such as this one in which nearly 15 years have passed from the date of breach to the Court issuing this judgment, the Court must reject each of defendants' charges.

### a. Dale Stoffel's Murder

Defendants contend Wye Oak's damages should be reduced as a result of Dale Stoffel's death because Wye Oak was a small company in which Dale Stoffel was an extraordinarily impactful individual with expertise in the work covered under the BSA. However, the Court does not believe Gale erred by not accounting for Stoffel's death despite the fact the Court cannot make a definitive finding that Dale Stoffel was murdered at the behest of Zayna and Cattan.

But for MoD's breach of the BSA, Dale Stoffel may very well not have been murdered. The evidence shows Stoffel was traveling on December 8 from Taji to Baghdad to try to arrange for the funding owed to Wye Oak to finally be disbursed. Defs.' Ex. 40. The Court therefore cannot pretend as though this fateful trip would have occurred just the same if Wye Oak had been paid as it should have been under the BSA. But for MoD's continued failure to pay Wye Oak, forcing Dale Stoffel to persistently wrangle with MoD officials and Zayna (who was paid instead of Wye Oak) to extract the money rightfully belonging to Wye Oak, Stoffel likely never would have been making the trip on which he was killed. In other words, but for MoD's breach Stoffel never would have been in the situation he was in on December 8, 2004 when he was murdered. Therefore, but for MoD's breach Stoffel may never have been murdered.

Accordingly, it was not improper that Gale did not incorporate this event in his construction of the but for world. Dale Stoffel may very well still be alive today if not for MoD's breach. This is the insight the Court draws from looking within the "book of wisdom." To discount Wye Oak's

damages for Dale Stoffel's murder, which at least in part resulted from a series of events set into place by MoD's breach, would not be wise, as defendants contend, it would be unjust.

### b. Wye Oak's Withdrawal of American Personnel

Defendants further argue Wye Oak's damages should be diminished because Wye Oak could not have performed to the level it asserts without American personnel present in Iraq. This again ignores defendants' role in this post-breach event. David Stoffel testified Wye Oak and CLI were willing to send their U.S.-based personnel back to Iraq if Wye Oak got paid the money it was owed for the three invoices and could have the appropriate security (after Dale Stoffel and Joe Wemple were killed). Tr. 12/18/18 AM 75:1–7. And Bill Felix echoed this sentiment. Felix stated the reason Wye Oak and CLI did not return to Iraq after Dale Stoffel was killed was because Wye Oak never received payment for its three invoices. Felix Dep. 69:10–19. MoD was in breach of contract so Wye Oak's personnel did not return to Iraq to continue performing work it was not being paid for. Felix further testified he would have returned to Iraq had Wye Oak been paid. Felix Dep. 69:10–19. And Felix indicated some of the money could have gone towards paying for security. Felix Dep. 201:21–203:1. Thus, defendants' argument about Wye Oak's withdrawal of U.S. personnel from Iraq completely disregards the primary reason these individuals left Iraq and did not return—MoD never paid Wye Oak, thereby breaching the contract. And this argument ignores the fact Wye Oak had non-American personnel in Iraq that continued to perform until sometime in 2005 as discussed in Section II(M).

### c. The Scrap Ban

Iraq and MoD contend Iraq prohibited the sale and export of scrap metal so Wye Oak was precluded from entering into any scrap sales contracts. Therefore, defendants assert Wye Oak would not have been able to earn broker fees from scrap sales.

63

As detailed in Section II(B), the General Secretary of the Cabinet issued a letter to the Ministry of Interior on July 17, 2004, regarding the prohibition of exporting scrap with copies to the Office of the Prime Minister, Ministry of Industry and Minerals, Ministry of Trade, and National Intelligence Service. Defs.' Ex. 53. The letter stated the Prime Minister agreed to the Ministry of Industry and Minerals' proposal to stop exporting scrap, with the exception that some materials of a military nature could continue to be exported upon the Prime Minister's and his economic committee's approval. *Id.* But this Court was never provided with the Ministry of Industry and Minerals' proposal referenced in this letter, which makes it impossible to fully comprehend the exact terms of the prohibition on exporting scrap the Prime Minister approved. This deliberation on scrap exports and decision by the Prime Minister was never communicated to Wye Oak at any time during the BSA negotiations or after Wye Oak and MoD signed the BSA.

And as explained in Section II(N), the General Secretary of the Council of Ministers sent a letter addressed to all ministries on December 28, 2004, stating scrap materials were proscribed from being sold to merchants or any private sector entities. Defs.' Ex. 58. Again, there is no evidence Wye Oak was ever informed about this directive and no copy of this letter was found in MoD's files.

These alleged scrap bans are an affirmative defense and therefore defendants bear the burden of proof. This Court finds defendants have not carried their burden of establishing the bans on exporting and selling scrap applied to sales made by MoD.

First, Neal testified General Bashar, an MoD official working on the effort to recover vehicles, informed him the scrap ban was intended to stop individuals from illegally taking scrap and did not affect Wye Oak. Tr. 12/19/18 AM 29:22–31:16; Tr. 12/19/18 PM 4:9–18.

Second, Wafaa Muneer, the Ministry of Justice's Legal Department's Senior Manager of Foreign Litigation, indicated the scrap bans did not apply to MoD. The Court previously found Muneer to be a "qualified person" under Federal Rules of Evidence 803(6) and 902(12) who could testify on the record-keeping systems of Iraq's ministries to admit the documents related to the alleged scrap bans as business records. Muneer has extensive experience as a lawyer in the Iraqi government and is responsible for managing document production, including managing the search and retrieval of documents maintained in the files of the Office of the Prime Minister, Council of Ministers, and Iraq's various ministries. She has significant knowledge of the record-keeping practice of the ministries across the Iraqi government. And during her *de bene esse* deposition, she testified regarding the flow of work between the Council of Ministers and various other ministries. "The instructions or directives are issued in the form of a letter that has a number and a date after it is signed off by the authorized official, whether it is the Secretary General of the Prime Minister's office. Then that letter is sent over to the party concerned." Muneer Dep. 2/5/19, 17:1–10.

Specifically, when discussing the June 19, 2004 letter from the General Secretary of Iraq's Council of Ministers informing the Ministries of Industry, Trade, and Finance the Prime Minister directed the formation of a committee of representatives from these ministries to study scrap exports and provide a recommendation on the topic, Defs.' Ex. 56, she asserted she knew the letter was sent to, and received by, the Ministry of Trade because it had a "stamp that you see on it, it is the stamp of the Ministry of Trade, and . . . this is proof that the Ministry of Trade has received this letter." Muneer Dep. 2/5/19, 96:18–22. Muneer further stated all ministries used this system to date and number the correspondence they received. Muneer Dep. 2/5/19, 95:7–97:12. But there is no similar document bearing MoD's stamp indicating it was sent to, or received, by MoD in regard to either the July 17, 2004 or the December 28, 2004 alleged scrap bans. Indeed, there is no

evidence copies of these letters exist in MoD's files. This suggests to the Court that MoD was not an intended recipient of the scrap ban directives and these prohibitions were not binding on MoD. Mallat deduced the same: "I understand from various testimonies and documents that the Ministry of Defense in the arguments presented by its counsel in the present case did not find any scrap ban documents in its possession and so were not produced. Considering the fact that it's a requirement that Mrs. Muneer underlined that this should be filed properly, the fact that directives coming from the Council of Ministers were not filed suggests that they were simply not directives addressed to the Ministry of Defense." Mallat Dep. 2/14/19, 82:11-21. And MoD was going to be the scrap seller under the BSA—Wye Oak was merely brokering the sales for MoD—so there was no reason Wye Oak would be bound in any manner beyond MoD.

Third, the Court again notes there is no evidence Wye Oak was ever informed about these alleged scrap bans. One reason why MoD may not have provided notice was the scrap bans did not apply to MoD and therefore there was no need to give notice. Defendants failed to present any witness who could be questioned on this subject.

Because this is an affirmative defense, defendants bear the burden of proof. And records related to the alleged scrap bans were uniquely under their control. Yet defendants did not provide the Court all records to sufficiently understand the entire significance of the July 17, 2004 directive. And the lack of evidence that copies of these letters exist in MoD's files strongly indicates these prohibitions were not binding on MoD based on Muneer's testimony on ministries' filing practices. Therefore, defendants have not carried their burden of proving the scrap bans applied to MoD. Accordingly, the Court does not believe the December scrap ban was a superseding event that shielded defendants from liability for lost profits from scrap sales.

B. Damages for the Three Invoices

Wye Oak is entitled to damages for its three invoices. These invoices are described in Section II(F). Although plaintiff's damages expert only calculated an award based on Wye Oak's overhead and profits from these three invoices because he felt he lacked sufficient documentary evidence of direct costs incurred by Wye Oak not included in overhead costs, the testimony and evidence elicited at trial (which occurred after Gale produced his expert report) demonstrate Wye Oak performed the invoiced activities. Wye Oak has demonstrated it is more likely than not it incurred the invoiced costs for performing this work.

Invoice #MUQ001 covered the initial construction cost of an armored vehicle depot at Muqtadiya, the initial hiring and training of workers, and the initial purchasing of tools. The construction cost of the armored vehicle depot was invoiced at $1,600,000 and the initial hiring and training of workers and purchasing tools was invoiced at $220,000. Also, Invoice #MUQ001 included $273,000 in overhead and $209,300 in profits. Gale did not include in Wye Oak's damages either the construction cost or the cost to hire and train workers and purchase tools because he did not find documentary evidence of those costs. Pl.'s Ex. 101 at 8. But the evidence at trial demonstrates initial construction work at Muqdadiya was completed. The evidence shows armored vehicles were refurbished at that installation, which could not have been completed if the depot was not initially constructed. Further, this work could not have occurred if Wye Oak had not hired and trained workers or purchased tools. And it would have been impossible to construct the depot, hire and train workers, and purchase tools without spending money. Therefore, the Court finds the preponderance of the evidence shows Wye Oak expended funds for the direct costs billed in this invoice in addition to its overhead costs. Wye Oak is entitled to be reimbursed for the costs

it incurred. Thus, the Court will award Wye Oak for these costs and its overhead and profit on this invoice, which amounts to $2,302,300.

