UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WYE OAK TECHNOLOGY, INC.,** | |
| *Plaintiff,* | |
| **v.** | **Case No. 1:10-CV-01182-RCL** |
| **REPUBLIC OF IRAQ,** | |
| *Defendant.* | |

### MEMORANDUM OPINION

In July 2009, Wye Oak Technology, Inc. ("Wye Oak") sued the Republic of Iraq and its Ministry of Defense (collectively, "Iraq") in the Eastern District of Virginia for breach of contract. Compl. at 4, ECF No. 1. The contract at issue, the Broker Services Agreement ("BSA"), obligated Wye Oak to assist Iraq in re-equipping its military by, *inter alia*, conducting an inventory, providing refurbishment services, and arranging for the sale of unusable or unneeded equipment. Mem. Op. at 1, ECF No. 455. The parties executed the BSA in August 2004. BSA at 8, ECF No. 1-2. By October, Iraq had missed three payments to Wye Oak, having instead sent the money to a third party. Mem. Op. at 1, ECF No. 455. The parties reached an apparent understanding about payment in early December 2004. *Id.* But a few days later, under suspicious circumstances, Wye Oak president Dale Stoffel and his colleague Joe Wemple were murdered in Baghdad while en route to a meeting about the misdirected funds. *Id.* Wye Oak was never paid. *Id.* at 50.

After the Eastern District of Virginia transferred the case here due to improper venue, the Court conducted a bench trial in late 2018 and early 2019. *Id.*; Mem. Op. at 1, ECF No. 40. The Court found that Iraq had breached the BSA and was liable for $120.3 million in damages. Mem. Op. at 105, ECF No. 455; Judgment at 1, ECF No. 466. The Court also found Iraq liable, pursuant

to a fee-shifting provision in the BSA, for "reasonable attorneys' fees and expenses" incurred by

Wye Oak, but it reserved judgment on the exact amount of reimbursement owed. Mem. Op. at 104,

ECF No. 455. In May 2020, the Court granted Wye Oak's motion for $934,962.65 in expenses but

asked for further briefing on the issue of attorneys' fees. Mem. Order at 11, ECF No. 486; Bill of

Costs, ECF No. 467. Wye Oak submitted a revised fee request on July 9, 2020. Pl.'s Second Req.,

ECF 492. Iraq filed its opposition on September 22, challenging Wye Oak's fee estimate but

raising no arguments about the Court's award of expenses. Def's Second Opp., ECF No. 500. Wye

Oak replied on October 13. Pl.'s Second Reply, ECF No. 503. The parties then submitted a second

round of briefing after the Court raised concerns with redactions in Wye Oak's timesheets. *See*

ECF Nos. 505–15. Having considered these arguments, the Court will award Wye Oak

$7,672,487.89 in attorneys' fees pursuant to the BSA.

## I.   BACKGROUND

The Court has extensively detailed the facts of this case, which is nearing the twelfth

anniversary of its relationship with the federal courts. *See* Mem. Op. at 1-2. ECF No. 455; Mem.

Order at 1-2, ECF No. 486. Briefly, Wye Oak litigated this case with four law firms working on a

contingency basis, with the aggregate fee eventually set at 46 percent of the amount collected, plus

more than $1 million in expenses advanced by the firms. Pl.'s First Req. at 3, ECF No. 468-1.

At trial, in addition to arguing that Iraq had breached its payment obligations under the

BSA, Wye Oak invoked Paragraph 15 of the contract. Titled "INDEMNIFICATION," it provides:

> Each party shall indemnify, defend and hold harmless the other party from and
> against any and all liabilities, demands, claims, lawsuits, damages, actions,
> judgments, costs (including reasonable attorney's fees and expenses) including but
> not limited to injury to persons (including death), loss or damage to, or destruction
> of property arising out of that party's breach of this Agreement or that party's
> negligent or willful actions while performing hereunder.

BSA ¶ 15, ECF No. 1-2 at 8. Wye Oak argued that Paragraph 15 was a bilateral fee-shifting provision that required Iraq to compensate Wye Oak for the "reasonable attorneys' fees and expenses" it incurred while vindicating its rights after Iraq's breach. Mem. Op. at 104, ECF No. 455. The Court agreed, holding that Iraq was so liable but reserving its judgment on the exact amount of fees and expenses that Wye Oak could recover. *Id.*

Shortly after trial, Wye Oak filed a request for attorneys' fees. It demanded that Iraq pay the full freight of Wye Oak's contingent liability to its counsel: 46 percent of the $120.3 million damages award, which would have yielded a reimbursement of more than $55 million. First Fee Req. at 3, ECF No. 468-1; Mem. Order 2, ECF No. 486. The Court denied the request, explaining that "in theory, two parties *could* contract to pick up the tab of the non-breaching party's sizeable contingent fee arrangement," but that Iraq and Wye Oak did not do so in the BSA. Mem. Order at 6, ECF No. 486. The Court then ordered Wye Oak to submit a new fee request based on time records and reasonable hourly rates. *Id.* at 11.

In response, Wye Oak duly submitted a new estimate based on the hours worked by its counsel, multiplied by reasonable hourly rates pulled from the 2020 LSI *Laffey* matrix. Second Fee Req. at 12, ECF No. 492. This calculation returned an estimate of $10,688,634. *Id.* at 1. Notably, however, the calculation utilized 2020 rates, instead of the reasonable rate from the year each hour was billed. *Id.* at 14. Moreover, Wye Oak argued for two enhancements: application of both a 100 percent multiplier and eight years of interest at six percent. *Id.* Wye Oak explained that these measures were appropriate as compensation for "the substantial likelihood of non-collection [] resulting from the actions of the Defendants." *Id.* Thus, in Wye Oak's view, the total bill owed by Iraq for "reasonable attorneys' fees" is $28,085,285.10.

Iraq, which is currently appealing the $120.3 million damages award, contests Wye Oak's accounting of attorneys' fees on all fronts. Iraq spends the bulk of its briefing arguing that, under Iraqi law, Wye Oak is entitled to no reimbursement at all, despite the terms of Paragraph 15. For the reasons explained below, the Court rejects this argument. But it agrees with Iraq that Iraqi law does not support enhancement of the award of attorneys' fees. Accordingly, the Court holds that Wye Oak is entitled to $7,672,487.89—a figure based on Iraqi law and on the estimated number of hours worked by Wye Oak's counsel, less appropriate reductions, multiplied by reasonable current rates.

## II.   LEGAL STANDARD

This long-winding dispute implicates the Foreign Sovereign Immunities Act ("FSIA") and raises critical jurisdictional, venue, and choice-of-law issues. Beginning with subject-matter jurisdiction, the Court has power to adjudicate this fee-shifting case under the FSIA, which provides the only means of suing a foreign sovereign in U.S. courts. *See* 28 U.S.C. § 1330(a); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). The FSIA operates as a codification of immunity to foreign sovereigns, subject to enumerated exceptions. 28 U.S.C. § 1605(a). In this case, the Court has subject-matter jurisdiction under the FSIA's commercial activity exception:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a). As the Court explained in its post-trial opinion, Wye Oak's contract claim falls squarely within clause two: it is based upon "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." Mem. Op. at 46, ECF No. 455; *see* § 1605(a). Namely, David Stoffel worked in the United States to write a computer program to track Iraq's military inventory, and other Wye Oak personnel in the U.S. performed administrative activities in furtherance of the company's obligations under the BSA. Mem. Op. at 45, ECF No. 455.

Next, the Court has personal jurisdiction over Iraq under 28 U.S.C. § 1330(b), which provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district court" has subject-matter jurisdiction, as long as service was proper under 28 U.S.C. § 1608. The Court has previously found that proper service occurred under § 1608(a)(3). Mem. Op. at 46, ECF No. 455. During the post-trial dispute over attorneys' fees, neither party has raised additional jurisdictional arguments.

Turning to choice of law, this dispute implicates Paragraph 15 of the BSA, where the parties selected Iraqi law to govern any disputes. BSA ¶ 15, ECF No. 1-2. But because such choice-of-law provisions are not self-enforcing, the Court must also determine whether the appropriate body of law would apply Paragraph 15. Under established precedent of the D.C. Circuit and the D.C. Court of Appeals, District of Columbia choice-of-law doctrine controls this question. *Oveissi v. Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009) (forum doctrine applies, "rather than a set of federal common law principles"); *Parker v. K&L Gates, LLP*, 76 A.3d 859, 869 (D.C. 2013) (forum doctrine applies unless the contract selects another choice-of-law law). D.C. choice-of-law doctrine blends the traditional governmental interest and most-significant relationship analyses, along with principles from the Restatement (Second) of Conflict of Laws. *Hercules & Co., Ltd. v.*

*Shama Restaurant Corp.*, 556 A.3d 31, 40–41 (D.C. 1989). As the Court explains further below, these factors require the application of Iraqi law to the fee-shifting dispute.

Given that Iraqi law applies, the final question is how the Court should determine "reasonable attorneys' fees" under that law. "As the party seeking attorney's fees under foreign law," Wye Oak "bears the burden of establishing the substance of foreign law." *McKesson v. Islamic Republic of Iran*, 753 F.3d 239, 243 (D.C. Cir. 2014). Thus, Wye Oak must propound Iraqi statutes or cases that support its request for fees. Consistent with this burden, Wye Oak cites four Iraqi statutes. *See* Iraqi Adv. Law [Adv. Law] arts. 55[1] and 56;[2] Iraqi Civ. Code [Civil Code] arts. 145[3] and 150.[4] Iraq counters by invoking Articles 59 and 63 of the Iraqi Advocacy Law. *See* Adv. Law arts. 59[5] and 63.[6]

---

[1] "The lawyer deserves attorneys [sic] fees for carrying out the tasks assigned to him, and he is also entitled to payment of what he has spent in the interests of his client." ECF No. 476 at 6.

[2] "(1) The Lawyer shall be entitled to attorney fees in accordance with the contract concluded between him and his client, provided that in criminal cases not more than the equivalent of twenty percent of the value of the work subject to the power of attorney unless the purpose of the case is to benefit from the ruling issued in respect of it more than what is included in the lawsuit, he is entitled to his fees for For [sic] the total amount. (2) If the fees charged are more than the agreed fees, then the increase is a right of the lawyer." ECF No. 476 at 6. (Wye Oak's translation from Arabic).

[3] Civil Code art. 145: "A contracting party is under an obligation to perform his obligation (under the contract) whatever may be the object of the contract." ECF No. 476 at 6 (Wye Oak's translation from Arabic).

[4] Civil Code art. 150: "The contract must be performed according to its contents and in a manner which conforms to the norms (requirements) of good faith." ECF No. 476 at 6 (Wye Oak's translation from Arabic).

[5] Advocacy Law Article 59: "In the event where lawyer fees have not been fixed expressly by a specific agreement, they shall be determined by reference to rates for comparable work/services." ECF No. 500-1 at 19 (translation).

[6] Advocacy Law Article 63:

    1. The Court shall rule, even without a request, against the party who lost the lawsuit, in whole or in part, with attorneys' fees for what he lost to his opponent, who engaged a lawyer. The person who negated the lawsuit at his request shall be deemed to have lost it only in respect of attorneys' fees.

    2. First - The Court shall issue its judgment of lawyers [sic] fees in the following manner:

        (a) 10% ten percent of the value determined by the Court, provided that it does not exceed five hundred thousand (500,000) dinars.

