## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**WYE OAK TECHNOLOGY, INC.,**

    *Plaintiff,*

**v.**

                                      **Case No. 1:10-cv-1182-RCL**

**REPUBLIC OF IRAQ and MINISTRY OF DEFENSE OF THE REPUBLIC OF IRAQ,**

    *Defendants.*

### MEMORANDUM OPINION

This case concerns plaintiff Wye Technology, Inc.'s ("Wye Oak") nearly two decades-long breach of contract dispute with defendants Republic of Iraq ("Iraq") and the Iraqi Ministry of Defense ("MoD") pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*. Wye Oak's effort to collect its payment has brought the company to two U.S. district courts and two U.S. circuit courts.

Following a bench trial in 2018, this Court entered judgment for Wye Oak and awarded damages. Following an appeal, the Circuit vacated the judgment and remanded the case to this Court to determine whether subject-matter jurisdiction exists based on the third clause of 28 U.S.C. § 1605(a)(2), which abrogates sovereign immunity when a foreign state engages in an "act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

After considering the record, the relevant filings, the applicable law, and the parties' briefing, the Court once again concludes that it properly maintains subject-matter jurisdiction over the case and will **ENTER JUDGMENT** for Wye Oak.

## I.     BACKGROUND

### A.  Factual Background

The factual background of this case has been described in detail in previous opinions from this Court and the Circuit. *See Wye Oak Tech. v. Republic of Iraq*, No. 10-cv-1182 (RCL), 2019 WL 4044046, *1 (D.D.C. Aug. 27, 2019) ("*Wye Oak I*"); *Wye Oak Tech. v. Republic of Iraq*, 24 F.4th 686, 704 (D.C. Cir. 2022) ("*Wye Oak II*"). The Court includes below an overview of the most salient relevant facts and procedural history for consideration of the case on remand.

After the fall of Saddam Hussein's regime, Iraq possessed large stocks of military equipment, much of which consisted of Soviet-era weaponry. *Wye Oak I*, 2019 WL 4044046, at *3. U.S.-led coalition forces, working closely with the newly constituted transitional government of Iraq, endeavored to rebuild Iraq's armed forces. *Wye Oak II*, 24 F.4th at 692. The Iraqi Military Equipment Recovery Project ("IMERP") was developed to carry out this objective. *See Wye Oak I*, 2019 WL 4044046, at *3–4. According to retired General David Petraeus, then-leader of the group overseeing the rebuilding effort, IMERP "was a centerpiece" "to the establishment of a mechanized and armored division for Iraq[.]" Petraeus Dep., ECF No. 418-1, at 33:25–34:2. In particular, coalition forces and the Iraqi transitional government understood the critical importance of equipping an armored brigade to ensure the safety and security of the January 2005 parliamentary election. *See* Trial Tr. 12/17/18 PM at 35:21–37:5 (Testimony of Brigadier General Howard Clements); Trial Tr. 12/19/18 AM 25:9–26:14 (Testimony of Major Kevin Todd Neal); Pl.'s Ex. 16 (Joe Kane, *Iraqi Mech Brigade Moves Toward Initial Ops*, THE ADVISOR, Oct. 9, 2004) at 1, 8. Successful completion of the election was a key milestone for Iraqi security forces' self-sufficiency. *See* Petraeus Dep. 20:19–21:2, 28:19–30:3. And Iraqi security forces taking on

2

greater responsibility was a necessary precondition for coalition forces' expeditious withdrawal from Iraq. *See id.*

The U.S. military viewed Pennsylvania-based private defense contractor Wye Oak and its chief executive officer, Dale Stoffel, as particularly well-equipped to carry out the IMERP, given Dale Stoffel's extensive experience with Soviet military equipment and his global contacts. *Wye Oak I*, 2019 WL 4044046, at *3–4. After reviewing Wye Oak's pitch, the MoD hired Wye Oak to complete a variety of tasks, including "inventorying and assessing Iraq's existing military equipment; refurbishing any such equipment to the extent possible; and arranging for scrap sales of any equipment that was not salvageable." *Wye Oak II*, 24 F.4th at 692. In August 2004, the MoD and Wye Oak entered into a written Broker Services Agreement ("BSA"). *Id.* The BSA outlined Wye Oak's broker responsibilities and period of performance. *Id.* The BSA also included some of the details of Wye Oak's compensation, establishing that MoD would pay Wye Oak according to pro forma invoices. *Id.*

After executing the BSA, Wye Oak began performing both in Iraq and in the United States. *Id.* Wye Oak staff present in Iraq started "identifying, assessing, and refurbishing military equipment on the ground in that country." *Id.* Wye Oak staff in the United States—including David Stoffel, Dale Stoffel's brother and head of the company's information technology department— began purchasing computer equipment and software and overseeing all electronic communications. *Id.* Around the same time, Wye Oak granted Lebanese businessman Raymond Zayna a limited power of attorney to arrange financing and bank guarantees on behalf of Wye Oak for its contract with MoD. *Wye Oak I*, 2019 WL 4044046, at *8–9.[1]

---

[1] Based on the evidence presented at trial, this Court concluded that "it is more likely than not that Zayna was inserted at the behest of the MoD" but that "[n]either side offer[ed] definitive evidence on this point." *See Wye Oak I*, 2019 WL 4044046, at *9.

In October 2004, Wye Oak submitted three pro forma invoices to the MoD, totaling $24,714,697.15. *Wye Oak II*, 24 F.4th at 692. Each invoice instructed the MoD to remit payment to Wye Oak "at the Baghdad Iraq office of [the MoD]." Pl.'s Ex. 18 (Invoices). It is undisputed that the MoD never paid these invoices. *Wye Oak II*, 24 F.4th at 692.

In the weeks following Wye Oak's submission of the invoices, Wye Oak representatives met with American and Iraqi officials at least twice to discuss the still-outstanding invoices. *Id.* at 693. Eventually, the MoD remitted payment on the three invoices to Zayna, even though Wye Oak had not expressly or impliedly authorized that Zayna accept payment on its behalf. *Wye Oak I*, 2019 WL 4044046, at *13–14. At the same time, Wye Oak contacted and met with various U.S. legislative and military figures in the United States—including U.S. senators and the office of then-Secretary of Defense Donald Rumsfeld—to notify them that the MoD's nonpayment had significantly impacted its mission. *Id.* at *15 (citing Trial Tr. 12/18/18 AM 59:17–60:20 (Testimony of David Stoffel)).

In addition to leveraging contacts in Washington, Wye Oak attempted to recover the funds from Zayna. On November 25, 2004, Dale Stoffel contacted Zayna by email. *Wye Oak I*, 2019 WL 4044046, at *15. In that email, Dale Stoffel demanded that Zayna transfer money owed to Wye Oak to Wye Oak's bank account at National City Bank of Pennsylvania in Monongahela, Pennsylvania. *See* Pl.'s Ex. 31. Zayna declined and instead urged Dale Stoffel to travel from the United States to Iraq to sort out the payment details in person.[2] *See* Pl.'s Ex. 33.

---

[2] Wye Oak maintains a consistent theory throughout its papers that Zayna was Iraq's agent and thus any actions or statements by or directed to Zayna may be attributed as made by or directed to Iraq. *See, e.g.*, Pl.'s Reply at 10 ("Zayna Was Iraq's Man, And Dale's Instruction To Zayna Was An Instruction To Iraq"). Wye Oak supports this position with a handful of citations to Iraqi agency law, *see, e.g., id.* at 13 n.4, as well as a line from this Court's previous opinion that "Zayna was MoD's agent[,]" *see id.* at 5 (citing *Wye Oak I*, 2019 WL 4044046, at *17). Ultimately, this Court need not decide the precise legal contours of the agency relationship—which Iraq vigorously contests, *see* Defs.' PFFCL at 38–43—because no conclusion herein turns on the existence of any agency relationship. Additionally, this Court's previous statement regarding agency was made in the context of ruling that certain statements by Zayna were admissible as a statement by a party opponent. This evidentiary ruling should not have preclusive effect on the agency

On December 5, 2004, American officials and MoD representatives met again and the MoD again agreed to pay Wye Oak. Trial Tr. 12/17/18 PM 18:10–22:25 (Clements); Trial Tr. 12/20/18 AM 33:11–34:25, 35:9–25, 36:14-37:1 (Testimony of Lieutenant Colonel Patrick Marr); Trial Tr. 12/20/18 PM 72:17–74:9 (Testimony of Professor Nicholas Beadle). Three days later, Dale Stoffel was on his way to Baghdad to receive the payment when he was shot multiple times and killed. *Wye Oak I*, 2019 WL 4044046, at *17. After Dale Stoffel's death, Wye Oak withdrew all of its U.S. personnel from Iraq. *Wye Oak II*, 24 F.4th at 693. Through local contractors, Wye Oak coordinated the production of operational armored vehicles for Iraq's January 2005 parliamentary election. *Id.* An Iraqi general declared that the election would be secure thanks to Wye Oak's work refurbishing and equipping the military. *See Wye Oak I*, 2019 WL 4044046, at *19 (citing Pl.'s Ex. 47 (Andrew Hughan, *Iraqi Mechanized Brigade Assumes Mission*, THE ADVISOR, Jan. 15, 2005) at 3).

Eventually, the lack of payment caused Wye Oak to cease operations in Iraq sometime after the January 2005 election. *Wye Oak II*, 24 F.4th at 693.