Invoice #TAJI001 covered mobilization costs incurred for the construction of the Taji facility and the movement of spare parts to Taji. The mobilization costs totaled $4,200,000 and the cost to move spare parts to Taji was $500,000. Pl.'s Ex. 18. Invoice #TAJI001 included $705,000 in overhead and $540,500 in profits, too. Again, Gale only assessed Wye Oak was owed the overhead and profit amounts from Invoice #TAJI001 because he did not find evidence of the other costs. However, the evidence demonstrates Wye Oak performed refurbishment work at Taji. This required spare parts to be moved to Taji. As a result, the Court finds it is more likely than not that Wye Oak expended the $500,000 to move the spare parts to Taji. Wye Oak is therefore entitled to this amount to reimburse it for its expenditure. In addition, Wye Oak is entitled to its overhead costs, which the Court also finds were incurred in performing this work, and its profit on this invoice. Accordingly, the Court will award Wye Oak $1,745,500 for Invoice #TAJI001.[21]

Finally, Invoice #MUQ002 covered the cost of travel, lodging, and food for technical experts, materials to wash and paint vehicles, costs for skilled and unskilled labor, and costs for the initial repair of 246 armored vehicles at both Muqdadiya and Taji. The cost of travel, lodging, and food for technical experts was $112,150, the cost of materials to wash and paint vehicles was $83,600, the cost for skilled and unskilled labor was $56,000, and the costs for initially refurbishing vehicles at Muqdadiya and Taji amounted to $12,866,500. In addition. this invoice included $1,952,596.50 in overhead and $1,496,990.65 in profits. Once again, Gale only assessed Wye Oak was owed the overhead and profit amounts from Invoice #MUQ002 because he did not find documentary evidence of the other costs. But the evidence demonstrates Wye Oak incurred

---

[21] Wye Oak does not seek damages for the $4.2 million in mobilization fees included in Invoice #TAJI001.

more than just its overhead costs for this invoice, too. The evidence shows Wye Oak had a local workforce and paid this workforce. And the evidence shows Wye Oak washed and painted the vehicles as part of its refurbishment efforts, and incurred expenses obtaining the material necessary to do this work. Further, Wye Oak refurbished armored vehicles at Muqdadiya and Taji. In fact, Wye Oak exceeded the goal of producing a mechanized brigade of operational armored vehicles for Iraq's January 2005 parliamentary election. Accordingly, the Court finds it is more likely than not Wye Oak incurred the costs for these activities in addition to its overhead on this invoice. However, the record does not establish Wye Oak incurred expenses for technical experts' travel, lodging, and food. Instead, the evidence indicates GIG paid for this. In Dale Stoffel's November 25, 2004 email to Raymond Zayna, he stated the $112,150 from Invoice #MUQ002 was "due to GIG for completed work for the transportation of Ukrainian Experts to assess the repair/overhaul work." Pl.'s Ex. 31. The Court therefore finds Wye Oak was not the party that incurred this cost included in Invoice #MUQ002. In sum, the Court will award Wye Oak for its incurred costs in addition to its overhead and profit on this invoice, which amounts to $16,455,687.

Defendants contend the evidence does not sufficiently demonstrate Wye Oak expended funds beyond its overhead costs. Defendants point out that Wye Oak has not provided the Court with any bank records or other documentary evidence of specific expenditures for the costs it claims it incurred. While the ideal case may include such specific records, this is not always the situation. Expenses can be incurred in other ways than simply withdrawing funds from bank accounts. And the Court must note Dale Stoffel's computer was with him in the car when he was murdered. The computer was taken and the records that may have existed on his computer were lost to Wye Oak. This does not lower Wye Oak's burden in any way, but it may be one reason Wye Oak has not presented documentary evidence. Ultimately, the fact Wye Oak performed the

activities on the invoices and refurbished a significant number of armored vehicles demonstrates it was incurring costs. And defendants approved these invoiced costs at the October 19, 2004 meeting (and again stated it would pay Wye Oak for these invoiced costs at the December 5, 2004 meeting). Wye Oak is entitled to receive these (approved) costs, which the record establishes it incurred in performing the BSA.

Accordingly, the Court will award Wye Oak a total of $20,503,487.15 in damages for the three invoices.

C. <u>Lost Profits</u>

To recover lost profits for a breach of contract, the plaintiff must establish that the breach proximately caused the loss, that the loss of profits was a foreseeable result of the breach, and that the amount of damages can be established with a reasonable estimate. The Court will address these elements when assessing each of the lost profits claims. But the Court will first examine—and dispense with—five of defendants' overall objections to plaintiffs' lost profits calculations: (1) that the BSA excluded lost profits damages, (2) that Wye Oak was not qualified to perform under the BSA, (3) that Wye Oak did not have the capacity to perform under the BSA, (4) that Gale assumed an unrealistic timeframe for calculating Wye Oak's lost profits, and (5) that the Court should give additional scrutiny to Wye Oak's damage calculation because it was a new business.

### 1. *Defendants' Overall Objections to Plaintiffs' Lost Profits Calculations*

First, defendants argue the BSA explicitly exempted lost profits damages. They point to the provision in the BSA that states:

> In the event of any cancellation or termination of any Sales Contract by the Ministry regardless of cause:
> 1. Broker shall retain all commissions theretofore paid under this Agreement;
> 2. Broker shall be entitled to receive its commission which is payable in respect of each Sales Contract concluded by the Ministry during the term of this Agreement.

3. Broker shall also be entitled to receive its commissions from the Ministry on all Sales Contracts in which the Contract Value or portions thereof become payable by the Customers to the Ministry for a further period of one year from the date of termination with respect to Sales Contracts on which the Broker has represented or worked for the Ministry as its Broker.

Pl.'s Ex. 5 ¶ 4(c). Defendants allege this provision demonstrates the parties negotiated a limit on available damages to sales contracts Wye Oak brokered yet were canceled or terminated by MoD. Therefore, defendants argue Wye Oak should not be able to obtain lost future profits for contracts not yet brokered. But this provision does not limit damages resulting from a material breach of the BSA as defendants contend. And it does not indicate the parties contemplated limiting available damages resulting from a breach of the BSA. The BSA does not contain any such provision.

Second, defendants allege Wye Oak was not qualified to perform. Defendants charge Wye Oak did not put forward evidence it previously successfully undertook projects of a similar scale as the BSA, did not fully explain its business plan, and did not demonstrate it had available capital to perform. However, these claims are rebutted by the BSA's own language praising Wye Oak and by Wye Oak's demonstrated record of performance, as detailed above. The BSA recognized Wye Oak "has extensive experience in facilitating and arranging for the purchase and sale of all types of Military Equipment at the highest and best commercial prices and rates. The Ministry acknowledges that [Wye Oak] has established contacts throughout the world regarding the sale of Military Equipment and [Wye Oak] has also established government and other contacts in Iraq." *Id.* ¶ 2. Also, Wye Oak performed under the BSA, exceeding the goal set for the number of refurbished military vehicles produced by the January 2005 election. The evidence establishes Wye Oak only ceased performing under the BSA because of defendants' material breach not paying Wye Oak for the three invoices. Defendants cannot claim Wye Oak was not qualified to perform work under the BSA, some of which it was already performing, based on newly moved

71

goal posts defendants have only just asserted should be the standard upon which to judge Wye Oak's qualifications. Such a finding would contradict the record in this matter.

Third, defendants claim Wye Oak did not have the capacity to perform under the BSA. Defendants seem to base this allegation on the fact that Wye Oak was a small company, that Iraq was a war zone, and that there may not have been a demand for Wye Oak's services. For the reasons stated in the previous paragraph, Wye Oak's record of performance under the BSA establishes it had the capacity to perform; indeed, it already was. And the record demonstrates Wye Oak had already partnered with CLI and obtained local labor so Wye Oak's size does not seem to be the Achilles' heel defendants make it out to be. Also, Wye Oak already demonstrated it could perform in a war zone, which is exactly what the contract contemplated and called for, so the Court does not find this to be an impediment to Wye Oak's capacity. Finally, defendants' argument about a lack of demand for Wye Oak's services is bizarre. The Court has been presented with a great deal of testimony on the importance of the IMERP and the critical goal of re-equipping the Iraqi armed forces. This is why defendants contracted with Wye Oak. To now argue Iraq may not have been able to fund the services it contracted Wye Oak to perform is illogical. Essentially, defendants are stating Wye Oak should not receive lost profits damages because defendants may have materially breached the contract at some other point in time. This is not a valid (or serious) defense. In addition, Gale presented the Court with evidence regarding the robust worldwide demand for scrap. *See infra* Section III(C)(4). There does not seem to be any lack of demand for Wye Oak's services.

Fourth, defendants take issue with Gale's timeframe for calculating lost profits. Defendants argue it is unrealistic to think Wye Oak could have accomplished the base construction services, military equipment refurbishment activities, and scrap sales within one year, rather than spreading

it out over the three-year life of the contract.[22] Gale started his timeframe calculation by examining the percentage of total base construction cost at Taji and Muqtadiya covered by Wye Oak's October 2004 invoices. Taji had a total construction budget of $42,000,000 based on the calculations in Invoice #TAJI001, and Wye Oak invoiced $4,700,000 on this project on October 11, 2004. Invoice #MUQ001 did not provide the total construction budget for Muqtadiya, but showed Wye Oak invoiced $1,820,000 on this project on October 11, 2004. Gale used the fact Wye Oak had invoiced approximately 11% of the work for Taji in Invoice #TAJI001 to assess Wye Oak likely invoiced this same percentage of the work for Muqtadiya in Invoice #MUQ001. So Muqdadiya's total cost was $16,300,000. Pl.'s Ex. 101 at 8–10.