        (b) Not less than ten thousand (10,000) dinars, and not more than one hundred thousand (100,000) dinars in the lawsuit of unlimited value and the criminal case in which the plaintiff has a civil right.

## III.   DISCUSSION

### 1.   UNDER THE BSA AND DISTRICT OF COLUMBIA CHOICE-OF-LAW DOCTRINE, IRAQI LAW GOVERNS THE PRESENT FEE-SHIFTING DISPUTE

#### A.  Iraq's attorneys' fees arguments are properly before the Court

In its post-trial Opinion, the Court held that Iraqi law governs interpretation of the BSA and that Iraq is liable for Wye Oak's "reasonable attorney's fees" pursuant to Paragraph 15 of that agreement. Mem. Op. at 2. 104, ECF No. 455. And in a May 12, 2020 Order, the Court rejected Iraq's argument that Article 63 imposes a cap of 500,000 Iraqi dinars ("IQD") on Wye Oak's recovery under the BSA. Mem. Order at 3, ECF No. 486. Undeterred, however, Iraq continues to argue that Paragraph 15 does not cover Wye Oak's costs and, if it does, that the cap of 500,000 IQD ($342) applies. ECF No. 500 at 13–15. Wye Oak counters that Iraq is not only wrong on the law but also that Iraq cannot even contest those issues, since the Court's earlier rulings on them constituted a "final judgment" that had to be challenged within 28 days of the rulings' issuance under Federal Rule of Civil Procedure ("FRCP") 59(e). ECF No. 503 at 4–5. Wye Oak's timing argument is incorrect. For the reasons explained below, the Court holds that Iraq's arguments are timely and that Iraqi law governs this fee-shifting dispute.

Despite Wye Oak's claims to the contrary, the Court has not yet entered a final judgment on the attorneys' fees Iraq owes Wye Oak under Paragraph 15, so FRCP 59(e)'s 28-day clock has not yet started. ECF No. 503 at 4–5. While the Court explained in its post-trial opinion that it would require Iraq to "pay plaintiff's costs, including reasonable attorney's fees and expenses," the Court added that those sums would "be separately determined in accordance with Local Rule 54.2."[7] Mem. Op. at 106, ECF No. 455. As the Supreme Court has explained, "the court's decision

---

[7] Pursuant to the local rule, the Court then required Iraq and Wye Oak to confer on the issue. ECF No. 456.

of entitlement to fees [requires] an inquiry separate from the decision on the merits—an inquiry that cannot even commence until one party has 'prevailed.' . . . Their award is uniquely separable from the cause of action to be proved at trial." *White v. N.H. Dep't of Emp. Sec.*, 455 U.S. 445, 452 (1982) (citing *Hutto v. Finney*, 437 U.S. 678, 695 n.24 (1978)). Accordingly, the Court's November 15, 2019 judgment on damages and interest, entered pursuant to its August 27, 2019 opinion on liability, was final only regarding damages and interest. Iraq moved to correct *that* judgment in a timely—and successful—Rule 59(e) motion. Mot. to Amend, ECF No. 471; Order, ECF No. 483. Iraq did not raise attorneys' fees arguments in that motion because it did not have to; the Court had not yet completed its "separate" inquiry on fees. *White,* 455 U.S. at 452.[8]

Nor was the issue of general liability for "reasonable attorney's fees" appealable to the D.C. Circuit after the Court's November 15, 2019 judgment for damages and interest. *See* Judgment, ECF No. 466. Under 28 U.S.C. § 1291, "[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States[.]" Thus, because this Court had entered its final judgment on damages, Iraq could—and did—appeal that issue.[9] ECF No. 472. But Iraq could not have appealed the Court's assessment of a to-be-determined amount of attorneys' fees under the BSA, because "a claim for attorney's fees is not part of the merits of the action to which the fees pertain." *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200 (1988). Indeed, because the Court has not yet entered judgment on how much Iraq owes in "reasonable attorneys' fees," there was no final judgment regarding fees to be

---

[8] Wye Oak is correct that "unresolved issues of attorneys' fees, whether owed under a contract or by statute, do not affect the finality of the judgment under 28 U.S.C. § 1291." ECF No. 503 at 3; *see Ray Haluch Gravel Co. v. Cent. Pension Fund*, 571 U.S. 177, 179 (2014). This, of course, is why Iraq was able to appeal the judgment on damages and interest, which was final despite the Court's pending inquiry into attorneys' fees. ECF No. 466. *Haluch Gravel* does not support the proposition because the Court issued an interlocutory order on attorneys' fees before its final judgment on liability, the order as to attorneys' fees was final as well.

[9] In its appeal, Iraq did challenge a previous judgment ordering it to pay $27,596.48 in attorneys' fees arising out of discovery sanctions. *See* ECF No. 451. These fees are no longer before the Court, having been decided, entered in a judgment, and appealed.

appealed. And because there was no "final judgment" to trigger the alleged deadline, Iraq's arguments regarding the amount of its fee liability are properly before the Court.

### B. Iraqi law applies to the fee-shifting dispute

In the BSA, Iraq and Wye Oak agreed that Iraqi law would govern construction of the contract. BSA ¶ 21; ECF No. 1-2 at 8.[10] In its post-trial memorandum opinion, the Court held that this choice-of-law clause is enforceable and that Iraqi law guides interpretation of the BSA. Mem. Op. at 2, ECF No. 455. The Court repeated that holding in its May 12, 2020 memorandum order. ECF No. 486 at 2. Thus, it is now the law of the case that Iraqi law applies to interpretation of the BSA. *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) ("[T]he same issue presented a second time in the same case in the same court should lead to the same result."). The animating principle of the law-of-the-case doctrine is that courts "should not reopen [issues] without good reason." Bryan A. Garner, et al., *The Law of Judicial Precedent* 443, 448 (2016); *see also Crocker v. Piedmont Aviation, Inc.,* 49 F.3d 735, 739–740 (D.C. 1995). The Court finds no such "good reason" to reconsider its holding. Therefore, and for the following reasons, it reiterates that Iraqi law applies to the parties' fee-shifting dispute.

Contractual choice-of-law clauses, it is true, are not self-enforcing. Rather, they are enforceable only insofar as some relevant body of choice-of-law law would enforce them. In the FSIA context, the D.C. Circuit has held that the relevant choice-of-law law is that of the forum state, "rather than a set of federal common law principles." *Oveissi v. Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009).[11] Under the District of Columbia's approach to conflict-of-laws, "[t]he

---

[10] As the BSA states, "[t]his Agreement shall be exclusively construed and interpreted pursuant to the laws of the REPUBLIC OF IRAQ without regard to is principles of conflicts of laws."

[11] This case was originally filed in the Eastern District of Virginia, which found that venue was improper. ECF No. 40 at 21. *See also Wye Oak Technology, Inc. v. Republic of Iraq*, 666 F.3d 205, 209 n.2 (4th Cir. 2011) ("Wye Oak does not appeal the district court's finding of improper venue."). The case was then transferred to this court, where venue is proper for all FSIA suits "against a foreign state or political subdivision thereof." 28 U.S.C. § 1391(f)(4);

forum state's choice-of-law rules apply to choice-of-law questions, unless the contract explicitly provides otherwise." *Parker v. K&L Gates, LLP*, 76 A.3d 859, 869 (D.C. 2013). The BSA contains no such provision; in fact, it explicitly disclaims application of Iraqi choice-of-law law. BSA ¶ 21, ECF No. 1-2. Thus, D.C. choice-of-law rules govern whether this Court will enforce the BSA's selection of Iraqi law. The District's doctrine is a "constructive blending" of the governmental interest and most-significant-relationship analyses, as well as principles from the Restatement (Second) of Conflict of Laws (hereinafter "the Restatement"). *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995); *Hercules & Co.*, 556 A.3d at 40–41; Restatement (Second) of Conflict of Laws § 145. The Court addresses these three considerations in order.

Governmental interest analysis requires courts to "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules*, 556 A.2d at 41 (internal citations and quotation marks omitted). Iraq has three identifiable interests in this case. First, Iraq has a general interest in liberty of contract. Articles 73,[12] 145,[13] and 150[14] of the Iraqi Civil Code set out freedom-of-contract principles that would be furthered by enforcement of the BSA's choice-of-law provision. Second, Iraq has an interest in reasonable compensation of attorneys.

---

ECF No. 40 at 21 (finding venue improper); ECF No. 44 (reflecting venue transfer). Because venue in the Eastern District of Virginia was improper, Virginia's choice-of-law law does not apply to this dispute. "When cases have been transferred for improper venue, transferee courts generally apply the substantive law they would have applied had the action been brought there initially." *Lafferty v. St. Riel*, 495 F.3d 72, 77 (3d Cir. 2007); *accord Jackson v. West Telemarketing Corp. Outbound*, 245 F.3d 518, 523 (5th Cir. 2001); *Steen v. Murray*, 770 F.3d 698, 701 (8th Cir. 2014); 14D Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure: Jurisdiction* § 3827 (4th ed. 2008). In line with this authority, the Supreme Court has held that the initial forum's choice-of-law doctrine does not follow a case after a venue transfer if filing the case in the initial venue violated a forum-selection clause. *Atlantic Marine Const. v. U.S. Dist. Court*, 571 U.S. 49, 64 (2013).

[12] Article 73: "A contract is the unison of an offer made by a contracting party with the acceptance of another party in a manner which establishes the effect thereof in the object of the contract." ECF No. 500-1 at 21 (translation).

[13] Article 145: "A contracting party is under an obligation to perform his obligation (under the contract) whatever may be the object of the contract." ECF No. 476 at 6 (translation).

[14] Article 150: "The contract must be performed according to its contents and in a manner which conforms to the norms (requirements) of good faith." ECF No. 476 at 6 (translation).

Article 55[15] of the Iraqi Advocacy Code provides that "[t]he lawyer deserves fees for carrying out the tasks assigned to him." Additionally, Article 56[16] allows attorneys to contract for their fees, and Article 59[17] identifies "rates for comparable work / services" as the benchmark for attorney compensation in the absence of a specific agreement. Third, Iraq has an interest in enforcing the English Rule of attorneys' fees. As Iraq's expert, Dr. Al-Kabban, explained, "the Iraqi judicial system, like other civil law countries, has adopted the principle that the losing party pays costs of the winning party[.]" Al-Kabban Decl. at 13, ECF No. 500-1. Article 63 of the Advocacy Code evinces this policy by requiring judges, *sua sponte*, to award up to 500,000 Iraqi dinars of fee reimbursement to the prevailing party as a matter of law, even absent a fee-shifting agreement. *See* Appendix. And this statute says nothing about the scope of an additional fee-shifting agreement that the parties may otherwise enter into.[18]

Moreover, the District of Columbia's policy objectives do not conflict with Iraq's interest in the enforcement of the choice-of-law clause. True, the District's default approach to attorneys' fees is the American Rule, "which provides that a prevailing litigant ordinarily may not recover attorneys' fees from the defeated party when a case is concluded." *In re Jumper*, 984 A.2d 1232, 1247 (D.C. 2009). But D.C. recognizes exceptions to the American Rule, and it generally enforces

---

[15] Advocacy Code Article 55: "The lawyer deserves attorneys [sic] fees for carrying out the tasks assigned to him, and he is also entitled to payment of what he has spent in the interests of his client." ECF No. 476 at 6 (translation).