## B. Procedural Background

Wye Oak first filed its breach of contract complaint against the MoD and Iraq in the Eastern District of Virginia. *See Wye Oak Tech., Inc. v. Republic of Iraq*, No. 09-cv-793, 2010 WL 2613323, at *1 (E.D. Va. June 29, 2010). Iraq moved to dismiss, claiming sovereign immunity. *Wye Oak II*, 24 F.4th at 693. In 2010, the Eastern District of Virginia determined that venue was improper and transferred the case to this Court. *See Wye Oak Tech.*, 2010 WL 2613323, at *11. In the same opinion, the Eastern District of Virginia found that all three clauses of the FSIA's

---

question in a different context. *Cf. Secs. Ind. Ass'n v. Bd. of Govs.*, 900 F.2d 360, 364 (D.C. Cir. 1990) ("Courts are admonished not to permit "[u]nreflective invocation" of issue preclusion to gloss over serious questions of fairness and the scope of prior litigation") (quoting *Montana v. United States*, 440 U.S. 147, 162–64 & n.11 (1979)).

commercial activities exception applied and thus the court had subject-matter jurisdiction. *Id.* at *8–9. Iraq appealed that finding to the Fourth Circuit and this Court stayed the current case. *Wye Oak II*, 24 F.4th at 694. The Fourth Circuit affirmed the Eastern District of Virginia's jurisdictional finding, holding that the actions Wye Oak alleged to have taken inside of the United States meant that "Wye Oak ha[d] made a sufficient showing that its breach of contract claim [was] based upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere" under the second clause of 28 U.S.C. § 1605(a). *See Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 216–17 (4th Cir. 2011).

This Court lifted the stay following the Fourth Circuit's decision and the lawsuit proceeded, culminating in an eight-day bench trial in December 2018. *Wye Oak II*, 24 F.4th at 694. In August 2019, this Court issued its findings of fact and conclusions of law, holding both that the Fourth Circuit's decision with respect to clause two was binding on this Court based on the "law of the case" doctrine and that the facts supported an independent determination of clause two's applicability. *Wye Oak I*, 2019 WL 4044046, at *23–24. After determining that the exception to sovereign immunity applied, this Court examined the evidence and concluded that MoD had breached its contract with Wye Oak.[3] *Id.* at *27–28. Accordingly, this Court entered judgment for Wye Oak and against the MoD and Iraq. J., ECF No. 466.[4] The Court also ordered the defendants to pay Wye Oak's costs, including reasonable attorney fees and expenses. Mem. Order, ECF No.

---

[3] The Court also concluded that "MoD is not separate from the Republic of Iraq—MoD and Iraq are legally one and the same." *Wye Oak I*, 2019 WL 4044046, at *19.

[4] The Court originally entered judgment against the MoD and Iraq in the amount of "$120,338,393.71, plus $10,909.11 per day for each day after October 9, 2019." J., ECF No. 466. Following various dueling motions and additional considerations, the Court later amended the judgment to clarify that the MoD and Iraq were jointly and severally liable for "the amount of $120,742,030.78, comprised of the final judgment amount of $120,338,393.71, plus $10,909.11 per day for each day after October 9, 2019 through and including November 15, 2019, the date of entry of Judgment." Am. J., ECF No. 483-1. The Court further ordered that the "judgment set forth herein shall accrue interest from November 15, 2019 at the legal rate pursuant to 28 U.S.C. § 1961 of 1.58%, and shall be computed daily and compounded annually until paid in full." *Id.*

486; Order, ECF No. 517. Both parties appealed aspects of this Court's post-trial judgment and corresponding orders.[5] *Wye Oak II*, 24 F.4th at 695–96.

On appeal, the D.C. Circuit vacated the judgment and remanded the case. *Id.* at 703–04. The Circuit first determined that the Fourth Circuit's jurisdictional holding was not binding on this Court or the Circuit based on the "law of the case" doctrine.[6] *Id.* at 698–99. Next, the Circuit "disagree[d] with the view of the district court (and, for that matter, the Fourth Circuit) that the second clause of the commercial activities exception can be satisfied for FSIA purposes based on the various acts that the *plaintiff* (Wye Oak) took inside the United States to perform under the BSA." *Id.* at 702 (emphasis in original). The Circuit went on say that the inapplicability of the second clause "does not mean that Iraq must be found to have retained its sovereign immunity with respect to Wye Oak's breach of contract claims—at least not yet" *id.* at 703, because the Circuit did "discern a plausible basis for sustaining the district court's jurisdictional ruling in the language of the commercial activity exception's *third* clause." *Id.* at 690 (emphasis in original). Because this Court had not specifically addressed the applicability of the third clause in its post-trial opinion, and mindful that the "Court of Appeals should not . . . resolve[ ] in the first instance [a] factual dispute which had not been considered by the District Court[,]" *id.* at 703 (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982) (alterations in original)), the Circuit remanded the case for this Court to analyze the "direct effects arguments in the first instance." *Id.* at 703.

---

[5] Because the sole issue before this Court is the existence of subject-matter jurisdiction under clause three of the commercial activities exception, the Court will not address other matters still disputed by the parties, such as the Court's calculation of damages and attorney fees.

[6] The D.C. Circuit distinguished the different postures of the case, finding that the Fourth Circuit's determination that Wye Oak had plausibly pleaded that there was jurisdiction under the second clause of the commercial activities exception was sufficiently different from the Circuit's examination of the jurisdictional question following discovery and a bench trial. *Wye Oak II*, 24 F.4th at 698–99.

On remand, the parties submitted supplemental briefing. *See* Pl.'s Proposed Findings of Fact and Conclusions of Law, ECF No. 542 [hereinafter "Pl.'s PFFCL"]; Defs.' Proposed Findings of Fact and Conclusions of Law, ECF No. 546 [hereinafter "Defs.' PFFCL"]; Defs.' Resp. to Pl.'s PFFCL, ECF No. 547;[7] Pl.'s Reply in Supp. of Pl.'s PFFCL, ECF No. 550 [hereinafter "Pl.'s Reply"]. Wye Oak points the Court to four alleged direct effects in the United States due to Iraq's failure to pay the three invoices. *See* Pl.'s PFFCL at 6–7. Iraq argues that none of the effects proposed by Wye Oak are sufficient to satisfy an abrogation of sovereign immunity under the third clause of 28 U.S.C. § 1605(a)(2), and therefore this Court cannot properly exercise subject-matter jurisdiction over the case. *See* Defs.' PFFCL at 15–17.

## II.    LEGAL STANDARD

Under the FSIA, a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless one of specific statutorily defined exceptions applies. 28 U.S.C. § 1604 (emphasis added). The FSIA is thus the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). "The most significant of the FSIA's exceptions—and the one at issue in this case—is the 'commercial' exception of § 1605(a)(2)[.]" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992). Under Section 1605(a)(2)'s third clause, a foreign state is not immune when the "lawsuit is (1) 'based . . . upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [Iraq] outside this country; and (3) that 'cause[d] a direct effect in the United States.'" *Id.* (citing 28 U.S.C. § 1605(a)(2)).

A direct effect "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172

---

[7] ECF No. 546 and 547 appear to be the same document.

(D.C. Cir. 1994) (internal citation omitted). Though "jurisdiction may not be predicated on purely trivial effects in the United States[,]" the Supreme Court has "reject[ed] the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Weltover*, 504 U.S. at 618. While the plaintiff bears the burden of producing evidence that the FSIA exception applies, *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013), "the [defendant foreign state] bears the ultimate burden of persuasion (i.e., to show that the commercial-activity exception does not apply)." *FG Hemisphere Assocs., LLC v. Democratic Republic of the Congo*, 447 F.3d 835, 842 (D.C. Cir. 2006).

## III.   DISCUSSION

As a threshold matter, "there is no dispute that Wye Oak's lawsuit relates to Iraq's commercial activity and is based upon an act of Iraq that took place outside of United States territory: its failure to pay the invoices. Thus, the first two requirements for application of clause three of the FSIA's commercial activities exception are satisfied." *Wye Oak II*, 24 F.4th at 703 (citing *Ivanenko v. Yanukovich*, 995 F.3d 232, 238 (D.C. Cir. 2021)). Therefore, the sole issue on remand is "whether Iraq's breach of contract caused 'direct effects' in the United States for the purpose of the third clause of 28 U.S.C. § 1605(a)(2)." *Id.* at 690.

Wye Oak has posited four examples of direct effects in the United States flowing from Iraq's breach of the BSA: (1) Iraq was required to submit payment to Wye Oak's U.S. bank account, (2) Iraq specifically targeted Wye Oak because it knew that effects of its nonpayment would be felt in the United States; (3) Iraq's nonpayment caused the cut-off of a flow of capital, data, services, and personnel between the United States and Iraq; and (4) Iraq's nonpayment affected military and diplomatic operations in the United States. *See id.* at 703.

The Court will examine each of Wye Oak's theories in turn to determine whether it

constitutes a direct effect sufficient to satisfy the commercial activities exception. The Court concludes that Wye Oak has not met its burden to produce evidence showing the applicability of the sovereign immunity exception with respect to its first proposed direct effect. For the second, Wye Oak has met its burden of production, but Iraq has, in turn, met its burden to demonstrate entitlement to sovereign immunity. For the final two proposed direct effects, Wye Oak has met the burden of production, and Iraq has not met its burden of persuasion. Therefore, the Court may properly exercise subject-matter jurisdiction over the case.

### A. Wye Oak Has Not Demonstrated That Iraq Had an Obligation to Deposit Funds Into the Company's U.S. Bank Account

Wye Oak's first direct effect argument is that it designated its Pennsylvania-based bank account as the place of payment and Iraq's failure to pay into that account caused a direct effect in the United States. Pl.'s PFFCL at 12. Iraq's main rejoinder is that, because payment was due in Iraq, not the United States, its nonpayment could not create a direct effect in the United States on this basis. Defs.' PFFCL at 27.