On November 25, 2004, Dale Stoffel emailed Raymond Zayna, informing Zayna that Wye Oak had been advised to submit invoices for the next phase of construction work at Taji. Pl.'s Ex. 31 at 3. The new invoice would be for an additional $12,600,000 million for "the next 30% of the work." *Id.* Gale deduced this indicated Wye Oak planned to complete another 30% of the construction work at Taji by the end of the first quarter of 2005. He then assumed this same pace of construction, 30% per quarter, for both Taji and Muqtadiya. This means they would have been completed by the end of the third quarter of 2005. And Gale believed the remaining bases would have been started after the initial delivery of armored vehicles in January 2005. Using the same pace of construction for those bases, Gale calculated construction at the remaining bases would have been completed by the end of 2005. Gale testified the percentage of funds expended is a common economic proxy for determining the progress towards a project's completion. Tr. 12/21/18 PM 15:24–16:25, 17:1–18:3, 30:6–35:12.

---

[22] The term of the BSA was one year, commencing on August 16, 2004, with two option years, which would automatically renew unless either party notified the other in writing at least 60 days before the period would end of the intent not to renew. Pl.'s Ex. 5 ¶ 3.

Further, Gale's report states that he assessed Wye Oak would refurbish military equipment and engage in scrap sales during the same time frame in which it was constructing the facilities. Gale based his determination of the timing of military equipment refurbishment on the fact Wye Oak refurbished a significant number of armored vehicles between August 2004 and January 2005 at the same time that Wye Oak's invoices demonstrate it was starting to construct the facilities at Taji and Muqtadiya. Pl.'s Ex. 101 at 18. Gale indicates he assumes Wye Oak would have continued to operate in this manner, refurbishing military equipment while simultaneously constructing the facilities. He believes Wye Oak would have engaged in scrap sales during this time frame as well because it would have been optimal for Wye Oak to determine which vehicles could be refurbished and which had to scrapped simultaneously. *Id.* Therefore, it makes sense to engage in scrap sales at the same time as the other activities are occurring. In addition, Gale believed this pace was reasonable to assume because the pro forma invoice component of the contract was structured in such a manner as to encourage the work to be completed as fast as possible. The Court finds this pace of work to be reasonable based on the extensive evidence in this case that the IMERP was a key priority for Iraqi security and there was an urgency to re-equip the Iraqi military. Ultimately, the Court finds Gale's assessment to be reasonable, based on adequate evidence, and founded in solid economic principles.

Fifth, defendants also contend it is improper to award damages for lost profits to a new business because the absence of income and expense experience renders anticipated profits too speculative. However, defendants primarily rely on decisions applying state laws precluding lost profits damages for new businesses. And the one D.C. Circuit case defendants cite, *Eureka Inv. Corp. N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932, 939 (D.C. Cir. 1984), did not deny damages based on the businesses' newness. Defendants have not pointed the Court to any source indicating

74

this rule exists in Iraqi law or that it is even the general rule in the U.S. today. To the contrary, "most recent cases reject the once generally acceptable rule that lost profits damages for a new business are not recoverable." Robert L. Dunn, *Recovery of Damages for Lost Profits* § 4.3 (5th ed.1998). And the Federal Circuit has explicitly rejected this rule in a breach-of-contract suit against the U.S. Department of Housing and Urban Development. *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324–27 (Fed. Cir. 2002). The Court requires Wye Oak to establish all the elements required to recover lost profits, which may be difficult for a new venture to do, but such damages are not barred as a matter of law and the Court is not required under the law applicable to this case to examine Wye Oak's lost profits damages with additional scrutiny.

### 2. *Lost Profits from Construction*

As discussed above in Section III(C)(1), the BSA covered construction as an integral part of Wye Oak's military refurbishment services efforts. Gale found Wye Oak intended to build at least eight facilities to perform the services covered by the BSA. Gale used the construction budgets from Taji and Muqtadiya to determine the construction cost at the remaining bases. The Court finds that defendants' breach proximately caused Wye Oak's lost profits from construction, that this was a foreseeable result of the breach, and that Gale's estimates are reasonable.

First, defendants' breach was the natural and proximate cause of plaintiff's lost profits from construction. The Court has already detailed defendants' material breach. If defendants had not breached the BSA, Wye Oak would have been able to engage fully in this military refurbishment service. Indeed, Wye Oak had already begun construction activities at Taji and Muqtadiya even without receiving any payment. And the Court has already found Wye Oak and CLI, who had extensive construction experience, had a strong relationship and were prepared to formally establish a partnership once Wye Oak received payment on the three invoices. Pl.'s Ex. 51; Tr.

12/18/18 AM 53:8-25; Tr. 12/18/2018 PM 8:1–4, 50:21-25; Tr. 12/19/18 AM 43:1–4; Felix Dep. 6:16–7:24, 42:14-45:16, 114:1-115:11.

Second, the loss of profits from base construction was a foreseeable result of the breach. Constructing facilities was an essential aspect of Wye Oak's military refurbishment services duties under the BSA. Lost profits from construction were therefore a natural result of defendants' breach. And defendants had reason to foresee these lost profits damages would be a probable result of their breach when the BSA was signed. Restatement (Second) of Contracts § 351. Defendants were aware of the importance of constructing facilities to carry out the refurbishment military services and had reason to foresee failing to pay Wye Oak for the three invoices would inhibit Wye Oak's ability to construct facilities, thereby losing profits it would have garnered.

Third, Gale's assessment of the amount of lost profits from base construction was a reasonable estimate. Gale assessed Wye Oak would have constructed facilities at eight military installations. The BSA specifically listed five facilities where Wye Oak was to begin performing services: "Taji Military Base/Camp Cooke, Camp Normandy [also called Muqtadiya], Camp Ashraft, Camp Anaconda, and the Coalition facilities at the Hilla Military Facility." Pl.'s Ex. 5 ¶ 2. In addition to these military installations set forth in the BSA, Beadle testified there were plans to have facilities at Dahuk, Diwaniyah, and Nasiriyah. Tr. 12/20/18 PM 39:13–41:18; Pl.'s Ex. 96. And the three invoices demonstrate Wye Oak began construction at Taji and Muqtadiya shortly after the BSA came to fruition even without receiving payment. Based on this prompt action, Gale assessed Wye Oak would have also rapidly begun and completed construction at the other military installations had defendants not breached the contract. The Court finds these assessments to be reasonable based on the evidence elicited in this case.

Gale used the constructions costs invoiced at Taji and Muqtadiya to assess the costs for construction at the other sites. As discussed above, Taji had a total construction budget of $42,000,000 based on the calculations in Invoice #TAJI001 and Gale used the ratio of work initially invoiced at Taji compared with Taji's total cost to assess the cost of construction at Muqtadiya would have been $16,300,000. Taji and Muqtadiya were set to be used for both vehicle recovery and scrapping activities. Based on an interview with David Stoffel, Gale determined four of the other military installations would also have been used for both vehicle recovery and scrapping activities, and would have operated at a similar scale and scope as Muqtadiya.[23] This led Gale to set construction costs at those four installations at the same amount as Muqtadiya, $16,300,000, a reasonable estimation given that these facilities were supposed to be set up to perform the same type of work. The remaining two installations were only planned to be used for scrapping, so Gale estimated construction would cost half as much as it would for the other facilities because only half of the work (scrapping activities) was going to be performed there. Therefore, he estimated these sites would cost $8,150,000 each.[24] Further, Gale included a 15% overhead cost for construction based on the 15% overhead included in Wye Oak's three invoices. Although defendants argue the BSA did not specifically permit overhead costs to be paid to Wye Oak, overhead is a natural cost for businesses and the Court sees no reason this would have been excluded from future invoices, especially given that defendants approved Wye Oak's three

---

[23] At trial, Gale explained the damages amounts for construction set forth in his report were conservative, especially after he learned more about the scope and scale of the likely construction activity from listening to Beadle's testimony. Gale explained, "the testimony was that a couple of those facilities were contemplated to being almost as big as Taji, while I've assumed them all to be the size of Muqtadiya, which is significantly smaller than Taji Tr. 12/21/18 PM 26:3–7.

[24] Gale testified his assumption these two installations would only cost $8,150,000 each was conservative, too, because, "at each one of these facilities you still have to build barracks; you still have to build latrines; you still have to build food service, regardless of how much you're doing. And it's only the parts of the facility that are actually doing the work that you save half on." Tr. 12/21/18 PM 25:15–24.

invoices that all included 15% overhead. Gale's total cost estimation is therefore scaled with the 15% overhead charge even though Gale did not separately calculate that Wye Oak should receive that 15% overhead charge. In other words, the profit margin calculation includes the 15% overhead, but there is no separate claim for profit on that 15% overhead charge. Tr. 12/21/18 PM 4:24–5:15. The Court finds these cost assessments to be reasonable, and likely conservative.

And Gale estimated this construction work would all be completed by the end of 2005, as discussed above in Section III(C)(1). The Court believes this timeline is reasonable and based on sound economic principles.

Finally, under the First Amendment, defendants were required to pay Wye Oak 10% of the cost of military refurbishment services, which would include construction costs, as compensation. Pl.'s Ex. 19. The MoD was required to pay Wye Oak immediately upon the presentation of pro forma invoices at the beginning of each stage of construction. Pl.'s Ex. 5 ¶ 5(b). The loss of the expected 10% fees constitutes the lost profits to Wye Oak from facility construction due to defendants' breach. Gale calculated Wye Oak's lost profits from construction was $15,327,200.