[16] Advocacy Code Article 56: "The Lawyer shall be entitled to attorney fees in accordance with the contract concluded between him and his client, provided that in criminal cases not more than the equivalent of twenty percent of the value of the work subject to the power of attorney unless the purpose of the case is to benefit from the ruling issued in respect of it more than what is included in the lawsuit, he is entitled to his fees for For [sic] the total amount." ECF No. 476 at 6 (translation).

[17] Advocacy Code Article 59: "In the event where lawyer fees have not been fixed expressly by a specific agreement, they shall be determined by reference to rates for comparable work/services." ECF No. 500-1 at 19 (translation).

[18] The Court below concludes that Advocacy Article 63 does not cap Iraq's obligation to Wye Oak under Paragraph 15. Enforcement of the choice-of-law provision therefore furthers Iraq's governmental interests. It is of course true that, if the Court's reading of Article 63 is incorrect, enforcement of the choice-of-law provision would be inconsistent with Iraq's interests. But since the Court finds that Article 63 is merely a default rule that does not override separate contractual fee-shifting provisions, it follows that Iraqi policy is consistent with enforcement of the BSA's fee-shifting clause.

contractual fee-shifting agreements. *Id.*; *Cent. Fidelity Bank v. McLellan*, 563 A.2d 358, 360 (D.C. 1989) ("[W]here a contractual agreement expressly provides for the payment of attorney's fees, the trial court's discretion is limited to ascertaining what amount constitutes a 'reasonable' fee award."). Thus, though the District follows the American Rule as a general matter, application of Iraqi law to this dispute does not meaningfully offend the District's interests. *Hercules,* 556 A.2d at 41. For the District, too, would enforce the present agreement.[19]

Next, in order to refine governmental interest analysis, D.C. courts "also consider the factors enumerated in the Restatement § 145 [] to assist in identifying the jurisdiction with the 'most significant relationship' to the dispute." *Hercules,* 566 A.3d at 40–41. These factors include "the place where an injury occurred," "the place where the conduct causing the injury occurred," "the domicil[e], residence, nationality, place of incorporation, and place of business of the parties," and "the place where the relationship between the parties [] is centered." Restatement § 145. Under this analysis, Iraq clearly has the most significant relationship with the dispute. The BSA was executed in Iraq. ECF No. 19 at 4. It was an agreement for Wye Oak to supply the Iraqi military in Iraq. ECF No. 1 at 2. And it solidified a relationship between Wye Oak and Iraq that was unquestionably centered in Iraq. *Id.* That relationship broke down—giving rise to this litigation— after Iraq failed to meet its payment obligations and two Wye Oak executives were murdered in Iraq during negotiations to cure the breach. Mem. Op. at 3, ECF No. 455. By contrast, the District's

---

[19] For the reasons discussed above, D.C.'s interests in having its substantive law applied to this dispute are minimal. Under classical governmental-interest analysis, as propounded by Professor Brainerd Currie, these minimal interests would present a "false conflict" with Iraq's interests, and Iraqi law would apply. *See Kaiser-Georgetown Cmty. Health Plan, Inc. v. Stutsman*, 491 A.2d 502 (D.C. 1985) ("When the policy of one state would be advanced by application of its law, and that of another state would not be advanced by application of its law, a false conflict appears and the law of the interested state prevails."). Moreover, to the extent that there is a "true conflict" between D.C.'s interests and Iraq's interests, Iraqi law would still apply because each prong of D.C. conflict-of-laws doctrine—governmental interest, most-significant relationship, and the rules of the Restatement—shows that Iraq has "a greater interest in the controversy." *Kaiser*, 491 A.2d at 509 ("A true conflict is presented when both states have an interest in applying their own laws to the underlying facts; in that event, the forum law will be applied unless the foreign state has a greater interest in the controversy."); *see also* pages 9–13.

strongest tie to this case is the litigation's presence in this Court, which is itself fortuitous: Wye

Oak initially filed in the Eastern District of Virginia. Compl. at 1, ECF No. 1. That court found

that venue was improper and transferred it here, where venue happens to lie by virtue of the FSIA.

ECF No. 40 at 21; ECF No. 44; *see* 28 U.S.C. § 1391(f)(4). So the District's relationship to this

case did not grow out of the parties' real-world transaction, nor did it even arise from where the

plaintiff first attempted to vindicate its claims.

Finally, to the extent that D.C. courts would consult the Restatement's specific rules on

contractual choice-of-law disputes, these principles further support the application of Iraqi law.

*See Parker,* 76 A.3d at 869. Section 187 of the Restatement addresses contractual choice-of-law

provisions. Section 187(1) dictates enforcement of these provisions when they would be

enforceable in the chosen jurisdiction, including when they contract around local default rules.

Section 187(2) counsels enforcement of choice-of-law provisions—even when they override a rule

of contractual validity—as long as the chosen state has a substantial relationship to the parties and

enforcement would not be contrary to the law of a state with a materially greater interest in the

transaction. While the Court reads Paragraph 15 as implicating a default rule, both prongs of § 187

would support enforcement, if applicable. Under § 187(1), Paragraph 15 is enforceable because

Article 25[20] of the Iraqi Civil Code explicitly allows parties of different domiciles to contractually

select the law governing their transaction. And under § 187(2), Iraq has a substantial relationship

to the transaction and application of its law would not violate the law of a state with a materially

greater interest in the transaction. The Court therefore holds, again, that Iraqi law guides

interpretation of the BSA.

---

[20] Article 25: "(1) The contractual obligations shall be governed by the law of the state wherein lies the domicile of the contracting parties if they have a common domicile; where they have different domiciles the law of the state within which the contract was concluded will be applied unless the contracting parties have agreed (otherwise) or where it would be revealed from the circumstances to be applied." ECF No. 500-1 at 21 (translation).

## 2.  UNDER IRAQI LAW, PARAGRAPH 15 OF THE BSA IS A VALID FEE-SHIFTING PROVISION, AND ARTICLE 63 DOES NOT CAP RECOVERY

Having determined that the BSA's choice-of-law clause is enforceable, the Court now applies Iraqi law to three threshold questions arising from the BSA and contested by the parties. First, Iraq argues that, under its law, Paragraph 15 of the BSA—which requires one party to reimburse the other's "reasonable attorney's fees" incurred as a result of breach—only covers costs borne by third parties, not by Wye Oak. Def's Second Opp. at 13, ECF No. 500; BSA ¶ 15, ECF No 1-2. Second, Iraq maintains that even if Paragraph 15 does cover Wye Oak's attorneys' fees, Iraqi law limits reimbursement to 500,000 Iraqi dinars. Def's Second Opp. at 13, ECF No. 500. Third, the parties disagree whether the Court is authorized to enhance Wye Oak's recovery under the BSA. *See* Pl.'s Second Req. at 14, ECF No. 492; Al-Kabban Decl. at 15, ECF No. 500-1. For the reasons explained below, the Court holds that Wye Oak is entitled to reasonable attorneys' fees, that those fees are not subject to a statutory cap, and that no fee enhancements are applicable.[21]

### A.  Paragraph 15 is a valid fee-shifting provision under Iraqi law

Like many attorneys' fees cases, this dispute is one of statutory and contractual interpretation. The contractual provision at issue is Paragraph 15 of the BSA. Titled "INDEMNIFICATION," it provides:

> Each party shall indemnify, defend and hold harmless the other party from and against any and all liabilities, demands, claims, lawsuits, damages, actions, judgments, costs (including reasonable attorney's fees and expenses) including but not limited to injury to persons (including death), loss or damage to, or destruction

---

[21] As the Court discusses *infra* at pages 33–36, it does not consider the use of current billing rates to be an impermissible "enhancement" applied on top of the "lodestar" calculation, i.e., reasonable hourly rates multiplied by reasonable hours expended. Rather, following legion Circuit court precedents, it understands the use of current billing rates to be one way to determine a "reasonable hourly rate" when calculating the lodestar itself, and a particularly reasonable method of doing so when there has been demonstrable litigation delay.

of property arising out of that party's breach of this Agreement or that party's
negligent or willful actions while performing hereunder.

BSA ¶ 15, ECF No. 1-2. The Court has twice held that Paragraph 15 entitles Wye Oak to
reasonable attorneys' fees and expenses, but it has thus far reserved judgment on the specific
amount owed by Iraq. Mem. Op. at 104, ECF No. 455; Mem. Order at 3, ECF No. 486. Iraq
continues to challenge this construction, insisting that Paragraph 15 "[applies] only to indemnity
costs for third-party claims, and not to costs arising from claims by one contracting party against
the other." Def's Second Opp. at 13, ECF No. 500.

The Court's interpretation of Paragraph 15—which it has already reaffirmed once—is the
law of the case. *Lashawn A.*, 87 F.3d at 1393. As discussed above, holdings that are the law of the
case are entitled to significant deference because "when a court decides upon a rule of law, that
decision should continue to govern the same issues in subsequent stages of the same case."
*Musacchio v. United States*, 136 S. Ct. 709, 716 (2016). The Court may revisit its previous
holdings, but only for "good reason" and "as justice requires." Garner, *supra* at 448; *Capitol
Sprinkler Inspection, Inc. v. Guest Servs. Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (citation
omitted). Here, justice does not require reconsideration because the Court's reading of Paragraph
15 was correct. The Court elaborates below.

"As the party seeking attorney's fees under foreign law," Wye Oak "bears the burden of
establishing the substance of foreign law." *McKesson v. Islamic Repub. of Iran*, 753 F.3d 239, 243
(D.C. Cir. 2014). Only after Wye Oak makes this showing can the Court consider the merits of its
fee request. *Id.*; *see In re Avantel, S.A.*, 343 F.3d 311, 321–322 (5th Cir. 2003) (party invoking
foreign law "had the burden of proving its substance to a reasonable certainty such that the district
court could apply it"). Iraq maintains that Wye Oak failed to carry this burden by "choosing to
support its [fee] application purely by reference to [American] law." Def's Second Opp. at 13,

ECF No. 500. That is incorrect. Wye Oak has duly invoked four Iraqi statutes to support its fee request, citing Articles 145 and 150 of the Iraqi Civil Code and Articles 55 and 56 of the Iraqi Advocacy Law. Pl.'s First Reply at 6, ECF No. 476. Article 145 requires each contracting party "to perform his obligation (under the contract) whatever may be the object of the contract," while Article 150 provides that "[t]he contract must be performed according to its contents and in a manner which conforms to the norms (requirements) of good faith." Civil Code arts. 145 and 150. Advocacy Law Article 55 provides that "[t]he lawyer deserves reasonable attorneys [sic] fees for carrying out the tasks assigned to him," and Article 56 declares that "[t]he Lawyer shall be entitled to attorney [sic] fees in accordance with the contract concluded between him and his client[.]" Iraqi Adv. Law arts. 55[22] and 56;[23] Pl.'s First Reply at 6, ECF No. 476.

Wye Oak's proffer of these statutes "establish[es] the substance" of Iraqi law, satisfying its burden of production under *McKesson*. 753 F.3d at 243. Article 55 explicitly allows attorneys to contract for their reasonable fees, and Article 2 enshrines even broader freedom-of-contract principles. Thus, Wye Oak has produced sufficient Iraqi law to support its contentions that attorneys can contract for their reasonable fees and that their clients then may contract for who should pay those reasonable fees in the event of a dispute. Iraq's argument to the contrary is unpersuasive. Its expert, Dr. Al-Kabban, maintains that "[Paragraph] 15 of the BSA does not, as a matter of custom or as a matter of its language, demonstrate the mutual consent of the contracting parties to cover anything other than third party claims." Al-Kabban Decl. at 9-11, ECF No. 500. But Dr. Al-Kabban does not explain which Iraqi custom prohibits a bilateral fee-shifting provision.