In this Circuit, in determining whether there is a direct effect in the United States based on the place of payment, "our touchstone is the Supreme Court's decision in *Republic of Argentina v. Weltover*." *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1140 (D.C. Cir. 2020). In *Weltover*, the government of Argentina issued U.S. dollar-dominated bonds as part of a foreign exchange program. 504 U.S. at 609. Bondholders were permitted to elect one of four cities—one of which was New York—as the place to receive payment upon the bonds' maturity date. *Id.* at 609–10. When the bonds matured, Argentina attempted to reschedule the payments. *Id.* at 610. Several bondholders, exercising their rights under the bonds' terms, then demanded full payment in New York. *Id.* After Argentina failed to make the payments, the bondholders sued under 28 U.S.C. § 1605(a)(2)'s third clause. *Id.* The Supreme Court agreed with the bondholders that the

10

court properly maintained subject-matter jurisdiction because "New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 619.

Contrary to Wye Oak's insistence that "[t]his case is directly and obviously analogous to *Weltover*," Pl.'s PFFCL at 8, there is one significant difference here: the BSA did not designate any possible places of payment. Instead, Section 5(b) of the BSA, the section devoted to payment instructions, merely stated:

> Payments to [Wye Oak] of the aforementioned commission will be paid pursuant to proforma invoices submitted by [Wye Oak] and then reconciled by final invoice. Upon providing such proforma invoice, [the MoD] will make full payment on such invoice immediately upon presentation. All payments to be made to [Wye Oak] under this Agreement shall be made in United States Dollars in the form and manner as directed by [Wye Oak].

*See* Pl.'s Ex. 5 (BSA), at § 5(b).

Wye Oak, focusing on the last sentence of Section 5(b), insists that payment was due in the United States because Wye Oak designated its U.S. bank account in its November 25, 2004 email to Zayna. Pl.'s PFFCL at 9–10. Iraq, focusing on the first sentence of Part 5(b), counters that the MoD's office in Baghdad, Iraq was the location of payment because that was the place designated in Wye Oak's October 2004 pro forma invoices. Defs.' PFFCL at 28–29.[8]

Under the law of this Circuit, there is no direct effect in the United States when a foreign sovereign did not have an obligation pay in the United States. Since *Weltover*, the Circuit's cases

---

[8] Iraq also resists the notion that the November 25, 2004 email created an obligation to pay into a U.S. bank account because it was sent after Iraq's breach and it was directed to Zayna, not Iraq. *See* Defs.' PFFCL at 35–43. Iraq further argues that even if the email created an obligation, it was superseded by Dale Stoffel's return to Iraq in December 2004 to accept payment in Iraq. *See id.* at 91–92. Because the Court finds that Iraq did not have an obligation to pay Wye Oak in the United States based on the terms of the BSA or the parties' course of performance, the Court need not address these remaining arguments.

"draw a very clear line: For purposes of clause three of the FSIA commercial activity exception, breaching a contract that establishes or necessarily contemplates the United States as a place of performance causes a direct effect in the United States, while breaching a contract that does not establish or necessarily contemplate the United States as a place of performance does not cause a direct effect in the United States." *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 40 (D.C. Cir. 2014). Accordingly, the Circuit has found a direct effect when the parties knew at the time of contracting that performance was to occur in the United States. *See de Csepel v. Republic of Hungary*, 714 F.3d 591, 601 (D.C. Cir. 2013) ("Hungary  promised to return the artwork to members of the Herzog family it knew to be residing in the United States and then breached that obligation by refusing to do so"); *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1186, 1190 (D.C. Cir. 2003) (finding a direct effect when a memorandum of understanding required payment to a U.S. company's U.S. bank account because "the involvement of a U.S. bank was immediate and unavoidable").

More often, however, the Circuit has found no direct effect when an agreement was silent on where payment was to occur. *See Valambhia*, 964 F.3d at 1140–42 (Irish corporation held a judgment against Tanzania but Tanzania was under no obligation to satisfy the judgment in the plaintiffs' New York-based account); *Odhiambo*, 764 F.3d at 40 (Kenya was not obliged to pay a whistleblower award to a Kenyan national in the United States); *Peterson v. Kingdom of Saudi Arabia*, 416 F.3d 83 (D.C. Cir. 2005) (Saudi Arabia had no obligation to pay retirement funds to former employee in the United States); *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143 (D.C. Cir. 1994) (Iraqi bank had no obligation to make payments in the United States on letters of credit

issued to Irish corporations).[9] Put differently, it is not enough, under this Circuit's precedent, that a foreign sovereign might have anticipated that payment would occur in the United States. The foreign sovereign must have been bound under a contractual obligation, express or implied, to make a payment in the United States. *See Valambhia*, 964 F.3d at 1142.

Here, neither MoD nor Iraq under an obligation to pay Wye Oak in the United States. The BSA specified that Wye Oak would be paid pursuant to the pro forma invoices it submitted. *See* Pl.'s Ex. 5. In October 2004, Wye Oak submitted pro forma invoices designating Iraq, not the United States, as the location of payment. Presumably, Wye Oak considered the invoices it submitted to be sufficiently detailed; it was only after the MoD had failed to pay them, and Wye Oak repeatedly sought to recover the funds, that Dale Stoffel sent the email with Wye Oak's bank account information.[10] Even if, at the time of contracting, Iraq might have contemplated that Wye Oak would demand payment in the United States, Iraq was not specifically bound to do so.[11]

Wye Oak insists that the pro forma invoices lacked all of the details necessary for Iraq to successfully make payments, and, therefore, the Court should look to Dale Stoffel's November 25, 2004 email to Zayna to resolve the ambiguity. *See* Pl.'s PFFCL 12–17; Pl.'s Reply at 10–32. By providing the account and routing numbers for payment to Wye Oak's Pennsylvania-based account, *see* Pl.'s Ex. 31, and addressing the email to Zayna, Wye Oak contends that this email

---

[9] Iraq's reliance on *Zedan v. Kingdom of Saudi Arabia*, however, is misplaced. *See* Defs.' PFFCL at 100. That case relied on the pre-*Weltover* requirement that a direct effect be "one that is substantial and foreseeable." *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514 (D.C. Cir. 1988).

[10] The parties engage in an extended discussion of whether a direct effect can be established if an obligation to make a payment arises after a party's breach. *See, e.g.*, Defs.' PFFCL at 83–87; Pl.'s Reply at 17–18. Because the Court concludes there was no obligation, the Court need not answer this question.

[11] Wye Oak argues that certain clues in the BSA—such as its English language, the requirement that payment be made in U.S. dollars, and the directive to send written notices and requests to Wye Oak's address in the United States—put Iraq on notice that the United States was the place of performance for payment. *See* Pl.'s PFFCL at 12. These facts, without more, are not enough to establish a direct effect in the United States. *See Friedman v. Gov't of Abu Dhabi, U.A.E.*, 464 F. Supp. 3d 52, 65 (D.D.C. 2020).

created binding obligations on Iraq. *See* Pl.'s PFFCL at 13–16; Pl.'s Reply at 10–14. However, Wye Oak has not sufficiently explained why the invoices lacked the necessary details to enable Iraq to pay especially when, by the terms of the BSA, the parties apparently contemplated that payment could—and would—be made according to the invoices' instructions. Similarly, even if the BSA's payment provision and the invoices, or both, were ambiguous, Wye Oak has not demonstrated to this Court whether Iraqi law, which governs the BSA, permits the introduction of email communications to explain the potential ambiguity.

To be sure, this case plainly does not evince the same concerns animating the various panels finding no direct effect when the agreement was silent on place of payment, namely, preventing "opportunistic plaintiffs from unilaterally haling foreign sovereigns into United States courts[.]" *See Odhiambo*, 764 F.3d at 47 (Pillard, J., concurring in part). Nor is this the sort of "'pay wherever you are' scenario[] in which the asserted direct effect in the United States is simply that plaintiffs reside or are citizens here, without more[.]" *Valambhia*, 964 F.3d at 1142. There is, simply put, much more to Wye Oak's connection to the United States than its Pennsylvania bank account. At all relevant times, Wye Oak was, and continues to be, a U.S. corporation headquartered in the United States. Wye Oak performed essential services for the contract from the United States. At the time of contracting, Iraq could very well have predicted that Wye Oak's forthcoming pro forma invoices would have sought payment in the United States for its services. With these facts in mind, the direct effects "result should be different where, for example, a foreign government hires an American [ ] firm abroad without specifying place of performance, and, once the work is complete, reneges on payment[.]" *Odhiambo*, 764 F.3d at 45 (Pillard, J., concurring in part).

Nevertheless, this Court is bound by the Circuit's precedent requiring an obligation on the

part of the foreign sovereign to deposit funds to a U.S. account.[12] *See Goodman Holdings*, 26 F.3d

at 1146 (no direct effect because "[n]either New York nor any other United States location was

designated as the 'place of performance' where money was 'supposed' to have been paid");

*Peterson*, 416 F.3d at 91 (no direct effect because "Saudi Arabia 'might well have paid' [the

plaintiff] in the United States 'but it might just as well have done so' outside of the United States")

(internal citations omitted).

Because Wye Oak has not demonstrated that Iraq was obligated to make a payment in the

United States, Wye Oak's first putative direct effect is insufficient to abrogate Iraq's sovereign

immunity. *See Bell Helicopter*, 734 F.3d at 1183.

### B. Iraq Has Met Its Burden of Persuasion to Show That Iraq Did Not "Target" Wye Oak

Wye Oak's second direct effects theory is that Iraq "targeted" Wye Oak, "clearly

kn[owing] that a U.S. company would feel the loss in the United States when Iraq failed to pay."