Ultimately, the Court finds Gale's assessment was a reasonable estimate of the lost profits from construction that was proximately caused by defendants' breach and a foreseeable result of this breach. Accordingly, the Court will award Wye Oak $15,327,200 in lost profits from construction.

### 3. Lost Profits from Refurbishing Military Equipment

Wye Oak suffered lost profits from not being able to refurbish military equipment under the BSA. Refurbishing military equipment was one of Wye Oak's key responsibilities and it was a vital task as part of the IMERP. Under the BSA, MoD was required to pay Wye Oak 10% of the equipment's refurbishment cost. Pl.'s Ex. 5 ¶ 5(a). Defendants' breach proximately caused Wye

Oak's lost profits from refurbishing military equipment, this was a foreseeable result of the breach, and Gale's estimates are reasonable.

First, defendants' breach was the natural and proximate cause of plaintiff's lost profits from refurbishing military equipment. If defendants had not breached the BSA, Wye Oak would have been able to continue refurbishing military equipment, thus earning 10% of the equipment's refurbishment cost. Wye Oak had already begun refurbishing military equipment despite the fact defendants did not pay Wye Oak for this work. Indeed, the Court has already found Wye Oak exceeded the goal of producing a mechanized brigade of operational armored vehicles for Iraq's January 2005 parliamentary election. The evidence shows Wye Oak was eventually forced to cease performing these refurbishment activities because defendants never paid Wye Oak. Thus, defendants' breach caused Wye Oak's lost profits from refurbishing military equipment.

Second, the loss of profits from refurbishing military equipment was a foreseeable result of the breach. Refurbishing military equipment was a key component of the BSA. Iraq needed to re-equip its armed forces. Lost profits from refurbishing military equipment was therefore a natural result of defendants' breach. And defendants had reason to foresee these lost profits damages would be a probable result of their breach when the BSA was signed. Restatement (Second) of Contracts § 351. Defendants were aware of the importance of refurbishing military equipment; this was a driving factor in entering into the BSA. And defendants had reason to foresee failing to pay Wye Oak for the three invoices would inhibit Wye Oak's ability to refurbish military equipment, thereby losing profits it would have garnered.

Whether Gale's calculation for lost profits from refurbishing military equipment constitutes a reasonable estimate is more difficult. Iraq had a significant military with extensive equipment prior to the U.S.-led Coalition invasion in 2003. A significant amount of military

equipment was damaged during the invasion. Wye Oak was surveying this military equipment to develop an inventory, but it did not complete this effort by the time defendants breached the BSA. *See* Tr. 12/18/18 AM 38:11–41:17; Pl.'s Ex. 65 (discussing David Stoffel's work writing a computer program that could ultimately be used to inventory and track all the equipment Wye Oak was refurbishing and would potentially broker for sales based on information Dale Stoffel sent him). Gale therefore had to rely on Wye Oak's initial estimates of the amount of salvageable military equipment and on public sources listing Iraq's military equipment during the relevant time. Gale found the numbers of military equipment were largely consistent across the public sources he relied on.

At this point, the Court must take a brief detour to note defendants' discovery abuses that severely limited the material available to Wye Oak and Gale. Wye Oak's discovery sought information about Iraq's weapons inventories between 2003 and 2007. But defendants did not provide any documentation or answers in response. *See generally* Tr. 12/21/18 PM 91:20–93:19; Wye Oak's Second Set of Interrogatories (requesting inventories for specified weapons between 2003 and 2007 and inventory of equipment damaged during the invasion); ECF No. 228-5 (Iraq Response to Wye Oak's Second Set of Interrogatories); ECF No. 228-7 (MoD Response to Wye Oak's Second Set of Interrogatories); ECF No. 228-11 (Iraq Response to Wye Oak's Fourth Set of Interrogatories); ECF No. 228-15 (MoD Response to Wye Oak's Third Request for Production of Documents). Then when conducting Talib's *de bene esse* deposition, after the first week of trial had already been completed, Wye Oak learned Talib never even looked for relevant documents. Talib Dep. 2/8/19, 111:4–117:22. Talib only looked for records on large-scale weapons inventories from 2003. *Id.* He did not search for documents at any military bases or otherwise look for documents that could be used to extrapolate inventory. Further, Talib did not make any effort to

look for inventories from 2004 through 2007, despite Wye Oak specifically requesting documents from this period during discovery. Talib Dep. 2/8/19, 117:10–121:9.[25] Defendants' flagrant disregard for its discovery obligations can only be seen as bad faith. Defendants have used their own egregious discovery abuses to attempt to deprive Wye Oak of the evidence it would have used to obtain a damages award. Defendants' discovery abuses forced Gale to locate and rely on third-party data sources instead of primary data sources and documents. And during trial, defendants sought to leverage their own discovery failures to call into question the reliability of Gale's assessments. This cannot stand. *See Shepherd v. Am. Broad. Companies., Inc*, 62 F.3d 1469, 1478 (D.C. Cir. 1995) (determining district courts may impose issue related sanctions—sanctions for litigation misconduct that are fundamentally remedial, rather than punitive and do not preclude trials on the merits—for litigation misconduct—whenever "a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue"). The Court will therefore credit Gale's estimates based on these data sources as a sanction. *See id.* at 1475 (declaring "inherent power sanctions available to courts include fines, awards of attorneys' fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence").

Returning to Gale's assessments: To calculate Wye Oak's lost profits from not being able to complete the military equipment refurbishment, Gale had to identify the quantity of each type of equipment, the cost of replacement of each type of equipment, and the threshold percentage at

---

[25] In response to Wye Oak's sanctions motion, defendants attempted to excuse Talib's definitive statements that he did not make any effort to search for the documents Wye Oak explicitly requested by filing an affidavit from Talib claiming that when he investigated whether MoD possessed responsive documents, he learned the original armored brigade was reorganized and records were not maintained after 2009. Talib Decl., ECF No. 406-3. But this affidavit, submitted after the trial ended, contradicts Talib's clear *de bene esse* deposition testimony. Talib did not equivocate during his testimony—he asserted he did not search for the documents Wye Oak requested. And to the extent Talib's affidavit is truthful, which the Court has serious reason to doubt given his sworn trial testimony, defendants never disclosed this information to Wye Oak. Therefore, the Court cannot credit defendants' after-the-fact excuses for its clear discovery abuses.

which equipment would be refurbished or scrapped. He then multiplied the cost of refurbishment by the number of pieces of each type of equipment. Finally, he multiplied that number by 10% to derive Wye Oak's lost profits. Pl.'s Ex. 101 at 11.

With completed surveys about repair records, purchase prices, and replacement rates, Gale could have developed economic models to determine the expected cost of refurbishing each type of military equipment by examining the timing of repairing and replacing the equipment. Tr. 12/21/18 PM 41:18-42:25. Such models rely on a comparison between the repair cost and the replacement cost of a piece of equipment. *Id.* at 12. The repair cost an owner would be willing to expend is commonly a percentage of the cost to replace the equipment. *Id.* Absent such completed surveys, Gale created a range of refurbishment costs for each type of military equipment as a function of the replacement cost, which he drew from public information on sales and listings. *Id.*

Gale separated the military equipment Wye Oak would have refurbished under the BSA into five categories: (1) tanks; (2) armored personnel carriers (APC) and other armored vehicles; (3) helicopters; (4) artillery, airplanes, and ships; and (5) other military equipment. *Id.*[26] Wye Oak estimated that 20% of military equipment would be salvageable. *Id.* at 13; *see* Tr. 12/21/18 AM 87:4–14. Gale used this estimate that 20% of the equipment could be refurbished. Pl.'s Ex. 101 at 13.[27] He testified he believed this 20% figure was actually a conservative estimate based on publicly available analysis about the state of Iraqi military equipment after the invasion because numerous studies assessed that only a small percentage of Iraqi military equipment was even

---

[26] The BSA defined military equipment as "any equipment that is used by or in the provision of military, including, without limitation, any and all vehicles, aircrafts, guns, missiles, armored personnel carriers, heavy armor/tanks, military radar equipment, ballistic missiles, rocket launchers, artillery, artillery scrap, small arms, small arms scrap or any parts or components thereof." Pl.'s Ex. 5 ¶ 1(d). Non-armored vehicles, missiles, military radar equipment, ballistic missiles, rocket launchers, and small arms are all included in this definition but fall outside the four defined categories of military equipment in Gale's report. This military equipment is therefore referred to as "other military equipment." Pl.'s Ex. 101, 17–18.

[27] Gale did not have any other information to rely on because defendants disregarded their discovery obligations and did not provide any records showing the numbers of equipment that were refurbished and scrapped.

engaged in the war. Tr. 12/21/18 AM 65:23–67:3, 73:3–18. And Gale testified reports found about half of Iraqi military equipment was not functional before the war because sanctions limited Iraq's ability to obtain spare parts to make the necessary repairs for that equipment. Tr. 12/21/18 AM 65:23–67:3, 73:3–18. This information led Gale to believe a significantly greater percentage of Iraqi military equipment was likely capable of being refurbished because it was never in battle and likely only needed rather insignificant repairs once sanctions no longer prevented parts from being obtained. Tr. 12/21/18 AM 65:23–67:3, 73:3–18. Gale explained that if more equipment was capable of being refurbished, the damages estimate would have been higher. Tr. 12/21/18 AM 65:23–67:12.

Defendants take issue with Gale's use of Wye Oak's estimate that 20% of the military equipment would have been suitable for refurbishment. Although Gale discussed reports indicating Iraq did not use most of its military equipment during the U.S.-led Coalition invasion during his testimony, these studies are not listed in his expert report as documents he relied on. Defendants conclude Gale has therefore failed to support his assumption that 20% of Iraqi military equipment was salvageable. While the Court is troubled by Gale's failure to include these studies as documents he relied on in his expert report, the Court must also note defendants engaged in discovery abuse by not even searching for inventories of military equipment that Wye Oak requested. Defendants' disregard for their discovery obligations forced Gale to have to rely on Wye Oak's own business estimates and look for publicly available studies. Defendants cannot weaponize these abuses to call Gale's estimates into question. Therefore, the Court finds it was reasonable for Gale to rely on Wye Oak's estimate that 20% of the military equipment would have been suitable for refurbishment.