---

[22] "The lawyer deserves attorneys [sic] fees for carrying out the tasks assigned to him, and he is also entitled to payment of what he has spent in the interests of his client." ECF No. 476 at 6 (Iraq's translation from Arabic).

[23] "(1) The Lawyer shall be entitled to attorney fees in accordance with the contract concluded between him and his client, provided that in criminal cases not more than the equivalent of twenty percent of the value of the work subject to the power of attorney unless the purpose of the case is to benefit from the ruling issued in respect of it more than what is included in the lawsuit, he is entitled to his fees for For [sic] the total amount. (2) If the fees charged are more than the agreed fees, then the increase is a right of the lawyer." ECF No. 476 at 6 (Wye Oak's translation from Arabic).

And the plain terms of Paragraph 15 directly contradict his position. Paragraph 15 commands that "[e]ach party shall indemnify, defend, and hold harmless the other party from and against *any and all* [] costs (*including reasonable attorney's fees* and expenses) [] arising out of that party's breach of this Agreement[.]" BSA ¶ 15, ECF No. 1-2 (emphasis added). The Court declines the invitation to interpret "any and all [] costs" as anything other than "any and all," and it finds no express textual command that otherwise limits the application of Paragraph 15. *See* Civil Code art. 150 (contracts must be performed according to their contents). So on the merits, too, the statutes that Wye Oak has proffered provide a clear basis in Iraqi law to conclude that the BSA's bilateral fee-shifting provision is both valid and enforceable.

It is important to be clear about what Iraq is proposing. In the BSA, it explicitly agreed to reimburse "the other party"—Wye Oak—for "reasonable attorneys' fees." *See* BSA ¶ 15, ECF No. 1-2. After more than 10 years of litigation, Iraq now asks the Court to hold that this commitment was worthless or, as discussed below, worth approximately $342. This position is not only atextual, but it offends Article 150's command that "contract[s] be performed according . . . to the norms of good faith." The Court will not bless Iraq's transparent attempt to avoid an explicit contractual obligation, nor will it accept that $342—slightly less than the $350 Wye Oak paid to file this case in 2009, *see* ECF No. 1—is somehow enough to cover Wye Oak's "reasonable attorneys' fees."

The Court finds that Wye Oak has satisfied its *McKesson* burden with regard to the reach of Paragraph 15, having put forth specific provisions of Iraqi law supporting enforcement of the fee-shifting agreement. Wye Oak's submissions are also convincing on the merits: Civil Code Articles 145 and 150 require good-faith performance of contractual obligations, and Advocacy Law Articles 55 and 56 explicitly allow lawyers to contract for reasonable fees. Because Iraq's

arguments in response are unpersuasive, the Court reiterates its holding that Paragraph 15 requires Iraq to reimburse Wye Oak's reasonable attorneys' fees and costs.

### B. Iraqi law allows parties to contract for reasonable attorneys' fees, and those fees are not subject to a statutory cap

Iraq next argues that Article 63 limits its reimbursement obligation to 500,000 Iraqi dinars ($342). Def's First Opp. at 2, ECF No. 474. The Court rejected Iraq's first formulation of this argument in its May 2, 2020 order. *See* Mem. Order at 2, ECF 486. The Court now reiterates that conclusion and rejects Iraq's new claim that, even if not directly controlling, Article 63 "would still be used as a reference" to limit Wye Oak's recovery to 500,000 Iraqi dinars ("IQD"). *See* Civil Code art. 59; Def's Second Opp. at 15, ECF No. 500. Iraq's attempt to revise its losing argument through wordplay is too clever by half and, needless to say, unavailing. The Court concludes, again, that Article 63—whether as a "cap" or as a "reference"—does not limit Wye Oak's recovery. In reality, that statute automatically entitles Wye Oak to 500,000 IQD in fee shifting as a matter of law, separate and apart from what Iraq must pay Wye Oak under Paragraph 15 of the BSA.

Iraq contends that Article 63 "provides the *exclusive* grounds for attorneys' fees claims and awards arising out of any litigation between the parties to the BSA." Def's First Opp. at 3, ECF No. 474 (emphasis in original). In pertinent part, the statute provides:

1. The Court shall rule, even without a request, against the party who lost the lawsuit, in whole or in part, with attorneys' fees for what he lost to his opponent, who engaged a lawyer. The person who negated the lawsuit at his request shall be deemed to have lost it only in respect of attorneys' fees.
2. First - The Court shall issue its judgment of lawyers [sic] fees in the following manner:
   (a) 10% ten percent of the value determined by the Court, provided that it does not exceed five hundred thousand (500,000) dinars.
   (b) Not less than ten thousand (10,000) dinars, and not more than one hundred thousand (100,000) dinars in the lawsuit of unlimited value and the criminal case in which the plaintiff has a civil right.

18

*Id.*; Adv. Law art. 63. After the Court rejected Iraq's construction of Article 63, Iraq responded by invoking Advocacy Law Article 59 ("Article 59"). Mem. Order 2, ECF No. 486; Def's Second Opp. at 14, ECF No. 500. Article 59 provides that "where lawyer fees have not been fixed expressly by a specific agreement, they shall be determined by reference to rates for comparable work/services." Al-Kabban Decl. at 19, ECF No. 500-1. Iraq maintains that, by appealing to prevailing community rates, Article 59 incorporates the same Article 63 cap that this Court has already rejected.

Under *McKesson*, Wye Oak again bears the burden of supporting its fee application with substantive Iraqi law, which here means that it must rebut Iraq's Article 59 and 63 arguments. 753 F.3d at 243. Wye Oak has three lines of attack. First, it notes that "nothing in [Article 63] recites that it displaces a contractual fee-shifting provision." Pl.'s First Reply at 6, ECF No. 476. Second, it cites Article 55, which entitles lawyers to "attorneys [sic] fees for carrying out the tasks assigned," as well as Article 56, which explicitly allows lawyers to contract for their fees. Adv. Law arts. 55 and 56; Pl.'s First Reply at 6, ECF No. 476. Third, Wye Oak invokes Civil Code Articles 145 and 150, which require good-faith performance of contractual obligations, as defined by the contents of the agreement. Pl.'s Second Reply at 5, ECF No. 503.

The Court agrees with Wye Oak that Article 63 does not displace valid fee-shifting agreements, such as Paragraph 15 of the BSA. Instead, the Court reads Article 63 as providing for a baseline amount of fee-shifting—up to 500,000 IQD—that is always available to prevailing parties as a matter of law. When the parties agree to additional fee shifting, as they did here, Article 63 is silent. However, other provisions of Iraqi law require enforcement of such agreements. *See* Adv. Law art. 55 ("The lawyer deserves attorneys' fees for carrying out the tasks assigned to him."); Adv. Law art. 56 ("The Lawyer shall be entitled to attorney fees in accordance with the

contract[.]"). The Court does not have the option to simply ignore these provisions, as Iraq's argument suggests. Doing so would create avoidable surplusage and contravene Article 2 of the Iraqi Civil Code, which provides that "[w]here there is a provision, no independent judgment is possible." As Dr. Al-Kabban, Iraq's own expert, explains, "[Article 2] means that when there is a provision of the Civil Code that addresses a particular subject, its application is mandatory[.]" Al-Kabban Decl. at 7, ECF No. 500-1. The Court's reading of Article 63 is correct because it harmonizes with other on-point Iraqi statutes, while Iraq's construction of Article 63 negates applicable law.

Iraq cannot save its weak statutory argument with an appeal to Iraqi case law. Attempting to do so, it cites three decisions from the Iraqi Courts of Cassation. Def's First Opp. at 4, ECF No. 474. None of these cases is on point. In the first, Judgment No. 125 (March 12, 2009), the Federal Court of Cassation considered a trial court's award of 130,700 IQD in attorneys' fees to counsel for an Iraqi official who intervened in a marital property dispute. *Id.* The original parties to the lawsuit appealed the fee award, arguing that it was in violation of Article 63. *Id.* The court remanded for reconsideration of the award. *Id.* Plainly, however, Judgment No. 125 does not support Iraq's position in this case. First, it did not even involve an award above Article 63's putative 500,000-dinar cap, and second it did not involve a bilateral fee-shifting agreement like the BSA's Paragraph 15.

Iraq's second case is Judgment No. 177 (Nov. 12, 2009). Here, the Diyala Federal Court of Appeal considered a breach-of-contract action in which the trial court had found in favor of the plaintiff. Def's First Opp. at 5, ECF No. 474. At issue on appeal was the trial judge's award of 95,000 IQD in attorneys' fees to the plaintiff. *Id.* The court held that this award was improper because the total amount at issue in the case was 550,000 IQD, and Article 63(2)(A) limits statutory

fee-shifting to 10 percent of the value of the claim. *Id.* As a result, the appeals court set aside the trial court's award of fees. *Id.* It is clear that Judgment No. 177 does not support Iraq's reading of Article 63, since the case did not implicate a contractual fee-shifting provision.

Iraq's final case, Judgment No. 178 (Nov. 11, 2009) of the Diyala Federal Court of Appeal, also fails to support its argument. Def's First Opp. at 5-6, ECF No. 474. In Judgment No. 178, the court considered a trial court's decision to dismiss a case without awarding any attorneys' fees to the prevailing party. *Id.* Because Article 63 explicitly requires judges to award fees "even without a request," the appeals court remanded the matter and directed the trial judge to apply Article 63. *Id.* As with Iraq's other doctrinal arguments, Judgment No. 178 does not support the position that Article 63 overrides bilateral fee-shifting arrangements, because no such arrangement was at issue in the case. *Id.* Indeed, it is telling that Iraq cannot produce even a single case supporting its reading of Article 63.

Next, Iraq appeals to Article 59. This provision directs courts to award attorneys' fees with reference to "rates applicable to comparable work or services." Adv. Law. Art. 59; Def's Second Opp. at 8, ECF No. 500. On its face, this language is uncontroversial: compensation based on "rates applicable to comparable work" is precisely what Wye Oak seeks with its petition for reasonable attorneys' fees. *See* Pl.'s Second Req. at 11, ECF No. 492 (requesting reimbursement for the "number of hours reasonably expended by the attorneys and other personnel, multiplied by a reasonable hourly rate"). But to Iraq, Article 59 is something else: a last-ditch effort to revive its losing argument that Article 63 caps Wye Oak's recovery at 500,000 IQD. As Iraq explains it, under Article 59, "Article 63 would still be used a reference for Wye Oak's claim," with the result that "Wye Oak would be entitled to no more than 500,000 Iraqi Dinars[.]" Response at 15, ECF No. 500. Iraq itself acknowledges that the Court has already held that Article 63 does not limit

Iraq's recovery. Mem. Order at 2–3, ECF No. 486; Def's Second Opp. at 15, ECF No. 500. Iraq's attempt to outflank this holding with Article 59 is not persuasive. Indeed, the provision's plain language indicates that Wye Oak is entitled to a fee determination that is based on a reasonable hourly rate multiplied by the number of hours worked.