Pl.'s PFFCL at 10. Wye Oak contends that such "targeting" occurred both before and during the

relationship between the parties. *See id.*; *see also* Pl.'s Reply at 33. Wye Oak points to the Circuit's

decision in *EIG Energy Fund XIV v. Petroleo Brasileiro*, 894 F.3d 339 (D.C. Cir. 2018) in support

of its position. In that case, the Circuit found that a U.S. company had "made out a *prima facie*

case for [subject-matter] jurisdiction" when it alleged that Petrobras, a state-owned oil company

in Brazil, "specifically targeted U.S. investors" for its foreign investment vehicle Sete Brasil

Participações, S.A. ("Sete"), all the while "intentionally conceal[ing] the ongoing fraud at

---

[12] Likewise, even if the funds had been delivered to Wye Oak in Iraq in accordance with the pro forma invoices, the possibility that the funds might eventually have made their way to Wye Oak's account in the United States is insufficient to establish a direct effect based on failure to pay into a U.S. bank account. After all, by the plain terms of the BSA, which sets out the financial obligations that form the basis of Wye Oak's claims, Iraq theoretically could have satisfied those obligations by depositing funds in "any other country." *See Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 136 (2d Cir. 2022).

Petrobras and Sete" and using "money invested in Sete" "to pay bribes and kickbacks." *Id.* at 345 (emphasis in original). Iraq counters that there is no evidence that it targeted a U.S. company, and if there was any targeting, it was *Wye Oak* that targeted *Iraq*.[13] In reply, Wye Oak refines its "targeting" argument as "Iraqi officials carefully 'insert[ing]' Zayna into the relationship with Wye Oak, intentionally craft[ing] the 'fraudulent' [contract of financial agreement],[14] and generally orchestrat[ing] '[a] scheme' 'to steal millions of dollars.'" Pl.'s Reply at 33 (quoting *Wye Oak I*, 2019 WL 4044046, at *9, 13).

Based on a careful review of the trial record, the Court concludes that the facts in the instant case are sufficiently different in kind from the actions in *EIG Energy* so as to render the "targeting" theory inapplicable. Thus, Iraq's sovereign immunity is not pierced by Wye Oak's second direct effects argument. To support the finding of "specific targeting" giving rise to FSIA jurisdiction, the Circuit in *EIG Energy* noted that Petrobras had undertaken concrete actions in the United States to initiate the relationship with the U.S. company, including disseminating multiple documents and presentations in the United States as well as sending Petrobras representatives to the United

---

[13] Iraq's other arguments are without merit. Iraq first disputes Wye Oak's targeting theory because the IMERP and BSA were conceived of, presented in, and did not contemplate any performance outside of Iraq. *See* Defs.' 46–52. Assuming without deciding that Iraq's version of facts is correct, none of those facts is directly responsive to the targeting argument. Iraq also argues that *EIG Energy* is not controlling because it was a tort, rather than contract, case. Defs.' PFFCL at 22–23, 92, 93–94. There is no such categorical approach to evaluating the FSIA in this Circuit. *See EIG Energy*, 894 F.3d at 349. Iraq further urges the Court not to adopt Wye Oak's targeting theory, warning that it is a "sweeping proposition" and would mean that "such a rule that would strip sovereign immunity where a foreign government simply seeks to do business with a U.S. individual or corporation." Defs.' PFFCL at 94. The Court does not view Wye Oak's papers as advancing such a theory. *See* Pl.'s PFFCL at 32–33. Regardless, the Court understands Wye Oak's legal argument to be based in *EIG Energy*, which, as this Court will explain, is distinguishable from this case.

[14] In October 2004, the MoD and Zayna discussed, and Wye Oak did not object to, concluding an agreement whereby Zayna's company would finance the IMERP. *Wye Oak I*, 2019 WL 4044046, at *12 (citing Pl.'s Ex. 21 (Contract of Financial Agreement)). In 2011, three MoD officials involved in negotiating and executing the agreement were criminally convicted for "conclud[ing] a financial agreement" with Zayna's company. *See id.* (citing Defs.' Suppl. Mem. in Opp'n to Pl.'s Mot. for Sanctions, ECF No. 430, and Ex. A. to Pl.'s Mot. to Reopen Evid., ECF No. 438-1). Because the parties, subject matter, timeframe, and amounts involved in the summary of the conviction matched the facts admitted into evidence at trial, the Court concluded that the conviction "more likely than not refers to the [contract of financial agreement]." *Id.* The Court further remarked that the existence of this conviction evidence "strongly indicate[d]" "a fraudulent scheme between these MoD officials and Zayna to steal millions of dollars." *Id.*

States to meet with the U.S. company on at least two occasions. *See EIG Energy*, 894 F.3d at 342.

These actions were essential to the jurisdictional analysis in the U.S. company's fraudulent

inducement lawsuit because "[a]t least some of the misstatements and omissions in service thereof

took place in the United States, where the ultimate consequences of the fraud were later felt." *Id.*

at 348.

Here, the record does not show any affirmative actions taken by Iraq or the MoD in the

United States to identify Wye Oak. Instead, it appears that the significant steps to begin the

relationship between the parties were taken by Wye Oak and were carried out in Iraq. Wye Oak

representatives had a history of operating in Iraq and were present in Iraq in early 2004. William

Felix Dep., ECF No. 418-10, at 7:14–25:14. Wye Oak approached the MoD and coalition leaders

with an early version of the IMERP concept in February or March 2004. *See* Pl.'s Ex. 8.3. In April

2004, Wye Oak submitted a more detailed plan to the MoD in Iraq. *See* Pl.'s Ex. 8.4. In June 2004,

Wye Oak sent the MoD a letter formally proposing the IMERP in Iraq. *See* Pl.'s Ex. 1. In August

2004, Wye Oak and the MoD officially executed the BSA in Iraq. *See* Pl.'s Ex. 5. This evidence

indicates that Wye Oak initiated the relationship with Iraq.

Wye Oak's secondary argument, that the "targeting" occurred during the existence of the

relationship, is not supported by this Circuit's caselaw. Wye Oak contends that "Zayna's key

email," from December 2, 2004, establishes targeting because Zayna urged Dale Stoffel to travel

from the United States to Iraq with the promise of payment, all the while knowing that Iraq had no

intention of paying Wye Oak. *See* Pl.'s Reply at 33 (citing Pl.'s Ex. 33). That Zayna's

"misstatements and omissions in service of the fraud were affirmatively *directed into* the United

States," *see* Pl.'s Reply at 33 (emphasis added), such as they were, is not enough to meet the

targeting standard set forth in *EIG Energy*. As previously explained, *EIG Energy* focused on the

17

fact that "the misstatements and omissions in service thereof *took place in* the United States."[15] 894 F.3d at 348 (emphasis added). The absence of such actions here is dispositive.

Furthermore, *Nnaka v. Fed. Republic of Nigeria*, 756 Fed. App'x 16 (D.C. Cir. 2019) (per curiam), which Wye Oak cites for the proposition that a letter sent from abroad to the United States can support FSIA jurisdiction, is inapposite. The letter at issue in that case was "an intergovernmental communication from Nigeria to the United States regarding who had authority to represent the Nigerian government in an asset-forfeiture action" and receipt of such "letter caused the district court to dismiss [the plaintiff] from the asset forfeiture case[.]" *Nnaka*, 756 Fed. App'x at 18. The letter thus had immediate legal consequences in the United States. By contrast, there were no immediate legal consequences of Zayna's email to Dale Stoffel.

Finally, Wye Oak's contention that "Iraq knew that the losses [due to its nonpayment] would be felt in the United States" is insufficient to establish a direct effect under this Circuit's precedent. *See* Pl.'s PFFCL at 21. Wye Oak's argument proceeds as follows: (1) Iraq "knew it targeted a U.S. company";[16] (2) Iraq knew that Wye Oak was carrying out administrative functions in the United States in support of the BSA and that Wye Oak expected the pro forma invoices to compensate the company for these activities; (3) payment was required to be made in U.S. dollars; and (4) thus, Iraq knew that nonpayment would directly cause a loss to Wye Oak in the United

---

[15] Relatedly, even if the operative fraudulent action was not Zayna's email but the contract of financial agreement between the MoD and Zayna's company, this argument would similarly fall short of *EIG Energy*. In that case, the Circuit remarked that the injury occurred to the U.S. company when "'Petrobras successfully induced [it] to invest in the Petrobras-Sete project,' which 'occurred, at least in part, in the United States.'" *EIG Energy*, 894 F.3d at 344 (internal citation omitted) (alteration in original). Here, the contract of financial agreement was negotiated and concluded in Iraq. *Wye Oak I*, 2019 WL 4044046, at *12–13. Moreover, the agreement "did not legitimately implicate the BSA, as the evidence establishes the [agreement] was not agreed to—let alone signed—by Wye Oak and therefore did not meet the requirements set forth in the BSA's modification clause." *Id.* (citing Pl.'s Ex. 5).

[16] Based on facts such as the English language of the BSA, a September 2004 Limited Power of Attorney document bearing Wye Oak's U.S.-based contact information and corporate seal, and the fact that the BSA required notices to be sent to Wye Oak's U.S.-based address. *See* Pl.'s PFFCL at 17–21.

States. *See* Pl.'s PFFCL at 17–21. Even if these facts are true, they do not together establish a direct effect in the United States, but rather, a kind of indirect effect on the Wye Oak balance sheet in this country. To conclude that this chain of facts satisfies 28 U.S.C. § 1605(a)(2)'s third clause would so expand the Circuit's "targeting" rule from *EIG Energy* as to cover potentially the vast majority of large business deals between foreign sovereigns and U.S. companies. Therefore, the Court is unable to find that Iraq's nonpayment caused a direct effect in the United States on this basis.