Then Gale calculated refurbishment cost of each piece of military equipment using a range of refurbishment cost between 10% to 40% of replacement cost. Pl.'s Ex. 101 at 14. At the time defendants breached the BSA, Wye Oak had already invoiced costs to refurbish 246 armored vehicles in Invoice #MUQ002. The invoiced refurbishment costs per vehicle from this invoice were approximately 5% of the replacement costs of the vehicles. But Gale did not believe it would be appropriate to use this number as a benchmark for the cost to refurbish the remaining salvageable vehicles. *Id.* at 13–14. Wye Oak targeted military equipment that required the least amount of work to refurbish so that such work could be done quickly. Wye Oak was focused on producing armored vehicles for the January 2005 election. Gale asserted that subsequently refurbished equipment would require significantly higher refurbishment costs than those already invoiced because they would require more work. He therefore assumed the lower range of average per-unit cost to refurbish subsequent vehicles would be 10% of the replacement costs of the vehicles. And he determined the higher range of average per-unit cost to refurbish subsequent vehicles would be 40% based on industry guidelines that advise not spending more than 40% of the replacement cost on refurbishing existing equipment. *Id.* at 14. While defendants argue Gale should have used the 5% figure based on Wye Oak's invoiced costs, the Court finds Gale's estimates were reasonable. The evidence in this case demonstrates Wye Oak was initially focused on the armored vehicles that required the least amount of work to refurbish so that these vehicles could be put into operation expeditiously and in time for the January 2005 election. The Court therefore concurs with Gale's assessment that using the 5% figure would not have been appropriate for subsequently refurbished equipment that would typically require more work and therefore cost more. *Id.*

Subsequently, Gale examined the number and types of equipment in each category of military equipment present in Iraq, the amount of each type of equipment that was salvageable, the per-unit low and high refurbishment costs for each type of equipment, and the scrap value of the non-salvageable equipment for each type of equipment.[28] Gale used data from Wye Oak's estimates and public sources in these assessments. And he calculated refurbishment cost per unit using a range of refurbishment cost between 10% to 40% of replacement cost for all military equipment, except the tanks, APCs, and other armored vehicles that were included in Wye Oak's Invoice #MUQ002, since he used the refurbishment cost Wye Oak already invoiced for this equipment. Gale assumed no Iraqi Navy assets could be salvaged and would therefore all be sold as scrap because of a lack of information on whether Iraqi Navy equipment could be salvaged following the 2003 invasion. *Id.* at 17. This assumption was informed by public studies showing the Iraqi Navy was operating solely with ships supplied by the U.S. military as of October 2005. *Id.* at 17 n.68. And Gale did not include estimates of quantities, refurbishment costs, or scrap value for the category consisting of other military equipment because he was only able to find limited information on these types of equipment. *Id.* at 17–18. Although Wye Oak asks the Court to enhance Gale's damages calculation by issuing an award for the category consisting of other military equipment as a sanction for defendants' discovery abuses, Wye Oak has not provided any factual basis upon which the Court could issue such an award. Therefore, the Court will not disturb Gale's estimates by trying to fashion an estimate of its own absent any factual underpinning.

---

[28] Gale stated "the minimum value of a helicopter that cannot be refurbished would be its disposal value. The disposal value would be its scrap value plus the value of any parts that could be recovered and sold. Unlike armored vehicles, simply using the scrap value likely vastly understates the disposal value of the helicopter as it does not value any electronic or mechanical components that could be separately salvaged and sold as replacement parts." Pl.'s Ex. 101 at 16. Therefore, he estimated the average disposal value of helicopters that could not be salvaged was 10% of the replacement cost based on the value of a helicopters' components, which would be sold as parts. *Id.*; Tr. 12/21/18 PM 67:3–71:14.

Defendants' only complaint regarding Gale's assessments for the specific types of equipment focuses on aircraft. Defendants contend there was not a plan to refurbish aircraft based on General Petraeus' testimony. When asked by defense counsel whether he observed aircraft equipment being refurbished as part of the effort to rehabilitate Iraqi military equipment, General Petraeus stated he did not recall observing aircraft equipment being refurbished. General Petraeus asserted:

> there was an effort to retrieve and to at least assess Iraqi aircraft, which, interestingly, in some places had been buried. Presumably they were going to go back and dig it up. But that's not really good for the maintenance of jets and all the rest of that. So I don't -- I don't recall if any Iraqi aircraft were ever made capable of flying again. But that wasn't one of the efforts that we were pursuing at that time . . . We really didn't even have an Iraqi Air Force program, I don't recall us having at that time. We ultimately did . . .

Petraeus Dep. 8/8/18, 58:17–59:15. General Petraeus was then cut off by defense counsel, who asked a new question focused on Iraqi naval vessels. Petraeus Dep. 8/8/18, 59:16–20. General Petraeus' statements are not as definitive as defendants make them out to be. General Petraeus was very careful throughout his testimony to only discuss topics on which he had personal knowledge. He was typically not willing to make statements about events he did not know about. So the Court is not especially troubled by his testimony that he did not recall observing aircraft equipment being refurbished. Stating he did not recall observing this is different than definitively stating it did not occur at all. And it is worth noting General Petraeus' high-level responsibilities in Iraq during this period would likely have limited his ability to be fully aware of every particular facet of the refurbishment effort. Further, General Petraeus' testimony indicates there was an effort to assess Iraqi aircraft and that eventually there was an Iraqi Air Force program. In addition, the BSA specifically cites aircraft as one of the types of military equipment covered by the contract. Pl.'s Ex. 5 ¶ 1(d). Wye Oak's record of performance, especially its quick work refurbishing armored

vehicles in the run-up to the January 2005 election, indicates Wye Oak would have refurbished Iraqi aircraft as part of the BSA had defendants not breached the Agreement.

Gale determined the low refurbishment cost for tanks would be $34,954,500 and the high refurbishment cost for tanks would be $126,420,000. Pl.'s Ex. 103 tbls.3–3B. For APCs and other armored vehicles, Gale determined the low refurbishment cost would be $33,880,000 and the high refurbishment cost would be $119,360,000. Pl.'s Ex. 103 tbls.4–4B. For helicopters, Gale determined the low refurbishment cost would be $46,245,359 and the high refurbishment cost would be $184,981,437. Pl.'s Ex. 103 tbls.5–5B. And for artillery, airplanes, and ships, Gale determined the low refurbishment cost would be $31,201,024 and the high refurbishment cost would be $124,804,096. Pl.'s Ex. 103 tbls.6–6B. As stated above, Gale did not assess any refurbishment costs for the category of other military equipment.[29]

And Gale estimated this refurbishment work would all be completed by the end of 2005, as discussed above in Section III(C)(1). The Court believes this timeline is reasonable and based on sound economic principles.

In sum, Gale calculated the total low refurbishment cost for all categories would be $146,280,883. He calculated the total high refurbishment cost for all categories would be $555,565,533. The Court finds that Gale's assumptions, methodologies, and calculations are grounded in sound economic principles and result in reasonable estimates. Ultimately, the Court believes it is most appropriate to award Wye Oak lost profit damages for refurbished military equipment at a refurbishment cost rate of 20% of replacement cost (except for the T-54/-55 and APCs, for which the Court will apply the invoiced cost per unit): $267,707,266. The Court believes

---

[29] Gale assessed the scrap value for the brass shell casings that were stolen at this point in his report. However, as discussed above in Section II(D), the evidence presented to the Court is insufficient to establish defendants were at fault for this theft, so the Court will not award Wye Oak damages based on this estimated scrap value.

this refurbishment cost rate, slightly below what the midpoint cost rate would be (25%), is a conservative assessment. It accounts for the fact that some equipment was bound to be in better condition while other equipment would need more significant work to refurbish. And the Court believes this award accounts for the fact that some equipment would not require significant refurbishment work, as demonstrated by Wye Oak's initial invoices and by Gale's finding that some Iraqi military equipment likely only needed spare parts to be refurbished. This equipment would likely slightly reduce the refurbishment cost rate. Therefore, the Court believes this award best captures the true refurbishment cost across the vast array of military equipment. And accordingly, Wye Oak's 10% broker fee is $26,770,726.60. So the Court will award Wye Oak $26,770,726.60 in lost profits from military equipment refurbishing.

### 4. *Lost Profits from Scrap Sales*

Scrap sales were an important part of the BSA. Absent the breach by MoD, Wye Oak would have arranged for the sale of scrap and earned broker fees from these sales. Defendants' breach directly proscribed Wye Oak's ability to engage in scrap sales, thereby removing Wye Oak's ability to earn broker fees on these deals. And Wye Oak's lost profits from scrap sales was a foreseeable result of defendants' breach and Gale's estimates on this topic are reasonable.

Defendants assert the lost profits on scrap sales are speculative because Wye Oak had not completed any scrap sales at the time defendants breached the BSA. They contend there is too much uncertainty in whether Wye Oak would have completed any scrap sales for the Court to award these damages. However, defendants ignore that scrap sales were a fundamental aspect of the BSA. Arranging scrap sales was one of Wye Oak's primary responsibilities under the BSA, and earning commissions on these sales was a primary manner in which Wye Oak would be compensated under the BSA. Pl.'s Ex. 5 ¶ 2–5. Lost profits are recoverable when those profits

emanate "from the use of the subject of the contract itself," regardless of whether independent or collateral undertakings, such as dealings with third parties, are involved. *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001).