The Court finds that Article 63 does not cap Wye Oak's recovery at 500,000 IQD. Instead, the provision requires a baseline shifting of fees irrespective of what the litigating parties otherwise agreed to. Thus, Wye Oak is entitled to 500,000 IQD in reimbursement from Iraq as a matter of law, before the Court even considers Wye Oak's additional recovery under Paragraph 15 of the BSA.

### C. Iraqi law does not support "enhancement" of a contractual fee-shifting award

Wye Oak next asks the Court to take its Paragraph 15 recovery and enhance it in three ways. First, Wye Oak invites the Court to apply 2020 billing rates to services performed between 2008 and 2020. Pl.'s Second Req. at 12, ECF No. 492. Second, Wye Oak maintains that its recovery for "reasonable attorneys' fees" should be doubled. *Id.* at 13. Third, Wye Oak argues that its award should also include eight years' interest at a rate of six percent. Pl.'s Second Req. at 14, ECF No. 492; Pl.'s Second Reply at 24-25, ECF No. 503. Wye Oak explains that these enhancements—which would result in a fee award of $31,638,358.59[24]—are appropriate as compensation for "the substantial likelihood of non-collection [ ] resulting from the actions of the Defendants." Pl.'s Second Req. at 14, ECF No. 492. But while Wye Oak has successfully established that Iraqi law supports its entitlement to uncapped "reasonable attorneys' fees" pursuant to Paragraph 15 of the BSA, it cannot make its *McKesson* showing with regard to its

---

[24] Or, according to the revised estimate in its sealed submission, $28,085,285.10.

requested enhancements. Indeed, Wye Oak does not reference a single Iraqi statute or custom that supports any type of enhancement of fee awards, much less the specific measures that it asks for.

Once again, Wye Oak must "establish[ ] the substance of foreign law" that supports every element of its request for attorneys' fees. *McKesson*, 753 F.3d at 243. Here, *McKesson* requires Wye Oak to show which portions of substantive Iraqi law authorize the three enhancements Wye Oak seeks. But the best that Wye Oak can offer is that "[w]hile enhancements are rare, the [United States] Supreme Court has not ever foreclosed them." Pl.'s Second Reply at 25, ECF No. 503. Wye Oak also cites *Missouri v. Jenkins*, 491 U.S. 274. 282 (1989), where the Supreme Court said that a current-rate enhancement is "within the contemplation" of 42 U.S.C. § 1988, which governs fee shifting in civil rights cases. This all may be true, but it is not relevant to this matter, where § 1988 does not apply and where Wye Oak has the burden of showing that Iraqi law affirmatively supports each enhancement it claims. Wye Oak has failed to do this. Iraq, on the other hand, forcefully argues that "Iraqi legal standards do not recognize . . . any enhancement of attorneys' fees at all[.]" Al-Kabban decl. 15, ECF No. 500-1. Simply put, Wye Oak has produced nothing to show that this conclusion is incorrect.

Wye Oak has failed to carry its *McKesson* burden of showing that substantive Iraqi law supports the three enhancements it requests. Therefore, the Court declines to increase Wye Oak's recovery under Paragraph 15 of the BSA beyond "reasonable attorneys' fees." Wye Oak is entitled to reimbursement for the estimated number of hours worked by its counsel in this matter, multiplied by the reasonable hourly current rate, with no multiplier or prospective interest. The Court details this calculation below.

### 3. FEE CALCULATION

Having determined that the BSA entitles Wye Oak to reasonable attorneys' fees and that Article 63 does not cap those fees at 500,000 IQD, the Court must now determine the precise amount of fees that Iraq owes.

The BSA itself contemplates that Iraq—the breaching party—must "indemnify" Wye Oak for the "reasonable attorney's fees" that it expended in contesting Iraq's breach. BSA ¶ 15, at 8, ECF No. 1-2. Since the BSA does not explain how the Court must calculate a "reasonable" fee, the Court turns to background principles of Iraqi law to assist in construing the BSA. Particularly relevant is Article 59, which explains that "where"—as here—"lawyer fees have not been fixed expressly by a specific agreement, they shall be determined by reference to rates for comparable work/services." Adv. Law. Art. 59, ECF No. 500-1 at 19 (translation). Background principles of Iraqi law thus codify a fee-calculation method similar to what American law commonly calls the "lodestar"; the multiplication of reasonable rates by the hours (i.e., "work/services") reasonably incurred in the representation. Ascertaining comparable work or services naturally entails consideration of the time worked and the rates for such services given the skill, experience, and reputation of the attorneys for similar services in the relevant community. A reasonable fee thus requires determining the hours reasonably expended and a reasonable rate.

### A. Hours reasonably expended

"The fundamental purpose of the fee award is to compensate the attorney for his efforts. The first task for [the Court,] therefore, is determining the amount of time reasonably expended." *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C. Cir. 1980). This seems intrinsic in both the plain meaning of "*reasonable* attorney's fees," as the BSA provides, and in the "norms (requirements) of good faith," as Civil Code Article 150 provides. Where tasks and the time they took to complete

are appropriate given the specific circumstances of the litigation, a fee award is necessarily reasonable. By contrast, where tasks are excessive or unwarranted by the matter or the time to completion is too long, an award is unreasonable. As the fee applicant, Wye Oak "bears the burden of establishing entitlement to an award" and thus "documenting the appropriate hours." *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995). With this in mind, the Court considers the billing statements that Wye Oak submitted and the challenges that Iraq offers.

### 1. Quinn, Racusin & Gazzola Chartered's hours are chargeable to Iraq.

The first objection Iraq raises to Wye Oak's attorneys' reasonable hours sum involves the time spent by Quinn, Racusin & Gazzola Chartered ("the Quinn Firm"), Wye Oak's corporate counsel, after June 2017. Iraq notes that once Whiteford, Taylor & Preston LLP ("WTP") joined the litigation team "in June 2017, Wye Oak did not need" the Quinn Firm to serve as "local counsel." Defs.' Second Opp'n at 25–26, ECF No. 500. Iraq also points to Wye Oak's Agreement Concerning Attorneys' Fees and believes it illustrates that the Quinn Firm "'served as litigation counsel and appellate counsel for the Litigation' only 'from 2009 to 2017,' when WTP joined." *Id.* at 26 (quoting Errata Pl.'s Second Req. Ex. 1, at 2, ECF No. 469). These points together, according to Iraq, require the Court to omit categorically all hours the Quinn Firm "claimed after WT[P] entered its appearance in this case" from its reasonable hours total. *Id.* at 27.

Wye Oak responds by noting that Iraq is required to reimburse "all costs (including reasonable attorney's fees and expenses) 'arising out of' their breach of the" BSA and that "the time that the Quinn firm devoted to the litigation, whether as litigation counsel or as the general counsel overseeing the litigation, is [such] a cost." Pl.'s Second Reply at 16, ECF No. 503 (emphasis omitted). Wye Oak also notes that this Court rejected a similar objection from Iraq to

including the Quinn Firm's hours in the reasonable hours calculation in its award of attorneys' fees upon a motion for discovery sanctions earlier in the litigation. *See id.* at 16.

The Court finds that the Quinn Firm's hours are compensable as attorney's fees. Corporate or in-house counsel hours are generally reimbursable where such counsel actively participates in litigation rather than serves as "a mere liaison." *FDIC v. Bender*, 182 F.3d 1, 5 (D.C. Cir. 1999); *accord PPG Indus., Inc. v. Celanese Polymer Specialties Co., Inc.*, 840 F.2d 1565, 1570 (Fed. Cir. 1988); *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 761 F.2d 553, 558 (9th Cir. 1985); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1499 (11th Cir. 1983). This comports with the BSA's requirement to indemnify "reasonable attorney's fees." It seems eminently reasonable and consistent with "norms (requirements) of good faith," Civil Code art. 150, ECF No. 476 at 6, to compensate attorneys regardless of whether they are hired for the first time upon a lawsuit or have an ongoing corporate relationship, so long as they are actually involved in the litigation itself.

Even after June 2017, the Quinn Firm was no mere liaison. Its hourly logs reveal that it remained involved in the litigation well after that date, reviewing and commenting on filings, researching issues, drafting memoranda on relevant topics, and coordinating case strategy, for example. *See generally* Pl.'s Second Req. Ex. D, ECF No. 492-4. And contrary to Iraq's argument, the Agreement Concerning Attorneys' Fees does not say that the Quinn Firm was involved in the litigation "only 'from 2009 to 2017.'" Defs.' Second Opp'n at 26. That "only" is Iraq's addition. The Agreement indicated that the Quinn Firm and WTP would "supervise the appellate advocacy and judgment collection efforts" and "provide Wye Oak with quarterly billing statements showing the fees and costs accrued." Errata Pl.'s Second Req. Ex. 1, at 2, ECF No. 469. The Quinn Firm's logs, moreover, dispel any remaining doubt about whether the Quinn Firm continued its active participation in the litigation after June 2017.

Finally, as Wye Oak notes, the Court resolved a similar issue earlier in the case. In finding that the Quinn Firm's hours were compensable upon a motion for discovery sanctions, the Court noted that the Quinn Firm was "one of the signatories on all Wye Oak filings" and that "Wye Oak's counsel ha[d] determined that it [was] appropriate for [it] to review, edit, and comment on most of Wye Oak's work-product." Mem. Op. at 7 (Nov. 21, 2018), ECF No. 351. This activity persisted after June 2017, and the Court has no discerned no material difference between then and now justifying a different outcome.

The Court therefore finds that the Quinn Firm's hours are compensable and will include them in its reasonable hours sum.

### 2. The Court will not further reduce Wye Oak's award on the basis of timesheet concerns, given Wye Oak's recent agreement to reduce its request.

Iraq next argues that "an across-the-board reduction" of 25 percent is warranted due to "ambiguous," "vacuous," and "block-billed entries." Defs.' Second Opp'n 24, ECF No. 500. Wye Oak responds that "it is the total [hours] that matter[ ]" in "determin[ing] the reasonable cost of prosecuting a complex commercial litigation case," "not the allocation of the total to specific tasks." Pl.'s Second Reply 22, ECF No. 503.

The Court agrees that Wye Oak submitted subpar billing statements justifying a reduction in compensable hours. Again, Wye Oak "bears the burden of establishing entitlement to an award" and thus "documenting the appropriate hours." *Covington*, 57 F.3d at 1107. Wye Oak is correct that the total hours expended matters, but the analysis does not cease there. Rather, billing statements must be "sufficiently detailed to permit the [ ] Court to make an independent determination whether or not the hours claimed are justified." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982). The requirement for sufficient detail flows

from the condition that an "attorney's fee" be *reasonable*," BSA ¶ 15, at 8, ECF No. 1-2 (emphasis added), and that "[d]oubt . . . be construed to the benefit of the debtor," Civ. Code art. 166, Al-Kabban Decl. 23, ECF No. 500-1.

A non-negligible number of Wye Oak's time entries lack this sufficient detail. The billing statements include "instances where no mention is made of the subject matter" for communications or other "work performed during hours billed." *In re Meese*, 907 F.2d 1192, 1204 (D.C. Cir. 1990). Entries for emails or meetings often mention only the recipient and sender. Billings for "legal research" are devoid of other detail. The timekeepers have listed, for example, "Prepare for trial" or "Prepare for status conference" with no elaboration. These entries exemplify "overly vague" and "generic" descriptions. *New Jersey v. EPA*, 703 F.3d 110, 116 (D.C. Cir. 2012). There are also several instances where many tasks spanning numerous hours, sometimes upwards of twelve, are grouped together in a single entry. Excessive block billing like this tends to be disfavored because it stymies the Court's ability to determine "the nature of the services for which compensation is sought." *Copeland*, 641 F.2d at 891 (citation omitted). The combination of these problems renders some number of the hours Wye Oak submitted non-compensable.