Because this Court is not persuaded that Iraq specifically targeted a U.S. company, let alone Wye Qak, Iraq has met its burden to demonstrate that there is no exception to sovereign immunity on this basis. *See FG Hemisphere Assocs.*, 447 F.3d at 842.

### C. Iraq's Nonpayment Directly Resulted in the Cut-Off of the Flow of Data, Services, Capital, and Personnel Between the United States and Iraq

This Court's conclusion that Wye Oak's first two direct effects arguments do not carry the day is not the end of the inquiry, because Wye Oak next argues that "Iraq's breach cut off the flow of capital, personnel, data, and intangible services between the United States and Iraq." Pl.'s PFFCL at 22. Wye Oak points to two main examples of such a cut-off: (1) "Iraq disrupted Wye Oak's subcontract with CLI [Construction ("CLI")], a U.S. company that was also to operate in Iraq," and (2) "[Iraq] starved Wye Oak of the funds it needed to expand its U.S. presence for its own operations in the United States and Iraq, forced Wye Oak to cease providing administrative and digital services in the United States related to operations in Iraq, disrupted the flow of data and services between the two countries, and ultimately required Wye Oak to withdraw[] its personnel from Iraq because they were not being paid." *Id.* at 10. Iraq argues that neither the facts nor the law support Wye Oak's theory. *See* Defs.' PFFCL at 23–24.

Based on its review of the extensive record and the parties' briefing, the Court concludes

that Wye Oak has established that Iraq's nonpayment resulted in a direct effect in the United States based on the cut-off of data, services, capital, and personnel, and Iraq has failed to meet its burden to convince this Court otherwise.

### 1.  Interference with Subcontractor Relationship is Not a Direct Effect

Wye Oak first claims that Iraq's nonpayment caused its relationship with its main subcontractor to be disrupted. Specifically, Wye Oak claims that Iraq's failure to pay the invoices prevented Wye Oak from proceeding with a formal subcontracting relationship with CLI, another Pennsylvania-based corporation of which Dale Stoffel was a co-owner. *See* Pl.'s PFFCL at 27. Iraq insists that any inability to form this subcontracting relationship, if it occurred, does not qualify as a direct effect for FSIA purposes because the BSA did not expressly require Wye Oak to hire CLI as a subcontractor nor was there a formal, written agreement between Wye Oak and CLI. *See* Defs.' PFFCL at 97–99.

Wye Oak's argument turns on the proper interpretation of *Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada*, 600 F.3d 661 (D.C. Cir. 2010). In that case, a U.S. company signed a contract with the Canadian government which, by its terms, required the U.S. company to subcontract with U.S.-based cruise lines as part of the U.S. company's performance in Vancouver. *See Cruise Connections*, 600 F.3d at 662. Under the subcontracts, the U.S. company "would have received a flat fee" from the cruise lines while performing. *See id.* at 664–65. The U.S. company and U.S. cruise lines had already drafted the subcontracts and were waiting on final assurances from the Canadian government regarding the cruise lines' tax liability before consummating the agreements. *See id.* at 663–64. The Circuit found that the Canadian government's termination of the main contract, thereby scuttling the subcontracts, caused a direct effect in the United States because the action's result was that "revenues that would otherwise have

been generated in the United States were 'not forthcoming.'" *See id.* at 665 (citing *Weltover*, 504 U.S. at 619).

After review, the Court concludes that Wye Oak has not met its burden to demonstrate that its inability to enter into a formal subcontracting relationship with CLI was a direct effect in the United States caused by Iraq's nonpayment. Like the U.S. company and its would-be subcontractors in *Cruise Connections*, Wye Oak and CLI drafted an extensive, written subcontract agreement; the document introduced at trial totaled some 60 pages. *See* Pl.'s Ex. 25. And like *Cruise Connections*, the subcontract agreement went unsigned while Wye Oak and CLI awaited action from Iraq. *See* Trial Tr. 12/18/18 AM 53:8–25 (Stoffel). But unlike *Cruise Connections*, and dispositively, the BSA did not require Wye Oak to hire CLI.

Wye Oak's response is that Iraq was aware of Wye Oak's need for and intention to hire CLI, even if not expressly stated in the BSA, due to factors such as the nature and scope of the work under the IMERP, CLI's connection to Wye Oak, and CLI's experience working on similar projects in Iraq. *See* Pl.'s PFFCL at 18–20. However, the possibility of Wye Oak hiring CLI is not enough to show a direct effect under the standard laid out in *Cruise Connections*. In that case, the Circuit focused on the fact that the subcontracts guaranteed a flat fee to the U.S. company, that the subcontracts were required by the main agreement, and that the Canadian government's actions interfering with the subcontracts necessarily deprived the U.S. company of guaranteed revenue. *See Cruise Connections*, 600 F.3d at 662–65. Here, the record does not establish what revenues, if any, Wye Oak was deprived of due to its inability to consummate its relationship with CLI.[17]

Moreover, and distinct from *Cruise Connections*, Wye Oak engaged other subcontractors

---

[17] Dale Stoffel, as sole owner of Wye Oak and part-owner of CLI, may have lost out on revenue. *See* Felix Dep. at 7:3–5. Still, the Court has not been presented with evidence of what share of the revenue, if any, Dale Stoffel would have received. Regardless, additional fact-finding is not necessary because the Court, which "is in a much better

even though Wye Oak could not finalize its agreement with CLI. Wye Oak hired local Iraqi subcontractors to complete some aspects of the IMERP. *See* Trial Tr. 12/18/18 PM 64:10–24 (Stoffel); Trial Tr. 12/21/18 PM 94:2–14 (Testimony of Dr. John Gale). Thus, Iraq's nonpayment did not prevent Wye Oak from hiring *any* subcontractors, just *this* one. Even if CLI's unique experience in Iraq and the field would have made CLI the best subcontractor possible for the job, the lack of an obligation on Wye Oak's part to hire CLI as well as the lack of guaranteed revenue for Wye Oak means that the argument about interference with the subcontractor relationship, standing alone, does not establish a direct effect.[18]

### 2. *Cut-Off of Data, Services, Capital, and Personnel is a Direct Effect*

Wye Oak finds firm footing, at last, in the second part of its third argument. Wye Oak insists that Iraq's nonpayment disrupted flows of data, services, capital, and personnel between the United States and Iraq, thus establishing a direct effect. Wye Oak bases its legal argument in *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101 (D.C. Cir. 2001), *partially on other grounds*, 320 F.3d 280 (D.C. Cir. 2003). In that case, McKesson, a U.S. corporation, owned a minority stake in an Iranian dairy farm, a relationship that involved McKesson's contribution of capital and members to the farm's board of directors in return for McKesson's receipt of annual dividends. *McKesson*, 271 F.3d at 1104. Both the capital and personnel flows ceased in the wake

---

position than [the Circuit is] to analyze Wye Oak's direct effects arguments in the first instance," has determined that Wye Oak has established a direct effect on two other bases. *Wye Oak II*, 24 F.4th at 703.

[18] Iraq advances other arguments concerning why the subcontractor relationship is insufficient, none of which have merit. Iraq argues that the subcontractor relationship theory is insufficient because it did not have any role in selecting CLI or subcontractors. *See* Defs.' PFFCL at 99. "The FSIA, however, requires only that effect be 'direct,' not that the foreign sovereign agree that the effect would occur." *Cruise Connections*, 600 F.3d at 665 (citing *Weltover*, 504 U.S. at 618). Iraq also disputes that CLI was a U.S. corporation because the address listed for CLI in the draft subcontract agreement is in Iraq. *See* Defs.' PFFCL at 58. This is incorrect because a corporation's mailing address alone does not dictate its domicile. *Richard v. Bell Atlantic Corp.*, 946 F. Supp. 54, 73–74 (D.D.C. 1996). Finally, Iraq contends that any performance by CLI was not required to be in the United States. *See* Defs.' PFFCL at 97. Circuit precedent plainly holds that a direct effect in the United States can be established even if the subcontractor performance is to occur outside of the country. *See Cruise Connections*, 600 F.3d at 662.

of the 1979 Islamic Revolution and the Iranian government's takeover of the dairy farm. *Id.* The Circuit held that the district court properly maintained subject-matter jurisdiction over McKesson's suit alleging illegal expropriation by Iran because Iran's action resulted in two independent direct effects (1) "the cut-off of the constant flow of capital, management personnel, engineering data, machinery, equipment, materials and packaging between the two companies," and (2) "the abrupt end of McKesson's role as an active investor." *McKesson*, 271 F.3d at 1105 (internal quotations and citations omitted).

Wye Oak carried out a number of activities in the United States daily in connection with the IMERP program. As the Circuit already determined, "[t]here is no error, much less clear error, with respect to the district court's determination that 'Wye Oak performed work in the United States'" to support the BSA. *Wye Oak II*, 24 F.4th at 700 (quoting *Wye Oak I*, 2019 WL 4044046, at *15). Specifically, this Court found that David Stoffel "focused on writing a computer program that could ultimately be used to inventory and track all the equipment Wye Oak was refurbishing and would potentially broker for sales," *Wye Oak I*, 2019 WL 4044046, at *24 (citing Trial Tr. 12/18/18 AM 38:11–41:17 (Stoffel); Pl.'s Ex. 65 (D. Stoffel Logistics Application Code)), that he "oversaw the company's electronic communications from his perch in the U.S.," *id.* (citing Trial Tr. 12/18/18 AM 44:9–19 (Stoffel)), and that "Wye Oak performed administrative activities in the U.S. in support of the BSA" including "purchas[ing] computer equipment and materials, such as software, for the business in the U.S."[19] *Id.* at 15 (citing Trial Tr. 12/18/18 AM 44:5–10 (Stoffel)).