The Federal Circuit set forth the applicable test for determining whether lost profits arise from activity collateral to the contract in *Wells Fargo*:

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

*Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1022–23 (Fed. Cir. 1996). The relevant inquiry in applying this test is whether the lost profits are too remote to be classified as a natural result of the breach.

Collateral undertakings are too remote to permit the award of lost profits when those undertakings are not directly related to the subject of the contract. *Mann v. United States*, 68 Fed. Cl. 666, 669 (2005). For example, in *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1333 (Fed. Cir. 2003), the plaintiff sought to recover lost profits associated with future contracts the plaintiff alleged it would have been awarded absent the harm to its business caused by the government's breach of an unrelated contract. The Federal Circuit determined such lost profits were too "remote and uncertain" to be recoverable because they were the result of independent and collateral undertakings. *Id.*

However, lost profits are recoverable when they directly relate to the subject of the contract, even if they would have required a transaction with a third party. *Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460, 472 (2006), *on reconsideration*, 81 Fed. Cl. 235 (2007), *on*

*reconsideration in part*, 81 Fed. Cl. 733 (2008), and *aff'd in part, rev'd in part and remanded*, 596 F.3d 817 (Fed. Cir. 2010), and *aff'd in part, rev'd in part and remanded*, 596 F.3d 817 (Fed. Cir. 2010); *Mann*, 68 Fed. Cl. at 670. In *Mann*, the plaintiff sought to recover lost profits from energy sales to third parties as a result of the government's breach of a geothermal lease agreement with the plaintiff. 68 Fed. Cl. at 666. The Court of Federal Claims denied the government's motion for summary judgment on the plaintiff's claim for lost profits, finding the profits from the energy sales from the leased property to third parties were contemplated by both parties. *Id.* at 670. The court held the subject matter of the contract was geothermal energy, and the "[p]rofits on the use of the subject of the contract itself . . . are recoverable as damages." *Id.* at 671.

Here, scrap was an essential aspect of the subject matter of the BSA. Wye Oak's lost profits from scrap sales therefore directly relate to the subject of the contract. Thus, Wye Oak's lost profits damages from scrap sales are recoverable despite the fact they would have required Wye Oak to transact with a third party. Such sales were specifically contemplated by the parties to the BSA.

The Federal Circuit's decision in *Energy Capital* further illustrates lost profits from scrap sales are recoverable here. In *Energy Capital*, the government challenged the Court of Federal Claims' lost profits award to Energy Capital on its breach of contract claim, arguing such lost profits were premised on several uncertain steps that needed to occur. Specifically, the government objected to the fact that several parties would have needed to agree to the transaction for Energy Capital to have earned the profit. But the Federal Circuit rejected this argument, finding Energy Capital's anticipated profits flowed directly from the agreement the government breached, rather than from other independent and collateral undertakings. The purpose of the agreement between Energy Capital and the government was to permit Energy Capital to make a profit by engaging in transactions with third parties. "When the government breached the [] agreement, Energy Capital

was no longer able to issue those loans [to third parties], and its resulting loss of profits flowed directly from the government's breach." *Id.*

Accordingly, Wye Oak's claim for lost profits from scrap sales is not speculative. Wye Oak may recover such lost profits, which naturally flowed from defendants' breach. And the loss of these profits was a foreseeable result of the breach.

Further, Gale's calculations on Wye Oak's lost profits from scrap sales were reasonable estimates. Gale divided scrap into the same five categories as the refurbishment costs: (1) tanks; (2) APCs and other armored vehicles; (3) helicopters; (4) artillery, airplanes, and ships; and (5) other military equipment. Pl.'s Ex. 101 at 19. Gale used the same data discussed in the previous section for the number and types of equipment in each category of military equipment present in Iraq. And he determined the military equipment that was not refurbished would be turned into scrap. In addition, Gale included the 70,000 tons of brass shell casings Wye Oak had attempted to sell before it was stolen. However, the evidence presented to the Court is insufficient to establish defendants were at fault for this theft so the Court will not award Wye Oak damages based on the brass shell casings' estimated scrap value.

For tanks, APCs, and other military equipment, Gale used the equipment's weight and the price of scrap steel to calculate the scrap value because the largest components of these types of equipment are made from steel. Scrap steel is shipped internationally and prices vary by location. Gale found the international scrap market was doing well during the relevant period, driven by Chinese imports. *Id.* at 20. Gale elected to use Turkey as a proxy to set the value of scrap steel. Gale explained he looked for the closest market to Iraq that had a significant volume of scrap from the U.S., as his data was from the U.S. geological survey that reports the quantities and value of U.S. scrap exports. Tr. 12/21/18 AM 62:3–63:8. In 2004, 631,000 tons of scrap were shipped from

91

the U.S. to Turkey, which was valued at $136 million. And those numbers increased in 2005 to 1.5 million tons of scrap shipped from the U.S. to Turkey at a value of over $300 million. Pl.'s Ex. 101 at 20. Gale set the value of scrap Wye Oak would have been processing and the value of the scrap sales at the price Turkey was paying for U.S. scrap. This was a reasonable estimate of what Turkey would have paid for Iraqi scrap. *Id.* Gale also believed Turkey was an attractive export market for Iraqi scrap because of its geographic proximity. Tr. 12/21/18 AM 63:9–25. Accordingly, Gale used the 2004 average scrap steel price in Turkey, which was $215 per metric ton, for his calculations.

Gale also used ships' weight and the price of scrap steel to determine their scrap value even though Gale believed this approach was conservative. Even assuming ships do not have any valuable components that could be sold separately, Gale asserted ships contain significant amounts of other types of scrap metal that command higher scrap prices than steel. Pl.'s Ex. 101 at 21. Nonetheless, Gale used the conservative approach to determine scrap value for naval equipment.

Gale did not believe it was appropriate to solely rely on the weight and price of scrap steel for helicopters and aircrafts. Gale determined this would understate their scrap value because helicopters and aircrafts are not predominately steel. Instead, helicopters and aircrafts contain parts that could be salvaged or sold as spare parts. This led Gale to estimate the value of a helicopter or aircraft that could not be refurbished would be 10% of the replacement cost. Pl.'s Ex. 101 at 20–21.

Using this methodology, Gale determined the scrap value for tanks would be $14,994,100. Pl.'s Ex. 103 tbls.3–3B. For APCs and other armored vehicles, Gale determined the scrap value would be $6,334,829. Pl.'s Ex. 103 tbls.4–4B. For helicopters, Gale determined the scrap value would be $184,981,437. Pl.'s Ex. 103 tbls.5–5B. And for artillery, airplanes, and ships, Gale

determined the scrap value would be $57,534,782. Pl.'s Ex. 103 tbls.6–6B. Gale did not assess any scrap value for the category of other military equipment besides the brass shell casings, which the Court does not accept.

And Gale estimated this refurbishment work would all be completed by the end of 2005, as discussed above in Section III(C)(1). The Court believes this timeline is reasonable and based on sound economic principles.

In sum, Gale calculated the total scrap value would be $263,845,148.[30] Accordingly, Wye Oak's 10% commission on the total scrap value would be $26,384,514.80. The Court finds that Gale's assumptions, methodologies, and calculations are grounded in sound economic principles and result in reasonable estimates. Defendants' objections that Gale baselessly assumed there would have been demand for Iraqi scrap and that Gale failed to consider the impact on prices due to Iraqi scrap entering the market are without merit. Gale found the scrap market was quite vibrant during this period, especially given China's significant demand. Pl.'s Ex. 101 at 20. There is no reason to think Iraqi scrap would have been rejected by a market with a high demand for scrap. Gale's data shows both the amount and value of scrap being shipped from the U.S. to Turkey increased from 2004 to 2005. And defendants have not provided any reason to think the influx of Iraqi scrap would have significantly altered global prices, especially given the high demand in the market. Thus, the Court will award Wye Oak lost profits damages from scrap sales in the amount of $26,384,514.80.

### 5. *Lost Profits from the Sale of Surplus Military Equipment*

Wye Oak was appointed as the sole and exclusive broker to arrange for the sale of military equipment and refurbished military equipment to customers under the BSA. Pl.'s Ex. 5 ¶ 2(iv).

---

[30] This value does not include the scrap value of the brass shell casings because the Court does not believe these were properly included in Gale's assessments.

Wye Oak asserts it would have earned profits from brokering the sale of surplus military equipment MoD did not need or want had MoD not breached the contract. But Gale did not calculate lost profits damages for this because he did not have any records on equipment Iraq sold during the 2004 through 2007 timeframe. So he could not make any reasoned estimate.

Wye Oak contends the Court should nonetheless award it lost profits damages for this category as a sanction for defendants' discovery abuses. Defendants did not turn over any documents indicating how many military vehicles it kept for itself and how many were sold on the international market. On the other hand, defendants assert it would be highly speculative to award such lost profits.

Wye Oak would only have been able to earn these lost profits if MoD determined it did not need or want the military equipment, and then Wye Oak successfully brokered a sale with another party. Without any data on whether Iraq sold surplus military equipment during this period, the Court cannot fairly find Iraq made any such sales. The evidence in this case demonstrates how vital it was for Iraq to re-equip its own military, which indicates Iraq may not have been in a position to sell surplus military equipment at this time. Further, without any data on this matter the Court does not believe a reasonable estimate on this topic is possible. Therefore, the Court will not award Wye Oak lost profits for the sale of surplus military equipment.

D. Terminal Value

Wye Oak asks this Court to award it damages from the BSA's terminal value despite Gale's assumption there was no terminal value. Terminal value measures the value of the business at the end of the forecasting period, which in this case was when the BSA would have terminated had it been fully carried out, August 2007. Terminal value could result from continuing with a follow-on contract or liquidating assets at the end of a contract. Tr. 12/21/18 AM 70:9–71:4. Gale

"assum[ed] Wye Oak's lost business opportunity under the contract ha[d] no value beyond the forecasting period." Pl.'s Ex. 101 at 22. Therefore, he assessed the BSA's terminal value was zero.