At the same time, however, these deficiencies were not so systemic or egregious that the Court was unable to generally assess the reasonableness of the hours expended. A "fee application need not present 'the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney.'" *Concerned Veterans*, 675 F.2d at 1327 (citation omitted). Block billing, for example, tends to be most problematic where a fee applicant prevailed on only some of their claims or where it interferes with the Court's ability to evaluate the reasonableness of cumulative hours spent on specific motions or filings. *See, e.g.*, *Hernandez v. Chipotle Mexican Grill, Inc.*, 257 F. Supp. 3d 100, 111–12 (D.D.C. 2017). The Court is not

28

particularly troubled in either respect here. The central goal of an attorney's fee award is "to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). Moreover, following the latest round of briefing on privilege issues, Wye Oak has agreed to reduce its fee request by a sizeable portion. *See* ECF Nos. 510–515. The Court thus declines to impose a further, across-the-board reduction on Wye Oak's award given any remaining concerns about the timesheets.

### B. REASONABLE HOURLY RATE

Having detailed the *hours* that Wye Oak's lawyers reasonably expended on the representation, the Court must now establish those lawyers' reasonable hourly *rates*. As Article 59 of Iraq's Advocacy Law confirms, a reasonable rate constitutes whatever lawyers would usually charge for "comparable work/services." And while this transaction was both centered in Iraq and governed by Iraqi law, that does not mean that Wye Oak's lawyers may recover only what *Iraqi* lawyers might charge had this case unfolded in the Iraqi courts. Rather, the question is the rate that lawyers comparable to *Wye Oak's lawyers* might ordinarily charge. Wye Oak's lawyers hail from American law firms practicing complex litigation in the federal courts. Thus, this Court looks to prevailing rates in similar suits in the federal courts of the United States, rather than in the courts of Iraq.

That reasonable-hourly-rate determination in complex federal litigation like this case primarily involves three considerations: "(1) 'the attorneys' billing practices'; (2) 'the attorneys' skills, experience, and reputation'; and (3) 'the prevailing market rates in the relevant community.'" *Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58, 62 (D.C. Cir. 2015) (quoting *Covington*, 57 F.3d at 1107). The Court examines these considerations in the subsections that follow. Since Wye Oak is the party seeking fees, it "bears the burden of . . . justifying the

reasonableness of the rates" that it requests. *Covington*, 57 F.3d at 1107; *see also* Adv. Law. Art. 59 (translation), ECF No. 500-1 at 19 (requiring "reference to comparable work/services"); Civ. Code Art. 166 (translation) (requiring that doubt about rates be construed "in favor of the debtor").

1. **The usual billing rates of Wye Oak's attorneys, rather than *Laffey* matrix rates, apply.**

The parties' first dispute about hourly rates concerns the "billing-practices" element— whether Legal Services Industry ("LSI")-Adjusted *Laffey* matrix rates or, instead, the usual billing rates of Wye Oak's attorneys should form the basis of the rate. Wye Oak favors the former, which would result in overall-higher rates. *See* Pl.'s Second Req., ECF No. 492. Iraq favors the latter, which would result in overall-lower rates. *See* Defs.' Second Opp'n 12–13, ECF No. 500.

Iraq has the better of the arguments. "[A]n attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Kattan ex rel. Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993) (quoting *Blum v. Stenson*, 465 U.S. 886, 895–96 n.11 (1984)); *see Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 735 F. App'x 733, 735 ("[T]he District Court appropriately relied on this Court's holding that 'an attorney's usual billing rate is presumptively the reasonable rate.'" (citation omitted)). "[I]n cases" like this one "in which prevailing attorneys request rates which are greater than those they normally charge, the attorneys must offer some evidence that they charge reduced rates for public-spirited or non-economic reasons." *Covington*, 57 F.3d at 1107. Here, Wye Oak has not made the requisite showing that upward departure from its attorneys' usual rates is warranted.

Wye Oak's arguments to the contrary are unavailing. It contends that "the actual rates charged by the lawyers for the prevailing party are simply not relevant to the issue of how much the losing party must pay; the rates that the losing party must pay are the applicable market rates."

Pl.'s Second Reply 8, ECF No. 503. That is wrong. Again, "the attorneys' billing practices" are an important element in a reasonable rate determination, *Covington*, 57 F.3d at 1107; "an attorney's usual billing rate is" in fact "presumptively the reasonable rate," *Kattan*, 995 F.2d at 278.

The presumption that an attorney's usual rate approximates the applicable market rate for "comparable work/services" also makes basic economic sense. Adv. Law. Art. 59, ECF No. 500-1 at 19 (translation). "In an efficient market, the price that competitors charge is driven down to the lowest price any competitor charges"; thus, a firm's actual rate "*is* presumptively the market rate for its services" given the skills, experience, and reputation of the attorneys. *Adolph Coors Co. v. Truck Ins. Exch.*, 383 F. Supp. 2d 93, 98 (D.D.C. 2005) (emphasis in original); *see Concerned Veterans*, 675 F.2d at 1324 ("[T]he actual rate that . . . counsel can command in the market is itself highly relevant proof of the prevailing community rate."); *Yazdani v. Access ATM*, 474 F. Supp. 2d 134, 138 (D.D.C. 2007) ("[T]he best measure of what the market will allow are [sic] the rates actually charged by the two firms representing these litigants.").

Wye Oak cites a series of decisions to dispute the claim that "the *Laffey* Matrix cannot be applied when the law firms in question regularly charge less," including *Blum*, *Covington*, and *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc) ("*SOCM*"). *See* Pl.'s Second Reply 10–11, ECF No. 503. But in so doing, Wye Oak misconstrues the rulings in these cases. *Blum* concluded that prevailing market rates were appropriate for attorneys at non-profit legal-services organizations. *See* 465 U.S. at 895–96. The D.C. Circuit has noted in cases since *Blum*, such as *SOCM* and *Covington*, that the use of prevailing market rates, rather than actual rates, generally is appropriate only where attorneys discount their rates out of demonstrated non-economic or public-spirited motivations. *See Covington*, 57 F.3d at 1107, 1110 & n.19; *SOCM*, 857 F.2d at 1524; *see also Baylor*, 735 F. App'x at 735. The assertion that these

cases illustrate that attorneys are generally entitled to *Laffey* matrix rates even when their usual rates are lower is thus unfounded.

Wye Oak itself—albeit only passingly in a single footnote—acknowledges that demonstrated public-spiritedness is needed to overcome the presumption of usual rates. *See* Pl.'s Second Reply 11 n.5, ECF No. 503. Its claim that this case involves such motivations, though, is unpersuasive. The burden is on Wye Oak's attorneys to show that they charged discounted rates out of public-spiritedness. *See Covington*, 57 F.3d at 1108. None of the declarations or other evidence Wye Oak submitted evinces any public-interest motivation. Wye Oak's suggestion of public-spiritedness—appearing for the first time in its lonesome footnote— cannot suffice to meet this burden.

Nor is it likely that Wye Oak's attorneys *could* theoretically substantiate such a motivation. Wye Oak was a for-profit company, and the present dispute involves a lucrative, defense-related commercial contract. Its attorneys sought a 46-percent contingency fee on a potential (now actual) multimillion-dollar judgment. This case bears little resemblance to the precedent Wye Oak cites. *See Blum*, 465 U.S. at 889 (noting that suit was brought on behalf of a class of Medicaid recipients alleging a violation of procedural rights); *Covington*, 57 F.3d at 1103–04 (noting that prisoners alleged that they were beaten in violation of their constitutional and statutory rights); *Save Our Cumberland Mountains, Inc. v. Hodel*, 622 F. Supp. 1160, 1160 (D.D.C. 1985) (noting that citizen groups brought suit "to curb the widespread avoidance of the environmental protections"), *vacated and remanded*, 857 F.2d 1516 (D.C. Cir. 1988). It strains credulity to call the representation here public-spirited.

The presumption for usual rates thus applies, "provided that [they are] 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill,

experience, and reputation.'" *Kattan*, 995 F.2d at 278. Wye Oak has sufficiently shown that its rates—modestly lower than those in the LSI-Adjusted *Laffey* matrix—conform generally to the community's rates for all but one of its attorneys. It submitted the LSI-Adjusted *Laffey* matrix, attorney declarations, and an expert report, all of which illustrate that the attorneys' usual rates are comparable to the prevailing rates for similar services, i.e., given their skill, experience, and reputation, and the complexity of a case like this against a foreign sovereign and involving a multimillion-dollar defense services contract. *See generally* Laffey Matrix, ECF 492-5; Decl. C. Allen Foster, ECF 492-6; Decl. Haig Kalbian, ECF 492-7; Decl. John H. Quinn, Jr., ECF 492-9; Decl. Robert J. Pavich, ECF 492-10; Expert Report & Decl. Barry Coburn, ECF 493-1. Patrick Klemz, however, charges rates above those in the LSI-Adjusted *Laffey* Matrix for his degree of experience. "In this circuit, the rates contained in the *Laffey* Matrix are typically treated as the highest rates that will be presumed to be reasonable." *Rooths v. District of Columbia*, 802 F. Supp. 2d 56, 61 (D.D.C. 2011); *see also Blackman v. District of Columbia*, 56 F. Supp. 3d 19, 25 (D.D.C. 2014); *Winston & Strawn LLP v. FDIC*, 894 F. Supp. 2d 115, 130 (D.D.C. 2012). Nothing in Wye Oak's submissions justifies departing from this presumption, so the Court caps the rate for Klemz's hours at the corresponding *Laffey* rates. Iraq does not challenge the use of usual rates for Wye Oak's attorneys—as noted, it argued for such rates. *See* Defs.' Second Opp'n 12–13, ECF No. 500.

The Court therefore uses the usual billing rates of Wye Oak's attorneys to assess a reasonable attorneys' fee award.

### 2. Using Wye Oak's attorneys' current rates, rather than their historical rates, is warranted to compensate for the delay in payment.

The parties also dispute whether Wye Oak and its attorneys are entitled to compensation for the delay in payment due to the length of time the litigation has lasted. In other words, even if

the Court uses Wye Oak's lawyers' actual rates to calculate fees, should it use their actual *historical* rates—rates when the services were rendered years ago—or should it instead use their actual *current* rates? Wye Oak contends that current rates are necessary to compensate for the delay. Pl.'s Second Req. 12–13, ECF No. 492 (emphasis omitted); *see also* Pl.'s Second Reply 14–15, ECF No. 503. Iraq counters that historical rates should apply instead. Defs.' Second Opp'n 19, ECF No. 500.

Compensation for delay is, as a starting proposition, within the scope of the BSA's guarantee of "reasonable" compensation. Delays in payment not only impose opportunity costs on the eventual recipient but "can present cash-flow problems." *Copeland*, 641 F.2d at 893. "[P]ayment today for services rendered long in the past," moreover, "deprives the . . . recipient of the value of the use of the money in the meantime," and especially with inflation, that use could be "valuable." *Id.*; *see West v. Potter*, 717 F.3d 1030, 1034 (D.C. Cir. 2013). Compensation for delay, where appropriate, is thus intrinsic to or "*part* of a reasonable attorney's fee," *Missouri v. Jenkins*, 491 U.S. 274, 282 (1989) (emphasis added)—and a "reasonable attorney's fee" is precisely what the parties agreed to, *see* BSA ¶ 15, at 8, ECF No. 1-2. The temporality of value likewise means that failing to account for any protracted delay deprives a recipient of compensation equal to the value of "comparable work/services," Adv. Law. Art. 59, ECF No. 500-1 at 19 (translation).