The constant connection between Wye Oak's U.S. and Iraqi operations bears worth repeating: David Stoffel testified that because "[e]-mail communications and internet connections

---

[19] Iraq seems to argue that because the BSA did not specifically charge Wye Oak with carrying out work in the United States, "[t]he work David Stoffel did in the United States was not compensable under the BSA" and, in Iraq's view, cannot be considered in the direct effects analysis. *See* Defs.' PFFCL at 53. The Court is aware of no authority espousing such a narrow view of the commercial activities exception and rejects such a limitation.

were challenging at that time, particularly in Iraq," "part of [his] regular job was to read and receive or at least review every e-mail that came into the [server]" and to follow up with Wye Oak representatives, through email or telephonic communications, as needed. Trial Tr. 12/18/18 AM 44:11–19. Moreover, David Stoffel maintained a computer server in Ohio and paper files in Pennsylvania related to the IMERP. Trial Tr. 12/18/18 AM 31:7–32:1, 32:25–33:5, 44:11–20 (Stoffel). These activities necessarily involved managing the flow of data and services, and these activities stopped when Wye Oak stopped working on the IMERP as a result of Iraq's nonpayment.

In addition to the cut-off of the flow of data and services between the United States and Iraq, Iraq's nonpayment disrupted capital flows between the two countries. Wye Oak had clear plans to use funds from the project to expand its business in the United States to support the BSA and the company's work in Iraq. Pl.'s PFFCL at 21. For example, at trial, David Stoffel testified that Wye Oak planned to expand its computer infrastructure and hire additional U.S.-based personnel to support the IMERP program. Trial Tr. 12/18/18 AM at 49:6–18, 54:22–55:9. Iraq's nonpayment obviously, and predictably, prevented Wye Oak from carrying on these activities. To be sure, it may often be the case that a U.S. company that signs a business contract with a foreign sovereign has plans to do more business in the United States, and that the breaching foreign sovereign's nonpayment necessarily disrupts those plans. These facts alone would not create subject-matter jurisdiction based on direct effect. However, the relationship between Wye Oak and Iraq was not that of a typical contractor and customer. The parties participated in commercial activity intertwined with a consequential transnational mission. The size, scope, and importance of the project, as well as Wye Oak's existing infrastructure—or lack thereof—was apparent from the start of the relationship.

Along with the flow of data, services, and capital between the two countries, Wye Oak

facilitated the flow of personnel between United States and Iraq, and Iraq's failure to pay resulted in both the loss of human life and the halting of the flow of Wye Oak personnel between the United States and Iraq. Prior to December 2004, Wye Oak personnel, particularly Dale Stoffel, made frequent trips between the United States and Iraq. Pl.'s PFFCL at 30–31. Evidence at trial established that Dale Stoffel last traveled to Iraq in early December 2004 in an attempt to secure payment and that on December 8, 2004, Dale Stoffel and CLI representative Joe Wemple were shot and killed on their way to Baghdad to arrange for funding to be released later that day. Trial Tr. 12/18/18 PM 5:3–6:11 (Stoffel); Pl.'s Ex. 42 (Emails between W. Felix and Capt. J. O'Sullivan).[20] William Felix, Dale Stoffel's successor as Wye Oak's chief executive officer, testified that the deaths of Dale Stoffel and Joe Wemple resulted in the cessation of all travel by Wye Oak and CLI personnel from the United States to Iraq.[21] Felix Dep. 48:24–49:7. *See* Pl.'s Ex. 49 (Email from W. Felix to Gen. D. Petraeus and others); Trial Tr. 12/18/18 PM 50:13–16 (Stoffel); Trial Tr. 12/19/18 PM 84:10–16 (Marr).

In addition to the disruption of Wye Oak personnel traveling in support of the IMERP, Iraq's nonpayment dismantled the larger personnel network Wye Oak was building. As Iraq concedes, Professor Nicholas Beadle, the coalition's senior advisor to the MoD at the time, testified at trial that one of the reasons that Wye Oak was especially well-qualified to carry out the IMERP was its extensive contact list of experts in refurbishing Soviet military equipment. *See* Defs.' PFFCL at 54, 61 (citing Trial Tr. 12/20/18 PM 44:8–45:2). And David Stoffel testified that Wye Oak was in the process of building that network. *See* Defs.' PFFCL at 54–55 (citing Trial Tr.

---

[20] As this Court previously stated, "[b]ut for MoD's breach of the BSA, Dale Stoffel may very well not have been murdered." *Wye Oak I*, 2019 WL 4044046, at *33.

[21] Wye Oak notes that Dale Stoffel's death caused lasting emotional impacts on William Felix and David Stoffel as well as Dale Stoffel's widow and four children. Pl.'s PFFCL at 26–27. This Court draws no conclusion as to whether a foreign sovereign's commercial activity causing a direct emotional effect on individuals in the United States, if true, would be sufficient to establish jurisdiction under 28 U.S.C. § 1605(a)(2)'s third clause.

12/18/18 PM 64:10–24; 65:5–9). This network consisted of representatives from Ukraine, Moldova, Belarus, and Russia, in addition to Wye Oak personnel and local Iraqi employees. *See* Defs.' PFFCL at 63 (citing Pl.'s Ex. 8.9–8.10 (IMERP Presentation Slides), Pl.'s Ex. 11 (Letter from D. Stoffel to M. Morozov), Felix Dep. at 103:2, Trial Tr. 12/18/18 PM 16:8–11; 65:17–20 (Stoffel)). Iraq's nonpayment directly resulted in Wye Oak's inability to continuing building or maintaining this network.[22]

Iraq's arguments to the contrary are unavailing. Iraq first contends that *McKesson* does not apply to Wye Oak's case because "McKesson was a *substantial* investor" and Iran's actions "interrupted *substantial* flows of McKesson personnel, equipment, and technical know-how from the United States to Iran." *See* Defs.' PFFCL at 23 (emphases added) (citing *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 451 (D.C. Cir. 1990)). This argument is a red herring: nothing in the *McKesson* case states or even implies that a substantiality showing is required to establish a direct effect. What's more, Iraq's citation to pre-*Weltover* precedent is ineffective in the face of the Supreme Court's clear command: "[W]e reject the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality.'" *Weltover*, 504 U.S. at 618. Even if some substantiality standard were required, the facts demonstrate that the effect of nonpayment here was indeed substantial in its disruption of data, services, capital, and personnel between the United States and Iraq.

Iraq also argues that Wye Oak's inability to expand or continue its U.S. operations "is an inherently indirect consequence of [MoD]'s nonpayment and irrelevant to [MoD]'s obligations under the BSA" because the agreement did not contemplate Wye Oak's "business activities" in

---

[22] Iraq seems to suggest that a disruption to personnel cannot serve as a direct effect if the personnel were non-Americans. *See* Defs.' PFFCL at 53–54. *McKesson* imposes no such requirement. A direct effect is established when the foreign sovereign's actions prevent personnel affiliated with the U.S.-based company from carrying on their roles. *See McKesson*, 271 F.3d at 1105–06.

the United States. Defs.' PFFCL at 99. In an apparently related argument, Iraq contends that any

flow of personnel or information "was entirely incidental to the express terms of the BSA and

solely for Wye Oak's account." *Id.* at 96–97. Iraq misconstrues Wye Oak's argument and thus its

entitlement to jurisdiction. Wye Oak advances, and the trial record establishes, that Iraq's failure

to pay the invoices as required by the BSA prevented Wye Oak from expanding or continuing U.S.

operations *devoted to the IMERP*, not the company's activities in general. *See* Pl.'s PFFCL at 33–

34. This is a clear example of a direct effect in the United States. And the foreseeability of the

direct effect to the foreign sovereign is immaterial for the jurisdictional analysis. *See Cruise

Connections*, 600 F.3d at 665.

Iraq next seems to suggest, unconvincingly, that Wye Oak's status as an independent

contractor, and not an investor, renders the instant case sufficiently distinguishable from

*McKesson. See* Defs.' PFFCL at 24–25, 96–97. The U.S. company's status as an investor in a

foreign corporation had potential relevance in *McKesson* only as another, independent example of

a direct effect in the United States of a foreign country's action, separate and apart from the direct

effect consisting of the cut-off of capital, data, personnel, equipment, and materials. *See* 271 F.3d

at 1105. Accordingly, Wye Oak's status as an independent contractor is irrelevant to the direct

effect argument it advances and this Court accepts.

Finally, Iraq's insistence that "[t]his case more closely resembles" the Circuit's opinion in

*Rong v. Liaoning Province Gov't*, 452 F.3d 883 (D.C. Cir. 2006) falters on several levels. From

the start, the primary issue in that case was whether a Chinese province's takeover of a business

in which the plaintiffs had invested was "commercial activity" under 28 U.S.C. 1605(a)(2)'s third

clause, and, because the Circuit determined it was not, the court expressly did not consider the

plaintiffs' direct effects argument. *See Rong*, 452 F.3d at 889. Therefore, the majority's position

in that case does not shed any light on the issue at bar. Iraq's invocation of Judge Karen Henderson's concurrence in that case is equally unhelpful. Judge Henderson would have also found there not be subject-matter jurisdiction under the FSIA because the province's action did not cause a direct effect in the United States. *See id.* at 515 (Henderson, J., concurring). In reaching her decision, Judge Henderson distinguished the alleged direct effect in *Rong*—"only the monetary loss of a Chinese national resident in the U.S."—from the direct effect in *McKesson*—"not merely nonpayment but also cessation of the 'flow of capital, management personnel, engineering data, machinery, equipment, materials and packaging' between Iran and the United States." *See id.* (internal citation omitted). Iraq responds that Wye Oak's loss, like that of the unsuccessful plaintiffs in *Rong*, was merely monetary. Defs.' PFFCL at 97. But as previously outlined, Wye Oak has established several other losses beyond payment due under the invoices and lost profits. Thus, Wye Oak has shown a direct effect consistent with Judge Henderson's position in *Rong*.