Notwithstanding Gale's assessment, Wye Oak claims fairness suggests there would have been some terminal value and the reason Gale had to be so conservative in his analysis was defendants' discovery abuses. This stems from Gale's testimony there may have been terminal value, but to be conservative in his estimates he assumed there was not. Tr. 12/21/18 AM 70:9–71:4. But this single exchange during trial is not sufficient to persuade the Court to depart from the expert's final assessment on this matter. The Court will not award Wye Oak damages for any lost terminal value.

E. Discounted Future Income

The Court must calculate the expected value of the future profits Wye Oak would have earned as of the date of the breach, October 28, 2004. To estimate the expected value of the lost profits, Gale applied a discounted cash flows (DCF) methodology. Pl.'s Ex. 101 at 21. The DCF methodology looks at the discounted value of damages through an investor's eyes. *Id.* An investor in Wye Oak would see value in the company through future payouts to the business. The value of a lost future business opportunity can be estimated as the present value of expected net future cash flows. *Id.* at 21–22. The present value is calculated by applying a discount rate to future cash flows. As Gale explained: "[L]et's say an investor was going to come invest in Wye Oak . . . Wye Oak would say: I'll give you $130 a year from now. And the investor will say: Well, I'll buy that for $100. They're going to expect a 30 percent rate of return by investing in Wye Oak." Tr. 12/21/18 PM 60:6–60:17. This valuation approach has three elements: (1) a forecast of future net cash flows; (2) an estimate of the terminal value of the project at the end of the forecasting period; and (3) selecting and applying an appropriate discount rate to compute the present value of future cash

flows and the terminal value. Pl.'s Ex. 101 at 22. As explained in the previous section, Gale assumed the BSA did not have a terminal value. And Gale assumed the lost business opportunities would occur over a finite period of time—until the BSA was set to end in August 2007—so the forecast of future net cash flows ended in August 2007. *Id.*

The discount rate is the most important aspect of the DCF methodology. *Id.* The discount rate reflects the "opportunity cost" to investors for investing in alternative investments of "comparable risk and other investment characteristics." *Id.* For the purpose of selecting a discount rate, Gale assumed 100% equity funding for Wye Oak. *Id.* at 22–23. While Gale noted equity funding is more expensive than debt funding, he asserted it is a common source of funding among high-growth companies and, therefore, is a reasonable assumption in Wye Oak's case. *Id.* Assuming 100% equity funding yields a higher discount rate and, therefore, a lower damages estimation here. *Id.*

The cost of equity is the rate of return required by equity investors as compensation for the risk of financing the business. *Id.* at 23. Gale asserted methods for estimating the cost of equity include the "build-up" method, the capital asset pricing model, the arbitrage pricing theory, and the Farma-French "three-factor" model. *Id.* The capital asset pricing model, arbitrage pricing theory, and Farma-French "three-factor" model all require historical market prices for the company (or industry benchmarks); whereas, the build-up method does not. In the absence of historical pricing data, the build-up method utilizes an additive approach to estimate the cost of equity. It uses the sum of the risk-free rate and various risk premiums. Gale used the build-up method to estimate the equity cost of capital for Wye Oak as of October 28, 2004, adding the risk-free rate, the equity-risk premium, the firm size premium, and the industry risk premium. *Id.*

### 1. *Risk-Free Rate*

Gale used the 3-year United States Treasury note as of January 5, 2005, which was 3.39%, as the risk-free rate. U.S. Treasury securities are commonly accepted risk-free investments and the three-year time horizon matches the time horizon of the cash flows at issue. *Id.* at 24. Defendants did not object to this risk-free rate and the Court finds it was reasonable.

### 2. *Equity Risk Premium*

The second component of the cost of equity is the equity-risk premium. The equity-risk premium compensates equity investors for taking on risks not present among risk-free assets. *Id.* Gale included a country-specific risk premium in his estimate because there were greater risks associated with doing business in a country like Iraq from an investor's perspective. *Id.* The sources of country risk are economic life cycle risk (early growth countries are riskier), political risk, legal risk, and economic structures risk (e.g., oil sector dependence). *Id.* at 25. Gale found it was appropriate to look to the current equity-risk premium estimate when estimating the 2005 level because the World Bank's latest data on political instability and violence, rule of law, corruption, and regulatory quality in Iraq remain at similar levels as 2005. *Id.* at 25. Thus, Gale used the 2018 estimate of Iraq's equity-risk premium, which was 13.72%. *Id.* at 24–25.

Defendants complain Gale did not adequately take into account Wye Oak was operating in a war zone. But this ignores the fact Gale did look at country-specific risks, including political instability and violence. He found that the most recent data from the World Bank is similar to the data from 2005. And he included a country-specific risk premium in his estimate. This would seem to account for the fact Iraq was a war zone. So the Court finds Gale's equity-risk premium calculation of 13.72% to be reasonable.

### 3. *Firm Size Premium*

The discount rate's third component is a company size premium. Smaller companies are more likely to fail than larger ones so they are seen as riskier investments. For this purpose, Gale assumed the risk premium on the 10% smallest companies by market capitalization (up to approximately $500 million). He derived the size premium from the Ibbotson SBBI 2005 Yearbook, finding it was 4.02%. *Id.* at 25–26. Defendants argue Gale used the incorrect tables in Ibbotson, leading to a smaller size premium.

Ibbotson breaks down size premiums based on company size, categorizing companies in terms of size on a 1 through 10 scale, with 10 representation the smallest companies. The categories applicable to Wye Oak are the "micro-cap" category that combines categories 9 and 10, category 10, or category 10b, which is subset of category 10 and represents the very smallest of the small companies (with market capitalization up to $144 million). Gale selected the micro-cap category, which has a size premium of 4.02%. Defendants contend Gale should have solely focused on category 10, which represents the smallest companies and has a size premium of 6.41%, or solely focused on category 10b, which represents the smallest of the small companies and has a size premium of 9.90%. Defendants think it would have been most accurate to rely on category 10b. And even then defendants argue Gale should have further raised this figure because Wye Oak did not have a market capitalization approaching $144 million. However, this ignores the fact that the micro-cap category contains a larger sample size of data on small companies and is therefore more reliable than solely looking at category 10. This is even more of an issue when comparing the micro-cap category to category 10b alone. *See In re Bachrach Clothing, Inc.,* 480 B.R. 820, 871 (Bankr. N.D. Ill. 2012) (observing that Ibbotson cautioned: 'Breaking the smallest decile down lowers the significance of the results compared to results for the 10th decile taken as a whole,

however. The same holds true for comparing the 10th decile with a micro-cap aggregation of the 9th and 10th decile.' . . . In other words, the data reported in the micro-cap category was more reliable because it contained a larger sample size of small companies."). Accordingly, the Court finds Gale's assessment the size premium was 4.02% based on Ibbotson's micro-cap category was reasonable.

### 4. *Industry Risk Premium*

The final component of the discount rate is the industry premium. The industry premium is intended to compensate investors for risks particularly associated with the industry at issue. Gale determined that industry-wide risks, beyond country risks, were present here, namely in the business of dismantling scrap metals. Based on the Standard Industrial Classification (SIC) code for miscellaneous durable goods, which includes scrap and waste materials, Gale determined the industry risk premium was 9.07%. Pl.'s Ex. 101 at 26.

Defendants counter that Gale should have used the industry risk premium for the SIC code for scrap and waste materials, instead of the aggregate industry risk premium for the entire miscellaneous durable goods category. The industry risk premium for the SIC code for scrap and waste materials specifically was 12.21%. So defendants allege Gale's use of the lower aggregate value artificially inflates the lost profits calculation.

However, this ignores that scrap was only one aspect of the BSA. The BSA also included refurbishing military equipment and refurbishment services. Thus, confining the industry risk premium rate to the SIC code for scrap and waste materials would not account for the other aspects of Wye Oak's work under the BSA. Accordingly, the Court finds Gale's determination the industry risk premium was 9.07% to be reasonable.

5. *Defendants' Objections that Gale Did Not Include a Company-Specific Risk Premium and Did Not Apply a Higher Discount Rate to Damages in Option Years*

Defendants have two additional objections to Gale's discount rate calculation. First, defendants take issue with the fact Gale did not include a company-specific risk adjustment. Defendants believe this is appropriate because Wye Oak was heavily dependent on key figures, such as Dale Stoffel, and was operating in a dangerous environment during this period. However, the company size premium inherently takes into account the dependence of companies on key personnel. Smaller companies are more dependent on key personnel than larger companies. So the size premium already accounts for this. And the dangers of operating in Iraq was taken into account when determining the equity-risk premium, as discussed above. Therefore, the Court is not persuaded by this objection.

Second, defendants assert Gale should have applied a higher discount rate to damages in option years. The damages period calculated by Gale only extends two and one-half months into the first option year. Defendants believe Gale should have applied a higher discount rate to the damages during this two and one-half months period that extends beyond the BSA's first year. The Court is not convinced it was necessary for Gale to adjust the discount rate for this period, especially given the unlikely prospect defendants would have terminated the BSA if Wye Oak was performing on the timeline Gale assumed, which this Court has found was reasonable.  Thus, the Court also rejects this objection to Gale's calculation.

6. *Discount Rate*

Applying the build-up methodology of adding the risk-free rate, the equity-risk premium, the firm size premium, and the industry risk premium to estimate the equity cost of capital for Wye Oak, Gale determined the discount rate was 30.2%. The Court finds Gale's methodology and

calculations were grounded in sound economic principles and were reasonable. Accordingly, the Court accepts 30.2% as a reasonable discount rate for determining damages.