Courts have thus concluded for similar reasons that compensation for delay is appropriate across a variety of contexts where a "reasonable attorney's fee" is at stake. *See, e.g.*, *Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016) (common-fund case); *Ohio River Envtl. Coal., Inc. v. Green Valley Coal Co.*, 511 F.3d 407, 419 (4th Cir. 2007) (Surface Mining Control and Reclamation Act); *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 617–18 (6th Cir. 2007) (False

Claims Act); *Anderson v. Dir., Office of Workers Comp. Prog.*, 91 F.3d 1322, 1325 (9th Cir. 1996) (Longshore and Harbor Workers' Compensation Act); *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 414, 424–25 (3d Cir. 1993) (Clayton Act); *Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1060 (2d Cir. 1989) (Employee Retirement Income Security Act); *cf. City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (noting that the Solid Waste Disposal Act's and Clean Water Act's use of reasonable attorneys' fees "language is similar to that of many other federal fee-shifting statutes" and that "case law construing what is a 'reasonable' fee applies uniformly to all of them").

Whether "compensation for delay is necessary to provide a reasonable fee" is a discretionary decision. *West*, 717 F.3d at 1034. So is how to compensate for delay: "either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value." *Jenkins*, 491 U.S. at 282; *see also Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 556 (2010); *West*, 717 F.3d at 1034. In exercising this discretion, appropriate considerations include but are not limited to the length of delay and the extent of dilatory or stalling conduct from the party responsible for the delay. *See West*, 717 F.3d at 1034. Iraq does not dispute the discretionary nature of this determination. *See* Def's Second Opp. 19, ECF No. 500.

The Court finds that compensation for delay is warranted for two independently sufficient reasons. First, this litigation exemplifies "unusually long" delay. *West*, 717 F.3d at 1034. It has lasted twelve years. That is twelve years of Wye Oak and its attorneys being deprived of the benefit of the bargain. Twelve years of "cash-flow problems," *Copeland*, 641 F.2d at 893, which, as Wye Oak has noted, were not just hypothetical but all too real. Twelve years of forgone opportunities to invest the funds back into Wye Oak's and their attorneys' businesses (or other ventures), or indeed to make any "use of the money," to speak nothing of inflation or cost-of-living increases.

*Id.* Second, Iraq engaged in "dilatory or stalling conduct." *West*, 717 F.3d at 1034. It was recalcitrant in discovery, to say the least. It requested delays in discovery only to let the extended deadlines pass by. It refused to produce many witnesses in the United States, necessitating much time-consuming international travel for depositions. It failed to produce other witnesses in a timely manner, leading the Court to award Wye Oak attorneys' fees on its related motion for sanctions. It refused to provide many documents Wye Oak requested and, as the Court eventually learned, it failed to even look for some of them, which led the Court to impose evidentiary sanctions. Compensation for delay is more than warranted.

The Court will thus use the current rates of Wye Oak's attorneys to compensate for that delay. Again, the Court has discretion in how to do so: "either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value." *Jenkins*, 491 U.S. at 282; *see also Perdue*, 559 U.S. at 556; *West*, 717 F.3d at 1034. Current rates, compared to a set of historical rates with interest or a cost-of-living adjustment, offer computational and thus administrative ease. The hours expended span over ten years in time, and the billing records over seven hundred-plus pages. Use of current rates thus comports with the spirit of fee determinations, which is to avoid "a second major litigation," *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983), and "to do rough justice, not to achieve auditing perfection," *Fox v. Vice*, 563 U.S. 826, 838 (2011).

Iraq's assertion that current rates would yield a windfall is unconvincing. It supports this claim by noting that only about 25 percent of the total hours billed occurred since 2019. *See* Defs.' Second Opp'n 20, ECF No. 500. That, however, fails to capture the full story. Iraq's own expert submission notes that a substantial majority (62 percent) of the total hours billed occurred from 2018 to 2020—years close in time to the present. *See* Decl. Boaz S. Morag Ex. 3, at 21, ECF No. 500-3. The fees of many of the attorneys who billed the most hours also have grown only modestly.

From 2018 to the present, the hourly rate of Robert Pavich, who billed over 1,200 hours, increased from $750 to $800 (about 6.7 percent). *See* Decl. Boaz S. Morag Ex. 1, at 11, ECF No. 500-3; Report Barry Coburn 9 n.3, ECF No. 332-1; Expert Report & Decl. Barry Coburn 6, ECF 493-1. The rates of C. Allen Foster, who also billed over 1,200 hours, increased from $790 in 2017 to $855 currently (about 8.2 percent). *See* Decl. Boaz S. Morag Ex. 1, at 11; Report Barry Coburn 72; Expert Report & Decl. Barry Coburn 4. Adrian Snead billed nearly 2,700 hours—the most of any timekeeper—under 250 of which occurred before 2018, and his rates increased from $330 in 2018 to $360 currently (about 9.1 percent). *See* Decl. Boaz S. Morag Ex. 1, at 11; Report Barry Coburn 72; Expert Report & Decl. Barry Coburn 4. Finally, *some* increase in rates is necessary to achieve the objective at hand: compensation for delay and its attendant consequences, including opportunity costs, inflation, and so on. The Court finds in its discretion that no windfall would occur and that use of current rates is appropriate.

### 3. No fees are warranted for attorneys who failed to submit information on their usual rates.

Wye Oak failed to submit information on the billing practices, including usual rates, for Francisca Otero, Daniel Faircloth, Matthew Connell, Ross Sarraf, Yakhsha Sharif, Alison Silberberg, and Caren Quinn, attorneys and paralegals from the Quinn Firm. As such, Wye Oak is not entitled to reasonable fees for their service. Wye Oak "bears the burden of . . . justifying the reasonableness of the rates" it requests, *Covington*, 57 F.3d at 1107, which includes "the attorneys' billing practices," *id.* at 1107. Because Wye Oak provided no information on usual billing rates of these Quinn attorneys and paralegals, the Court declines to award corresponding fees. *See Rooths*, 802 F. Supp. 2d at 60 ("*At a minimum*, a fee applicant must provide some information about the attorneys' billing practices[.]") (emphasis added); *A.C. ex rel. Clark v. District of Columbia*, 674 F. Supp. 2d 149, 153 ("To demonstrate a reasonable hourly rate, the fee applicant *must show*: an

attorney's *usual billing practices*; counsel's skill, experience and reputation; as well as the prevailing market rates in the community.") (emphasis added).

### 4. Applicable hourly rates for each timekeeper

For the above reasons, the Court finds reasonable and thus uses the below hourly rates for the corresponding timekeepers' hours:

| TIMEKEEPER | HOURLY RATE |
|---|---|
| C. Allen Foster | $855 |
| Erik D. Bolog | $855 |
| Eric C. Rowe | $695 |
| Adrian Snead | $360 |
| Javier Gomez-Jacome | $300 |
| Blerina Jasari | $300 |
| Samira Ghaderi | $120 |
| Nicole West | $200 |
| Andreja Komnenovic | $90 |
| Andrew Martinez | $40 |
| Madeline Tutman | $20 |
| Robert J. Pavich | $800 |
| John J. Pavich | $695 |
| Jeffrey A. Leon | $795 |
| Anthony A. D'Amato | $795 |
| Scott M. Goehring | $205 |
| John H. Quinn, Jr. | $795 |

| | |
|---|---|
| Patrick Klemz | $458 |
| Carter McClain | $340 |
| Haig Kalbian | $600 |
| Hisham Kassim | $250 |
| Amal Quattan | $150 |
| Aaron Knights | $450 |
| Evan Lisull | $250 |
| Kristina Javier | $100 |
| Marale Garabetian | $150 |

*See* Decl. Boaz S. Morag Ex. 1, at 11–12, ECF No. 500-3; Expert Report & Decl. Barry Coburn 4, 6–7, 9, ECF 493-1; Errata Pl.'s Second Req. Ex. 1, at 2, ECF No. 469.

### 5. Hours reasonably expended by each time keeper

Next, the Court considers the hours each Wye Oak timekeeper reasonably expended. The Court draws the following figures from Wye Oak's sealed submission to Chambers. The Court has reviewed that submission page by page and line by line. It has also considered Iraq's objections thereto, such as for alleged "non-working travel time," "vague" and "vacuous" descriptions, and the Quinn Firm's hours. *See* Response at 2–3, ECF No. 514. Having reviewed the sealed submission, the Court is satisfied that the hours therein all reasonably relate to the firms' representation of Wye Oak. The Court thus finds reasonable the following hours expended, broken down by each law firm and timekeeper:

| WHITEFORD, TAYLOR, & PRESTON L.L.P. | |
| --- | --- |
| **TIMEKEEPER** | **REASONABLE HOURS** |
| C. Allen Foster | 1,057.80 |
| Erik D. Bolog | 818.70 |
| Eric C. Rowe | 817.10 |
| Adrian Snead | 2,540.90 |
| Javier Gomez-Jacome | 27.50 |
| Blerina Jasari | 61.80 |
| Samira Ghaderi | 67.90 |
| Nicole West | 205.20 |
| Andreja Komnenovic | 69.40 |
| Andrew Martinez | 178.20 |
| Madeline Tutman | 40 |

| PAVICH LAW GROUP, P.C. | |
| --- | --- |
| **TIMEKEEPER** | **REASONABLE HOURS** |
| Robert J. Pavich | 1,158.30 |
| John J. Pavich | 1,815.00 |
| Jeffrey A. Leon | 1,542.65 |
| Anthony A. D'Amato | 263.95 |
| Scott M. Goehring | 157.25 |

| QUINN, RACUSIN & GAZZOLA | |
|---|---|
| **TIMEKEEPER** | **REASONABLE HOURS** |
| John H. Quinn, Jr. | 1,923.80 |
| Patrick Klemz | 425.90 |
| Carter McClain | 14.40 |

| KALBIAN HAGERTY, L.L.P. | |
|---|---|
| **TIMEKEEPER** | **REASONABLE HOURS** |
| Haig Kalbian | 13.0 |
| Hisham Kassim | 51.7 |
| Amal Quattan | 12.0 |
| Aaron Knights | 0.50 |
| Evan Lisull | 0.40 |
| Kristina Javier | 3.0 |
| Marale Garabetian | 0.25 |