Based on the Court's review of the record, Iraq's nonpayment resulted in the cut-off of capital, personnel, data, and intangible services between the United States and Iraq, a flow which occurred daily for months. Thus, Iraq's action created a direct effect in the United States.[23]

### D. Iraq's Nonpayment Directly Affected U.S. Diplomatic and Military Operations in the United States

Wye Oak's final proffered example of a direct effect is that "Iraq's breach directly affected U.S. military and diplomatic operations." Pl.'s PFFCL at 11. In terms of harm to diplomatic operations, Wye Oak argues there was a direct effect in the United States because various U.S. government officials in the legislative and executive branches "became involved in attempting to

---

[23] Iraq expresses a concern that finding a direct effect here would expose a foreign sovereign to U.S. courts' jurisdiction any time the sovereign hires a U.S. company to carry out services. *See* Defs.' PFFCL at 24. The Court takes under consideration the defendants' concern about expanding FSIA jurisdiction beyond the line provided for in this Circuit's case law but is confident that the record here supports subject-matter jurisdiction in this highly unusual, fact-specific instance.

get Wye Oak paid so the IMERP program could get back on track." *Id.* at 34. Additionally, because Wye Oak's work on the "IMERP program was critical to the effort to return U.S. troops to the United States from Iraq[,]" Wye Oak's inability to complete the program due to nonpayment delayed the return of U.S. forces from Iraq to the United States. *Id.* Iraq disputes that its breach of the BSA caused any effect on U.S. diplomatic or military operations, and, if it did, the effect was only in Iraq. Defs.' PFFCL at 100–01. Additionally, Iraq argues that the IMERP program was only a part of the overall U.S. exit strategy, such that any changes to U.S. policy due to hiccups in the IMERP program caused by Iraq's nonpayment would not be sufficiently direct for purposes of 28 U.S.C. § 1605(a)(2)'s third clause. *Id.* at 101–02. The Court will address each argument in turn.

### 1. *Involvement by U.S. Government Officials is a Direct Effect*

It is undisputed that, after Iraq refused to pay Wye Oak's invoices, Wye Oak corresponded with a variety of U.S. governmental officials through written, telephonic, and in-person communications in an attempt to secure payment. Such officials included then-Senator Rick Santorum, then-Deputy Under Secretary for International Technology Security John Shaw, the office of then-Secretary of Defense Donald Rumsfeld, and others. *See* Trial Tr. 12/18/18 AM 59:17–60:20 (Stoffel); *Wye Oak I*, 2019 WL 4044046, at *15. After corresponding or meeting with Wye Oak, certain U.S. government officials took action to attempt to secure payment for Wye Oak. For example, upon learning of Wye Oak's nonpayment predicament, then-Senator Rick Santorum contacted the State Department and asked what actions that department had taken to help Wye Oak. *See* Pl.'s Ex. 60.6 (Letter from Sen. R. Santorum to Asst. Sec. Kelly). The State Department reported that it had discussed the matter with the Department of Defense. *See* Pl.'s Ex. 60.9–60.10 (Letter from Asst. Sec. Kelly to Sen. R. Santorum). Additionally, after Wye Oak representatives met with Deputy Shaw, he appointed a Defense Department representative to serve

as an advisor to the MoD and to make weekly reports to the Defense Department. Trial Tr. 12/19/18 PM 91:19–92:5; 94:23–95:10 (Marr). Following Dale Stoffel's death, William Felix sent a letter to then-Senator Arlen Spector as another effort to receive payment. *See* Pl.'s Ex. 51.

The thrust of Iraq's opposition to the notion that efforts by U.S. diplomatic officials to secure payment on behalf of Wye Oak cannot be a direct effect centers on—and misunderstands— the causation standard required under the FSIA. Iraq first argues that, under the prevailing law, the "immediate consequence" of Iraq's nonpayment must be felt in the United States and, because "[MoD]'s nonpayment was felt first by Wye Oak *in Iraq*[,]" this cannot be a direct effect. *See* Defs.' PFFCL at 100 (emphasis in original). Iraq cites *Millicom Int'l Cellular v. Republic of Costa Rica*, 995 F. Supp. 14 (D.D.C. 1998) as authority for this proposition. In that case, cellular telephone operators based in Luxembourg and Costa Rica alleged that the Costa Rican government had engaged in a number of illegal activities preventing the operators' customers from placing calls to the United States on the operators' network and instead requiring customers to place calls on the Costa Rican government's network. *See Millicom*, 995 F. Supp. at 21. The district court found that there was no direct effect in the United States because the "immediate consequence" of the sovereign's activity was the operators' "inability to compete in that market," not the customers' inability to place international calls to the United States. *Id.*

There are several reasons why Iraq's position, and its reliance on *Millicom*, is mistaken. The Circuit has not adopted the district court's strict reading of the immediacy requirement. To the contrary, the Circuit has consistently rejected a "highly restrictive causation requirement" in the FSIA context. *See EIG Energy*, 894 F.3d at 346 (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004)). Most recently, the Circuit limited a direct effect only in so far as it is not "purely trivial" or too "remote and attenuated." *Valambhia*, 964 F.3d at

1140 (citing *Weltover*, 504 U.S. at 618). Here, while Wye Oak certainly felt the effect of Iraq's nonpayment in Iraq, the company also felt the effect contemporaneously, and non-trivially, in the United States.

In a related argument, Iraq contends that the meetings and correspondence Wye Oak had with U.S. officials do not satisfy the immediacy requirement because they "were dependent upon intervening events and actors; Wye Oak chose to set up such meetings, the members of Congress or their staff or Pentagon officials decided to accept those meetings, and then those individuals chose whether or not to take any action." *See* Defs.' PFFCL at 92–93.[24]

The two, out-of-circuit cases Iraq cites in another effort to support its strict construction of immediacy are inapposite. *Frank v. Antigua & Barbuda* concerned an Antigua-based bank that engaged in a ponzi scheme by selling fraudulent certificates of deposit. 842 F.3d 362, 365–66 (5th Cir. 2016). The Fifth Circuit held that the Antiguan government had not caused any direct effect in the United States when U.S.-based investors bought the fraudulent certificates, even though "Antigua may have helped facilitate" the scheme, because the bank's "criminal activity served as an intervening act interrupting the causal chain between [the] Antigua[n government's] actions and any effect on investors." *Id.* at 370. In *Virtual Countries, Inc. v. Republic of South Africa*, the Second Circuit held that there was no direct effect in the United States when South Africa issued a negative press release about a U.S. company's business, South African media outlets publicized the press release, the U.S. company's potential investors and potential business partner learned of the press release, and then the potential investors and business partner declined to engage with the U.S. company. 300 F.3d 230, 237 (2d Cir. 2002). Both cases cited the specific concern that

---

[24] In the same section, Iraq cites to two cases for the proposition that courts in this Circuit have not considered the involvement of U.S. government officials in remedying a contractual breach to be a "direct effect." *See* Defs.' PFFCL at 103 (citing *Friedman*, 464 F. Supp. 3d at 65 and *Odhiambo*, 764 F.3d at 45). This statement is misleading. Neither case specifically addressed the question.

"[d]efining 'direct effect' to permit jurisdiction when a foreign state's actions precipitate reactions by third parties, *which reactions then have an impact on a plaintiff*, would foster uncertainty in both foreign states and private counter-parties." *Id.* at 238 (emphasis added). Such a concern is not present here. It was Iraq's actions—failing to pay the invoices—that caused the impact on Wye Oak, which *then* precipitated actions or reactions by third parties (U.S. government officials).

Evidence at trial established that Iraq was aware that Wye Oak was not just any U.S. company, but one that was closely connected to and supported by the U.S. government. Part of Wye Oak's pitch to Iraq was that it "had government contacts throughout the world." *Wye Oak I*, 2019 WL 4044046, at *4 (citing Trial Tr. 12/18/18 PM 65:7–9 (Stoffel)). MoD ultimately hired Wye Oak "at the recommendation of the United States government[.]" *Wye Oak II*, 24 F.4th at 692. And "[a]lthough the IMERP program [was] an Iraqi funded program, it [was] clearly a joint program with the US and Coalition Forces." Pl.'s Ex. 36 (Email from D. Stoffel to Capt. J. O'Sullivan). Thus, Iraq's commercial activity, in the form of the IMERP, was inextricably tied up in its relationship with the U.S. government, and by extension, Wye Oak's relationship with the U.S. government. Because of these close connections, U.S. government officials' attempts to secure payment for Wye Oak were an "immediate consequence" of Iraq's nonpayment. *See Weltover*, 504 U.S. at 618.