F. Prejudgment Interest

Under Iraqi law, Wye Oak is entitled to prejudgment interest on the judgment from the date the suit was filed. Article 171 of the Iraqi Civil Code sets prejudgment interest rate at 5% in commercial matters. Pl.'s Ex. 97.[31] Prejudgment interest is not compounded under Iraqi law and cannot exceed the sum of the judgment. Pl.'s Ex. 97 art. 174.

After acknowledging Article 171 typically sets the prejudgment interest rate, Wye Oak argues the Court should augment the rate in this case pursuant to Article 175. Article 175 provides: "The legal rate of the commercial interest charged on current accounts will vary according to fluctuations of the local market applicable; capitalization (the method of computing compound interest) is effected on current accounts according to the commercial usage." *Id.* at art. 175. *Black's Law Dictionary* defines current account as "[a] running or open account that is settled periodically." Black's Law Dictionary (11th ed. 2019). This does not describe the BSA. The compensation terms under the BSA did not create running or open accounts. Under the BSA, MoD was supposed to pay Wye Oak a 10% commission on sales contracts for military refurbishment

---

[31] Defendants state Iraqi law caps prejudgment interest at 6% per annum commencing on the date of filing the suit, citing Article 171 of the Iraqi Civil Code. Defs.' Proposed Findings of Fact & Conclusions of Law: Mem. Regarding Damages 3 n.1, 41, ECF No. 428. This led plaintiff to adjust the interest rate it sought to 6% and to state defendants corrected plaintiff's mistaken reference to 5%. Pl.'s Reply 80, ECF No. 433. However, the Iraqi Civil Code entered into evidence in this case by the parties' stipulation states: "Where the object of the obligation is a sum of money which was known at the time the obligation arose and the debtor delayed the payment thereof he shall be obligated to pay to the creditor by way of damages for the delay a legal interest at the rate of four per cent in regard to civil matters and five per cent in respect of commercial matters; this interest will commence from the date of filing a judicial claim in respect thereof if the agreement or the commercial usage has not fixed a different date for the running of the interest save in all cases where the law provides otherwise." Pl.'s Ex. 97 art. 171. And plaintiff's Iraqi law expert declared Article 171 limited interest to 5% for commercial transactions running from the date the suit commenced. Pl.'s Ex. 117. Accordingly, the Court finds that the 5% interest figure is correct. Defendants appear to be mistaken in citing a 6% interest figure, as this number does not appear anywhere in the applicable Iraqi statutes governing this action. Perhaps defendants' mistake caused plaintiff to become confused (or to see this as an opportunity to enhance their damages by capitalizing on defendants' mistake). Regardless, the Court will use the correct interest rate, 5%.

services, refurbished military equipment, and scrap sales; MoD was supposed to pay Wye Oak 10% of the refurbishment cost for refurbished military equipment; and MoD was supposed to cover expenses associated with performing military equipment services, as Wye Oak was required to use all reasonable commercial efforts to perform military refurbishment services yet was not required to spend any money carrying out these services. Payments to Wye Oak based on the sales contracts or refurbishment costs were to be paid immediately upon Wye Oak's presentation of pro forma invoices. Pl.'s Ex. 5 ¶ 5(b). These payment mechanisms do not fall within the definition of current accounts. Therefore, Article 175 is inapplicable here and the Court will not augment the statutory interest rate.

Accordingly, Wye Oak will be awarded prejudgment interest at a rate of 5% per annum, calculated as simple interest, dating back to the date Wye Oak filed this suit, July 20, 2009.[32]

G. Enhanced Damages

Wye Oak argues it is entitled to enhanced damages under Iraqi law because of defendants' bad faith and fraud. The Iraqi Civil Code explicitly provides for enhanced damages in cases of bad faith, fraud, or cheating. Article 173(2) states: "The creditor may claim a complementary compensation to be added to the legal or contractual interests if he has established that the damage which exceeds the interests was due to cheating or gross fault committed by the debtor." Pl.'s Ex. 97 art. 173(2). Professor Mallat analogized complementary damages under Article 173(2) to the concept of punitive damages under American law. Mallat Dep. 2/15/19, 452:15–453:11; Mallat Dep. 2/16/19, 463:20–464:11. Although Mallat stated "[g]enerally civil law system does not accept punitive damages . . . the closest to [punitive damages] would be this [complementary damages under Article 173(2)]." Mallat Dep. 2/15/19, 452:15–453:11. Later, in response to a question from

---

[32] The Court will order plaintiff to submit a proposed order with the calculated amounts based on this interest rate.

plaintiff's counsel on his "opinion as it relates to the availability of punitive damages under Iraqi law," Mallat clearly articulated:

> Punitive damages as a concept is not recognized in civil law generally, including in Iraqi law. But what I explained yesterday is that under Article 173.2, which allows the judge in egregious cases such as the ones that are based on fraud or cheating, or a gross mistake, the judge is entitled and has a discretion to add -- to complement whatever damages he sees to be fit for the gross fault, the mistake or the cheating, and that would be the closest equivalent to punitive damages in American law.

Mallat Dep. 2/16/19, 463:20–464:11. The Court agrees that complementary damages under Iraqi law mirror punitive damages under American law. Punitive damages are awarded in addition to actual damages in circumstances where a defendant acts with recklessness, malice, or deceit, or when the Court finds it appropriate to penalize the wrongdoer or attempt to deter similar behavior. *See* Black's Law Dictionary (11th ed. 2019).

But punitive damages are not available against foreign states under the FSIA (except against state sponsors of terrorism under 28 U.S.C. § 1605A, but this provision is not applicable here). The FSIA explicitly provides "a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages." 28 U.S.C. § 1606. As discussed *supra* in Section III(A), MoD is an inseparable part of the Republic of Iraq, it is not an agency or instrumentality under the FSIA. So although punitive damages may not exist in Iraqi law in exactly the same manner as in American law, complementary damages are essentially equivalent to punitive damages. It would violate the FSIA's clear intent to allow Wye Oak to recover complementary damages based on the technicality that Iraqi law has given a different name to punitive damages.

And the FSIA provides the means of suing a foreign sovereign in U.S. courts but does not establish the cause of action. Instead, parties must look elsewhere for the private right of action.[33]

---

[33] The exception to this is that the FSIA has created a private right of action as part of the state sponsors of terrorism exception. But this is not applicable here.

But parties cannot overcome the FSIA's prohibition on punitive damages being levied against foreign states just because punitive damages may be otherwise possible against a private party sued under the same cause of action. Thus, defendants cannot be held liable for punitive damages—called complementary damages in Iraqi law—here.[34]

### H. Costs, Including Reasonable Attorney's Fees and Expenses

Finally, Wye Oak is entitled to costs, including reasonable attorney's fees and expenses, under the BSA. The BSA provides:

> Each party shall indemnify, defend and hold harmless the other party from and against any and all liabilities, demands, claims, lawsuits, damages, actions, judgments, costs (including reasonable attorney's fees and expenses) including but not limited to injury to persons (including death), loss or damage to, or destruction of property arising out of that party's breach of this Agreement or that party's negligent or willful actions while performing hereunder.

Pl.'s Ex. 5 ¶ 15. This provision explicitly requires defendants to indemnify Wye Oak because Wye Oak's costs, including reasonable attorney's fees and expenses, arose out of MoD's breach of the BSA. Thus, defendants will be ordered to pay plaintiff's costs, including reasonable attorney's fees and expenses. This amount will be separately determined in accordance with Local Rule 54.2.

---

[34] Although defendants never raised the argument that punitive damages are not available against foreign states under the FSIA, the Court does not believe that it is required to ignore the FSIA's clear statutory text. Such a result would be bizarre. And while the D.C. Circuit recently concluded the district court lacked authority to *sua sponte* raise a forfeited statute of limitations defense in an FSIA terrorism exception case, at least where the defendant sovereign failed to appear, that situation is easily distinguishable from the one at hand. *See Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1115 (D.C. Cir. 2019). The statute of limitations defense is an affirmative defense that would defeat the entire claim and must ordinarily be raised in a defendant's answer or amendment thereto. But the prohibition on punitive damages being levied against foreign states only reduces the potential damage award a plaintiff can obtain. And ordinarily the issue of punitive damages does not arise at the pleadings stage, unlike a statute of limitations. Further, the D.C. Circuit has previously determined plaintiffs who disregarded the statutory text in seeking punitive damages against Iran, who did not appear in the case, and did not follow Congress' explicit mechanism for converting their case to the updated FSIA terrorism exception, which allowed for punitive damages, could not obtain punitive damages. *Bakhtiar v. Islamic Republic of Iran*, 668 F.3d 773, 775 (D.C. Cir. 2012). The court came to that conclusion based on the FSIA's clear text, despite the fact Iran did not raise these arguments. Thus, this Court finds it is necessary to adhere to the FSIA's clear statutory text rather than disregard the statute, rendering Congress' careful calibration of when punitive damages should be available meaningless.

## V. Conclusion

For the reasons stated above, the Court finds MoD materially breached the BSA. The Republic of Iraq is also liable for MoD's breach because MoD is an integral component of the national government itself. The Court will award Wye Oak $88,985,928.55 in damages: $20,503,487.15 for its three invoices and $68,482,441.40 in lost profits ($15,327,200 from construction; $26,770,726.60 from refurbishing military equipment; and $26,384,514.80 from scrap sales). Further, the Court will accept 30.2% as a reasonable discount rate for determining the lost profit damages. The Court will award prejudgment interest at a rate of 5% per annum, calculated as simple interest, dating back to the date Wye Oak filed this suit, July 20, 2009. Finally, the Court will order defendants to pay Wye Oak's costs, including reasonable attorney's fees and expenses. A separate order will follow.

SIGNED this 27th day of August, 2019.

_Royce C. Lamberth_
Royce C. Lamberth
United States District Judge

105