### 6.  Total fees awarded

Having established the appropriate hourly rate and reasonable hours expended by each timekeeper, the Court will now calculate the appropriate attorney fees by multiplying the reasonable hours expended by the appropriate hourly rate:

| WHITEFORD, TAYLOR, & PRESTON L.L.P. | | | |
|---|---|---|---|
| **TIMEKEEPER** | **REASONABLE HOURS** | **HOURLY RATE** | **TOTAL** |
| C. Allen Foster | 1,057.80 | $855 | $904,419 |
| Erik D. Bolog | 818.70 | $855 | $699,988.50 |
| Eric C. Rowe | 817.10 | $695 | $567,884.50 |
| Adrian Snead | 2,540.90 | $360 | $914,724.00 |
| Javier Gomez-Jacome | 27.50 | $300 | $8,250.00 |
| Blerina Jasari | 61.80 | $300 | $18,540.00 |
| Samira Ghaderi | 67.90 | $120 | $8,148.00 |
| Nicole West | 205.20 | $200 | $41,040.00 |
| Andreja Komnenovic | 69.40 | $90 | $6,246.00 |
| Andrew Martinez | 178.20 | $40 | $7,128.00 |
| Madeline Tutman | 40 | $20 | $800.00 |
| | | Total: | $3,177,168 |

| PAVICH LAW GROUP, P.C. | | | |
|---|---|---|---|
| **TIMEKEEPER** | **REASONABLE HOURS** | **HOURLY RATE** | **TOTAL** |
| Robert J. Pavich | 1,158.30 | $800 | $926,640.00 |
| John J. Pavich | 1,815.00 | $695 | $1,261,425.00 |
| Jeffrey A. Leon | 1,542.65 | $795 | $1,226,406.75 |
| Anthony A. D'Amato | 263.95 | $795 | $209,840.25 |
| Scott M. Goehring | 157.25 | $205 | $32,236.25 |

| | |
|---|---|
| Subtotal: | $3,656,548.25 |
| Less a 25% reduction for multiple attorneys working under the PLG collaborative environment:[25] | ($914,137.06) |
| Total: | $2,742,411.19 |

| QUINN, RACUSIN & GAZZOLA | | | |
|---|---|---|---|
| **TIMEKEEPER** | **REASONABLE HOURS** | **HOURLY RATE** | **TOTAL** |
| John H. Quinn, Jr. | 1,923.80 | $795 | $1,529,421.00 |
| Patrick Klemz | 425.90 | $458 | $195,062.20 |
| Carter McClain | 14.40 | $340 | $4,896.00 |
| | | Total: | $1,729,379.20 |

| KALBIAN HAGERTY, L.L.P. | | | |
|---|---|---|---|
| **TIMEKEEPER** | **REASONABLE HOURS** | **HOURLY RATE** | **TOTAL** |
| Haig Kalbian | 13.00 | $600 | $7,800.00 |
| Hisham Kassim | 51.70 | $250 | $12,925.00 |
| Amal Quattan | 12.00 | $150 | $1,800.00 |
| Aaron Knights | 0.50 | $450 | $225.00 |
| Evan Lisull | 0.40 | $250 | $100.00 |
| Kristina Javier | 3.00 | $100 | $300.00 |

---

[25] ECF No. 513-2 at 1.

| Marale Garabetian | 0.25 | $150 | $37.50 |
| --- | --- | --- | --- |
| | | Total: | $23,187.50 |

| | | NET TOTAL: | **$7,672,145.89** |
| --- | --- | --- | --- |

## 4. CONCLUSION

Wye Oak is thus entitled to $7,672,145.89 in "reasonable attorney's fees and expenses" arising from Iraq's breach of the BSA. BSA ¶ 15, ECF No. 1-2 at 8. Wye Oak is additionally entitled to 500,000 IQD ($342) as a matter of Iraqi Advocacy Law Article 63, which the Court will divide among the four firms in proportion to their attorneys'-fee recovery.[26] This sums to a grand total of $7,672,487.89. A separate Order consistent with this Memorandum Opinion shall issue this date.

SIGNED this _17th_ day of August, 2021.

Royce C. Lamberth
United States District Judge

---

[26] Thus, Whiteford, Taylor & Preston L.L.P. shall be awarded 41.4% of $342, i.e., $141.63; Pavich Law Group, P.C. shall be awarded 35.75%, i.e., $122.28; Quinn, Racusin & Gazzola shall be awarded 22.5%, i.e., $77.00; and Kalbian Hagerty, L.L.P. shall be awarded 0.3%, i.e., $1.09.

# STATUTORY APPENDIX

## 1.  IRAQI CIVIL CODE

Article 2: "Where there is a provision no independent judgment is permissible." *See* Al-Kabban Decl. at 7, ECF No. 500-1 (Iraq translation from Arabic).

Article 25: "(1) The contractual obligations shall be governed by the law of the state wherein lies the domicile of the contracting parties if they have a common domicile; where they have different domiciles the law of the state within which the contract was concluded will be applied unless the contracting parties have agreed (otherwise) or where it would be revealed from the circumstances to be applied. (2) The law of the site of the immovable shall be applied in respect of contracts which have been concluded in respect thereof." *See* Al-Kabban Decl. at 21, ECF No. 500-1 (Iraq translation from Arabic).

Article 73: "A contract is the unison of an offer made by a contracting party with the acceptance of another party in a manner which establishes the effect thereof in the object of the contract." *See* Al-Kabban Decl. at 21, ECF No. 500-1(Iraq translation from Arabic).

Article 77: "(1) Offer and acceptance are every two expressions (words) used customarily for the creation of a contract; whichever expression is made first is an offer and the second is the acceptance.  (2) Offer and acceptance will be in the past tense and may be in the future tense and may be in the form of an order where immediate execution (performance) is intended." *See* Al-Kabban Decl. at 22, ECF No. 500-1 (Iraq translation from Arabic).

Article 142: "(1) The effects of a contract shall apply to the contracting parties and to their universal successors without prejudice to the rules of succession (inheritance) save when it is revealed from the contract or the nature of dealings or from the provisions of the law that this effect will not be transferred to the universal successors. (2) Where the contract has created obligations and rights in rem related to a thing which thereafter was transferred to a singular successor such obligations and rights will be transferred to this successor at the same time as that of transference of the thing where said obligations and rights are of the prerequisites thereof and the singular successor was aware of the same at the time when the thing passed to him." *See* Al-Kabban Decl. at 22, ECF No. 500-1 (Iraq translation from Arabic).

Article 145: "A contracting party is under an obligation to perform his obligation (under the contract) whatever may be the object of the contract." *See* Pl.'s First Reply at 6, ECF No. 476 (Wye Oak translation from Arabic).

Article 150: "The contract must be performed according to its contents and in a manner which conforms to the norms (requirements) of good faith. (2) The contract does not bind the contracting party as regards its express conditions only but also as regards those which are in accordance with

the law, custom, and equity deemed to be requisites thereof depending on the nature of the obligation." *See* Pl.'s First Reply at 6, ECF No. 476 (Wye Oak translation from Arabic).

Article 156: "The truth is left out (disregarded) where custom indicates otherwise." *See* Al-Kabban Decl. at 22, ECF No. 500-1 (Iraq translation from Arabic).

Article 163: "(1) That which is current as custom and usage is like that which is stipulated; that which is implied by usage is like that which is stipulated. (2) What is current among traders is like that which has been stipulated among them. (3) What is impossible customarily (in common practice) is like that which is truly (de facto) impossible." *See* Al-Kabban Decl. at 22, ECF No. 500-1 (Iraq translation from Arabic).

Article 164: "(1) Custom be it universal or specific is a rule (to establish a shari'a rule). (2) The usage common among people is proof which must be observed (admitted)." *See* Al-Kabban Decl. at 23, ECF No. 500-1 (Iraq translation from Arabic).

Article 165: "Custom will be considered (to be effectual) if it is in continuous practice or predominantly widespread; that which is predominantly widespread and not scarce will be considered (effectual) (taken into consideration)." *See* Al-Kabban Decl. at 23, ECF No. 500-1 (Iraq translation from Arabic).

Article 166: "Doubt will be construed to the benefit of the debtor." *See* Al-Kabban Decl. at 23, ECF No. 500-1 (Iraq translation from Arabic).

Article 171: "Where the object of the obligation is a sum of money which was known at the time the obligation arose and the debtor delayed the payment thereof he shall be obligated to pay to the creditor by way of damages for the delay a legal interest at the rate of four per cent in regard to civil matters and five per cent in respect of commercial matters; this interest will commence from the date of filing a judicial claim in respect thereof if the agreement or the commercial usage has not fixed a different date for the running of the interest save in all cases where the law has provided otherwise." *See* Al-Kabban Decl. at 23, ECF No. 500-1 (Iraq translation from Arabic).

Article 174: "Interest may not be charged on the outstanding interest and in no case may the total of the interest received by the creditor be more than the principal sum without in all cases prejudice to the commercial rules of custom and usage." *See* Al-Kabban Decl. at 23, ECF No. 500-1 (Iraq translation from Arabic).

## 2. IRAQI ADVOCACY LAW

Article 55: "The lawyer deserves attorneys fees for carrying out the tasks assigned to him, and he is also entitled to payment of what he has spent in the interests of his client." *See* Pl.'s First Reply at 6, ECF No. 476 (Wye Oak translation from Arabic).

Article 56: "(1) The Lawyer shall be entitled to attorney fees in accordance with the contract concluded between him and his client, provided that in criminal cases not more than the equivalent of twenty percent of the value of the work subject to the power of attorney unless the purpose of the case is to benefit from the ruling issued in respect of it more than what is included in the lawsuit, he is entitled to his fees for For [sic] the total amount. (2) If the fees charged are more than the agreed fees, then the increase is a right of the lawyer." *See* Pl.'s First Reply at 6, ECF No. 476 (Wye Oak translation from Arabic).

Article 59: "In the event where lawyer fees have not been fixed expressly by a specific agreement, they shall be determined by reference to rates for comparable work/services (Ajer El Mithil)." *See* Al-Kabban Decl. at 19, ECF No. 500-1 (Iraq translation from Arabic).

Article 63:
"(1) The Court shall issue a judgment, even without a request, against the party who lost the lawsuit, either in whole or in part, to pay lawyer's fees to the opponent who was represented by an attorney. The person who requests to drop the lawsuit shall be deemed as the losing party in the lawsuit only with respect to lawyer's fees.
(2) First –The Court shall estimate the lawyers' fees according to the following:
    a. – to estimate lawyers' fees by not exceeding 10% of the judgment amount, provided they do not exceed in any way five hundred thousand (500,000) dinars.
    b. – to estimate lawyers' fees in a case where the claim amount is not determined and in a criminal case in which the plaintiff has a civil claim, at no less than ten thousand (10,000) dinars and no more than one hundred thousand (100,000) dinars.
    c. - to estimate lawyers' fees in an expropriation case by no more than 5% of the expropriation allowance ruled by the Court, provided such fees are no less than twenty thousand (20,000) dinars and no more than eighty thousand (80,000) dinars.
    d. – to estimate lawyers' fees at no less than ten thousand (10,000) dinars and no more than thirty thousand (30,000) dinars to be borne by the State Treasury where the lawyer has been appointed pursuant to article 144 of the Criminal Actions Law number (23) of 1971.
Second –
    a) The Minister of Finance shall issue instructions for the determination of lawyer's fees in connection with claims where a state agency or department is a party, taking into consideration the claim amount and the effort exercised, within the limits set out in the first paragraph of this section. Case 1:10-cv-01182-RCL Document 500-1 Filed 09/22/20 Page 19 of 50 3
    b) The competent minister and the head of any unit that does not report to a ministry shall have the right to increase the amounts up to twice the amounts set out under the first paragraph of this section, by virtue of a justified resolution.
    c) the Council of Ministers shall have the right to amend the amounts of lawyer's fees set out in the first paragraph of this subsection whenever it deems necessary." *See* Al-Kabban Decl. at 19-20, ECF No. 500-1 (Iraq translation from Arabic).