*2. Impact on U.S. Military Operations is a Direct Effect*

Wye Oak's observation that Iraq's nonpayment had a direct impact on U.S. military operations in the United States has even more force. Evidence introduced at trial repeatedly illustrated the importance of the IMERP program to the U.S. military's overall strategy with respect to Iraq after the fall of Saddam Hussein's regime. As General Petraeus testified, Wye Oak's work on the IMERP was the "centerpiece" to "the establishment of a mechanized and armored

division for Iraq, starting with a battalion the would be available . . . for the elections in January of 2005." Petraeus Dep. at 34:1–4. *See* Trial Tr. 12/17/18 PM at 36:7–10 (Clements) ("So the Iraqi forces had to step up to the plate by the 30th of January. They needed the weapons and equipment to do it. And the target was to equip the Iraqi armored brigade, and get them on the streets by then"); Trial Tr. 12/19/18 AM 25:9–25 (Neal). Professor Beadle, whose "testimony was especially convincing," *Wye Oak I*, 2019 WL 4044046, at *11 n.3, further testified that "the obvious inference from managing to get an [Iraqi] armed forces, which included a small element of the Air Force and Navy as well, in due course, was the faster that he [Gen. Petraeus, through the IMERP program] could build it, then the easier it was for the U.S. and for the Coalition troops to step back."). Trial Tr. 12/20/18 PM 44:3–7. General Petraeus similarly added: "The entire concept for Iraq from the U.S. and coalition perspective was I think succinctly stated by President George W. Bush when he said, As the stand up, the Iraqi security forces, we will stand down"). Petraeus Dep. at 29:1–5.

Communications made shortly before and after Dale Stoffel's death underscored the continuing importance the U.S. military placed on the program. For example, on December 2, 2004, Dale Stoffel wrote an email to Captain John "Ronnie" O'Sullivan, the deputy to Brigadier General Clements, a key U.S. military representative on the IMERP program in Iraq, relaying his impressions from meetings he had the previous day: "The senior Pentagon people and the Secretary's Office are really intense and passionate about the IMERP program and its success. *In their words, there is nothing of higher priority in theater than this program with respect to its success and speed*." *See* Pl.'s Ex. 36 (emphasis added). Shortly after Dale Stoffel's death, General Petraeus wrote to his widow emphasizing her late husband's accomplishments, particularly the fact that "Iraq is on track to have a battalion's worth of soldiers trained and equipped prior to

January's elections" and "[n]one of this would have been possible without your husband's visionary leadership, relentless drive, and complete dedication." Petraeus Dep. 26:23–27:25; Pl.'s Ex. 43. And recall, re-equipping the Iraqi military was a necessary first step for the United States and coalition forces to withdraw from Iraq. Petraeus Dep. at 20:19–21:2, 28:19–30:3.

In its main attempt to rebut Wye Oak's argument, Iraq again disputes the proper definition of causation. Iraq posits that any effect that its breach may have had on overall U.S. military policy with respect to Iraq is too attenuated to be a direct effect. Defs.' PFFCL at 101–02. In support, Iraq cites *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) and *Energy Allied Int'l Corp. v. Petroleum Oil & Gas Corp. of South Africa*, Civ. No. H-082387, 2009 WL 2923035, at *4 (S.D. Tex. Sept. 4, 2009). In *Princz*, the Circuit found that the work the plaintiff performed as a slave laborer in Poland and Germany for Nazi-supporting employers did not have a direct effect in the United States because "[m]any events and actors necessarily intervened between" his work and the United States' military effort against Nazi-controlled territories. 26 F.3d at 1172. In *Energy Allied Int'l Corp.*, the district court determined that a hypothetical oil shortage in the United States resulting from a South African state-owned oil company's refusal to participate in a joint venture with a Texas corporation in Egypt was too attenuated to serve as a direct effect. 2009 WL 2923035, at *4. Both cases are far afield from Wye Oak. Iraq's nonpayment caused an impact on the U.S. military that was far from hypothetical. Multiple U.S. military leaders linked the overall success of the U.S. mission in the Iraq with Wye Oak's work to equip the Iraqi military and the Iraqi military's corresponding ability to achieve self-sufficiency.[25] Wye Oak was

---

[25] Iraq expresses concern that there are not enough facts in the record for the Court to determine "when U.S. forces would have departed Iraq for the U.S. had [the MoD] paid Wye Oak's Invoices by October 28, 2004." *See* Defs.' PFFCL at 102. The Circuit recently rejected such "a highly restrictive causation requirement under which contributing factors readily and predictably caused by the defendant's same act would preclude jurisdiction." *See EIG Energy*, 894 F.3d at 346.

only able to equip one Iraqi brigade, *Wye Oak I*, 2019 WL 4044046, at *19. While still a success, one brigade was not sufficient for Iraqi forces to take on enough security responsibility and allow the coalition forces to withdraw. *Id.* at *3–4. And unlike in *Princz*, there are no intervening actors that cut off the chain of causation between Iraq's nonpayment and the impact on the U.S. military's readiness to leave Iraq.

Iraq was repeatedly made aware of the close relationship between Wye Oak and the U.S. military. In July 2004, before Iraq and Wye had finalized the BSA, Iraqi Defense Minister Hazim al-Shalan wrote to General Petraeus requesting access to coalition-controlled military equipment depositories in Taji. *See* Pl.'s Ex. 2. In granting the request, General Petraeus wrote: "I fully support the Iraqi Ministry of Defense in initiating and expediting the Iraqi Military Equipment Recovery Project." *See* Pl.'s Ex. 3. He further stressed that the U.S. military would "provide all necessary documentation and escort" for the MoD and Wye Oak delegations. *Id.* Representatives from the U.S. military attended key meetings between the MoD and Wye Oak. *See, e.g.*, Trial Tr. 12/20/18 AM 13:21–14:19, 33:3–34:25 (Marr); Pl.'s Ex. 20.6 (Letter from P. Marr to MoD); Trial Tr. 12/17/18 PM 19:4–20:11 (Clements); Trial Tr. 12/20/18 PM 71:17–72:16 (Beadle). And the U.S. military worked shoulder-to-shoulder with Wye Oak on its IMERP operations. *See* Trial Tr. 12/19/18 AM 42:1–43:4 (Neal); see Pl.'s Ex. 64 (Photographs). Thus, through statements and actions directed to or in the presence of Iraq, the U.S. military demonstrated its commitment to Wye Oak's work.

Iraq, seemingly recognizing this fact, accuses Wye Oak of impermissibly co-opting effects on the U.S. military, a third party, into the direct effect analysis. *See* Defs.' PFFCL at 103–04. This argument is easily dispatched of through the cases that Iraq itself cites. Most critically, the Circuit has unambiguously stated that "[n]othing in the FSIA requires that the 'direct effect in the United

States' harm the plaintiff."[26] *Cruise Connections*, 600 F.3d at 666 (citing 28. U.S.C. § 1605(a)(2)).

"The commercial activities exception requires only that the foreign government's act outside the

territory of the United States cause a direct effect in the United States." *Id.* (internal citation,

quotations, and alterations omitted). This requirement is clearly met here. And, as the Circuit has

counseled, the relationship between the direct effect and the plaintiff's injury is relevant to the

question of *damages*, not whether this Court has *jurisdiction* over the case. *Id.*

In sum, Iraq's nonpayment of Wye Oak caused a direct effect in the United States by

disrupting a program that bore directly on the U.S. military's readiness to withdraw from Iraq.

That, along with the other bases identified above, is sufficient to abrogate Iraq's sovereign

immunity in this suit.

\* \* \*

"As the FSIA cases consistently demonstrate, there is no single factual *sine qua non* of a

United States direct effect." *Odhiambo*, 764 F.3d at 46 (Pillard, J., concurring in part) (emphasis

in original). Wye Oak's case is a quintessential example of "[w]here the facts, taken together, show

that a foreign government's commercial activity has a direct effect in the United States," and thus

"claims in United States court relating to that commercial activity are not barred by the FSIA." *Id.*

Consistent with this tradition, the Court therefore holds that Iraq's breach of the BSA caused a

direct effect in the United States because its nonpayment to Wye Oak, a U.S. company carrying

out a program essential to U.S. diplomatic and military policy, resulted in the cut-off of the flow

---

[26] Puzzlingly, Iraq similarly looks to side-step *Exxon Mobil Corp. v. Corporación CIMEX S.A.*, 534 F. Supp. 3d 1, 20 (D.D.C. 2021), which relied on the same proposition from *Cruise Connections*, by apparently arguing that the FSIA's lack-of-injury-to-the-plaintiff requirement somehow ought to be viewed differently in tort and contract cases. *See* Defs.' PFFCL at 104. The Court sees no basis for this distinction. In addition, the Court is unsure what effect Iraq's position would even have on the current case, as both this case and *Cruise Connections* involved breach of contract claims. Moreover, the Court is unsure why Iraq cites an out-of-circuit district court case, *Morris v. People's Republic of China*, 478 F. Supp. 2d 561, 569 (S.D.N.Y. 2007), for a similar position, *see* Defs.' PFFCL at 103–04, as the case suggests a more expansive reading of subject-matter jurisdiction than the Circuit permits.

of capital, personnel, data, and intangible services between the United States and Iraq, triggered actions by top U.S. officials, and straightforwardly impacted U.S. military operations. That is precisely an effect that is "sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case[.]" *Frank*, 842 F.3d at 369 (quoting *Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 313 (2d Cir. 1981)).[27]

## IV.   CONCLUSION

This Court concludes that Iraq's breach of the BSA caused "direct effects" in the United States for the purpose of the third clause of 28 U.S.C. § 1605(a)(2) and thus an exception to Iraq's presumption of sovereign immunity applies. Therefore, the Court properly maintains subject-matter jurisdiction over the case and will re-enter judgment for Wye Oak. A separate and consistent Order shall issue this date.

SIGNED this _____ 20th _____ day of December, 2022.

                                           Royce C. Lamberth
                                           United States District Judge

---

[27] Because Wye Oak has demonstrated that subject-matter jurisdiction is proper under the theories outlined, this Court need not consider whether additional factfinding to establish other theories of subject-matter jurisdiction is appropriate. *See Wye Oak II*, 24 F.4th at 703, 704 n.3.